IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

AMERICAN FEDERATION OF
   TEACHERS, et al.,

       Plaintiffs-Appellees,

          v.

SCOTT BESSENT, et al.,

       Defendants-Appellants.

No. 25-1282

**TIME-SENSITIVE MOTION FOR STAY PENDING APPEAL AND AN
IMMEDIATE ADMINISTRATIVE STAY**

In this case, the district court issued a preliminary injunction against

three Executive Branch departments, blocking anyone whose "principal

role is to implement the DOGE agenda" from accessing certain agency data

or systems. That injunction has no legal basis. For one thing, Plaintiffs

suffer no cognizable Article III injury based on *which agency employee* has

access to their data. For another, there is no "final agency action" to review

here, just routine operational acts that are not subject to the Administrative

Procedure Act (APA). For a third, there is nothing remotely unlawful

about allowing agency employees to access agency data; the Privacy Act

expressly authorizes such access when employees "need" it, and it is not

for a district judge to second-guess the President's determination that these

(and other) agencies have a "need" to implement the "DOGE agenda" of

modernizing the government's information technology and rooting out

fraud, waste, and abuse.  Even if all that were insufficient, there is simply

no irreparable harm warranting preliminary relief—as three other district

judges have concluded in materially identical cases.

At bottom, the district court's injunction represents an illegitimate

effort to usurp Article II authority and micromanage the Executive Branch

by making its own determinations about what "agenda" federal employees

should be implementing.  Correcting this error cannot await ordinary

appellate review.  The injunction is already posing immediate impediments

to the government's critical efforts to correct well-documented problems

with its technological systems and to combat fraud and waste in federal

government programs.  And the district court's reasoning is already being

adopted by *other* district judges, including in a recent injunction that has

sparked questions over whether the Acting Social Security Administrator is

entitled to access Social Security data.  This is the natural but untenable

consequence of district judges using TROs and injunctions to meddle in the everyday business of Executive Branch departments.

For these reasons, the government respectfully requests that this Court stay the district court's March 24, 2025, preliminary injunction order pending the government's appeal. Given its immediate impacts, the government asks this Court to issue an immediate administrative stay of the order and to rule on this stay motion by March 26, 2025.

## STATEMENT

### A. Background

Executive Order 14,158, established the U.S. DOGE Services (formerly the United State Digital Service) to implement the President's directive to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." Exec. Order No. 14,158, §§ 3(a), 4, 90 Fed. Reg. 8441 (USDS EO). Agency heads are required under the USDS EO to establish within their respective agencies a "DOGE Team" of at least four employees. *Id.* § 3(c). The USDS EO directs the USDS Administrator to collaborate with agency heads to modernize the technology and software infrastructure of the

3

federal government to increase efficiency, productivity, and data integrity. *Id.* § 4.

To accomplish its objectives, the USDS EO directs the USDS Administrator and relevant agency heads to work together to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law."  USDS EO § 4(b).  At all times, the USDS EO instructs, USDS must "adhere to rigorous data protection standards."  *Id.*

The government's critical need to update and improve its information technology systems is well-documented.  For example, with respect to the Department of Treasury's systems, the Government Accountability Office (GAO) has identified, among other issues, "problems in accounting for transactions between federal agencies," resulting in potentially improper payments totaling approximately 2.7 trillion dollars. *See* U.S. GAO, GAO-23-104786, *Financial Audit: Bureau of the Fiscal Service's FY2022 Schedules of the General Fund* (Mar. 30, 2023).[1]  As to OPM's existing technology, GAO has identified 16 "priority recommendations" involving

---

[1] https://perma.cc/8Z4T-PE49.

"[p]reventing improper payments," "[i]mproving payroll data," and "[s]trengthening IT security and management." *See* Letter from Gene Dodaro, Comptroller Gen. of the U.S. GAO, to Honorable Robert Shriver, Acting Dir., OPM (May 28, 2024) at 1-2.[2]  GAO stated that, "[f]ully implementing these open recommendations could significantly improve both OPM's operations and its efforts to assist federal agencies in addressing various human capital management issues."  *Id.* at 1.

## B. Procedural History

Plaintiffs—several labor organizations, a nonprofit organization, and six individuals—brought this action under the Administrative Procedure Act.  Plaintiffs allege that the Treasury, the Education, and the OPM granted agency personnel implementing the USDS EO access to records containing personally identifiable information in a manner that violates the Privacy Act and was arbitrary and capricious.

After expedited preliminary injunction briefing and a hearing, the district court issued a preliminary injunction on March 24, 2025.  The court determined that plaintiffs had standing because the injuries they alleged

---

[2] https://perma.cc/9ZVD-RNKR.

"closely resemble … the common law tort of intrusion upon seclusion."
Dkt. No. 68, at 20 (Mem. Op.). The court also held that plaintiffs had
adequately identified "final agency action" for purposes of APA review in
the form of internal agency decisions to allow employees to access certain
systems.[3] Mem. Op. 27-35.

Finally, turning to the substance of plaintiffs' motion, the district
court concluded that plaintiffs were likely to succeed in showing that
defendants' actions violate the Privacy Act. While recognizing that the
Privacy Act allows agency employees to access agency records when they
need to, the district court held that defendants had not adequately
established the DOGE employees' need for access. Mem. Op. 42-60.
Turning to the remaining preliminary injunction factors, the district court
found that plaintiffs would suffer irreparable harm in the form of agency
review of their private information, *id.* 61-64, and the government would

---

[3] The district court also refused to consider certain materials outside
the agency record—namely, declarations further explaining the data access
decisions at issue. Defendants disagree with that decision, but do not
contest it in motion.

suffer no cognizable injury (and the public interest would be served) from an order enjoining unlawful agency action. *Id.* 65-66.[4]

The government filed a timely notice of appeal on March 24, Dkt. No. 70, and moved for a stay in district court the same day, Dkt. No. 72. The government will inform this Court when the district court acts on the motion. Plaintiffs oppose this motion and plan to file a response.

## ARGUMENT

The familiar stay factors—likely success on the merits, irreparable injury, the balance of the equities, and the public interest—strongly favor a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009). The district court enjoined employees of three government agencies from accessing information-technology systems that those employees, like other employees at the relevant agencies, need to access to perform their vital work of modernizing and improving the systems, while also rooting out fraud and

---

[4] On March 20, 2025, another district court in the District of Maryland granted different plaintiffs a temporary restraining order against the Social Security Administration and certain related defendants. That court's 134-page TRO decision relied heavily on the district court's analysis in its earlier order granting a TRO in this case. *See* ECF No. 49, *American Federation of State, Cnty. & Mun. Empls., AFL-CIO* v. *Social Security Admin.*, No. ELH-25-0596 (D. Md. Mar. 20, 2025).

waste within government programs.  The injunction intrudes on the basic

operation of federal agencies and thwarts the implementation of critical

Presidential directives.  Conversely, plaintiffs suffer no harm from the

potential disclosure of their information to agency employees who are

bound by law to maintain the information's confidentiality.  Indeed, such

disclosure occurs routinely.  This Court should grant a stay pending

appeal.

## I.　　The Government Is Likely to Succeed on the Merits.

The government is likely to prevail both at the threshold and on the

merits.  Plaintiffs lack standing and have not challenged final agency action

subject to review under the APA.  Even if plaintiffs' Privacy Act claim was

subject to review, it would fail.  The Privacy Act allows agency employees

and others to access protected information when they need to do so to

perform their job duties.  The work of DOGE team members at the three

agencies easily satisfies that requirement.

### A.　　The district court lacked jurisdiction over plaintiffs' claims.

#### 1. Plaintiffs lack standing.

To establish standing, "a plaintiff must demonstrate (i) that she has

suffered or likely will suffer an injury in fact, (ii) that the injury likely was

8

caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "The party seeking to establish standing carries the burden of demonstrating these elements." *Chambers Med. Techs. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1265 (4th Cir. 1995).

Here, plaintiffs have not—and cannot—demonstrate that they or their members have suffered injury-in-fact. To satisfy Article III standing, harm must be "actual or imminent, not speculative," meaning "the injury must have already occurred or be likely to occur soon." *Alliance for Hippocratic Med.*, 602 U.S. at 381. The harm must also be "concrete." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). To be concrete, an injury-in-fact must have a "close relationship" to a "harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417, 424 (quotation omitted). An alleged statutory violation alone does not meet that standard, because Congress can create "a statutory prohibition or obligation and a cause of action" but may not override Article III's injury requirement. *Id.* at 426.

Those requirements are fatal to plaintiffs here. Plaintiffs assert a purely intangible form of injury—namely, they allege that the disclosure of

9

their personal information to DOGE team members at the agencies constitutes an invasion of privacy.  That injury is not concrete.  Plaintiffs do not contend their information has been shared with parties outside the government or others likely to misuse their information.  The DOGE employees at the relevant agencies are bound by the same legal and ethical restrictions on the disclosure of plaintiffs' information that bind all agency employees with access to that information.

Plaintiffs' asserted injury thus bears a close resemblance to the harms the Supreme Court deemed insufficiently concrete in *TransUnion*.  There, the Court held that the mere fact that the defendant allegedly maintained inaccurate information about the plaintiffs within the company's files, in violation of a statutory requirement, was not sufficient to establish standing; any harm to the plaintiffs in *TransUnion* would become concrete only upon publication of the inaccurate information to third parties. *TransUnion*, 594 U.S. at 434.  Here too, the mere fact that the government allegedly committed a statutory violation in allowing government employees to access information stored in government databases does not alone demonstrate a concrete harm.

10

The district court nevertheless held plaintiffs established an injury-in-fact because plaintiffs' alleged injury purportedly "resemble[d] a specific type of invasion of privacy—the common law tort of intrusion upon seclusion." Mem. Op. 20. That conclusion is wrong in several respects.

First, it is incompatible with this Court's precedent. In *O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2023), this Court rejected the plaintiffs' attempt to analogize the disclosure of their partial social security numbers to intrusion into seclusion, explaining that there was no "unwanted intrusion into the home" and therefore no intrusion into seclusion. *Id.* at 246; *see id.* at 245 (noting "federal courts' traditional protection of 'privacy interested in the home'"). As this Court emphasized there, it is "the unwanted intrusion into the home that marks intrusion upon seclusion," and therefore a plaintiff must plead something "that closely relates to that" kind of invasion in order to establish a cognizable Article III injury. *Id.* at 246. Contrary to the district court's contention (Mem. Op. 26), an agency employee's review of an individual's personal information that the individual has voluntarily provided to the agency, and which is stored on government systems does not bear a "close relationship" to unwarranted

physical intrusion into one's "home."  *O'Leary* forecloses the district court's contrary conclusion.

In concluding otherwise, the district court instead focused on this Court's decision in *Garey v. James S. Farrin.*, 35 F.4th 917 (4th Cir. 2022). Mem. Op. 17-21.  But there, the plaintiffs alleged not only that the defendant unlawfully obtained their names and addresses, but that they also *used* the data they obtained to send unsolicited mail to plaintiffs' homes.  *See* 35 F.4th at 921.  And as this Court noted in *O'Leary*, that kind of "invasion" into plaintiffs' reasonable expectation of privacy is the *sine qua non* of the injury underlying the tort of invasion upon seclusion.

Even if *O'Leary* does not control, the district court's conclusion that plaintiffs' alleged injury bears a resemblance to the tort of inclusion on seclusion should be rejected.  Black-letter law confirms that, to establish the tort of intrusion upon seclusion, a plaintiff must show that they possess a reasonable expectation of privacy, and that the defendant intruded upon that privacy interest in a manner that would "be highly offensive to a reasonable person."  Restatement (Second) of Torts § 652B (Am. Law Inst. 1977).  Plaintiffs cannot make that showing here.

Plaintiffs do not dispute that the agencies legally obtained their personal information, and that the agencies legally retain that information in data systems that are maintained by, and housed within, the agencies. Moreover, when plaintiffs provided their information to the government (in exchange for a government benefit), they did so on the understanding that the information would be routinely used by agency employees and others within and outside the government to perform the types of activities that the DOGE team members plan to undertake. For example, the System of Record Notice that pertains to Treasury's payment record system states that the information will be used by Treasury employees and others for the "development of computer systems" and in connection with the "investigation of unauthorized or fraudulent activity." 85 Fed. Reg. 11776, 11779 (Feb. 27, 2020). It further provides that the information will be "routine[ly]" shared with, among others, "federal or state agenc[ies], [their] employees, agents (including contractors of its agents), or contractors;" "financial agents" of the Treasury Department; and Treasury Department "contractors" for the purpose "of identifying, preventing, or recouping improper payments." *Id.* at 11,780. Given that plaintiffs provided their information to a government agency on the understanding that it would be

13

routinely used by agency employees and others to build and maintain computer systems and to investigate improper payments, disclosure of plaintiffs' information to DOGE team members—who are themselves agency employees and who are performing those very tasks—cannot possibly qualify as "highly offensive," even if it was in some manner improper (which it was not).

Indeed, plaintiffs do not dispute that their personal information *can* lawfully be accessed by employees of the agency and shared outside of the agency for any of the numerous purposes set forth in the Privacy Act and the agencies' Statement of Record Notices. *See* 5 U.S.C. § 552a(b)(2)-(13). Nor do plaintiffs dispute that their personal information, located in government systems, can and is regularly accessed by agency employees and others. And, in practice, plaintiffs would have no reason to know that a particular employee has accessed their information in the normal course of that employees' duties. *See TransUnion,* 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an injury sufficient to support standing where they did not "even *kn[o]w*" their files contained inaccurate information). For all these reasons, the accessing of plaintiffs' information by DOGE team members in no sense creates the kind of highly

14

objectionable invasion of personal privacy that forms the core of the common law tort.

### 2. Plaintiffs have not identified final agency action.

The district court lacked authority to resolve plaintiffs' claims for an additional reason: Only "final agency action" is reviewable under the APA, 5 U.S.C. § 704, and an agency's decision to provide employees with access to agency data systems does not qualify.

It is well-settled that not all agency conduct is subject to review under the APA. The APA does not permit "general judicial review of [an agency's] day-to-day operations." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990). Nor does the APA authorize agencies to oversee "the common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).

Plaintiffs' complaint seeks review of exactly that kind of day-to-day management of agency operations. The supposed "agency action" plaintiffs identify is a loosely defined series of personnel decisions related to granting individual employees access to agency systems. Plaintiffs contend that the agencies granted access to DOGE team employees in too rushed a manner and without adequately vetting those employees,

15

providing them with sufficient training, or correctly assessing those employees' need for access to the agencies' systems. These are precisely the type of day-to-day operational decisions and conduct that the Supreme Court in *Lujan* advised do not fall within the APA's ambit. *See Lujan*, 497 U.S. at 899. As this Court has recognized, courts "are woefully ill-suited ... to adjudicate" "'broad programmatic attack[s]'" "asking [the judiciary] to improve an agency's performance or operations." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019). In that kind of case, "courts would be forced either to enter a disfavored 'obey the law' injunction or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so." *Id.* (citations omitted).

Plaintiffs' understanding of what qualifies as "agency action" would have sweeping and untenable consequences. Agencies make thousands of personnel decisions every day of the type plaintiffs challenge here, whether creating an e-mail account for an employee, staffing an employee on a particular matter, or ensuring that an employee has the relevant training and credentials to access systems or participate in programs. A court could not review such decisions without bringing within the scope of the APA

16

virtually every aspect of an agency's relationship with its employees. Neither plaintiffs nor the district court identified any precedent accepting that those kinds of work-a-day internal decisions are reviewable under the APA.

In addition, even if it qualifies as agency action, granting certain employees access to agency databases is not "final" agency action, because it is not an action through which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Plaintiffs' Amended Complaint fails to demonstrate how providing an employee with system access necessary to his or her job duties creates any rights, obligations, or legal consequences for plaintiffs. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). There is no final agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities," and "d[id] not subject them to new penalties or enforcement risks." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). Plaintiffs are not regulated by internal agency decisions to allow new employees access to the agency's own systems, nor have they identified any direct legal consequences that arise from those decisions.

17

The fact that such decisions could potentially lead to indirect, practical consequences for plaintiffs does not change the analysis. Adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004). For example, "[i]nitiating an enforcement proceeding against a company … may have a devastating effect on the company's business, but that does not make the agency's action final." *Id.* What matter is that the alleged data access decisions here have no "direct and appreciable legal consequences" for plaintiffs. *See California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). That is fatal to plaintiffs' APA claim.

Nor is this a case where plaintiffs have identified some agency action or policy resulting in third-party disclosure of confidential information. Courts have recognized that unauthorized third-party disclosures can have direct and immediate consequences for plaintiffs. *See Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008). But review of data contained in internal agency systems by agency employees do not threaten the same immediate harms. Indeed, courts recognize that, without third-party disclosure, claims founded on internal disclosure of data do not even state a cognizable injury for standing purposes. *See Hunstein v. Preferred*

18

*Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc) (collecting cases).

### B. Even if Justiciable, Plaintiffs' Claims Fail.

#### 1. Plaintiffs' APA claims are foreclosed by the Privacy Act's narrow cause of action.

The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."). That requirement is not satisfied here, however, because the Privacy Act provides an exclusive and "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information in the government's possession. *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008) (citing *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)). Plaintiffs may not use the APA to circumvent that carefully crafted scheme.

Plaintiffs seek a form of relief that Congress did not make available under the Privacy Act. Section 552a(g) of the Act establishes the narrow causes of action under which an "individual may bring a civil action

against the agency" for violations of the Act.  *See* 5 U.S.C. § 552a(g)(1).

Here, plaintiffs seek an injunction barring the relevant agencies from taking

actions that, in plaintiffs' view, violate § 552a(b)'s prohibition on the

disclosure of their personal information.  Congress authorized suits

seeking prospective injunctive relief to enforce certain provisions of the

Act, namely where a plaintiff asks an agency to "amend" a record or seeks

to access a record they are entitled to under the statute.  5 U.S.C.

§ 552a(g)(2), (3).  It did not, however, authorize suits for injunctive relief to

prevent violations of § 552a(b).  Congress instead permitted individuals to

enforce their rights under § 552a(b) only through suits for money damages.

*See* 5 U.S.C. § 552a(g)(4); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122

(D.C. Cir. 2007).  In short, Congress concluded that suits for money

damages provide an adequate remedy for violations of § 552a(b) and

limited relief to suits for such damages.  That congressional determination

forecloses plaintiffs' APA claim. [5]

---

[5] Defendants recognize, that, in dicta, this Court has suggested that prospective injunctive relief may be available under the APA for alleged Privacy Act violations.  *See Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir. 2006).  That is not binding on this panel, and even if it were, defendants disagree and raise the argument here to preserve it for any further review.

## 2. There is no Privacy Act violation.

Plaintiffs' Privacy Act claims fail on the merits, in any event. While the Privacy Act generally prohibits disclosure of covered records containing personal information absent consent, it authorizes disclosure of such records to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The disclosure of plaintiffs' records to DOGE team members within the agencies falls comfortably within that authorization.

First, the relevant employees at Treasury, Education, and OPM are employees of those agencies for Privacy Act purposes, a conclusion the district court did not question. "[F]or purposes of" Title 5 of the U.S. Code, which includes the Privacy Act, "employee" "means an officer and an individual who is" first "appointed in the civil service by one of the following acting in an official capacity"; as relevant here, the ensuing list of potential appointers includes "the President" and "an individual who is an employee under this section." 5 U.S.C. § 2105(a)(1)(A), (D). An employee must also be "engaged in the performance of a Federal function under authority of law or an Executive act; and ... subject to the supervision of an

21

individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position." *Id.* § 2105(a)(2), (3). The relevant employees easily satisfy that definition, and the district court reasonably did not conclude otherwise. *See* Mem. Op. 42.

Second, the employees at issue have a "need" to access the records contained in the relevant systems in order to perform their official duties. 5 U.S.C. § 552a(b)(1). The DOGE teams at Treasury, OPM, and the Department of Education exist under Executive Order 14,158 to modernize technology and to "[m]aximize [e]fficiency and [p]roductivity." USDS EO § 4. To that end, the Order instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards." *Id.* § 4(b), 90 Fed. Reg. at 8442. Given the purpose of the order—to modernize technology—it necessarily follows that agency personnel seeking to improve agency systems would need access to them to conduct that modernization. Put another way, it would be impossible for the DOGE team members to modernize these data systems without access to the systems themselves.

22

It is likewise plain that DOGE team members investigating whether the government has made improper expenditures require access to the records detailing the relevant payments. To assess the propriety of any payment, an analyst needs to know the details surrounding that payment, including information about the recipient of that payment, the amount of the payment, the payment's purpose, and so forth. One is hard-pressed to understand how such investigative work could be performed without access to the relevant payment records.

The Systems of Record Notices for the various data systems likewise confirm the DOGE team employees' need to access those systems. As noted, those Notices state that the records contained within the systems will be used to, among other things, "develo[p] computer systems" and to identify, prevent, and recoup improper payments. 85 Fed. Reg. at 11,779-80; *see also infra* pp.24-25. The agencies have thus acknowledged and made clear to the public that the types of tasks being performed by DOGE team members involve the regular use of the records in those systems.

The "need" underlying the employees access here is both clear (arising directly from the mandates of an Executive Order and the functions being performed by DOGE team employees) and obvious (as it is

23

impossible to effectively review and modernize a data system without accessing that system, including the records within it, or to investigate improper payments without reviewing payment records). The district court's conclusion that the government had failed to establish that the DOGE team members need access to the relevant was thus plainly wrong. And, indeed, the district court's reasoning would appear to call into doubt the legality of the agencies' granting of access to the many non-DOGE team members who have had access to the relevant systems for years and who performs tasks substantially similar to the work being performed by DOGE team members. That is not correct. Like other employees at the agencies, the DOGE team members need to access records in the pertinent systems. Accordingly, section 552a(b)(1) authorizes that access.

In the alternative, Defendants' actions are permissible under the Privacy Act's exception for "routine use." *See* 5 U.S.C. § 552a(b)(3) (permitting disclosure absent consent for certain "Routine Uses" that are defined in a published Systems of Record Notice ("SORN")). As noted previously, Treasury's published Routine Use 17 permits disclosure to federal agency personnel "for the purpose of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, federal

funds." 85 Fed. Reg. at 11,780. Treasury's DOGE Team is tasked with doing just that. *See* USDS EO §§ 1, 4. Education's SORNs likewise cover the functions of the DOGE Team. For example, they allow for disclosure "to support the investigation of possible fraud and abuse and to detect and prevent fraud and abuse" in program funds. *See* 88 Fed. Reg. 41,942, 41,949 (June 28, 2023); 88 Fed. Reg. 42,220, 42,222 (June 29, 2023); *see also* 84 Fed. Reg. 47,265, 47,269 (Sept. 9, 2019) (permitting disclosure to "support governmental researchers and policy analysts"). So too with OPM's SORNs, which permit disclosure in certain circumstances "to help eliminate waste, fraud, and abuse in Governmental programs." 77 Fed. Reg. 73,694, 73,697 (Dec. 11, 2012). Because these are precisely the functions OPM DOGE team members are performing, the Privacy Act permits disclosure of the relevant records to them.

## II.     The Remaining Factors Favor a Stay.

The remaining factors—irreparable harm, the balance of harms, and the public interest—likewise favor the requested stay. Allowing the injunction to stay in effect threatens irreparable injuries to the government and the public, whose interests "merge" in this context. *Nken*, 556 U.S. at 435. The injunction here impinges on the President's broad authority over

and responsibility for directing employees in important work to modernize federal government systems and identify fraud, waste, and abuse throughout the federal government.  It is therefore "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Immigration & Naturalization Serv. v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers).

At every turn, the injunction inflicts irreparable constitutional harm. It erodes the President's control over subordinates. It frustrates the public's interest in having their elected President effectuate policy priorities through lawful direction of the Executive Branch. And it inserts the Judicial Branch into the day-to-day, internal operations of federal agencies.

By contrast, the district court's conclusions regarding the harm to plaintiffs were premised on fundamental errors.  For all the reasons Plaintiffs have failed to show cognizable injury for the purposes of Article III standing, *see supra* pp.8-14, they have necessarily failed to show irreparable harm, which is fatal to Plaintiffs' motion.  *See Mountain Valley Pipeline v. Western Procahontas Properties Ltd.*, 918 F.3d 353, 366 (4th Cir. 2019) ("Each of these four requirements must be satisfied.").  But even if

they had shown a cognizable injury for the purposes of standing, plaintiffs nonetheless fail to make a clear showing of actual and imminent harm from the intra-agency disclosure of information, where employees who view that information are subject to the same confidentiality obligations that apply to other similarly situated agency employees. Indeed, three other courts addressing similar claims have denied motions for emergency relief based on the plaintiffs' failure to establish irreparable harm. *See University of Cal. Student Ass'n v. Carter*, --- F. Supp. 3d ----, 2025 WL 542586, at *5 (D.D.C. Feb. 17, 2025) ("[C]ourts have declined to find irreparable injury where the challenged disclosure is not 'public,' but [rather] involves individuals obligated to keep it confidential"); *Electronic Privacy Info. Ctr. v. U.S. Office of Personnel Mgmt.*, 2025 WL 580596, at *6-7 (E.D. Va. Feb. 21, 2025); *Alliance for Retired Ams. v. Bessent*, --- F. Supp. 3d ----, 2025 WL 740401, at *20–24 (D.D.C. Mar. 7, 2025).

## CONCLUSION

For the foregoing reasons, this Court should stay the district court's

preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
GERARD SINZDAK
JACK STARCHER
  *s/ Jack Starcher*
(202) 514-8877
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., NW*
  *Room 7515*
  *Washington, DC 20530*

MARCH 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion satisfies the type-volume requirements set out in Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,190 words. This motion was prepared using Microsoft Word in Book Antiqua, 14-point font, a proportionally spaced typeface.

*s/ Jack Starcher*
Jack Starcher

**ADDENDUM**

## TABLE OF CONTENTS

**Relevant Record Materials, pursuant to Fed. R. App. P. 8(a)(2)(B)(iii) and Local Rule 8**

Preliminary Injunction (Mar. 24, 2025) (Dkt. No. 69) ............................. ADD1

Memorandum Opinion (Mar. 24, 2025) (Dkt. No. 68) ............................ ADD4

Amended Complaint (Feb. 12, 2025) (Dkt. No. 13) ................................ ADD72


**Previous Application for Relief and Outcome, pursuant to Local Rule 8**

Motion for Stay Pending Appeal (Mar. 24, 2025) (Dkt. No. 72) ......... ADD155

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **AMERICAN FEDERATION OF TEACHERS, *et al.*,** | * |
| | * |
| **Plaintiffs,** | * |
| | * |
| **v.** | *      **Civ. No. DLB-25-0430** |
| | * |
| **SCOTT BESSENT, *et al.*,** | * |
| | * |
| **Defendants.** | * |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion issued today, it is this 24th day of March, 2025 hereby ORDERED:

1.  The plaintiffs' motion for a preliminary injunction, ECF 59, is GRANTED as follows:

    a.  The U.S. Department of Education ("Education"); Denise L. Carter, the Acting Secretary of Education; and their officers, agents, servants, employees, and attorneys are ENJOINED from disclosing the personally identifiable information of the plaintiffs and the members of the plaintiff organizations to any DOGE affiliates, defined as individuals whose principal role is to implement the DOGE agenda as described in Executive Order 14,158 and who were granted access to agency systems of records for the principal purpose of implementing that agenda;

    b.  The Office of Personnel Management ("OPM"); Charles Ezell, the Acting Director of OPM; and their officers, agents, servants, employees, and

attorneys are ENJOINED from disclosing the personally identifiable information of the plaintiffs and the members of the plaintiff organizations to any DOGE affiliates, defined as individuals whose principal role is to implement the DOGE agenda as described in Executive Order 14,158 and who were granted access to agency systems of records for the principal purpose of implementing that agenda (DOGE affiliates does not include OPM Acting Director Ezell, Chief Information Officer Greg Hogan, and Chief of Staff Amanda Scales); and

c.    The U.S. Department of the Treasury ("Treasury"); Scott Bessent, the Secretary of the Treasury; and their officers, agents, servants, employees, and attorneys are ENJOINED from disclosing the personally identifiable information of the plaintiffs and the members of the plaintiff organizations to DOGE affiliates, defined as individuals whose principal role is to implement the DOGE agenda as described in Executive Order 14,158 and who were granted access to agency systems of records for the principal purpose of implementing that agenda (DOGE affiliates includes Thomas Krause and Ryan Wunderly);

2.    The plaintiffs' motion for extra-record discovery, ECF 53, is DENIED without prejudice;

3.    The plaintiffs' security of $10,000, which was posted on March 3, 2025, must remain in the Court registry until further order of the Court; and

2
ADD2

4.      The parties shall meet and confer to discuss whether the government intends to file

a notice of appeal or whether the Court should enter a scheduling order. The parties

shall file a joint status report on these matters by 5:00 p.m. on March 31, 2025.


_____

Deborah L. Boardman
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **AMERICAN FEDERATION OF TEACHERS**, *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civ. No. DLB-25-0430** |
| | * | |
| **SCOTT BESSENT**, *et al.*, | * | |
| | * | |
| **Defendants.** | * | |

## MEMORANDUM OPINION

On the first day of President Donald J. Trump's second term in office, he issued an Executive Order that created the Department of Government Efficiency ("DOGE") and renamed the United States Digital Service as the United States DOGE Service ("USDS"). Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ("DOGE Executive Order"). The stated purpose of DOGE is "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* at § 1. The DOGE Executive Order commands federal agency heads to "take all necessary steps . . . to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b). Almost immediately after the DOGE Executive Order was issued, federal government agencies hired or accepted as detailees individuals whose mission is to implement the DOGE Executive Order. Among those agencies were the U.S. Department of Education ("Education"), the U.S. Office of Personnel Management ("OPM"), and the U.S. Department of the Treasury ("Treasury"). Pursuant to the DOGE Executive Order, Education, OPM, and Treasury gave individuals affiliated with DOGE access to agency systems that hold records with the personally identifiable information ("PII") of millions of Americans.

This lawsuit is one of several filed by plaintiffs who seek to enjoin federal government agencies from disclosing records with their sensitive personal information to government personnel implementing the DOGE Executive Order. In this case, the plaintiffs are unions and membership organizations representing current and former federal employees and federal student aid recipients and six military veterans who have received federal benefits or student loans. In their amended complaint, filed on February 12, 2025, the plaintiffs assert claims under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA") against Education, OPM, and Treasury; Denise L. Carter, the Acting Secretary of Education; Charles Ezell, the Acting Director of OPM; and Scott Bessent, the Secretary of the Treasury (collectively, "the government" or "the agencies"). The plaintiffs allege that the agencies unlawfully granted access to records that contain their PII to DOGE representatives.

On February 24, 2025, the Court granted in part and denied in part the plaintiffs' motion for a temporary restraining order ("TRO"), enjoining Education and OPM from granting access to the plaintiffs' sensitive personal information to individuals who are implementing the President's DOGE agenda. *See* ECF 38. Since then, the government has produced the administrative records for each agency, and the plaintiffs have filed a motion for a preliminary injunction. Having considered the administrative records, the parties' TRO and preliminary injunction briefing, their exhibits, and oral argument by counsel, the Court grants the plaintiffs' motion for a preliminary injunction. They have shown a likelihood that they will succeed on their claim that the defendants violated the APA by not acting in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a; that they will suffer irreparable harm if the defendants are not enjoined; and that the balance of the equities and public interest weigh favor of preliminary injunctive relief.

I.      **Background**

   A. **DOGE Executive Order**

On January 20, 2025, President Donald J. Trump signed the DOGE Executive Order. It established the Department of Government Efficiency "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." DOGE Executive Order § 1. The order establishes "the U.S. DOGE Service Temporary Organization" to be "dedicated to advancing the President's 18-month DOGE agenda." *Id.* § 3(b). It directs each agency head to establish "a DOGE Team of at least four employees, which may include Special Government Employees, hired or assigned within thirty days of the date of this Order." *Id.* § 3(c). "Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney." *Id.* DOGE Team Leads will "coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*

The DOGE Executive Order directs the USDS Administrator to "commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems," which includes "work[ing] with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4(a). The DOGE Executive Order commands agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." *Id.* § 4(b). It also directs that "USDS shall adhere to rigorous data protection standards." *Id.*

## B. Agency Defendants

The defendants include Education, OPM, Treasury, and the respective agency heads in their official capacities. Members of the DOGE team or "DOGE affiliates" are working at each of these agencies.[1]

### 1. Education

Education manages the federal student loan system. ECF 13, ¶ 94. Within this system, the Federal Student Aid Office maintains the National Student Loan Data System ("NSLDS"), the Common Origination and Disbursement System ("CODS"), the FUTURE Act System ("FAS"), and the Financial Management System ("FMS"). *See id.* ¶¶ 95, 98, 100, 102. These systems house records that contain the PII of individuals who receive federal student aid, such as Social Security numbers and taxpayer identification numbers, names, dates of birth, mailing and email addresses, driver's license information, income and asset information, federal tax information, demographic information including marital and citizenship status, and family members' personal and financial information. *See, e.g., id.* ¶¶ 95–102; Privacy Act of 1974; System of Records, 89 Fed. Reg. 44652, 44656–57 (May 21, 2024) (listing categories of records in the NSLDS); Privacy Act of 1974; System of Records, 88 Fed. Reg. 41942, 41947–48 (June 28, 2023) (listing categories of records

---

[1] Unless otherwise noted, the Court uses the term "DOGE affiliates" throughout the opinion to refer to the personnel at Education, OPM, and Treasury whose principal role is to implement the DOGE agenda as described in the DOGE Executive Order and who were granted access to agency record systems for the principal purpose of implementing that agenda. The administrative records refer to these personnel as "employees implementing [the DOGE Executive Order]." *See* ECF 51-1, at 2; ECF 64-1, at 2; ECF 51-3, at 2; ECF 58, at 1; ECF 51-2, at 2. The government has redacted the names of DOGE affiliates at Education and OPM and refers to them by the agency initials and a number (*e.g.*, ED-1, OPM-1). Because the government produced three separate administrative records—one for each agency—citations to the administrative records also begin with the agency initials, followed by a four- or six-digit number (*e.g.*, ED-000001, OPM-000001, TR-0001).

in the CODS); Privacy Act of 1974; System of Records, 88 Fed. Reg. 42200, 42222 (June 29, 2023) (listing categories of records in the FAS); Privacy Act of 1974; System of Records—Financial Management System (FMS), 73 Fed. Reg. 177, 178 (Jan. 2, 2008) (listing categories of records in the FMS).

The government represents that there are six DOGE affiliates at Education.[2] ECF 62, at 7 (citing ECF 27-6, ¶¶ 4–6 (A. Ramada Suppl. Decl.)). Several of the DOGE affiliates at Education are detailed from other agencies. The administrative record shows that Education executed two memoranda of understanding with the DOGE affiliates' home agencies on February 12, 2025, "formaliz[ing] . . .prior oral agreement[s]." *See* ED-000005–07, ED-000013–16. One detailee, ED-1, is a Senior Advisor in the Office of the Secretary. ED-000005. Another detailee, ED-3, is a special government employee detailed from their position as a "Software Engineer (Consultant)" at the General Services Administration ("GSA") to the Office of the Secretary. ED-000013. Two other DOGE affiliates, ED-2 and ED-4, were appointed to Education on January 31, 2025 and February 4, 2025 as a Senior Advisor and a Consultant, respectively, in the Office of the Secretary. ED-000009–10, ED-000017.

In a February 5, 2025 memorandum, Thomas Flagg, the Chief Information Officer ("CIO") at Education, authorized IT system access to "USDS personnel onboarded to the Department of Education DOGE team":

> President Trump signed an Executive Order (EO) "Establishing and Implementing
> the President's "Department of Government Efficiency"" to implement the

---

[2] The government has consistently represented to the Court that "[t]here are six employees at the Department of Education whose principal role is to help advance the goals of [the DOGE Executive Order]," and submitted declarations to that effect. *See* ECF 62, at 7; ECF 27, at 9; ECF 27-5, ¶¶ 4–7 (A. Ramada Decl.); ECF 27-6, ¶ 2 (A. Ramada Suppl. Decl.). However, the administrative record only identifies four DOGE affiliates—two detailees and two appointees. *See* ED-000005–7, ED-000009, ED-000013–19, ED-000021.

President's DOGE Agenda by modernizing Federal technology and software to maximize governmental efficiency and productivity. The EO also tasked Agencies to establish an internal DOGE team and allow full access to the DOGE Administrator to all unclassified agency records, software systems and IT systems. This is to support the USDS Administrator Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. All ED Information System Owners (ISO) shall work with the USDS Administrator and internal DOGE Team members to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization.

This memorandum documents the need to know and authorizes USDS personnel onboarded to the Department of Education DOGE team full and prompt access to all unclassified IT systems and data. These new requirements support the implementation of the EO "Establishing and Implementing the President's [']Department of Government Efficiency[.']"

ED-000025.

One week later, Education and USDS executed "Terms and Conditions for Reimbursable Work" that "formalize[d] and supersede[d] [a] prior oral agreement, written interim assignment agreement, and supporting documentation between USDS and ED." ED-000001. These terms and conditions state that "ED will provide USDS detailees with access to all ED systems on USDS employees' EOP devices to the maximum extent allowable by law." ED-000002.

### 2. OPM

OPM acts as the "chief human resources agency and personnel policy manager for the Federal Government." ECF 13, ¶ 71 (quoting *About Us*, OPM, https://www.opm.gov/about-us [https://perma.cc/CQ7X-LLYA] (last visited Mar. 20, 2025)). OPM maintains a host of systems with information about federal government personnel. *See id.* ¶ 72. For example, OPM maintains the Electronic Official Personnel Folder ("eOPF"), which contains digital versions of federal employees' personnel files that cover their entire period of federal civilian service. *See* OPM, *Privacy Impact Assessment for Electronic Official Personnel Folder System (eOPF)* 1 (2020), https://www.opm.gov/information-management/privacy-policy/privacy-policy/eopf-pia.pdf

[https://perma.cc/T6KM-RGHU]. The eOPF contains current and former federal employees' PII such as Social Security numbers, bank account numbers, names and addresses, dates of birth, health and life insurance policy numbers, civil and criminal history information, and personnel actions such as promotions and suspensions. *Id.* at 5, 11–12. OPM also maintains the Enterprise Human Resources Integration Data Warehouse ("EHRI"), USA Performance, USA Staffing, and USAJOBS. ECF 13, ¶ 78. These systems also contain PII, including names, Social Security numbers, dates of birth, and citizenship status. *See* ECF 13, ¶¶ 78, 81–83; OPM, *Privacy Impact Assessment for Enterprise Human Resources Integration Data Warehouse (EHRI DW)* 3 (2019), https://www.opm.gov/information-management/privacy-policy/privacy-policy/ehridw.pdf [https://perma.cc/5UCS-N5V8]; OPM, *Privacy Impact Assessment for USA Staffing®* 6–7 (2021), https://www.fhfa.gov/sites/default/files/2023-12/OPM%20USA%20Staffing_pia.pdf [https://perma.cc/W3ER-CAWS]; OPM, *Privacy Impact Assessment for USA Performance (USAP)* 4 (2020), https://www.opm.gov/information-management/privacy-policy/privacy-policy/usap-pia.pdf [https://perma.cc/NR3C-WGMS].

At OPM, there are several DOGE affiliates.[3] *See* ECF 64-1, at 2; ECF 64, at 1; OPM-000103. The record contains employment documents for some of them. OPM-2, OPM-3, OPM-4, OPM-6, and OPM-7 are "Expert[s]" hired to work in the Office of the Director. OPM-000008, OPM-000010–11, OPM-000014, OPM-000021–22, OPM-000111–12. OPM-2 is also listed as a "Senior Advisor." OPM-000006. OPM-5 is a "Senior Advisor to the Director for Information Technology" in the Office of the Director, and OPM-8 is a "Senior Advisor to the Director." OPM-

---

[3] "DOGE affiliates" does not include OPM's CIO Greg Hogan, OPM Acting Director Charles Ezell, or OPM Chief of Staff Amanda Scales, because these individuals, by virtue of their positions at OPM, would otherwise have access to OPM systems and were not granted access for the principal purpose of implementing the President's DOGE agenda.

000016–17, OPM-000019, OPM-000114–15. All of these DOGE affiliates were appointed to OPM on either January 20, 2025 or January 24, 2025. OPM-000006, OPM-000010, OPM-000014, OPM-000016, OPM-000021, OPM-000112, OPM-000116. Most of them are developers, engineers, or "political tech staff." *See* OPM-000027–29, OPM-0000107–08.

On January 20, 2025, OPM Acting Director Ezell requested that several "[i]ndividuals from the [p]olitical [t]eam," including OPM-3, OPM-5, and OPM-7, be added to OPM systems as "admins." OPM-000107. That same day, these individuals were given "super user permissions" for USAJOBS administrative systems. OPM-000104. On January 27, 2025, Ezell sent an email with the subject line "Getting DoGE Engineers access." OPM-000028. The email told an OPM employee, MC Price, that "[w]e are rapidly ramping up some engineers here," and "[t]o accomplish this goal, these engineers"—OPM-2, OPM-3, OPM-4, OPM-5, and OPM-6— "need[ed] the following items urgently," including "a short list of all the systems OPM operates and manages" and a range of access permissions "for each computer system." OPM-000027–29. The access requested was "[c]ode read and write permissions," the "[a]bility to access the system as a regular user (e.g. hiring manager and onboarding user for USA Staffing)," and the "[a]bility to access the system as an admin user," with the instruction to "[p]rioritize USA Staffing, USAJOBS, and EHRI." OPM-000029. On January 28, 2025, Price stated in an email that "[w]e have already given several of the political devs/engineers comprehensive access to USAJOBS and USA Staffing" and that "[n]ow we have 3 more individuals with the same requirement," listing OPM-2, OPM-4, and OPM-6. OPM-000108–09. Price explained that this access would "start with USAJOBS, USA Staffing, and eOPF/EHRI," and "USAP will be next, so might as well go ahead there." OPM-000108. He noted that the individuals "need to have access today." *Id.* On February 3, 2025, Price was forwarded a request from OPM Chief of Staff Amanda Scales for OPM-8 to

have "account creation info" with "admin access" for USA Staffing, "[s]imilar to . . . [OPM-6]." OPM-000110.

Other OPM DOGE affiliates were granted access to OPM systems, including USA Performance, the Federal Employee Health Benefits system, and the Postal Service Health Benefits Data Platform, between January 24, 2025 and February 7, 2025. OPM-000103.

### 3. Treasury

The Treasury Department's Bureau of the Fiscal Service ("Fiscal Service") maintains systems for disbursement of payments for federal programs such as Social Security benefits, federal income tax refunds, and veterans' pay. ECF 13, ¶¶ 46, 48. Fiscal Service payment systems include the Payment Automation Manager ("PAM"), the Automated Standard Application for Payments ("ASAP"), and the Secure Payment System ("SPS"). *See* ECF 27-3, ¶ 5 (J. Gioeli Decl.). These payment systems contain PII including names, Social Security numbers, and bank information. *See* Fiscal Service, *Privacy and Civil Liberties Impact Assessment: Payment Automation Manager* 5 (2019), https://www.fiscal.treasury.gov/files/pia/pampclia.pdf [https://perma.cc/5JW9-S42K]; Fiscal Service, *Privacy and Civil Liberties Impact Assessment Secure Payment System (SPS)* 7 (2021), https://fiscal.treasury.gov/files/pia/spspclia.pdf [https://perma.cc/U6HS-AJE5]; Fiscal Service, *Privacy and Civil Liberties Impact Assessment: Automated Standard Application for Payments (ASAP)* 6–7 (2019), https://fiscal.treasury.gov/files/pia/spspclia.pdf [https://perma.cc/XA33-TRXC].

There are two DOGE affiliates at Treasury: Thomas Krause and Ryan Wunderly. Krause was appointed as the Senior Advisor for Technology and Modernization on January 23, 2025. *See* TR-0024, TR-0007, TR-0015, TR-0024. On February 5, 2025, Krause was delegated the duties of the Fiscal Assistant Secretary. *See* TR-0002–03. Wunderly took over a role previously held by

Marko Elez, who was hired by Treasury as a Special Advisor for Information Technology and Modernization on January 21, 2025 and resigned on February 6, 2025. TR-0004; *see* TR-0022–23; ECF 27-4, ¶ 8 (M. Wenzler Decl.); ECF 35-1, ¶ 2 (J. York Decl.).[4]

On January 24, 2025, Treasury Administrative Services set forth an "[e]ngagement [p]lan" for "supporting the USDS/DOGE team during their 4–6 week engagement to understand payment processes and opportunities to advance payment integrity and fraud reduction goals." TR-0057. The engagement plan describes how the Fiscal Service will grant system access to the DOGE team at Treasury. For the "technical team member," Elez, "USDS/DOGE confirmed . . . [he] require[d] access to Fiscal Service systems and data." *See* TR-0058, TR-0061–62. The plan states that Fiscal Service will issue the technical team member a Fiscal Service laptop by January 28, 2025, and that Treasury will "provide[] access to in scope payment systems source code" and "[d]evelopment access to the in scope payment systems." TR-0058–59. The engagement plan also notes that "USDS/DOGE requested to be granted 'over the shoulder' access to monitor Fiscal Service personnel conducting payment processing roles, which was approved by Fiscal Service on 1/23/25." TR-0059. According to a spreadsheet attached to a February 3, 2025 email from a Treasury executive point person for the engagement, as of February 1, Elez had access to Treasury systems including PAM, SPS, and ASAP, and it was recommended that his access to other Treasury systems be expanded. TR-0061–62; *see* TR-0057.

---

[4] In a February 21, 2025 letter, the government informed the Court that Treasury hired Ryan Wunderly "to perform the duties previously assigned to Marco Elez." *See* ECF 35, at 1. According to a declaration from John York, Counselor to the Treasury Secretary, Wunderly "will join Mr. Krause on the Treasury DOGE Team to fill the position at the Bureau of the Fiscal Service previously held by Mr. Elez," and "[h]is position description and job duties will be substantially the same as those of Mr. Elez." ECF 35-1, ¶¶ 3–4. There is no indication that Wunderly's access to the Treasury systems will be different from Elez's access.

### C. Plaintiffs

The organizational plaintiffs are: American Federation of Teachers ("AFT"), International Association of Machinists and Aerospace Workers ("IAM"), International Federation of Professional and Technical Engineers ("IFPTE"), National Active and Retired Federal Employees Association ("NARFE"), and National Federation of Federal Employees ("NFFE"). ECF 13, ¶¶ 18–21. AFT represents over 1.8 million people employed in the teaching and healthcare professions. ECF 14-9, ¶ 3 (S. Tammelleo Decl.). IAM and its affiliate organization NFFE represent more than 100,000 federal workers, as well as veterans and veterans' groups. ECF 14-10, ¶ 3 (B. Bryant Decl.). IFPTE represents approximately 34,000 federal employees, most of whom work for the Department of Defense. ECF 14-12, ¶ 2 (M. Biggs Decl.). IFPTE members include nuclear submarine engineers, NASA scientists and researchers, administrative law judges at the Social Security Administration, nuclear engineers at the Tennessee Valley Authority, and Environmental Protection Agency employees. *Id.* NARFE represents approximately 128,000 current and former federal employees and spousal annuitants. ECF 14-11, ¶ 2 (W. Shackelford Decl.).

The individual plaintiffs are Jason Cain, Kristofer Goldsmith, Clifford Grambo, Thomas Fant, Donald Martinez, and Christopher Purdy. *Id.* ¶¶ 22–27. Cain, a U.S. Army veteran, receives veterans' disability benefits and previously received GI bill benefits, student loans, and a VA home loan from the federal government. ECF 14-3, ¶¶ 3–5 (J. Cain Decl.). Cain also previously worked for the VA. *Id.* ¶ 6. Goldsmith, a U.S Army veteran, receives veterans' disability benefits and previously received federal student loans. ECF 14-5, ¶¶ 3–4 (K. Goldsmith Decl.). Grambo, a U.S. Navy veteran, receives veterans' disability benefits and a military pension. ECF 14-6, ¶¶ 3–4 (C. Grambo Decl.). Fant, a veteran of the U.S. Coast Guard, receives veterans' disability benefits. ECF

14-4, ¶¶ 3–4 (T. Fant Decl.). Martinez, a U.S. Army veteran, receives veterans' disability and combat-related special compensation, Social Security disability insurance, and a VA home loan, and previously received vocational rehabilitation and employment payments from the VA. ECF 14-7, ¶¶ 3–5. Martinez previously worked for the Federal Emergency Management Agency and received federal student loans. *Id.* ¶¶ 5–6. Purdy, a veteran of the Army National Guard, receives veterans' disability benefits and previously received federal student loans and a VA home loan. ECF 14-8, ¶¶ 3–5 (C. Purdy Decl.).

Because the members of the organizational plaintiffs and the individual plaintiffs have worked for the federal government, have federal student loans, and/or receive government benefits, their PII is housed in record systems maintained by Education, OPM, and/or Treasury. *See* ECF 13, ¶¶ 18–27; ECF 14-3, ¶¶7–8; ECF 14-4, ¶¶ 5–6; ECF 14-5, ¶¶ 6–7; ECF 14-6, ¶¶ 5–6; ECF 14-7, ¶¶ 7–8; ECF 14-8, ¶¶ 6–7; ECF 14-9, ¶¶ 6–7; ECF 14-10, ¶¶ 10–11; ECF 14-11, ¶¶ 5–6; ECF 14-12, ¶¶ 8–9.

The plaintiffs allege that Education, OPM, and Treasury have granted DOGE representatives sweeping access to systems that are typically accessed by only a small number of career employees at the respective agencies. *See* ECF 13, ¶¶ 49, 53, 56, 61, 74, 76–78, 103, 132. They cite to reports that DOGE representatives' access to systems with sensitive data caused significant concern among career agency employees and cyber security experts. *Id.* ¶¶ 103, 135. They also cite to an article that describes a Treasury analyst characterizing DOGE as an "insider threat." *Id.* ¶ 136. And they point to reports that DOGE representatives input sensitive data into artificial intelligence software. *Id.* ¶¶ 104, 110.

The plaintiffs allege that the "continued and ongoing disclosure of their records to DOGE representatives constitutes a violation of the Privacy Act, for which no exception applies." *Id.* ¶

87. They say that Education, OPM, and Treasury have given DOGE representatives unrestricted access to their PII, *id.* ¶¶ 61, 76–78, 84, 85, 103–04, 108; that none of the plaintiffs or the members of the plaintiffs' organizations requested disclosure or provided express written consent to the disclosure of their information to DOGE representatives, *id.* ¶¶ 62, 87, 109; and that none of the DOGE representatives needs to know the plaintiffs' personal information to perform their duties, *id.* ¶¶ 64, 89, 113–14. The purportedly unlawful disclosures to DOGE representatives have caused the plaintiffs "major distress and anxiety, as they do not know who their data has been or will be shared with, whether these disclosures have made them vulnerable to further privacy breaches, and how it may be weaponized against them." *Id.* ¶ 140.

The plaintiffs assert three violations of the APA. First, they allege that the agencies' actions violated the Privacy Act and that the agencies did not act in accordance with law. *Id.* ¶¶ 145–51. Second, they allege that the agencies acted arbitrarily and capriciously when they failed to consider the requirements of the Privacy Act and failed to engage in reasoned decision-making when they granted DOGE representatives broad access to their record systems containing sensitive and personal information. *Id.* ¶¶ 152–56. Finally, they allege that the agencies violated non-discretionary duties to protect records from unauthorized disclosure. *Id.* ¶¶ 157–59.

On February 12, 2025, the plaintiffs filed a motion for a TRO to enjoin Education, OPM, Treasury, and the respective agency heads from granting access to record systems with the plaintiffs' personal information. ECF 14. The Court granted in part and denied in part the plaintiffs' motion. ECF 38. On February 24, 2025 at 8:00 a.m., the Court issued a TRO that enjoined Education and OPM from disclosing the plaintiffs' PII to DOGE affiliates until March 10, 2025 at 8:00 a.m. *Id.* On February 26, the Court set a briefing schedule for a preliminary injunction motion. ECF 46. On March 7, the government produced the administrative records. ECF 51; *see also* ECF

58 (March 10 errata correcting parts of the Education and OPM administrative records). The next day, the plaintiffs moved for extra-record discovery, ECF 53, and the government opposed, ECF 54.[5] On March 10, the plaintiffs filed a motion for a preliminary injunction. ECF 59. The government opposed. ECF 62. The plaintiffs replied. ECF 63. After the plaintiffs filed a reply, the government supplemented the OPM administrative record. ECF 64-1. The Court held a hearing on the preliminary injunction motion on March 17.[6] For the reasons stated below, the Court grants the plaintiffs' motion for a preliminary injunction.

## II.    Discussion

The plaintiffs assert three claims under the APA, including a claim that the defendants violated the Privacy Act, 5 U.S.C. § 552a, and therefore acted "not in accordance with law," *see* 5 U.S.C. § 706(2)(A). The Privacy Act restricts agencies from disclosing records that contain PII unless the subject requests or consents to disclosure or an exception to consent applies. *See* 5 U.S.C. § 552a(b). The plaintiffs have shown they are entitled to preliminary injunctive relief on their APA claim that the agencies did not act in accordance with the Privacy Act. Before explaining why, the Court confirms it has jurisdiction over this case.

### A.  Standing

Article III of the Constitution extends the "judicial Power" of the federal courts only to "Cases" or "Controversies." U.S. Const. art. III, § 2, cl. 1; *see TransUnion LLC v. Ramirez*, 594

---

[5] For reasons discussed in greater detail below, the Court confines its review of the merits of the plaintiffs' APA claims to the administrative records and a handful of judicially noticeable materials. The plaintiffs' motion for extra-record discovery is denied without prejudice.

[6] At the hearing, the Court extended the TRO for good cause, for reasons stated on the record, until March 24, 2025 at 8:00 a.m. or until the Court rules on the preliminary injunction motion. The TRO expires upon the issuance of this ruling.

U.S. 413, 423 (2021). There is a case or controversy only if the plaintiff has standing to assert their claim. *TransUnion*, 594 U.S. at 423. To establish standing, a plaintiff must show "(1) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury would likely be redressed by judicial relief." *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The "injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). When, as here, "a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.* (citing *Clapper*, 568 U.S. at 401).[7]

---

[7] Several plaintiffs are organizations. "An organization . . . can assert standing either in its own right or as a representative of its members." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 182 (4th Cir. 2013). The organizational plaintiffs assert standing as representatives of their members. *See* ECF 14-9, ¶¶ 6–11; ECF 14-10, ¶¶ 10–15; ECF 14-11, ¶¶ 5–10; ECF 14-12, ¶¶ 8–13. An organization establishes "representational standing" by showing "that '(1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit.'" *S. Walk at Broadlands*, 713 F.3d at 184 (quoting *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)). The organizational plaintiffs have established that they have germane interests. *See* ECF 14-9, ¶¶ 4–5; ECF 14-10, ¶¶ 6–9; ECF 14-11, ¶¶ 3–4; ECF 14-12, ¶¶ 4–7. And "the Court discerns no reason Plaintiffs' members must participate directly in this case rather than allow their associations to speak on their behalf." *All. for Retired Americans v. Bessent*, --- F. Supp. 3d. ----, No. 25-0313, 2025 WL 740401, at *13 (D.D.C. Mar. 7, 2025) (finding third prong of associational standing met for organizations with APA claims, including for alleged Privacy Act violations); *see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) ("'[I]ndividual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members"). Thus, the standing question in this case is the same for the organizational and individual plaintiffs: have they established an injury in fact. For convenience, the Court uses "plaintiffs" to refer to the individual plaintiffs and the members of the organizational plaintiffs.

The plaintiffs "must demonstrate standing 'with the manner and degree of evidence' required at the relevant 'stage[ ] of the litigation.'" *Fernandez*, 116 F.4th at 295 (alteration in original) (quoting *Lujan*, 504 U.S. at 561). At this stage, that means they "must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Only the first element—injury in fact—is at issue here. The plaintiffs' injury is the ongoing access to their sensitive personal information by unauthorized government personnel. The Court finds that the plaintiffs have made a clear showing that they are likely to establish a concrete injury in fact.[8]

In *TransUnion LLC v. Ramirez*, the Supreme Court explained "[w]hat makes a harm concrete for purposes of Article III." 594 U.S. at 424. To determine whether the concrete-harm requirement has been met, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* The inquiry "does not require an exact duplicate in American history and tradition." *Id.* Traditional tangible harms include physical and monetary harms. *Id.* at 425. Intangible harms also can be concrete. *Id.* They include injuries such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.*[9]

---

[8] The Court "assumes the merits of a dispute will be resolved in favor of the party invoking [its] jurisdiction in assessing standing." *See Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011).

[9] *TransUnion* reaffirmed what the Supreme Court held in *Spokeo*: "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion*, 594 U.S. at 426 (quoting *Spokeo*, 578 U.S. at 341).

In the wake of *TransUnion*, the Fourth Circuit held that an injury resulting from a violation of a statute aimed at protecting a person's privacy bore a close relationship to a harm redressable at common law: invasion of privacy. In *Garey v. James S. Farrin, P.C.*, the plaintiffs were automobile drivers who had been involved in motor vehicle accidents. *See* 35 F.4th 917, 919–20 (4th Cir. 2022). They alleged that personal injury lawyers obtained accident reports from state law enforcement and private data brokers that contained their names and addresses and mailed them unsolicited advertisements. *Id.* at 920. The drivers alleged the personal injury lawyers violated the Driver's Privacy Protection Act ("DPPA"), which provides a cause of action against "'[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record,' for an impermissible purpose." *Id.* (quoting 18 U.S.C. § 2724(a)). The district court found the plaintiffs had standing to sue for damages.

On appeal, the Fourth Circuit's standing analysis began with *TransUnion*: "[P]laintiffs proceeding under a statutory cause of action can establish a cognizable injury by 'identif[ying] a close historical or common-law analogue for their asserted injury' for which courts have 'traditionally' provided a remedy." *Id.* at 921 (alteration in original) (quoting *TransUnion*, 594 U.S. at 424). "A plaintiff who does so has standing even if the precise injury would not, absent the statute, be sufficient for Article III standing purposes." *Id.*

"Consistent with *TransUnion*," the district court found that the drivers had alleged harms "closely related to the invasion of privacy, which has long provided a basis for recovery at common law." *Id.* (citation omitted). The Fourth Circuit agreed. *Id.* The court observed that it "recently rebuffed a nearly identical standing challenge in a case arising under the Telephone Consumer Protection Act ('TCPA'), another consumer privacy statute that, like the DPPA, provides a private right of action against offenders." *Id.* at 921–22 (citing *Krakauer v. Dish Network, LLC*, 925 F.3d

17
ADD20

643, 652–54 (4th Cir. 2019)). The court's explanation of its *Krakauer* decision is worth recounting here:

> In *Krakauer*, we explained that by enacting the TCPA, "Congress responded to the harms of actual people by creating a cause of action that protects their particular and concrete privacy interests." And we noted that injuries to personal privacy have long been "recognized in tort law and redressable through private litigation." . . . . [W]e concluded that our inquiry "focuse[s] on types of harms protected at common law, not the precise point at which those harms become actionable." Therefore, we held that the TCPA's "private right of action . . . plainly satisfies the demands of Article III."

*Id.* at 922 (third alteration in original) (citations omitted).

Applying its analysis in *Krakauer*, the court reached the same result in *Garey*. The drivers alleged in their complaint that they "sustained actual damages by having [their] privacy invaded by Defendants' knowingly obtaining [their] name[s] and address[es] from motor vehicle record[s] for an impermissible purpose in violation of law." *Id.* (citation omitted). These allegations stated a "legally cognizable privacy injury." *Id.* It did not matter that there were "some differences between the common law privacy torts and the DPPA" because the inquiry "'does not require an exact duplicate in American history and tradition.'" *Id.* (quoting *TransUnion*, 594 U.S. at 424). By pleading a violation of a statute "aimed squarely at 'the right of the plaintiff . . . to be let alone,'" the plaintiffs had standing. *See id.* (cleaned up) (quoting William L. Prosser, *Privacy*, 48 Calif. L. Rev. 383, 389 (1960)).

*Garey* applies with full force here.[10] Just as the drivers in *Garey* alleged personal injury lawyers invaded their privacy by obtaining their personal information, the plaintiffs allege the DOGE affiliates have invaded their privacy by obtaining their personal information. The privacy

---

[10] The Court relied on *Garey* in its TRO ruling, *see* ECF 38, at 12, but the government did not address *Garey* at all in its opposition to the preliminary injunction motion, *see* ECF 62.

invasion here is far more severe than in *Garey*: The information the personal injury lawyers obtained—the drivers' names and addresses—pales in comparison to the information the DOGE affiliates have obtained. That information includes the plaintiffs' banking information; Social Security numbers; dates of birth; physical and email addresses; income and asset information; demographic information such as marital and citizenship status; employment records such as personnel actions; and information about family members, such as their financial status, demographic information, dates of birth, and addresses. If the drivers in *Garey* established a cognizable privacy injury by merely alleging their names and addresses were unlawfully obtained, the plaintiffs have established a privacy injury in spades.[11]

And just as the plaintiffs in *Garey* alleged a violation of the DPPA, a privacy statute, the plaintiffs have alleged a violation of the Privacy Act, another privacy statute. "[W]hile the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy." *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462–63 (7th Cir. 2020). "Congress is empowered to 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law'. . . ." *Krakauer*, 925 F.3d at 654 (quoting *Spokeo*, 578 U.S. at 341). That is precisely what Congress did with the Privacy Act. The

---

[11] There is a factual difference between *Garey* and this case that, at first blush, might suggest *Garey* is materially distinguishable. In *Garey*, the personal injury lawyers not only obtained the drivers' names and addresses, but they also used the information to mail the drivers unwanted solicitations. 35 F.4th at 920. Here, by contrast, there is no allegation that the DOGE affiliates have used the plaintiffs' personal information to, for example, contact them. This difference does not matter for purposes of Article III standing. In *Garey*, the "cognizable privacy injury" was "having [the drivers'] privacy invaded by [the lawyers'] knowingly obtaining [their] name[s] and address[es] from motor vehicle record[s] for an impermissible purpose in violation of law." *Id.* at 922. That the lawyers then used the information they obtained to mail unsolicited advertisements was not a reason why the Court found a privacy injury. Here, the plaintiffs' cognizable privacy injury occurred when the DOGE affiliates obtained access to their personal information. Nothing more, under *Garey*, is required to establish concrete injury in fact.

Privacy Act is meant "to protect the privacy of individuals identified in information systems maintained by Federal agencies" by "regulat[ing] the collection, maintenance, use, and dissemination of information by such agencies." *Doe v. Chao* ("*Chao I*"), 540 U.S. 614, 618 (2004) (quoting Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896). The Privacy Act's purposes include "prevent[ing] the kind of illegal, unwise, overbroad, investigation and record surveillance of law abiding citizens produced in recent years from actions of some overzealous investigators, and the curiosity of some government administrators, or the wrongful disclosure and use, in some cases, of personal files held by Federal agencies." *Doe v.DiGenova*, 779 F.2d 74, 84 (D.C. Cir. 1985) (quoting S. Rep. No. 1183, 93d Cong., 2d Sess., *as reprinted in* 1974 U.S.C.C.A.N. 6916, 6916)). So just like the drivers in *Garey*, the plaintiffs have alleged a violation of a statute "aimed squarely at the right. . . to be let alone." *See Garey*, 35 F.4th at 922 (citation omitted). Their harm is closely related to an invasion of privacy. *See id.* at 921–22; *Pileggi v. Wash. Newspaper Publ. Co., LLC*, No. 23-345, 2024 WL 324121, at *5 (D.D.C. Jan. 29, 2024), *appeal pending*, (D.C. Cir.) (holding unlawful disclosure of consumer's information to third party in violation of Video Privacy Protection Act bears close relationship to intrusion upon seclusion, "which subjects [a person] to liability for invasion of privacy").[12]

To put a finer point on it, the plaintiffs' injuries closely resemble a specific type of invasion of privacy—the common law tort of intrusion upon seclusion. "The right of privacy is invaded by," among other things, "unreasonable intrusion upon the seclusion of another." Restatement

---

[12] In *Garey*, the Fourth Circuit found that the plaintiffs did not have standing to sue for *injunctive* relief—and could sue only for money damages—because they did not allege "an ongoing or imminent 'obtaining' . . . violation vis-à-vis their own personal information." *See* 35 F.4th at 922–24. Instead, "the obtaining of their personal information [wa]s a *fait accompli*." *Id.* at 923. Here, the plaintiffs allege ongoing access to their sensitive personal information. They have "establish[ed] a sufficient likelihood of future injury." *All. for Hippocratic Med.*, 602 U.S. at 381. Thus, they have alleged an injury-in-fact sufficient to sue for injunctive relief.

(Second) Torts § 652A. The Second Restatement of Torts defines "intrusion upon seclusion" as "intentional[] intru[sion], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person." *Id.* § 652B.

According to the plaintiffs' allegations, declarations from government employees, and the administrative records, Education, OPM, and Treasury gave DOGE affiliates access to the plaintiffs' sensitive personal information—data that obviously concerns their "private affairs." The plaintiffs gave their private information to the government with the expectation that the government would not disclose it to anyone within the government who was not authorized to access it. *See* ECF 14-3, ¶¶ 7–10; ECF 14-4, ¶¶ 5–8; ECF 14-5, ¶¶ 6–9; ECF 14-6, ¶¶ 5–8; ECF 14-7, ¶¶ 7–10; ECF 14-8, ¶¶ 6–9; ECF 14-9, ¶¶ 6–9; ECF 14–10, ¶¶ 10–13; ECF 14-11, ¶¶ 5–8; ECF 14-12, ¶ 8–11. If the agencies' disclosures violated the Privacy Act, as the Court must assume for purposes of the standing analysis, then the plaintiffs have established that their trust has been breached, that government employees who should not have access to their information do, and that those employees have accessed records containing their PII. Access to those records by unauthorized government officials intrudes into their private lives. This intrusion is not speculative; it is actual. The plaintiffs allege that DOGE affiliates have accessed information in record systems at each of the agencies. *See* ECF 13, ¶¶ 12, 55, 80, 85, 103–04, 110, 139. And the government submitted declarations that strongly suggest DOGE affiliates at all three agencies have accessed record systems that contain the plaintiffs' PII. *See* ECF 27-1, ¶¶ 15–16 (T. Krause Decl.); ECF 27-7, ¶ 4 (T. Flagg Decl.); ECF 33-1, ¶¶ 11–12 (G. Hogan Suppl. Decl.). If no injunction were in place, the DOGE affiliates would continue to access records containing PII because, according to the government, the DOGE affiliates *need* to access these records to do their jobs.

*See, e.g.*, ECF 62, at 26 ("all of the relevant employees have a need for the records to which they have access in the performance of their duties"); *see also* ECF 27-1, ¶ 15; ECF 27-3, ¶ 11; ECF 27-5 (A. Ramada Decl.), ¶ 9; ECF 33-1, ¶¶ 11–12. This ongoing intrusion into the plaintiffs' private affairs is highly offensive to a reasonable person. *See, e.g.*, *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710 (D.C. 2009) ("[C]onduct giving rise to unauthorized viewing of personal information such as a plaintiff's Social Security number and other identifying information can constitute an intrusion that is highly offensive to any reasonable person . . . ."). The plaintiffs' alleged harms are closely related to intrusion upon seclusion.

The government argues that "[m]ere access to data housed by a government agency by government employees—even if the *quantity* of data is potentially large—does not bear the 'close relationship to [the] traditional harm' of intrusion upon seclusion." ECF 62, at 14. This argument completely ignores the fact that the plaintiffs have a privacy interest in restricting access to their personal information *within* the government. They gave detailed sensitive personal information to the government for the purposes of obtaining federal employment, student loans, and government benefits with the expectation that only authorized government employees could access it. They now claim that, without their consent, the government has handed over their personal information to government employees who are not authorized to access it. To say that the plaintiffs suffer no intrusion upon their private affairs when their personal information is accessed by government employees who have no right to access it would nullify their cognizable interest in preventing unlawful government intrusion into their private affairs.[13]

---

[13] The government argues the plaintiffs must allege an unauthorized public disclosure—disclosure to someone outside of government—to establish concrete injury in fact. But the common law tort of intrusion upon seclusion does not require public disclosure of personal information. Intrusion upon seclusion, unlike the tort of public disclosure of private information, "does not depend upon any publicity given to the person whose interest is invaded or to his affairs." Restatement (Second)

The government insists that the alleged intrusion here is dissimilar from the types of intrusions contemplated by the Restatement. In the government's view, intrusion upon seclusion "involve[s] more than mere access to records—[it] involve[s] an actual 'intrusion,' such as examination or review of sensitive material." ECF 62, at 15. This argument, too, fails for several reasons.

First, the intrusion here is similar to the types of intrusion contemplated by the Restatement. The Restatement explains that a person's privacy is invaded when there is "some . . . form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." Restatement (Second) of Torts, § 652B, cmt. b. Here, the plaintiffs allege their privacy has been similarly invaded. Their PII is stored in government record systems—virtual filing cabinets with scores of information about their family, employment history, personal finances, and banking information, to name only a few. The plaintiffs trusted that the government would safeguard the keys to these virtual filing cabinets. Now, the plaintiffs allege that the agencies have handed the keys to government employees who are not authorized to open the cabinets but are doing so anyway. This alleged intrusion is just as, if not more, intrusive than an examination of a wallet or bank record.

Second, the Fourth Circuit in *Krakauer* rejected a similar argument that the alleged harm was not the same as an intrusion upon seclusion. In *Krakauer*, the intrusion was unwanted phone calls. There, the court explained that "Article III's injury-in-fact requirement" does not have to

---

Torts, § 652B, cmt. a. The disclosure to unauthorized government employees suffices. *See, e.g.*, *Hamberger v. Eastman*, 206 A.2d 239, 242 (N.H. 1964) ("The tort of intrusion on the plaintiffs' solitude or seclusion does not require publicity and communication to third persons").

rise "to a level that would support a common law cause of action." 925 F.3d at 653–54. "This sort of judicial grafting is not what *Spokeo* had in mind." *Id.* at 654. Instead, "[o]ur inquiry is focused on types of harms protected at common law, *not the precise point at which those harms become actionable*." *Id.* (emphasis added); *see also Drazen v. Pinto*, 74 F.4th 1336, 1343 (11th Cir. 2023) (holding that "a close relationship" between alleged privacy invasion and intrusion upon seclusion does "not require carbon copies").

As in *Krakauer*, the Court's inquiry is focused on the type of harm protected at common law. That harm—intrusion upon seclusion—is closely related to the harm alleged here. Even if the facts in this case do not perfectly match the Restatement's examples of intrusion, a perfect match is not necessary. The injury-in-fact inquiry "does not require an exact duplicate in American history and tradition." *Garey*, 35 F.4th at 922 (quoting *TransUnion*, 594 U.S. at 424).

Finally, the government argues that "mere access to records," without actual examination of the records, is not an intrusion upon seclusion. ECF 62, at 15. The government is incorrect. An unauthorized government employee's access to sensitive personal information protected by the Privacy Act is an intrusion into private affairs. Even if it were not, there is more than mere access here. On the government's account, the DOGE affiliates with "mere access to records" actually "have a *need* for the records to which they have access in the performance of their duties." *See id.* at 26 (emphasis added); *id.* at 27 (at Treasury, DOGE affiliates "have a need to access Privacy Act-protected records"; at OPM, they "need to access such records"; and at Education, they "need to access such records") (citations omitted)). If, by the government's own lights, the DOGE affiliates *need* access to the Privacy Act-protected records to perform their duties, then the DOGE affiliates must be putting that access to use. And the government has introduced evidence that says as much, including declarations that DOGE affiliates are accessing the agencies' systems and

records with sensitive personal information. *See* ECF 27-1, ¶¶ 15–16; ECF 27-3, ¶ 13, 18–19; ECF 27-5, ¶ 9; ECF 27-6, ¶ 7; ECF 27-7, ¶ 4; ECF 33-1, ¶¶ 11–13. This evidence aligns with the plaintiffs' allegations that DOGE affiliates are accessing and examining the records containing their personal information. *See* ECF 13, ¶¶ 12, 54–55, 80, 85, 103–04, 110, 139. So, the government's argument that "mere access to records" is insufficient to establish a concrete injury does not hold water. The plaintiffs have established an ongoing, concrete privacy injury.[14]

The government insists that the Court's finding of standing cannot be squared with the Fourth Circuit's decision in *O'Leary v. TrustedID, Inc.* Once again, the government is incorrect. In *O'Leary*, the Fourth Circuit held that an alleged violation of an identity theft statute did not closely relate to intrusion upon seclusion. 60 F.4th 240, 245 (4th Cir. 2023). The plaintiff, Brady O'Leary, input six digits of his Social Security number into a website to determine whether his data had been compromised in a data breach. *Id.* at 241. It had not. *Id.* Still, O'Leary filed suit against the website's owner for an alleged violation of South Carolina's Financial Identity Fraud and Identity Theft Protection Act, which prohibits "requir[ing] a consumer to use his social security number or a portion of it containing six digits or more to access an Internet web site, unless a password or unique personal identification number or other authentication device is also required to access the Internet web site." *Id.* (quoting S.C. Code Ann. § 37-20-180(A)(4)). When the Fourth Circuit addressed whether O'Leary had alleged a concrete injury in fact from this statutory violation, it observed that he had "pleaded that he chose to hand over his partial SSN '[i]n exchange for' finding out whether he was impacted by Equifax's data breach." *Id.* at 246

---

[14] *See also All. for Retired Ams.*, 2025 WL 740401, at *17 (finding concrete injury where "Plaintiffs' members disclosed their information to Treasury; individuals falsely purporting to have lawful access to that information demanded its disclosure; when Treasury acquiesced to that demand, the individuals invaded Plaintiffs' members' privacy").

(citation omitted). Those allegations, the Fourth Circuit held, were not "anything that closely relates" to "the unwanted intrusion into the home that marks intrusion upon seclusion." *Id.* The court concluded that O'Leary had not "adequately pled that he was injured by the alleged statutory violation at all—much less in a way that closely relates to a traditional analog for a federal lawsuit." *Id.* at 246.

This case is not *O'Leary*. O'Leary did not allege a violation of a statute that protected his right to privacy, as the plaintiffs have. O'Leary did not allege he entrusted troves of sensitive personal information to a party who breached his trust by unlawfully disclosing the information to others, as the plaintiffs have. O'Leary did not even allege that he expected the website not to disclose the last six digits of his Social Security number to anyone or that the website ever did disclose it. While the facts in *O'Leary* did not amount to an "unwanted intrusion into the home," they do here. What could be more "home" than one's Social Security number, banking information, income and asset information, and marital and citizenship status?

The ongoing unlawful access to the plaintiffs' sensitive personal information by DOGE affiliates who are not authorized to access it is a concrete injury in fact.[15] The plaintiffs have demonstrated that they have standing.

### B. Final Agency Action

The APA allows for judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Whether there is a final agency action is a

---

[15] The plaintiffs have suggested they suffered another injury in fact: the risk of identity theft. To establish standing based on the risk of identity theft, the plaintiffs must show that "their contention of an enhanced risk of future identity theft" is more than "speculative." *See Beck v. McDonald*, 848 F.3d 262, 274 (4th Cir. 2017). Because the Court finds that the unauthorized disclosure of sensitive personal information is a concrete injury, it need not decide whether the risk of identity theft also is a concrete injury.

jurisdictional question in the Fourth Circuit. *See, e.g.*, *Jake's Fireworks Inc. v. Consumer Prod. Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) ("finality under the APA is a jurisdictional requirement").

"'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). "[T]he term is not so all-encompassing as to authorize [courts] to exercise 'judicial review [over] everything done by an administrative agency.'" *Indep. Equip. Dealers Ass'n v. EPA.*, 372 F.3d 420, 427 (D.C. Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). Even so, "'agency action' undoubtedly has a broad sweep." *Id.* "[T]he word 'action[]' . . . is meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001); *see also FTC v. Standard Oil Co.*, 449 U.S. 232, 238 n.7 (1980) ("According to the legislative history of the APA: 'The term "agency action" . . . assure[s] the complete coverage of every form of agency power, proceeding, action, or inaction.'" (quoting S. Doc. No. 248, 79th Cong., 2d Sess., 255 (1946))). The term "action" encompasses an agency's "policy or routine practice." *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 164 (E.D.N.Y. 2018). And an agency policy is reviewable even when "the details of the . . . policy are still unclear." *See Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 929–30 (D.C. Cir. 2008). An agency action need not even be written down. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (concluding plaintiffs "attack[ed] *particularized* agency action" even though they did not "cite any statute, regulation, policy memoranda, or any other document memorializing the policy they challenge[d]"); *Grand Canyon Tr. v. Pub. Serv. Co.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) ("Unwritten agency actions have been subjected to judicial review under the

Administrative Procedure[] Act." (citation omitted) (citing *San Juan Audubon Soc'y v. Veneman*, 153 F. Supp. 2d 1, 5–6 (D.D.C. 2001)).

The administrative records reveal that, in the earliest days of the new presidential administration, Education, OPM, and Treasury granted DOGE affiliates access to agency systems that house records containing the plaintiffs' PII. They granted this access so that DOGE affiliates could implement the DOGE Executive Order.

At Education, CIO Thomas Flagg authorized "full and prompt access to all unclassified IT systems and data" to "USDS personnel onboarded to the Department of Education DOGE team" to "support the implementation of the [DOGE Executive Order]." ED-000025.

At OPM, declarations from the CIO describe "individuals with access to sensitive OPM records systems who are working to implement [the DOGE Executive Order]," ECF 27-8, ¶ 12 (G. Hogan Decl.), and "five key systems engineers, besides myself, implementing [the DOGE Executive Order ]," ECF 33-1, ¶ 13; *see also* ECF 51-1, at 2 (certification of OPM administrative record describing "the granting of access to data systems to employees implementing [the DOGE Executive Order ]"). In an email with the subject line "Getting DoGE Engineers access," Acting Director Ezell directed an OPM employee to grant OPM DOGE affiliates access to agency records because OPM was "rapidly ramping up [these] engineers." OPM-000028. Other emails confirm that OPM granted DOGE affiliates extensive access to OPM systems based on Acting Director Ezell's request to quickly give political staff system administrator access. *See* OPM-000104, OPM-000107 (email chain with subject line "Re: urgent request from political tech staff" describing process by which OPM granted "administrator accounts with super user permissions" to "Individuals from the Political Team" at "[t]he request . . . [of] the Acting Director to MC on Monday January 20th to add these people to the system as admins"); OPM 000108 ("We have

already given several of the political devs/engineers comprehensive access . . . . Now we have 3

more individuals with the same requirement."); OPM-000110 (February 3, 2025 email forwarding

a request from OPM Chief of Staff Amanda Scales for OPM-8 to have "account creation info"

with "admin access" for USA Staffing, "[s]imilar to" access granted to another DOGE affiliate

pursuant to Acting Director Ezell's January 27, 2025 email).

At Treasury, the engagement plan between the agency and "USDS/DOGE" describes the

"ongoing Payment Process Engagement" whereby the "Fiscal Service is supporting the

USDS/DOGE team during their 4–6-week engagement to understand payment processes and

opportunities to advance payment integrity and fraud reduction goals." TR-0057. The engagement

plan sets forth how access to Fiscal Service systems will proceed, including how "USDS/DOGE

confirmed" that the "designated technical team member[] requires access to Fiscal Service systems

and data" and how "USDS/DOGE requested to be granted 'over the shoulder' access to monitor

Fiscal Service personnel conducting payment processing roles, which was approved by Fiscal

Service on 1/23/25." TR-0058–59.

As these memoranda, declarations, and emails show, it is the policy of Education, OPM,

and Treasury to grant DOGE affiliates access to agency record systems so that they may implement

the DOGE Executive Order. *See Amadei v. Nielsen*, 348 F. Supp. 3d at 165 (inferring "existence

of an official policy" of U.S. Customs and Border Patrol to request identification documents at the

end of domestic flights even though the complaint did not allege an official policy); *De La Mota

v. U.S. Dep't of Educ.*, No. 02-CV-4276, 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003)

("[I]t is of no moment that the agency action here came in the form of an 'informal' email

correspondence between a DOE employee and the law schools and plaintiffs."); *see also Venetian*,

530 F.3d at 931 (deeming "the decision of the Commission to adopt a policy of disclosing

confidential information without notice" an agency action even though the policy was only referenced in a compliance manual). Even if "the details of the . . . policy are still unclear," what is clear is that each agency has a policy of granting DOGE affiliates access to agency records systems, which include the plaintiffs' PII. *See Venetian*, 530 F.3d at 929. The plaintiffs have challenged an agency action.

The government insists that by finding a reviewable agency action in this case, the Court is sanctioning judicial review over "broad programmatic attacks," when judicial review should be limited to discrete agency actions. *See* ECF 62, at 18 (citing *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004) and *Lujan,* 497 U.S. at 891). The government is correct that "[c]ourts are well-suited to reviewing specific agency decisions" and are "woefully ill-suited . . . to adjudicate generalized grievances asking [the court] to improve an agency's performance or operations." *See City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019); *see also id.* at 432 ("[C]ourts [may] review only those acts that are specific enough to avoid entangling the judiciary in programmatic oversight, clear enough to avoid substituting judicial judgments for those of the executive branch, and substantial enough to prevent an incursion into internal agency management."). But the government is incorrect that the Court is reviewing an agency's "performance or operations." *Id.* Contrast the facts here with those in *Lujan* and *SUWA*. In *Lujan*, the National Wildlife Federation ("NWF") broadly challenged what it termed Bureau of Land Management's ("BLM") "land withdrawal review program," a term that encompassed "the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by [statute]." 497 U.S. at 890. The Court concluded that the NWF did not challenge "an identifiable 'agency action'" because the term "land withdrawal review program" did "not refer to

a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations." *Id.* In *SUWA*, organizations sought to compel agency action because they believed BLM had "fail[ed] to act to protect public lands in Utah from damage caused by ORV [off-road vehicle] use." 542 U.S. at 60. The organizations "claim[ed], that by permitting ORV use in certain WSAs [wilderness study areas], BLM violated its mandate to 'continue to manage [WSAs] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness.'" *Id.* at 65 (quoting 43 U.S.C. § 1782(c)). The Supreme Court observed that the challenged agency action had to be "discrete" for a remedy to exist under the APA and that "[t]he limitation to discrete agency action precludes the kind of broad programmatic attack [the Court] rejected in *Lujan*." *Id.* at 62, 64. On that basis, it rejected the organizations' request that the Court order BLM "to comply with the [statute's] nonimpairment mandate" because "[g]eneral deficiencies in compliance . . . lack the specificity requisite for agency action." *Id.* at 66.

This case is not *Lujan* or *SUWA*. Here, the plaintiffs do not challenge the "continuing (and thus constantly changing) operations of" the agencies, *see Lujan*, 497 U.S. at 873, or any "[g]eneral deficiencies in compliance" by the agencies, *see SUWA*, 542 U.S. at 66. The plaintiffs challenge the discrete agency decisions to grant DOGE affiliates access to systems that contain records with their PII. They ask the Court to stop the agencies from taking a specific action that they believe is contrary to law.

Next, the government argues that the plaintiffs are asking the Court to review the agencies' "'workaday' dealings," which are beyond the scope of judicial review. ECF 62, at 17 (quoting *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427). The government likens the agency decisions at issue here to setting up employee email accounts, staffing decisions, and managing government programs. *Id.* at 17, 18. Trivial decisions about day-to-day workplace operations and even

substantive decisions about program management are hardly comparable. Unlike the "workaday" decisions in the government's strained analogy, the agencies' decisions to grant DOGE affiliates access to records with the PII of millions of Americans impacts the privacy rights of the people whose PII is housed within these systems. These decisions are agency actions.

And they are final agency actions. An agency action is "final" when two conditions are met: (1) "the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (first quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); and then quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)).

In *Venetian Casino Resort, L.L.C. v. EEOC*, the D.C. Circuit concluded that an agency's decision to permit its employees to disclose confidential information without notice was a final agency action. 530 F.3d at 930–31. There, a company operating a hotel and casino ("Venetian") filed suit against the EEOC. *Id.* Venetian asserted the EEOC violated the APA through a policy that allowed EEOC "employees to disclose an employer's confidential information to potential . . . plaintiffs without first notifying the employer that its information [would] be disclosed." *Id.* The EEOC argued that Venetian could not bring an APA claim because the challenged policy was referenced in its compliance manual, which was not a final agency action. *Id.* at 931. According to the D.C. Circuit, EEOC's "argument [was] misdirected" because the final agency action at issue was not the manual but rather "the decision of the Commission to adopt a policy of disclosing confidential information without notice." *Id.* "The Manual [wa]s relevant insofar as it illuminate[ed] the nature of the policy." *Id.* The court determined that "the agency took final action

by adopting the policy" and that this action was subject to judicial review. *Id.* Ultimately, the *Venetian* Court found that "[a]dopting a policy of permitting employees to disclose confidential information without notice is surely a 'consummation of the agency's decisionmaking process'" and "'one by which [the submitter's] rights [and the agency's] obligations have been determined.'" *Id.* (quoting *Bennett*, 520 U.S. at 178). The D.C. Circuit remanded the case for entry of "an injunction prohibiting the [EEOC] from disclosing Venetian's confidential information pursuant to its current disclosure policy." *Id.* at 927.

Here, as in *Venetian*, the decisions to grant DOGE affiliates access to agency record systems were final agency actions. Education, OPM, and Treasury granted DOGE affiliates access to systems that contain records with the plaintiffs' PII. The decisions to grant access were neither tentative nor interlocutory in nature. They were "the 'consummation' of the agenc[ies'] decisionmaking process." *See Bennett*, 520 U.S. at 177–78 (quoting *Chicago & S. Air Lines*, 333 U.S. at 113). There was nothing further for the agencies to do to formalize the decisions. And while the agencies can and have revoked DOGE affiliates' access to certain systems, that authority does not make their decisions tentative or interlocutory. The agencies decided that DOGE affiliates could access agency records containing PII and gave the affiliates such access. The agency actions marked the consummation of the agency's decisionmaking process.

And here, as in *Venetian*, Education, OPM, and Treasury "[a]dopt[ed] a policy of permitting . . . disclos[ure]" that determines the plaintiffs' legal rights and the agencies' legal obligations. *See Venetian*, 530 F.3d at 931. The Privacy Act prohibits disclosure of the records at issue "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless the disclosure falls within an enumerated exception. *See* 5 U.S.C. § 552a(b). The agencies determined that, to comply with the Privacy Act, they did not need

the plaintiffs' consent to disclose their records to DOGE affiliates. Thus, the practical effect of the

agencies' decisions was to determine the plaintiffs' rights and the agencies' obligations under the

Privacy Act. *See De La Mota*, 2003 WL 21919774, at *8 ("The practical effect of the DOE's

action, not the informal packaging in which it was presented, is the determining factor in evaluating

whether the DOE's action was 'final.'").

The government argues the agencies' decisions had no "actual legal effect." ECF 62, at 19

(citing *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) and *Mashni v. U.S.*

*Army Corps of Eng'rs*, 535 F. Supp. 3d 475, 482 (D.S.C. 2021)). Here, too, they are mistaken.

"Whether an agency action has 'direct and appreciable legal consequences' under the second prong

of *Bennett* is a 'pragmatic' inquiry." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020) (cleaned

up) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598–99 (2016)). The

agencies determined that disclosure of the plaintiffs' PII did not require their consent and that such

disclosure fell within one of the Privacy Act's exceptions. Thus, the decisions of Education, OPM,

and Treasury had a legal effect: They determined the plaintiffs' rights and the agencies' obligations

under the Privacy Act.

This case is not, as the government argues, similar to *Sierra Club v. EPA*, 955 F.3d 56. In

*Sierra Club*, the D.C. Circuit held that agency guidance concerning a state permitting process was

not final agency action because "it d[id] not determine rights or obligations and d[id] not effectuate

direct or appreciable legal consequences." *Id.* at 58. The guidance "impose[d] no obligations,

prohibitions or restrictions on regulated entities, d[id] not subject them to new penalties or

enforcement risks, preserve[d] the discretion of permitting authorities, require[d] any permitting

decision relying on the Guidance be supported with a robust record, and d[id] not prevent

challenges to individual permitting decisions." *Id.* at 63. The guidance was "*not necessary* for a

permitting decision," and "permitting authorities [we]re free to completely ignore it." *Id.* at 64. And the guidance "by itself d[id] not expose any regulated entity to the possibility of an enforcement action or to enhanced fines or penalties." *Id.* at 65.

*Sierra Club* is inapposite. It involved mere agency guidance that did not impose rights or obligations on regulated entities or interfere with the discretion of the state authorities making permitting decisions. In contrast, the agency actions challenged here did "determine rights or obligations" and did "effectuate direct or appreciable legal consequences." 955 F.3d at 58. The decision to grant DOGE affiliates access to agency systems with records containing PII had "direct or appreciable legal consequences" under the Privacy Act. *See id.* That statute—the "NorthStar" that "govern[s] the action at issue"—implicates the plaintiffs' rights to protect their sensitive personal information from unlawful disclosure and the agencies' obligations, with certain exceptions, to obtain their consent before disclosure. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019) ("[C]ourts should take as their NorthStar the unique constellation of statutes and regulations that govern the action at issue.").[16]

The agency decisions to grant DOGE affiliates access to systems that house records with the plaintiffs' PII are final agency actions. *See New York v. Trump*, No. 25-CV-01144, 2025 WL 573771, at *19 (S.D.N.Y. Feb. 21, 2025) (finding Treasury's decision to grant DOGE affiliates access to PII reviewable under the APA because "the APA allows challenges to unwritten agency policies and practices where the requirements of finality are otherwise satisfied").

---

[16] *California Communities Against Toxics v. EPA*, another case the government relies on, also is factually distinct. There, the D.C. Circuit held that an EPA memo forecasting the agency's interpretation of a statute was not a final agency action because it "has no direct and appreciable legal consequences." 934 F.3d at 638–39.

## C. Preliminary Injunction

The party seeking a preliminary injunction must establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20).

### 1.  Likelihood of Success on the Merits

#### i.  Administrative Procedure Act

"Congress enacted the APA to provide a general authorization for review of agency action in the district courts." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The APA "requires agencies to engage in 'reasoned decisionmaking'" and establishes procedures for judicial review and "accountab[ility] to the public." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (first quoting *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015) (internal quotation marks omitted), and then quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).

The APA directs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C). In determining whether agency action is "not in accordance with law," the court must "bear[] in mind that it is [the court's] duty under the APA to 'decide all relevant questions of law' and to 'interpret constitutional and statutory provisions.'" *Perez v. Cuccinelli*, 949 F.3d 865, 872 (4th Cir. 2020) (citing 5 U.S.C. § 706). "[W]here an agency's decision does not comport with governing statutes or regulations, that decision is 'not in accordance with law' and must be set aside." *J.E.C.M. ex rel. Saravia v. Lloyd*, 352 F. Supp. 3d

559, 583 (E.D. Va. 2018). An agency's "order may not stand if the agency has misconceived the law." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). When a court makes a final decision on the merits that an agency made an error of law, "the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (citing *Chenery*, 318 U.S. at 94–95).

In its review, the court "must only consider the record made before the agency at the time the agency acted" because it "may not 'intrude upon the domain which Congress has exclusively entrusted to an administrative agency.'" *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467 (4th Cir. 2013) (quoting *Chenery*, 318 U.S. at 88). The record includes "the facts presented to the agency" and "the reasons given by the agency for taking the action." *Id.* The record generally does not include "facts and justifications for agency action provided to a reviewing court for the first time." *Id.* at 468. Put differently, the court "'may not accept [the agency] counsel's *post hoc* rationalizations for agency action'" because the "court may look only to the[] *contemporaneous* justifications in reviewing the agency action." *Id.* at 467–68 (emphasis in *Dow AgroSciences*) (quoting *Motor Vehicle Mfr. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)). "During its evaluation of the agency action, 'the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.'" *Ergon-W. Va., Inc. v. EPA*, 980 F.3d 403, 410 (4th Cir. 2020) (quoting 5 U.S.C. § 706).

The court may, under narrow circumstances, look beyond the record. If the record utterly "fail[s] to explain administrative action" by not providing even a "curt" explanation and, as a result, "frustrate[s] effective judicial review," the court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see Env't Def. Fund, Inc. v.*

*Costle*, 657 F.2d 275, 285 (D.C. Cir. 1981) (noting that "[w]hen the record is inadequate," the court may seek "additional explanations," but "[t]he new materials should be merely explanatory of the original record and should contain no new rationalizations" (citing *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977)). Further, a "court may go outside [the] record for explanation of highly technical matters." *J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1147 (E.D. Va. 1995) (citing *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159–60 (9th Cir. 1980)); *Bunker Hill*, 572 F.2d at 1292 ("[C]ourts are not straightjacketed to the original record in trying to make sense of complex technical testimony, which is often presented in administrative proceedings without ultimate review by nonexpert judges in mind.").

To be clear, the court cannot accept a more fulsome explanation to supplant an explanation, albeit brief, in the record. If there is some explanation in the record, then the agency action must "stand or fall on the propriety of that [explanation], judged, of course, by the appropriate standard of review." *Camp*, 411 U.S. at 143. If the explanation "is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded . . . for further consideration." *Id.*

### ii.    Privacy Act

Congress passed the Privacy Act "in light of the government's 'increasing use of computers and sophisticated information technology,' which 'greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information.'" *Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) (quoting the Privacy Act of 1974 § 2(a)(2)).

The Privacy Act prohibits agencies from "disclos[ing] any record which is contained in a system of records by any means of communication to any person, or to another agency, except

pursuant to a written request by, or with the prior written consent of, the individual to whom the

record pertains." 5 U.S.C. § 552a(b). This restriction on disclosure extends to employees within

the agency. Disclosure to the agency's employees is limited "to those officers and employees of

the agency which maintains the record who have a need for the record in the performance of their

duties." *Id.* § 552a(b)(1).

The Privacy Act defines a "record" as "any item, collection, or grouping of information

about an individual that is maintained by an agency, including but not limited to, his education,

financial transactions, medical history, and criminal or employment history and that contains his

name, or the identifying number, symbol, or other identifying particular assigned to the individual,

such as a finger or voice print or a photograph." *Id.* § 552a(a)(4). A "system of record" is "a group

of any records under the control of any agency from which information is retrieved by the name

of the individual or by some identifying number, symbol, or other identifying particular assigned

to the individual." *Id.* § 552a(a)(5).

The Privacy Act does not define "disclosure," but agencies have interpreted the term to

include granting access to records. *See* OMB Guidelines, 40 Fed. Reg. 28948, 28953 (July 9, 1975)

("A disclosure may be either the transfer of a record or the granting of access to a record."); 5

C.F.R. § 297.102 ("Disclosure means providing personal review of a record, or a copy thereof, to

someone other than the data subject or the data subject's authorized representative, parent, or legal

guardian."). Likewise, courts have construed the term "liberally to include not only the physical

disclosure of the records, but also the accessing of private records." *See Wilkerson v. Shinseki*, 606

F.3d 1256, 1268 (10th Cir. 2010); *Tolbert-Smith v. Chu*, 714 F. Supp. 2d 37, 43 (D.D.C. 2010)

(reading "disclosure" to include "plac[ing] records . . . on a server accessible by other federal

employees and members of the public"); *cf. Wilborn v. Dep't of Health & Human Servs.*, 49 F.3d

597, 600–01 (9th Cir. 1995) ("[T]he Privacy Act, if it is to be given any force and effect, must be interpreted in a way that does not 'go[] against the spirit' of the Act" (quoting *MacPherson v. IRS*, 803 F.2d 479, 481 (9th Cir. 1986)), *abrogated on other grounds by Chao I*, 540 U.S. 614. Some courts have required "actual viewing or imminent viewing by another." *Wrocklage v. Dep't of Homeland Sec.*, 769 F.3d 1363, 1369 (Fed. Cir. 2014). But courts that have required more than mere transmission of records have suggested that disclosure occurs when "information has been exposed in a way that would facilitate easy, imminent access." *See, e.g.*, *In re Sci. Applications Int'l Corp. Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 29 (D.D.C. 2014).

### iii.    The APA Claim

The plaintiffs assert that Education, OPM, and Treasury did not act "in accordance with law"—the Privacy Act—when they disclosed agency records containing the plaintiffs' PII to DOGE affiliates. 5 U.S.C. § 706(2)(A). To determine whether the plaintiffs have established a likelihood of success on the merits of this claim, the Court confines its review of the final agency actions to the administrative records and looks outside the records only "for explanation of highly technical matters." *J.H. Miles & Co.*, 910 F. Supp. at 1147 (citing *Asarco*, 616 F.2d at 1159–60). Upon review of the administrative records, the Court finds that the plaintiffs have shown a likelihood of success on the merits of their APA claim that Education, OPM, and Treasury took final agency actions "not in accordance with law." 5 U.S.C. § 706(2)(A).[17]

---

[17] At the TRO stage, the government argued that the plaintiffs have not stated an APA claim because they have an "adequate remedy" under the Privacy Act. *See* 5 U.S.C. § 704 ("[F]inal agency action[s] for which there is no other adequate remedy in a court are subject to judicial review."). The government reasserted this argument in its opposition to the motion for a preliminary injunction. As the Court explained in the TRO, ECF 38, at 18–19, the Privacy Act provides a cause of action for damages when an agency improperly discloses records, but it does not provide a cause of action for injunctive relief in these circumstances. *See Doe v. Chao* ("*Chao II*"), 435 F.3d 492, 504–05 & n.17 (4th Cir. 2006). The plaintiffs seek injunctive relief, not damages. Thus, they do not have an adequate remedy under the Privacy Act. Their only available

The government does not dispute that the agencies granted DOGE affiliates access to systems of records that contain sensitive personal information subject to the Privacy Act, that the plaintiffs did not request disclosure of their PII contained in these systems, or that the agencies did not obtain the plaintiffs' consent before they granted DOGE affiliates access to the information. Still, the government insists the disclosures complied with the Privacy Act because, under the statute, the agencies did not need to obtain the plaintiffs' consent.[18]

The Privacy Act lists thirteen exceptions to the general rule that disclosure of agency records requires consent. *See* 5 U.S.C. § 552a(b). Of relevance here, disclosure is permitted "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." *Id.* § 552a(b)(1). To fall within this exception, the disclosure must be within the agency that maintains the record, *see Britt v. Naval Investigative Serv.*, 886 F.2d 544, 547 (3d Cir. 1989), and the recipient must "examine[] the record in connection with the performance of duties assigned to him . . . in order to perform those duties properly,"

---

remedy is an APA action for injunctive relief. *See id.* at 504 n.17 (explaining that "[o]ften . . . injunctive relief for a Government's violation of the [Privacy Act]" is "appropriate and authorized by the APA," which "empower[s] courts to 'hold unlawful and set aside agency action . . . found to be . . . not in accordance with [] law'") (quoting 5 U.S.C. § 706(2)(A)). Thus, the plaintiffs challenge a "final agency action for which there is no other adequate remedy in a court." *See* 5 U.S.C. § 704. The APA allows for judicial review of their claim.

[18] The government also suggests that no "disclosure" has occurred because there is no evidence that the DOGE affiliate have actually viewed the plaintiffs' information. For this proposition, they cite *Wrocklage v. Dep't of Homeland Security*, 769 F.3d at 1368–69. But in *Wrocklage*, the Federal Circuit determined an email with an attachment that contained someone's Social Security number, address, date of birth, and license plate number did not constitute "disclosure" of a record under the Privacy Act because "[i]t is undisputed that the recipient deleted the email and it is therefore not imminently viewable." *Id.* at 1365–66, 1368–69. Here, absent injunctive relief, the plaintiffs' records at Education, OPM, and Treasury would be "imminently viewable" by DOGE affiliates, *id.* at 1369, and the government has asserted that the DOGE affiliates need to access this information to perform their job duties. The agencies have disclosed the plaintiffs' records for Privacy Act purposes. *See, e.g., Tolbert-Smith*, 714 F. Supp. 2d at 43.

*Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000). The government relies on the need-to-know exception to defend the disclosure of entire systems of records to DOGE affiliates at Education, OPM, and Treasury.

"[T]he need to know exception applies only to intra-agency disclosures." *Britt*, 886 F.2d at 547. The government insists that the disclosures are intra-agency disclosures because the DOGE affiliates are employees of Education, OPM, and Treasury. The plaintiffs assert that at least some of the DOGE affiliates at Education are not employees. This dispute does not impact the likelihood of success analysis, because even if the disclosures were intra-agency, the administrative records do not show that the DOGE affiliates had "a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The Court assumes, without deciding, that the DOGE affiliates are employees of the agencies that granted them access to systems of records.

Courts have found that the Privacy Act's need-to-know exception applies when there is a valid explanation for why the employee needed access to the protected information to perform their job duties. *See, e.g.*, *Howard v. Marsh*, 785 F.2d 645, 648 (8th Cir. 1986) (attorney and personnel specialist gathering information about a discrimination complaint against the agency needed complainant's employment records to respond to the complaint); *Covert v. Harrington*, 876 F.2d 751, 752–54 (9th Cir. 1989) (Inspector General's agents needed employees' personnel files after receiving allegations that employees were falsifying their permanent residences to obtain a per diem); *Dinh Tran v. Dep't of Treasury*, 351 F. Supp. 3d 130, 137–39 (D.D.C. 2019) (employees evaluating a detail request needed to know information in the requestor's performance appraisal to evaluate her skillset and suitability for the detail), *aff'd per curiam* 798 F. App'x 649 (D.C. Cir. 2020).

For example, in *Bigelow v. Department of Defense*, Noyes, a U.S. Army colonel, reviewed the personnel file of Bigelow, whom Noyes supervised at the Pentagon. 217 F.3d at 876. Noyes reviewed Bigelow's personnel file after he "learned of allegations of misconduct concerning Bigelow," including "that he sometimes disappeared in foreign countries near sensitive international borders." *Id.* Bigelow sued the Department of Defense under the Privacy Act for the intra-agency disclosure of his personnel file. *See id.* The *Bigelow* Court's analysis focused on the need-to-know exception. The court explained that "[w]hat must be determined . . . is whether the official examined the record in connection with the performance of duties assigned to him and whether he had to do so in order to perform those duties properly." *Id.* at 877. As Bigelow's immediate supervisor, Noyes had a duty enumerated in Defense Department regulations to evaluate Bigelow's trustworthiness. *Id.* The court determined that because Noyes received information that "cast[] doubt" on Bigelow's trustworthiness, Noyes "had a need to examine the file in view of the doubts that had been raised in his mind about Bigelow and Bigelow's access to the country's top secrets." *Id.* The *Bigelow* Court assuaged the dissenting judge's concerns that the decision would "dramatically expand[] the number of people' within the military who may examine personnel files" by explaining that "[t]here may be many people in the military who have access to the nation's most important secrets, but we doubt that their supervisors regularly receive information casting doubt on their trustworthiness." *Id.* (quoting *id.* at 881–82 (Tatel, J., dissenting)). The court held that the need-to-know exception applied. *See id.* at 876, 878.

The Tenth Circuit reached the opposite conclusion in *Parks v. IRS*, 618 F.2d 677 (10th Cir. 1980). There, IRS employees sued the agency and the United States after other IRS employees used information from their personnel files to call them and solicit their purchase of U.S. Savings Bonds. *Id.* at 679. The government argued that "disclosure of savings bond information was

necessary to the performance of [the employees'] duties" because of an executive order signed by President Nixon. *Id.* at 681. The executive order "established an Interdepartmental Committee for the Voluntary Payroll Savings Plan for the Purchase of United States Savings Bonds." *See id.* The committee, "consist[ing] of the heads of all federal executive-branch agencies," was "charged . . . to formulate a plan of organization and sales promotion of the savings bond program." *Id.* The Tenth Circuit rejected the government's argument that the executive order justified the disclosure of the savings bond information from personnel files:

> Even though this may have been a worthy effort, it does not justify the use of information derived from the personnel files of employees, particularly in view of the subsequent passage of the Privacy Act. In short, the order, which was at odds with the stated legislative purpose of the Privacy Act, does not license the defendants to violate the Privacy Act . . . .

*Id.* The court held that the need-to-know exception did not apply. *See id.* at 681.

These cases establish the framework for the Court's analysis of the need-to-know exception. Factually, they are like other Privacy Act cases where the exception is invoked to defend the disclosure of a limited number of records. Here, the need-to-know exception has been invoked to defend the disclosure of millions of records. There appears to be no precedent with similar facts. However, even under existing precedent, the agencies' disclosures likely violate the Privacy Act. As discussed in detail below, the administrative records do not explain why the DOGE affiliates at Education, OPM, and Treasury need access to the plaintiffs' PII to do their jobs. "[P]ermitting agency-wide distribution under § 552a(b)(1) without any showing of why each employee needed to receive the information would allow the exception to swallow the rule." *Dick v. Holder*, 67 F. Supp. 3d 167, 178 (D.D.C. 2014).

### a. Education

DOGE affiliates have been granted seemingly unfettered access to Education's unclassified systems of record. In a February 5, 2025 memorandum, Education's CIO, Thomas Flagg, "document[ed] the need to know and authorize[d] USDS personnel onboarded to the Department of Education DOGE team full and prompt access to all unclassified IT systems and data." ED-000025. These unclassified systems at Education include systems of records that contain many of the plaintiffs' PII, including income and asset information, Social Security numbers, taxpayer identification numbers, dates of birth, demographic information (such as citizenship and marital statuses), and some similar information about family members. *See, e.g.*, Privacy Act of 1974; System of Records, 89 Fed. Reg. at 44656–57 (listing categories of records in the NSLDS); Privacy Act of 1974; System of Records, 88 Fed. Reg. at 41947–48 (listing categories of records in the CODS); Privacy Act of 1974; System of Records, 88 Fed. Reg. at 42222; Privacy Act of 1974; System of Records—Financial Management System (FMS), 73 Fed. Reg. at 178 (listing categories of records in the FMS); Privacy Act of 1974; System of Records, 88 Fed. Reg. at 42222 (listing categories of records in the FAS);[19] *see also* ECF 14-3, ¶¶ 7–8; ECF 14-5, ¶¶ 6–7; ECF 14-7, ¶¶ 5, 8; ECF 14-8, ¶¶ 6–7; ECF 14-9, ¶¶ 6–7; ECF 14-10, ¶¶ 10–11; ECF 14-11, ¶¶ 5–6; ECF 14-12, ¶¶ 8–9.[20]

The reasons *why* DOGE affiliates at Education need "full and prompt access to all unclassified IT systems and data" to perform their job duties are unclear. *See* ED-000025.

---

[19] The Court takes judicial notice of the Federal Register. *See* 44 U.S.C. § 1507.

[20] The government submitted an extra-record declaration from Steven Matteson, "an Executive Project Manager at the U.S. Department of Education, Federal Student Aid." ECF 62-1, ¶ 1 (S. Matteson Decl.). Matteson declares that he conducted a system access audit for NSLDS, COD, FAS, and FMS on March 7, 2025, and identified only one DOGE affiliate at Education—Adam Ramada—with a user account that "had access to, or had accessed, any of th[e]se four systems"—

According to the February 5 memorandum from Education's CIO, access was granted to "support the implementation of" the DOGE Executive Order. *Id.* The DOGE Executive Order states that DOGE is established "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." DOGE Executive Order § 1. In pursuit of that purpose, the Executive Order directs agency heads to establish "DOGE Teams," with "DOGE Team Leads" that "coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.* § 3(c). The Executive Order directs the USDS Administrator to "commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems," and to "work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4(a). The DOGE Executive Order does not explain why DOGE affiliates at Education (or any agency for that matter) need access to "all unclassified IT systems and data" to modernize technology and software. *See* ED-000025. And by merely citing to the DOGE Executive Order, the February 5 memorandum does not explain

---

the FMS. *Id.* ¶¶ 2–4. Matteson affirmed that Ramada's user account access was "substantially limited" as he "could not access any personally identifiable information." *Id.* ¶ 4. The Court will not consider Matteson's declaration to assess the merits of the plaintiffs' APA claim because it is not in the administrative record. In the record, there is no evidence that the sweeping access authorized by the February 5, 2025 memorandum has been curtailed. Even if the Court considered extra-record evidence, other government declarations contradict Matteson's statements. Ramada declared on February 13 that the DOGE affiliates at Education "require access to Department of Education information technology and data systems related to student loan programs in order to audit those programs for waste, fraud, and abuse." *See* ECF 27-5, ¶ 9. Education CIO Flagg declared on February 15 that DOGE affiliates "have accessed Department information technology and data systems." *See* ECF 27-7, ¶ 4. And the government has asserted that DOGE affiliates at Education "need access to [Privacy Act-protected] records in order to audit student loan programs for waste, fraud, and abuse." ECF 62, at 27. The government cannot, on the one hand, ask the Court to rely on one extra-record declaration that says DOGE affiliates are not accessing PII, and on the other, assert that DOGE affiliates need access to this information.

*why* full access to Education systems and data—which contain the sensitive personal information of millions of Americans, including many of the plaintiffs—is *necessary* for DOGE affiliates at Education to "support the implementation of" the DOGE Executive Order. *See id.*[21]

The DOGE affiliates may need some form of system access to modernize technology and software, but that does not mean that they need access to all of the records containing PII housed in those systems. At least one of Education's systems of records allows for masking PII with "dummy" data, but there is no indication in the administrative record that the DOGE affiliates' access is limited in this manner. *See* Education, *Privacy Impact Assessment (PIA) for the Financial Management System (FMS)* 21 (2024), https://www.ed.gov/sites/ed/files/notices/pia/fsa-financ-manag-syst.pdf [https://perma.cc/3JKT-K7WK].[22] By granting "full and prompt access" to all unclassified IT systems and data to DOGE affiliates, Education apparently did not contemplate limiting access to avoid the disclosure of PII. *See* ED-000025. An agency may not grant extensive access to records with PII "without any *showing* of why each employee needed to receive the information." *Dick*, 67 F. Supp. 3d at 178 (emphasis added); *see also Walker v. Gambrell*, 647 F. Supp. 2d 529, 538 n.4 (D. Md. 2009) (explaining disclosure did not fall within the need-to-know exception because "it is difficult to see how knowledge with such specificity was necessary"); *cf. Vargas v. Reno*, No. 99-2725, slip op. at 13 (W.D. Tenn. Mar. 30, 2000) (denying government's

---

[21] The DOGE Executive Order instructs agency heads to grant "full and prompt access to all unclassified records, software systems, and IT systems," but only "to the maximum extent consistent with law." DOGE Executive Order § 4(b). When agency heads implemented the DOGE Executive Order, they had to comply with the Privacy Act.

[22] The Court takes judicial notice of Privacy Impact Assessments and Privacy and Civil Liberties Impact Assessments retrieved from government websites. *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

summary judgment motion on Privacy Act claim of unlawful intra-agency disclosure to an investigator where "[d]efendants ha[d] not submitted evidence that Vargas had potentially violated any law or regulation or that Vargas's records were relevant or necessary to [the] investigation"). Neither the February 5 memorandum nor the DOGE Executive Order to which the memorandum refers explains why DOGE affiliates need to know the information in Education's records to perform their jobs.

Nothing else in the administrative record explains why either. At the preliminary injunction hearing, the government suggested the job descriptions of DOGE affiliates at Education explain why they have a need for the Privacy Act-protected records. But a review of the job descriptions in the record reveals they provide no such explanation.

A document titled "Terms and Conditions for Reimbursable Work" describes the "scope of work" for the USDS employees detailed to Education as follows:

> Providing software engineering, modern architecture and system design, project and team leadership, software delivery, security and site reliability engineering, data engineering, engineering management, and/or executive leadership expertise to champion and deliver modern technology[;] Performing a wide range of activities including debugging, software testing, and programming. USDS employees will quickly adapt and learn by problem-solving within legacy systems and organizational constraints while working collaboratively for rapid prototyping[;] . . . assess[ing] the state of current projects in agencies and plans and/or leads interventions where major corrections are required[;] Assisting on IT projects including infrastructure, implementing safeguards to prevent fraud, and ensuring the integrity and success of these efforts[;] Championing data strategies and building interoperability across other agencies as well as internal and external stakeholders.

*See* ED-000001. According to this document, USDS detailees at Education have job duties that cover a wide range of IT services, such as software engineering and programming, establishing protections to prevent fraud, and building interoperability. Other documentation in the record indicates that some Education DOGE affiliates perform research duties. ED-1 "conduct[s] research

to support EOP Department of Government Efficiency efforts." ED-000005. ED-3 is a software engineer detailed from GSA "conducting research and analysis to identify inefficiencies and areas for improvement in ED's administrative and programmatic functions." ED-000013. ED-3 is also responsible for "reviewing internal processes and operational procedures to identify areas for improvement." *Id.* Another DOGE affiliate, ED-4, is apparently tasked with duties that will lead to "[l]ess dollars . . . flow[ing]" from Education "to many non-profit and for profit institutions and companies." ED-000018. And there is a broader goal stated in several descriptions of DOGE affiliates' duties: "improvement of government efficiency." *See, e.g.*, ED-000003. None of these myriad job duties explain why the person performing them has a need for records with PII contained within Education's systems.

Apparently aware that the administrative record does not answer the need-to-know question, the government attempts to fill this gap after the fact with its own answers. The government asserts that "[a]ll six [DOGE affiliates] work to audit contract, grant and related programs for waste, fraud and abuse" and that they need access to records "in order to audit student loan programs for waste, fraud, and abuse." ECF 62, at 7, 27. This rationale appears to be created out of whole cloth. The DOGE Executive Order does not mention waste, fraud, and abuse, and it certainly does not mention auditing student loan programs. And the parts of the administrative record cited by the government for the proposition that DOGE affiliates were hired to audit Education programs do not describe any auditing tasks. *See id.* at 7 (citing ED-000001–19, ED-000021).

While the record does state that some DOGE affiliates are tasked with "improv[ing] government efficiency," *see, e.g.*, ED-000003, a vague reference to government efficiency cannot reasonably be interpreted to include auditing federal student loan programs for waste, fraud, and

abuse. It is more reasonable to interpret this "efficiency" goal in light of the DOGE Executive

Order, which established DOGE for the purpose of "implement[ing] the President's DOGE

Agenda, *by modernizing Federal technology and software to maximize governmental efficiency*

*and productivity*," DOGE Executive Order, § 1 (emphasis added). Other descriptions of DOGE

affiliates' job duties refer to similarly ill-defined "efficiency" roles. Consider ED-3. Recall that

this DOGE affiliate is tasked with "conducting research and analysis to identify inefficiencies and

areas for improvement in ED's administrative and programmatic functions and reviewing internal

processes and operational procedures to identify areas for improvement." ED-000013. But ED-3

is a software engineer detailed from GSA. *See id.* It is unclear how a software engineer's "research

and analysis" to "identify inefficiencies and areas for improvement" in either the programmatic or

administrative functions of the agency would encompass an audit of federal student loan programs.

Or consider ED-4—an unpaid consultant with "[s]ignificant experience in education [and]

technology" tasked with "[a]dvising the Department on change management" and "[p]erforming

cost reductions." ED-000018. ED-4's duties will purportedly lead to "[l]ess dollars . . . flow[ing]

from [the] Department of ED to many non-profit and for profit institutions and companies." *See*

ED-000018. It is not at all evident from these nebulous descriptions of ED-4's job duties that they

are auditing federal student loan programs.

The administrative record does not support the government's assertion that Education

granted full access to its systems of records to DOGE affiliates because they need to audit federal

student loan programs. *See Boyd v. Snow*, 335 F. Supp. 2d 28, 38 (D.D.C. 2004) (denying the

government's argument that disclosure fell under the need-to-know exception because "[i]t [wa]s

far from clear" from the record that the government employee disclosed Privacy Act-protected information "for the reason offered by the IRS").[23]

The administrative record does not explain why the DOGE affiliates at Education need access to all of Education's unclassified systems and data—which include the plaintiffs' PII—in the performance of their job duties. On the contrary, the record suggests that Education likely shared this protected information with DOGE affiliates who had no need to know the vast amount of sensitive personal information to which they were granted access.

### b. OPM

OPM granted DOGE affiliates access to several OPM systems of record that contain the plaintiffs' PII. Those systems of record include eOPF, EHRI, USA Staffing, and USA Performance, among others. *See* OPM-000028–29, OPM-000103, OPM-000104–10; ECF 14-3, ¶¶ 7–8; ECF 14-7, ¶¶ 7–8; ECF 14-9, ¶¶ 6–7; ECF 14-10, ¶¶ 10–11; ECF 14-11, ¶¶ 5–6; ECF 14-12, ¶¶ 8–9. The PII in these systems includes Social Security numbers, names and addresses, dates of birth, citizenship statuses, salaries, criminal history information, and personnel actions such as

---

[23] The government also cites to declarations from one of the DOGE affiliates at Education who says they need "access to Department of Education information technology and data systems related to student loan programs in order to audit those programs for waste, fraud, and abuse." *See* ECF 27-5, ¶ 9; ECF 62, at 27. Yet at the same time, the government asserts that the Court need not look outside the administrative records because the records "contain the extant materials that informed or reflect each agency's decisionmaking as to systems access for DOGE affiliates, and those materials provide sufficient information for the Court to evaluate Defendants' decisions." ECF 54, at 7. Indeed, the "court may look only to the[] *contemporaneous* justifications in reviewing the agency action." *Dow AgroSciences*, 707 F.3d at 467–68 (citing *Chenery*, 318 U.S. at 87–88); *see also Environ. Def. Fund.*, 657 F.2d at 285 (noting that while "[w]hen the record is inadequate, a court may 'obtain from the agency, either through affidavits or testimony, such additional explanations of the reasons for the agency decision as may prove necessary,'" but this "new materials should be merely explanatory of the original record and *should contain no new rationalizations*" (emphasis added) (quoting *Camp*, 411 U.S. at 143)). So, as the government concedes, the Court may not consider extra-record evidence as justification for the agency's actions.

promotions and suspensions. *See, e.g.*, OPM, *Privacy Impact Assessment for Electronic Official Personnel Folder System (eOPF)* 5 (2020); OPM, *Privacy Impact Assessment for USA Staffing®* 6 (2021); OPM, *Privacy Impact Assessment for Enterprise Human Resources Integration Data Warehouse (EHRI DW)* 3; OPM, *Privacy Impact Assessment for USA Performance (USAP)* 4.

As with Education, nothing in the administrative record explains why DOGE affiliates at OPM need to know the PII in OPM's systems of records in the performance of their job duties. The OPM record includes several internal emails from late January that document the agency's decision to grant DOGE affiliates access to the OPM systems of records, but none of the emails explains the DOGE affiliates' need to access the records contained within these systems. In a January 27, 2025 email with the subject line "Getting DoGE Engineers access," Acting OPM Director Ezell instructed an OPM employee to grant access to OPM computer systems to "some engineers"—several DOGE affiliates at OPM. *See* OPM-000028–29. As Ezell explained, "We are rapidly ramping up" these engineers, and "[t]o accomplish this goal," the DOGE affiliates needed "a short list of all the systems OPM operates and manages" and, "for each computer system," a list of permissions and access. *See id.* This included access to the back end of these systems, such as code read and write permissions; the ability to access the system as a "regular user," like a hiring manager who accesses USA Staffing; and "admin user" access. OPM-000029. Another email with the subject line "urgent request from political tech staff" indicates that OPM "ha[d] already given several of the political devs/engineers comprehensive access to USAJOBS and USA Staffing" and that, pursuant to Ezell's request, "[OPM-2, OPM-4, and OPM-6 have] the same requirement." OPM-000108–09. The email describes granting access to USAJOBS, USA Staffing, eOPF, EHRI, and USA Performance. OPM-000108. A January 30 email reveals that DOGE affiliates OPM-3, OPM-5, and OPM-7—described as "Individuals from the Political Team"—gained access to OPM

systems as "admins" with "super user permissions for the USAJOBS admin systems" based on a January 20 Ezell directive. *See* OPM-000104, OPM-000107. Between January 24 and February 7, other DOGE affiliates at OPM gained access to various OPM systems with PII, including USA Performance, the Federal Employee Health Benefits system, and the Postal Service Health Benefits Data Platform. OPM-000103.

These emails do not explain *why* the DOGE affiliates at OPM must know the PII contained in OPM's systems to perform their job duties. In fact, the emails suggest some of them do not have a need to know. Ezell granted sweeping access to OPM systems to DOGE affiliates who are engineers even though "[they] [did not] have immediate plans to change anything" and OPM did not "have any immediate plans for new engineers to make direct changes to any of these systems." OPM-000028–29. Ezell apparently granted DOGE affiliates broad access to OPM's systems to be prepared if OPM "need[ed] to move quickly" at some point to make system changes. OPM-000029. Then, after Ezell authorized this access, the CIO of OPM rolled it back. The CIO said that the DOGE affiliates who were granted access pursuant to Ezell's January 27 email "have never needed access to E[HR]I/eOPF." *See* OPM-000026–29.

These emails all but confirm that OPM disclosed records with the plaintiffs' PII to DOGE affiliates who did not have a need to know the information. Ezell granted extensive access to OPM systems even though the DOGE affiliates "[did not] have immediate plans to change anything." And Hogan later confirmed that these DOGE affiliates never needed access to some of these systems after all. This shoot first, ask questions later method of disclosing Privacy Act-protected records undermines the government's position that the disclosures were made on a need-to-know basis.

Nothing else in the OPM administrative record answers the need-to-know question. The record does not contain any substantive job descriptions, scope of work details, or other information about the DOGE affiliates' responsibilities at OPM. All that can be ascertained from the emails are that many of these individuals are engineers, developers, or "tech staff." *See* OPM-000028–29, OPM-000107–09. The employment forms in the record provide only meager clues as to their roles at OPM. OPM-2, OPM-3, OPM-6, and OPM-7 are "Expert[s]" who will "provide a high level of expertise relative to issues which have a significant impact on the formulation of agency goals and objectives to the OPM director." OPM-000008, OPM-000011, OPM-000022, OPM-000111. OPM-2 is also listed as a "Senior Advisor" with no corresponding job duties. OPM-000006. OPM-4 is another "Expert," though no additional details about their role are provided. *See* OPM-000014. OPM-5 is a "Senior Advisor to the Director for Information Technology," and OPM-8 is a "Senior Advisor to the Director." OPM-000017, OPM-000115. The record contains no information about their job duties. And there is no information about the positions or job duties of other DOGE affiliates who gained access to OPM systems of records—let alone why those positions or duties required access to records containing PII.

With nothing in the administrative record to justify OPM's disclosure, the government argues the DOGE affiliates need access to OPM systems of records because of the DOGE Executive Order's directive to modernize technology. Once again, the government does not cite any record evidence that explains *why* a directive to modernize technology requires access to the extensive PII housed within OPM's systems. And what little record evidence there is indicates that certain DOGE affiliates at OPM did not actually need the broad access to that Ezell initially authorized. OPM-000026.

The government also suggests that DOGE affiliates need access to these records to implement "workplace reform." *See* ECF 62, at 27. Ostensibly, this refers to the Executive Order "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," issued on February 11, 2025. Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 14, 2025) ("Workforce Executive Order").[24] Nothing in the record remotely suggests the DOGE affiliates gained access to OPM systems of record to implement the Workforce Executive Order. That is likely because the Workforce Executive Order was issued *after* all OPM DOGE affiliates were granted access to these systems. *See* OPM-000103. So even if OPM could rely on post-hoc rationalizations to explain the reason for its disclosure of Privacy Act-protected records to DOGE affiliates, the explanation makes no sense.

Upon a review of the administrative record, the Court finds that OPM likely disclosed records with the plaintiffs' PII to DOGE affiliates who did not have a need to know the information in the performance of their duties.

### c.  Treasury

Treasury granted two DOGE affiliates access to several payment systems, including the SPS, PAM, and ASAP. *See* TR-0062; TR-0058. These systems contain payment records with PII such as Social Security numbers, names, addresses, and bank information. *See, e.g.*, Fiscal Service, *Privacy and Civil Liberties Impact Assessment: Payment Automation Manager* 5; Fiscal Service, *Privacy and Civil Liberties Impact Assessment Secure Payment System (SPS)* 7; Fiscal Service, *Privacy and Civil Liberties Impact Assessment: Automated Standard Application for Payments*

---

[24] The Workforce Executive Order "commences a critical transformation of the Federal bureaucracy." Workforce Executive Order § 1. It proclaims that the Trump "Administration will empower American families, workers, taxpayers, and our system of Government itself" by "eliminating waste, bloat, and insularity." *Id.*

(ASAP) 6–7. Treasury also provided "over the shoulder" access to watch Fiscal Service employees process payments. *See* TR-0059 ("USDS/DOGE requested to be granted 'over the shoulder' access to monitor Fiscal Service personnel conducting payment processing roles, which was approved by Fiscal Service on 1/23/25"). By granting Treasury DOGE affiliates access to these payment systems, Treasury has given them access to records with the plaintiffs' PII. *See* ECF 14-3, ¶¶ 7–8; ECF 14-4, ¶¶ 5–6; ECF 14-5, ¶¶ 6–7; ECF 14-6, ¶¶ 5–6; ECF 14-7, ¶¶ 7–8; ECF 14-8, ¶¶ 6–7; ECF 14-9, ¶¶ 6–7; ECF 14-10, ¶¶ 10–11; ECF 14-11, ¶¶ 5–6; ECF 14-12, ¶¶ 8–9.

The administrative record reveals that the DOGE affiliates at Treasury were granted access to the payment systems to modernize technology at the agency. What the record does not reveal is *why* the DOGE affiliates need access to the PII within those payment systems to modernize technology.

One of the two DOGE affiliates at Treasury is Thomas Krause. Krause is a Senior Advisor for Technology and Modernization ("Senior Advisor"). TR-0007, TR-0015, TR-0024.[25] In his role as a Senior Advisor, Krause's job duties center on technology modernization and innovation. His duties are manifold. He was hired to provide services such as "advancing the Treasury's technology infrastructure, financial management systems, and cybersecurity initiatives"; "lead[ing] IT modernization efforts"; "oversee[ing] modernization of legacy systems";

---

[25] In addition to being a Senior Advisor for Technology and Modernization, Krause also has been delegated the duties of the Fiscal Assistant Secretary. Those duties do not shed any light on why Krause might need to know PII within Treasury's payment systems because he was granted "over the shoulder" access to Treasury payment systems *before* he assumed the duties of Fiscal Assistant Secretary. *See* TR-0003 (delegation of Fiscal Assistant Secretary duties dated February 5, 2025); TR-0024 (appointment affidavit showing Krause's date of appointment as a Senior Advisor as January 23, 2025); TR-0056–59 (engagement plan describing how the "USDS/DOGE team" got "over the shoulder" access to "monitor Fiscal Service personnel conducting payment processing" on January 23, 2025). So, any duties Krause might have assumed *after* he was granted access to Treasury payment systems cannot justify the disclosure.

"integrating real-time analytics, automation, and enhanced data-sharing capabilities across agencies"; "strengthen[ing] cybersecurity protocols to protect critical financial systems and mitigate risks"; and "foster[ing] public-private partnerships . . . to drive innovation." TR-0007, TR-0015. He is expected to "provide critical recommendations that shape government technology and financial management strategies" and to develop "policy guidance, modernization efforts, and strategic partnerships." *Id.* He will work with various Treasury officials "to lead . . . the development, execution, and management of the information technology and technological modernization efforts" and "programs for the Department of the Treasury and the internal management of the Department and its bureaus . . . as it relates to technology." TR-0013, TR-0021.

As plentiful as the descriptions of Krause's job duties are, they do not suggest Krause needs to know the PII in Treasury's payment records to perform any of his duties. Krause was hired to modernize Treasury's technology systems, improve cybersecurity, advise on financial management strategy, and take the lead on Treasury "information technology and technological modernization efforts and programs" and "internal management of [Treasury]. . . *as it relates to technology*." *See, e.g*, TR-0021 (emphasis added). To perform these duties, Krause does not appear to require access to payees' Social Security numbers, names, addresses, or bank information. And both the record and a privacy and civil liberties impact assessment indicate that some of this personal information can be redacted. *See* TR-0063 (email describing "unredacted" files in PAM and SPS systems); *Privacy and Civil Liberties Impact Assessment Secure Payment System (SPS)* 7 ("Treasury is committed to eliminating unnecessary collection, use, and display of full Social Security numbers ('SSN') and redacting, truncating, and anonymizing SSNs in systems and

documents to limit their accessibility to individuals who do not have a need to access the full SSN in order to perform their official duties.").

The other DOGE affiliate at Treasury is Ryan Wunderly, who was hired to fill Marko Elez's role of Special Advisor for Information Technology and Modernization ("Special Advisor"). The Special Advisor was granted access to several Treasury systems containing PII as early as February 1, 2025. *See* TR-0062. Like Krause, Wunderly's role centers on technology modernization. The Special Advisor's "primary purpose" is "to serve in a close and confidential capacity to the Chief of Staff's Senior Advisor for Information Technology and Modernization" (*i.e.*, Krause). TR-0022. Like Krause, Wunderly's job description is lengthy. He "is responsible for advising [Krause] on engineering, software, hardware, systems, and other technology matters." *Id.* His responsibilities are to "[c]onduct[] special and confidential studies on a variety of strategies and issues related to Treasury's information technology'"; "[r]eview[] and furnish[] [Krause] with recommendations regarding Treasury's critical software infrastructure"; "[i]dentif[y], analyze[], and make[] recommendations to strengthen Treasury's hardware and software"; "work closely with the engineers in [the Fiscal Service] on Information Technology matters to execute Fiscal's mission of promoting the financial integrity and operational efficiency of the federal government through exceptional accounting, financing, collections, payments, and shared services"; and "assist on key issues for Fiscal, including but not limited to (1) Operational Resiliency; (2) Advancing Governmentwide Payment Integrity; (3) Critical Modernization Programs; (4) Improving the Payment Experience; and (5) TreasuryDirect User Credential Costs." TR-0022–23. The engagement plan describes how "USDS/DOGE confirmed" that the Special Advisor (the "designated technical team member") "requires access to Fiscal Service systems and data" and "will be provided access to in scope payment systems source code." TR-0058.

Like the job descriptions of the Senior Advisor, the descriptions of the Special Advisor's job do not reveal why Wunderly needs access to the PII within Treasury's payment records. His role is focused on "engineering, software, hardware, systems, and other technology matters." TR-0022. His job responsibilities center on technology. He recommends, assists, and collaborates on "Treasury's critical software infrastructure"; "Treasury's hardware and software"; and "Information Technology matters." TR-0023. Nothing in his job description—and nothing in the administrative record as a whole—suggests he requires access to the PII in Treasury's payment records.

The record indicates that the Special Advisor "will not be able to adequately perform his/her duties without being privy to the critical information technology hardware and software infrastructure of Treasury Department," "will be exposed to conversations, dialogues, and other kinds of sensitive information," and will "perform[] a variety of confidential assignments requiring analysis and evaluation of programs and activities of importance to [Krause]." TR-0022. But nothing in the records suggests this "sensitive information" includes PII or that "confidential assignments" require access to PII.

Finally, the engagement plan describes how DOGE affiliates will "outlin[e] recommendations for greater efficiencies and potential improvements to the existing payment processes and associated technology and policies in support of payment integrity and fraud prevention." TR-0057. This task, when viewed in the context of the entire engagement plan and the DOGE affiliates' job duties, is part of the efforts to improve Treasury's technology. *See id*. It is not a directive to look at the PII within payment records to ferret out fraud.[26]

---

[26] The administrative record contains a "Preliminary Work Plan for IT Access" that describes the need for "[s]ystem access as well as on-going discussions with subject matter experts" to "understand[] and verify[] how [Treasury] payment and accounting systems work." TR-0060. The

With nothing in the administrative record to support the DOGE affiliates' need to know, the government argues that they need access to Treasury payment systems to implement the DOGE Executive Order. But once again, the government does not explain why implementing the DOGE Executive Order—which focuses on technology modernization—requires access to PII within Treasury payment records.

The administrative record does not show that DOGE affiliates at Treasury need access to the PII in the payment record systems to modernize technology at the agency.

*    *    *

The administrative records indicate that Education, OPM, and Treasury disclosed records with the plaintiffs' PII to DOGE affiliates. They also indicate that the DOGE affiliates do not need to know this information to perform their job duties. And on the record before the Court, no other Privacy Act exception applies to these disclosures.[27] Education, OPM, and Treasury likely violated the Privacy Act. In so doing, the agencies likely violated the APA by acting "not in accordance

---

document is not dated and its author is not identified. Regardless, it does not show that the author—or whichever DOGE affiliate is implicated by the document—needs access to PII to "understand[] and verify[]" how the systems work. *Id.*

[27] The government points to a provision of the Privacy Act that permits disclosure "for a routine use," defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7), (b)(3); *see* ECF 62, at 27–28. When an agency discloses records under the "routine use" exception, it must retain an account of "the date, nature, and purpose of each disclosure of a record to any person or to another agency" and the "name and address of the person or agency to whom the disclosure is made." *See* 5 U.S.C. § 552a(c)(1). The government has not produced such an accounting. The OPM account creation audit does not show the purpose of the disclosure to the DOGE affiliates. *See* OPM-000089–103. Nor does the BFS System Access Request in the administrative record for Treasury. *See* TR-0062. There is no account of the access given to DOGE affiliates at Education. And there is nothing else in the administrative records that resembles a documentation of use or access. The gap in the records cannot be backfilled by the Statement of Record Notices from the Federal Register in the OPM and Treasury records. The government's invocation of the routine use exception appears to be an after-the-fact attempt to fit the disclosures into an exception.

ADD63

with law." *See* 5 U.S.C. § 706(2)(A); *Doe v. Chao* (*"Chao II"*), 435 F.3d 492, 504 n.17 (4th Cir. 2006); *accord Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988) (noting case involving unauthorized disclosure claims under the Veterans' Records Statute, which incorporates the Privacy Act, "clearly is a case of agency action 'not in accordance with law'" (quoting 5 U.S.C. § 706(2))). The plaintiffs have established a likelihood of success on the merits of their APA claim that Education, OPM, and Treasury acted "not in accordance with law."[28] *See* 5 U.S.C. § 706(2)(A).

### 2. Irreparable Harm

"To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent'" and that the harm "'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (first quoting *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); and then quoting *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012)).

The plaintiffs have made a clear showing that they are likely to suffer actual and imminent harm without injunctive relief. Allegations that personal information is "currently" being "obtain[ed]" or will be obtained "imminently, unless they receive injunctive relief" are sufficient to show "an ongoing or imminent injury." *See Garey*, 35 F.4th at 923. Through their allegations and the record evidence, the plaintiffs have shown that DOGE affiliates have been granted access to systems of records that contain some of the plaintiffs' most sensitive data—such as Social

---

[28] The plaintiffs have raised two other APA claims against the government: that the agencies acted arbitrarily and capriciously and in excess of their statutory authority. Because the Court finds that the plaintiffs have shown a likelihood of success on the merits of one APA claim, it need not consider the plaintiffs' likelihood of success on the other APA claims.

Security numbers, dates of birth, home addresses, bank information, income and assets, and citizenship status—and that, without an injunction, the DOGE affiliates' access to this trove of personal information will continue. In fact, the government takes the position that the DOGE affiliates' access to records containing the plaintiffs' PII is not only lawful, but it is *necessary* for them to do their jobs. *See* ECF 62, at 27 (asserting the "relevant personnel . . . have a need to access Privacy Act-protected records"). If the agencies' disclosures are not enjoined, the DOGE affiliates—whose mission to implement the DOGE Executive Order is ongoing—will access records with the plaintiffs' personal information.[29] The plaintiffs have made a clear showing that they will suffer actual and imminent harm if the Court does not order injunctive relief.

They also have made a clear showing that their harm is irreparable. The Fourth Circuit has not decided whether the continuing unlawful disclosure of sensitive personal information is irreparable harm. Other courts presented with similar questions have. Many have found that ongoing unauthorized disclosure, and even the mere unauthorized retention, of sensitive personal

---

[29] The OPM administrative record shows that some DOGE affiliates at OPM had their access to two systems of record—eOPF and EHRI—revoked prior to the Court's issuance of a TRO. *See* OPM-000023–27. However, the administrative record also shows that many OPM DOGE affiliates still have access to other OPM systems of records that house records with the plaintiffs' PII. *See* OPM-000103. And a declaration submitted by the government suggests that some DOGE affiliates still have access to eOPF and may re-gain access to EHRI in the future. *See* ECF 33-1, ¶¶ 12–14. Thus, the partial and apparently temporary revocation of access to certain OPM systems of records does not render the harm any less actual or imminent. The same goes for Education. Matteson, an Executive Project Manager, says that only one of the DOGE affiliates' user accounts had access to one of the four Education systems of records identified in the plaintiffs' complaint and that this access was "substantially limited" as he "could not access any personally identifiable information." *See* ECF 62-1, ¶ 4. However, the Court cannot ignore the February 5 memorandum from Education's CIO that granted DOGE affiliates at Education "full and prompt access to all unclassified IT systems and data," ED-000025; Ramada's declaration that "[t]he relevant employees require access to Department of Education information technology and data systems related to student loan programs in order to audit those programs for waste, fraud, and abuse," ECF 27-5, ¶ 9, or the government's assertion that the DOGE affiliates at Education "need to access to [Privacy Act-protected] records in order to audit student loan programs for waste, fraud, and abuse," ECF 62, at 27—all of which suggest that the harm to the plaintiffs is ongoing.

information is irreparable harm that money damage cannot remedy. *See, e.g.*, *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1275 (9th Cir. 1998) (finding "the retention of [the plaintiffs'] undisputedly intimate medical information [without consent] . . . would constitute a continuing 'irreparable injury' for purposes of equitable relief"); *Roberts v. Austin*, 632 F.2d 1202, 1214 (5th Cir. 1980) (finding irreparable harm from state agency's unauthorized release of food stamp recipients' files to state's attorney because "the [Food Stamp] Act and accompanying regulations give recipients statutory protection from disclosure of confidential information" and "recipients possess a legitimate expectation that the information will be kept confidential"); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 802 (N.D. Cal. 2022) ("The invasion of privacy triggered by the Pixel's allegedly ongoing disclosure of plaintiffs' medical information is precisely the kind of intangible injury that cannot be remedied by damages."); *Haw. Psychiatric Soc. v. Ariyoshi*, 481 F. Supp. 1028, 1052 (D. Haw. 1979) (finding irreparable injury because "[t]he disclosure of the highly personal information contained in a psychiatrist's files to government personnel is itself a harm that is both substantial and irreversible"); *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) ("The disclosure of private, confidential information 'is the quintessential type of irreparable harm that cannot be compensated or undone by money damages.'" (quoting *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000))).

In *Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019), *vacated and remanded on other grounds sub nom. Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020), the Second Circuit affirmed a holding that President Trump would suffer irreparable harm if his personal financial information were disclosed to two congressional committees. Although the district court denied the preliminary injunction because President Trump had not shown a likelihood of success on the merits, the court concluded he had shown an irreparable injury if his financial information were

disclosed. *See Trump v. Deutsche Bank AG*, No. 19 Civ. 3826 (ER), 2019 WL 2204898, at *1

(S.D.N.Y. May 22, 2019); Joint Appendix at 149, *Deutsche Bank AG*, 943 F.3d 627 (No. 19-1540).

The district court reasoned that the "plaintiffs have an interest in keeping their records private from

everyone, including congresspersons, and that interest necessarily will be impinged by the records'

disclosure to the committees." *See* Joint Appendix at 125–26, *Deutsche Bank AG*, 943 F.3d 627

(No. 19-1540). It acknowledged that "some courts outside of this circuit have questioned whether

the mere disclosure of information, absent evidence of misuse or unauthorized disclosure by the

receiving party automatically constitutes irreparable injury." *See id.* at 124–25 (citing *Baker DC,

LLC v. NLRB*, 102 F. Supp. 3d 194 (D.D.C. 2015)). The court did not find those cases persuasive.

Instead, the court concluded, "that plaintiffs possess strong privacy interests in their financial

information such that unwanted disclosure may properly constitute irreparable injury, without an

additional showing of likelihood of misuse or unauthorized disclosure by the recipient." *Id.* at

125.[30]

---

[30] The court referred to a case from the U.S. District Court for the District of Columbia. In that jurisdiction, the mere disclosure of personal information, without more, is not automatically irreparable harm if it is expected that the recipient will keep the information confidential. In *Ashland Oil, Inc. v. FTC*, a district court held that disclosure of a company's trade secrets to a congressional committee would not cause irreparable injury because they did not show that their trade secret information would be disclosed to competitors or to the public. 409 F. Supp. 297, 308 (D.D.C. 1976), *aff'd*, 548 F.2d 977 (D.C. Cir. 1976) (per curiam). The court "presume[ed] that the committees of Congress w[ould] exercise their powers responsibly and with due regard for the rights of affected parties." *Id.* The D.C. Circuit affirmed. 548 F.2d at 982. Similarly, in *Baker DC, LLC v. NLRB*, a district court concluded that no irreparable harm resulted from an agency rule compelling an employer to divulge its employees' "names, job locations, phone numbers, and email addresses" to a union. 102 F. Supp. 3d 194, 203 (D.D.C. 2015). The court reasoned that the rule "place[d] explicit limits on the purposes for which employee information can be used." *Id.* And it concluded that any risk that the union would misuse the employees' private information or disclose it to outside individuals was speculative. *Id.* Relying on *Ashland Oil* and *Baker DC*, two judges in the District of Columbia have denied preliminary injunctive relief in similar cases against Treasury and Education because the plaintiffs did not establish irreparable harm. *See Univ. of Cal. Student Ass'n*, Civ. No. 25-354 (RDM), 2025 WL 542586, at *5 (D.D.C. Feb. 17, 2025); *All. for Retired Ams. v. Bessent*, Civ. No. 25-0313 (CKK), 2025 WL 740401, at *21 n.7 (D.D.C. Mar. 7,

In line with courts in the Second, Fifth, and Ninth Circuits, this Court finds that the ongoing disclosure of the plaintiffs' PII to government employees not authorized to access it constitutes irreparable harm. The plaintiffs have a strong interest in keeping their PII private, they have not consented to its disclosure to DOGE affiliates, and they have shown it is likely that the DOGE affiliates will continue to have and use access to records with their sensitive personal information absent an injunction. This ongoing violation of the plaintiffs' privacy interests cannot be redressed by a final judgment of money damages or by permanent injunctive relief.

Without a preliminary injunction, the DOGE affiliates' access to the plaintiffs' private information will continue. This invasion of the plaintiffs' privacy and the intrusion upon their seclusion is neither speculative nor remote; it is actual and imminent. A final judgment of money damages or a permanent injunction will not make them whole. The plaintiffs have made a clear showing that they will experience irreparable harm without an injunction.

### 3. Balance of Equities and Public Interest

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). To balance the equities, the Court considers "the relative harms to the [plaintiffs] and [defendants], as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)). These factors weigh in favor of a preliminary injunction.

The plaintiffs have shown that Education, OPM, and Treasury likely violated the APA by granting DOGE affiliates sweeping access to their sensitive personal information in defiance of

---

2025). *Ashland Oil* and *Baker DC* are not binding on this Court, and the Court does not find them persuasive.

the Privacy Act. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Although the Court should not "collapse[] the first *Winter* factor—likelihood of success on the merits—with the merged balance of equities and public interest factor," *USA Farm Lab., Inc. v. Micone*, No. 23-2108, 2025 WL 586339, at *4 (4th Cir. Feb. 24, 2025), the factors overlap here. The likely unlawful agency action concerns the privacy rights of individuals who had to give their sensitive personal information to the federal government to obtain federal benefits, student loans, or employment. They trusted the federal government to safeguard their information. That public trust likely has been breached. Preventing the government's unauthorized disclosure of the plaintiffs' sensitive personal information is in the public interest. *See CACI, Inc. – Fed. v. U.S. Navy*, 674 F. Supp. 3d 257, 279 (E.D. Va. 2023) ("There is a strong public interest in curing the effects of the government's unlawful acts.").

The government argues that preliminary injunctive relief would harm the public interest because it would "limit[] the President's ability to effectuate the policy choices the American people elected him to pursue by limiting his advisors and other employees' ability to access information necessary to inform that policy." ECF 62, at 32. A preliminary injunction in this case does not prevent the President from effectuating the administration's policies. It prevents the likely unlawful disclosure of the plaintiffs' sensitive personal information to DOGE affiliates who, on the record before the Court, do not have a need to know the information to perform their duties.

The balance of the equities and the public interest favor preliminary injunctive relief.

The plaintiffs have established that they are entitled to a preliminary injunction.

### D. Scope of the Injunction

"[I]njunctive relief should be designed to grant the full relief needed to remedy the injury to the prevailing party," but "it should not go beyond the extent of the established violation." *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993). "Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends." *S.C. Dep't of Wildlife & Marine Res. v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989) (quoting *Consol. Coal Co. v. Disabled Miners*, 442 F.2d 1261, 1267 (4th Cir. 1971)).

Here, the injury is the unauthorized disclosure of the plaintiffs' PII to DOGE affiliates at Education, OPM, and Treasury. To prevent the injury pending the outcome of this case, the Court will limit the preliminary injunctive relief to the disclosure of the PII of the individual plaintiffs and the organizational plaintiffs' members.

### III.  Conclusion

On the first day of his second term in office, President Trump signed an Executive Order directing agencies to "take all necessary steps . . .  to the maximum extent consistent with law, to ensure" people implementing his DOGE agenda have "full and prompt access to all unclassified agency records, software systems, and IT systems." DOGE Executive Order § 4(b). Following this directive, Education, OPM, and Treasury granted expansive access to their systems of record—which house the plaintiffs' PII—to individuals charged with implementing the President's DOGE Executive Order. In doing so, the agencies likely violated the Privacy Act and the APA.

Enacted 50 years ago, the Privacy Act protects from unauthorized disclosure the massive amounts of personal information that the federal government collects from large swaths of the public. Congress's concern back then was that "every detail of our personal lives can be assembled

instantly for use by a single bureaucrat or institution" and that "a bureaucrat in Washington or Chicago or Los Angeles can use his organization's computer facilities to assemble a complete dossier of all known information about an individual." *See* Danielle Keats Citron, *A More Perfect Privacy*, 104 B.U. L. Rev. 1073, 1078 (2024) (first quoting 120 Cong. Rec. 36,917 (1974) (statement of Sen. Goldwater); and then quoting 120 Cong. Rec. 36,917 (statement of Sen. Percy)). Those concerns are just as salient today. No matter how important or urgent the President's DOGE agenda may be, federal agencies must execute it in accordance with the law. That likely did not happen in this case. The plaintiffs' motion for a preliminary injunction is granted. A separate order follows.

Date: March 24, 2025

Deborah L. Boardman
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| AMERICAN FEDERATION OF TEACHERS,<br>    555 New Jersey Ave. N.W.<br>    Washington, DC 2000, | Case No. 8:25-cv-00430 |
| | |
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS,<br>    9000 Machinists Place<br>    Upper Marlboro, MD 20772, | |
| | |
| INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS,<br>    513 C St. NE<br>    Washington, DC 20002, | |
| | |
| NATIONAL ACTIVE AND RETIRED FEDERAL EMPLOYEES ASSOCIATION,<br>    606 N Washington St.<br>    Alexandria, VA 22314, | |
| | |
| NATIONAL FEDERATION OF FEDERAL EMPLOYEES,<br>    225 New York Ave., NW, Suite 450<br>    Washington, DC 20005, | |
| | |
| DONALD MARTINEZ,<br>    c/o Murphy Anderson PLLC<br>    1401 K St. NW<br>    Washington, D.C. 20005, | |
| | |
| JASON CAIN,<br>    c/o Murphy Anderson PLLC<br>    1401 K St. NW<br>    Washington, D.C. 20005, | |
| | |
| CLIFFORD GRAMBO,<br>    c/o Murphy Anderson PLLC<br>    1401 K St. NW<br>    Washington, D.C. 20005, | |
| | |
| THOMAS FANT,<br>    c/o Murphy Anderson PLLC<br>    1401 K St. NW<br>    Washington, D.C. 20005, | |
| | |
| CHRISTOPHER PURDY, | |

1

c/o Murphy Anderson PLLC
1401 K St. NW
Washington, D.C. 20005, and

KRISTOFER GOLDSMITH
    c/o Murphy Anderson PLLC
    1401 K St. NW
    Washington, D.C. 20005,

        *Plaintiffs*,

vs.

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury,
    1500 Pennsylvania Ave. NW
    Washington, D.C. 20220,

The UNITED STATES DEPARTMENT OF
THE TREASURY,
    1500 Pennsylvania Ave. NW
    Washington D.C. 20220,

CHARLES EZELL, in his official capacity as
the Acting Director of the Office of Personnel
Management,
    1900 E St. NW
    Washington, D.C. 20415,

The UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT,
    1900 E St. NW
    Washington, D.C. 20415,

DENISE L. CARTER, in her official capacity
as the Acting Secretary of Education, and
    400 Maryland Ave., SW
    Washington, D.C. 20202,

The UNITED STATES DEPARTMENT OF
EDUCATION,
    400 Maryland Ave., SW
    Washington, D.C. 20202,

        *Defendants*.

## <u>AMENDED COMPLAINT</u>

1.      Americans who interact with the U.S. Government routinely entrust federal

agencies with sensitive personal information: Social Security numbers, home addresses, financial

records, and more. The government has codified its promise to treat their information with care in the requirements of the Privacy Act. Today, Defendants are permitting Elon Musk and a cadre of loyalists imported from his private companies to help themselves to the personal information of millions of Americans, in violation of those legal requirements. Plaintiffs in this case seek immediate relief to stop the Defendants from further unlawful disclosures and halt the serious harms that flow from the exposure and dissemination of sensitive personal information.

2.    On January 20, 2025, President Trump issued an executive order refashioning the United States Digital Services as the "U.S. DOGE Service," ostensibly to promote government efficiency. It has been widely reported that the DOGE effort is led by the world's richest man, Elon Musk, and a small team of DOGE representatives that he directs, including at least one 19-year-old who had previously leaked proprietary information.

3.    The White House has revealed little about the members of the DOGE and their qualifications, training, or background. It is similarly unclear whether and to what extent the members of the DOGE have been subject to the same rigorous background checks that federal employees who have access to some of the government's most sensitive and closely guarded data systems undergo. Notwithstanding this, Defendants have provided representatives of the DOGE with access to these systems, which includes Social Security numbers, bank account numbers, dates and places of birth, and other extraordinarily sensitive records of millions of Americans.

4.    Steamrolling into sensitive government record systems threatens to upend how these critical systems are maintained and compromises the safety and security of personal identifying information for Americans all across the country. It also violates federal law.

5.    Collecting and securely maintaining sensitive personal information allows the federal government to provide crucial services—from managing Social Security and veterans' disability payments, to supporting Americans pursuing higher education and helping them access health care.

6.    The Privacy Act balances the government's legitimate need for information about individual Americans with the imperative to mitigate the risks inherent in collecting personal

information at scale. "Enacted in the wake of the Watergate and the Counterintelligence Program ("COINTELPRO") scandals involving illegal surveillance on opposition political parties and individuals deemed to be 'subversive,' the Privacy Act sought to restore trust in government and to address what at the time was seen as an existential threat to American democracy." Off. of Privacy & Civ. Liberties, *Overview of the Privacy Act of 1974: 2020 Edition*, at 1. The statute carefully regulates the circumstances in which agency records about individuals can be shared. Disclosures beyond what the statute authorizes are unlawful.

7.      Defendants' mass disclosure of personal information flies in the face of that legal framework and tramples on the individual privacy rights and interests protected by the Privacy Act. It also threatens real people, including individual Plaintiffs and members of the Plaintiff Organizations (collectively, "Plaintiffs"), by exposing them to the risk of identity theft, harassment, intimidation, and embarrassment.

8.      For example, Defendants Treasury Department and Secretary of Treasury Bessent have improperly disclosed to DOGE representatives the contents of the Federal Disbursement System, which is the government's mechanism for sending payments it owes to individual Americans (as well as other payees). That system contains records relating to every American who receives (among other things) a tax refund, social security benefit, veterans pay, or a federal salary. To facilitate these payments, the system maintains highly sensitive information about millions of Americans, including Social Security numbers, dates of birth, bank account information, and home addresses.

9.      Similarly, Defendants Department of Education and Acting Secretary of Education Denise L. Carter have improperly disclosed information maintained in the National Student Loan Data System. That system contains information on almost 43 million borrowers and their families necessary to manage federal student loan programs. This includes sensitive personal information such as Social Security numbers, bank records, tax returns, home addresses, employment data, documentation of marital status, mortgage statements, bank records, tax returns, child support, investments, family financial status and records, dependent-care cost,

death, divorce, job loss, immigration status, and demographic data about student-borrowers—
and, often, also for their parents, spouses, or other family members.

10.     Defendants U.S. Office of Personnel Management and its Acting Director Charles
Ezell have improperly disclosed information in multiple sensitive record systems. Those records
contain information about the 2.3 million federal employees, as well as millions of other former
federal employees and job applicants. These files contain exceedingly sensitive personal
information: in addition to Social Security numbers, contact information, and demographic
information, they contain highly sensitive employment information.

11.     All of these agencies have valid purposes for maintaining these record systems.
But that does not mean that Elon Musk or other DOGE representatives may have unlimited
access to them. The Privacy Act requires each of these agencies to provide access to records only
as part of the agencies' routine work to advance the legitimate purposes for which the records are
maintained in the first place, or with the express written consent of the individual whose data is
being sought.

12.     Representatives of the DOGE, however, do not believe themselves constrained by
those legitimate purposes or by the individual record-holders' consent. They have accessed
Defendants' data systems and the sensitive information contained within to "shut[] down"
payments and in the case of the Education Department, the agency itself.[1]

13.     The risks to Americans whose sensitive information is improperly disclosed are
very real. Failing to handle these records according to established safeguards increases the risks
that external actors may access them. The personal data contained in these systems could readily
facilitate identity theft and other economic crimes, with potentially devastating consequences for
the victims.

14.     These disclosures have directly harmed Plaintiffs.  Plaintiffs include veterans who
receive benefit payments as provided by law, current and former federal employees whose

---

[1] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217; Elon Musk (@elonmusk), X (Feb. 3, 2025, 8:30 PM), https://x.com/elonmusk/status/1886633448078475593.

confidential employment files reside in the Office of Personnel Management's ("OPM") system, and teachers, first responders, and health care workers whose pathway to careers in public service included relying on student loans to fund their own educations. As to all of them, their personal data has been improperly disclosed to DOGE representatives in a manner completely divorced from the legitimate purposes for which it was maintained and in violation of their privacy rights. Plaintiffs are anxious about the implications of this government-facilitated breach of their personal information and uncertain about how their data is being used or who it will be shared with and whether it will be weaponized against them. They are concerned that the breach may well result in serious personal, social, and economic harm, from being targeted for harassment and threats to doxxing, swatting, and identity theft.

15. The Administrative Procedure Act authorizes persons whose information has been unlawfully disclosed in violation of the Privacy Act to seek injunctive relief. *Doe v. Chao*, 435 F.3d 492, 505 n.17 (4th Cir. 2006). Accordingly, Plaintiffs ask this Court to restore the privacy they are entitled to under federal law by preventing further unauthorized and improper disclosures and ensuring that improper disclosures to DOGE representatives stop immediately.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

17. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers and agencies of the United States, no real property is at issue in this case, and one or more Plaintiffs are residents of this District.

## PARTIES

18. Plaintiff **American Federation of Teachers ("AFT")** is a national labor organization headquartered in Washington, D.C., representing over 1.8 million members who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. For over a

6

decade the AFT has been fighting to help teachers and nurses burdened by student debt receive Public Service Loan Forgiveness. The national union has hosted hundreds of student debt clinics for tens of thousands of its members. As part of those clinics, the AFT has helped its members apply for the Public Service Loan Forgiveness Program, which is administered by the Department of Education. AFT members have records housed within OPM and Department of Education record systems and receive payments of various kinds from the United States Treasury. AFT also advocates for the ethical use of artificial intelligence and enforcement of government regulations that protect its members' personal data.[2]

19.    Plaintiff **National Active and Retired Federal Employees Association ("NARFE")** is a nonprofit organization founded in 1921, incorporated in the District of Columbia, and headquartered in Alexandria, Virginia, with a membership of approximately 128,000 current and former federal employees as well as spousal annuitants. NARFE's mission is to promote the general welfare of current federal civilian employees and federal retirees and their survivors, to advise and assist them with respect to their federal benefits, to represent their interests before appropriate authorities, and to support legislation and regulations beneficial to such employees and retirees and to oppose those detrimental to their interests. NARFE's members have records housed within OPM and Department of Education record systems and receive payments of various kinds from the United States Treasury. NARFE's advocacy efforts include calling on federal agencies to take reasonable steps to protect the privacy of NARFE members' digital information.[3]

20.    Plaintiff **International Association of Machinists and Aerospace Workers ("IAM")** is an international labor organization and unincorporated membership organization headquartered in Upper Marlboro, Maryland. IAM is one the largest and most diverse labor unions in North America with nearly 600,000 active and retired members. Among IAM's

---

[2] *See, e.g.*, *The Future of Public Work: Artificial Intelligence, Algorithms & Data Protection in a Digital Age*, Am. Fed'n Tchrs. (July 17, 2022), https://www.aft.org/resolution/future-public-work-artificial-intelligence-algorithms-and-data-protection.
[3] *See, e.g.*, *Updates on OPM Cybersecurity Incident*, Nat'l Active & Retired Fed. Emps. Ass'n (Jan. 10, 2019), https://www.narfe.org/blog/2019/01/10/updates-on-opm-cybersecurity-incident.

7

affiliate organizations is the National Federation of Federal Employees ("NFFE"), which is a national labor organization and unincorporated membership organization headquartered in Washington, D.C. Together, IAM and NFFE represent more than 100,000 federal workers, approximately 13,000 of whom are dues-paying members, from agencies across the federal government. IAM and NFFE also represent many veterans and veterans' groups, advocate on their behalf, and assist them in receiving their benefits, among other services. IAM and NFFE members have records housed within OPM and Department of Education record systems and receive payments of various kinds from the United States Treasury. IAM and NFFE advocacy efforts include assisting their members in seeking redress for federal agencies' unlawful disclosures of members' sensitive data.[4]

21.    Plaintiff **International Federation of Professional and Technical Engineers ("IFPTE")** is an international labor organization headquartered in Washington, D.C., that represents approximately 34,000 federal employees, 7,000 of which are dues-paying members. The majority of federal employees represented by IFPTE work at the Department of Defense, primarily shipyards. Other represented members include nuclear submarine engineers, scientists and researchers at NASA, Administrative Law Judges at the Social Security Administration, and nuclear engineers at the Tennessee Valley Authority, as well as employees of the Environmental Protection Agency. IFPTE comprises many members who are veterans and represents and advocates for veterans and veterans' groups. IFPTE members have records housed within OPM and Department of Education record systems and receive payments of various kinds from the United States Treasury.  IFPTE advocacy efforts include calling on federal legislators and agencies to implement policies that protect IFPTE members' privacy interests.[5]

22.    Plaintiff **Jason Cain** is a resident of North Carolina and currently works as an instructor of political science. He served for 10 years in the U.S. Army, as Sergeant First Class in

---

[4] *See, e.g.*, *Privacy Rights*, Nat'l Fed'n Fed. Emps., https://nffe.org/members-center/privacy-rights.
[5] *See, e.g.*, Letter from Paul Shearon, Pres., Int'l Fed'n Prof. Tech. Engs., to Diane Feinstein, U.S. Senator (June 14, 2021), https://www.ifpte.org/s/IFPTE_NASA_MAP_Feinstein_letter _June142021_FINAL.pdf.

the U.S. Army Special Operations Command and the 82nd Airborne and had a Top Secret security clearance. He receives financial benefits from the federal government, including VA disability benefits. He previously received GI bill benefits, student loans, and a VA home loan from the federal government. As a result of his military service, employment in the civil service, and financial benefits, federal government agencies, including Defendants OPM and the Departments of Education and Treasury, have sensitive personal information about him in their record systems. When his VA account was previously hacked, and his disability and education benefits diverted to criminal enterprises, Plaintiff Cain experienced the fear and helplessness of having his personal information compromised. He is anxious about repeating this experience based on this unauthorized access to his personal information. He is outraged that such a grave breach of his privacy took place, given the extreme caution with which he was required to handle sensitive information during his service in the military and at the VA.

23.     Plaintiff **Kristofer Goldsmith** is a resident of New York and currently works as the head of a nonprofit organization combating domestic extremists. He is a military veteran of the U.S. Army, was deployed to Iraq in 2005, and left the Army as a Sergeant. He receives financial benefits from the federal government, including VA disability benefits. He has also previously received student loans from the federal government. As a result of his military service and financial benefits, federal government agencies, including Defendants Departments of Education and Treasury, have sensitive personal information about him in their record systems. Plaintiff Goldsmith is deeply concerned that his personal information is compromised, and may be exploited by domestic extremist organizations to harass, intimidate, and harm him and his family. These concerns are even more acute in light of the presidential pardons of many domestic extremists, with Musk's apparent support.

24.     Plaintiff **Clifford "Buzz" Grambo** is a resident of Maryland and is currently retired. He is a military veteran who served in the U.S. Navy for 20 years, retiring as Chief Petty Officer. He receives financial benefits from the federal government, including VA disability benefits and a military pension. Because of these financial benefits from his military service,

federal government agencies, including Defendant Treasury, have sensitive personal information about him in their record systems. Plaintiff Grambo believes that the unauthorized access to his and others' personal information poses a national security risk.

25.    Plaintiff **Thomas Fant** is a resident of Massachusetts and is currently retired. He is a military veteran of the U.S. Coast Guard, from which he was medically discharged. He receives financial benefits from the federal government, including VA disability benefits. Because of these financial benefits from his military service, federal government agencies, including Defendant Treasury, have sensitive personal information about him in their record systems. Plaintiff Fant is apprehensive and anxious that the unauthorized access to his and others' personal information will enable third parties affiliated with DOGE representatives to profit at the expense of him and other Americans.

26.    Plaintiff **Donald Martinez** is a resident of Colorado and currently works as a rancher. He is a military veteran of the U.S. Army, and had two deployments to Iraq as a Field Artillery Officer with a Top Secret/Sensitive Compartmented Information security clearance. During his service, he sustained a traumatic brain injury and was medically retired. He receives financial benefits from the federal government, including veterans' benefits, Social Security Disability Insurance/Medicare, Combat Related Special Compensation, and a VA home loan. Apart from his military service, Plaintiff Martinez also worked for the Federal Emergency Management Agency. And he received student loans from the federal government. As a result of his military service, employment in the civil service, and financial benefits, federal government agencies, including Defendants OPM and Departments of Education and Treasury, have sensitive personal information about him in their record systems. Especially because of his previous military service in a geographically sensitive area and involvement in high-level negotiations because of which he received death threats from terrorists, Plaintiff Martinez is worried that unauthorized access and disclosure of his personal information held within the federal government will compromise his personal safety and security.

27.    Plaintiff **Christopher Purdy** is a resident of Georgia and currently works as the head of a nonprofit organization. He served for eight years in the Army National Guard, where he was deployed to Iraq in 2011. He receives financial benefits from the federal government, including VA disability benefits. He previously also received a VA home loan and student loans from the federal government. As a result of his military service and financial benefits, federal government agencies, including Defendants Departments of Education and Treasury, have sensitive personal information about him in their record systems. Plaintiff Purdy is distressed that the breach of his personal information by unauthorized parties makes it more vulnerable to being released to the public, which could cause him severe economic harm. He is also very worried that Musk and DOGE may use their unauthorized access to his personal information to stop his VA disability payments, a major source of income in his household.

28.    Defendant the **United States Department of the Treasury** ("Treasury") is an agency of the United States.

29.    Defendant **Scott Bessent** is sued in his official capacity as the Secretary of the Treasury.

30.    Defendant the **Office of Personnel Management** is an agency of the United States.

31.    Defendant **Charles Ezell** is the Acting Director of the Office of Personnel Management ("OPM") and is sued in his official capacity.

32.    Defendant **United States Department of Education** is an agency of the United States.

33.    Defendant **Denise Carter** is the Acting Secretary of Education and is sued in her official capacity.

## FACTUAL ALLEGATIONS

**Establishment of DOGE**

34.    On January 20th, 2025, President Trump signed an executive order replacing the United States Digital Services with the "United States DOGE Service," which serves as the

parent agency for the new "U.S. DOGE Service Temporary Organization."[6] The order called for DOGE to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."[7]

35.    Even before the inauguration, President Trump announced that Elon Musk would lead the DOGE effort.  It has been publicly reported that Musk directly leads and supervises activities of DOGE and its team.[8]  According to the White House, Musk now serves as a Special Government Employee.[9]

36.    The order establishing DOGE also provided for "DOGE teams" of at least four employees, which can include Special Government Employees, to be embedded within Federal agencies. Special Government Employee is a temporary employment status typically used for outside advisors, experts or consultants appointed to work on a short-term basis within the federal government. They are exempt from some federal ethics rules.

37.    DOGE representatives within the government are a combination of friends and former employees of Musk and his companies and a cadre of young adult software engineers, including college students and at least one teenager, whose identities the White House and DOGE have sought to conceal.[10]

**The Privacy Act's Prohibitions on Disclosure of Records Without Express Written Consent**

38.    "The Privacy Act directs agencies to establish safeguards to protect individuals against the disclosure of confidential records 'which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained.'" *F.A.A. v. Cooper*, 566 U.S. 284, 294-95 (2012) (quoting 5 U.S.C. § 552a(e)(1)). It

---

[6] Madeleine Ngo & Theodore Schleifer, *How Trump's Department of Government Efficiency Will Work*, N.Y. Times (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/doge-government-efficiency-trump-musk.html
[7] Executive Order, *Establishing and Implementing The President's "Department of Government Efficiency"* The White House (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/establishing-and-implementing-the-presidents-department-of-government-efficiency.
[8] Bobby Allyn & Shannon Bond, *Elon Musk Is Barreling into Government With DOGE, Raising Unusual Legal Questions*, NPR (Feb. 3, 2025), https://www.npr.org/2025/02/03/nx-s1-5285539/doge-musk-usaid-trump.
[9] Kaitlan Collins & Tierney Sneed, *Elon Musk Is Serving as a 'Special Government Employee,' White House Says*, CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/03/politics/musk-government-employee/index.html.
[10] Theodore Schleifer et al., *Young Aides Emerge as Enforcers in Musk's Broadside Against Government,* N.Y. Times (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html.

ADD83

does that by providing a legal framework for how the government handles sensitive records about Americans in a manner that protects their significant privacy rights.

39.    The Privacy Act states, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency" without consent of the individual whose information is in the record, subject to twelve statutory exceptions.[11]

40.    Under the Privacy Act, a system of records is "a group of any records under the control of an agency from which information is retrieved by the name of the individual or … other identifying particular assigned to the individual."[12]

41.    A record is "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph."[13]

42.    Office of Management and Budget ("OMB") guidelines state that disclosure under the Privacy Act "may be either the transfer of a record or the granting of access to a record."[14] Disclosure can be written, oral, electronic, or a mechanical transfer between computers of record content.[15]

43.    The Privacy Act specifies when individual information maintained in an agency record system may be disclosed. It does not prohibit disclosures to employees of the maintaining agency "who have a need for the record in the performance of their duties."[16]

44.    Similarly, the Privacy Act does not prohibit disclosures made for a "routine use," defined as "the use of such record for a purpose which is compatible with the purpose for which

---

[11] 5 U.S.C. § 552a(b).
[12] 5 U.S.C. § 552a(5).
[13] 5 U.S.C. § 552a(a)(4).
[14] OMB Guidelines, 40 Fed. Reg. 28,948, 28,953 (July 9, 1975).
[15] *Id*.
[16] 5 U.S.C. § 552a(b)(1).

it was collected."[17] Agencies must publish a Statement of Record Notice ("SORN") identifying all possible routine uses of a system of records.[18]

45.    Additionally, the Privacy Act mandates that "Each agency that maintains a system of rec-ords shall . . . establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained[.]"[19]

**The Treasury Department's Federal Disbursement Services**

46.    The Federal Disbursement Services ("FDS"), which is housed within the Treasury Department's Bureau of the Fiscal Service (the "Fiscal Service"), provides critical payment services for hundreds of federal agencies, allowing them to disburse payments such as Social Security benefits, federal income tax refunds, and veterans' pay, on which more than 70 million Americans rely.[20]

47.    In fiscal year 2024, FDS disbursed more than 1.27 billion payments, valued at more than $5.45 trillion.[21]

48.    The payment systems that make up FDS contain extensive amounts of sensitive, personally identifiable information ("PII"). This includes name, Social Security number, date and location of birth, physical address, telephone number, and financial institution information, among many other pieces of PII.[22] Within the payment systems, there is PII for tens of millions of individuals, if not more.[23]

---

[17] 5 U.S.C. § 552a(a)(7).
[18] *Id.*
[19] 5 U.S.C. § 552a(e)(10).
[20] *See* U.S. Dep't Treasury, *Federal Disbursement Services (FDS)*, (last modified Oct. 15, 2024), https://fiscal.treasury.gov/fds/; *Monthly Statistical Snapshot, December 2024*, Social Security Administration (Jan. 2025), https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/.
[21] *Id.*
[22] U.S. Dep't Treasury, Notice of a Modified System of Records. 85 Fed. Reg. 11,776, 11,778 (Feb. 27, 2020).
[23] U.S. Dep't Treasury, *Privacy and Civil Liberties Impact Assessment: Payment Automation Manager* (Jul. 11, 2019), https://www.fiscal.treasury.gov/files/pia/pampclia.pdf.

14

49.    Historically, "only a small group of career employees" has operated the payment systems.[24] It is "extremely unusual" for "anyone connected to political appointees" to request or gain access to the payment systems.[25] Payment system access is strictly limited to "[o]nly employees whose official duties require access."[26]

50.    The Fiscal Service does not play a discretionary role in providing payment services. Rather, when federal agencies provide the Fiscal Service with a payment voucher to disburse money to a recipient and the Fiscal Service verifies that the voucher has been completed properly, payment systems within Fiscal Service issue the disbursement without exercising independent judgment.[27] Stated differently, the Fiscal Service's routine use of the FDS is limited to issuing disbursements requested by various federal agencies.

**DOGE's Repeated Efforts to Improperly Access the Federal Disbursement Services**

51.    For months, individuals affiliated with the initiative that would later become DOGE have worked to gain access to the Federal Disbursement System.[28] Indeed, soon after the November 2024 election, they asked for access to the system in an effort to have the Treasury Department serve as a "chokepoint" on payments.[29]

52.    David A. Lebryk, a senior career civil servant at Treasury, denied all of DOGE's requests for access to the sensitive personal data stored on the FDS. On January 24, 2025, DOGE-related officials asked Lebryk, at the time Acting Secretary of the Treasury, to "immediately shut off all USAID payments using [Treasury's] ultra-sensitive payment processing system."[30] Lebryk refused to do so on the grounds that stopping payments other

---

[24] Jacqueline Alemany et al., *Senior U.S. Official Exits After Rift with Musk Allies over Payment System*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/business/2025/01/31/elon-musk-treasury-department-payment-systems.
[25] *Id.*
[26] 85 Fed. Reg. 11,776, 11,778.
[27] *See* 31 U.S.C. § 3325(a).
[28] Jacqueline Alemany et al., *Senior U.S. Official Exits After Rift with Musk Allies over Payment System*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/business/2025/01/31/elon-musk-treasury-department-payment-systems.
[29] Katelyn Polantz, Phil Mattingly & Tierney Sneed, *How an Arcane Treasury Department Office Became Ground Zero In The War Over Federal Spending*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/01/31/politics/doge-treasury-department-federal-spending.
[30] *Id.*

federal agencies have requested is not within the Treasury's purview or part of its practice.[31] Lebryk was subsequently placed on administrative leave and later announced his retirement.[32]

53.     On or before January 31, 2025, and following Lebryk's placement on administrative leave, at least two people affiliated with DOGE gained access to the Federal Disbursement System.[33] They included Tom Krause, the CEO of Cloud Software Group, and Marko Elez, a 25-year-old DOGE staffer and Elon Musk deputy.[34] The government has claimed that both Krause and Elez were appointed as Special Government Employees in the Treasury Department.

54.     The day after Krause and Elez gained access to the payment systems, Musk posted on X that DOGE representatives "discovered" that "payment approval officers at Treasury were instructed always to approve payments, even to known fraudulent or terrorist groups."[35]

55.     On February 2, 2025, Musk posted on X that "[c]areer Treasury officials are breaking the law every hour … by approving payments that are fraudulent" and this had to "stop NOW!"[36] The same day, Musk replied to a post on X criticizing funding to specific religiously affiliated non-profit organizations and stated that "[t]he @DOGE team is rapidly shutting down these illegal payments."[37]

56.     On February 3, 2025, White House Press Secretary Karoline Leavitt said DOGE staff had been granted read-only access to the Treasury payments system.[38] A letter from the Treasury Department to members of Congress on February 4, 2025 reiterated that Treasury staff

---

[31] *Id.*

[32] Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's Requests on Payments*, N.Y. TIMES (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/us/politics/david-lebryk-treasury-resigns-musk.html.

[33] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.

[34] Tobias Burns, *DOGE Staffer Who Accessed Treasury Department Payment Systems Resigns after Racist Posts Exposed*, THE HILL (Feb. 6, 2025), https://thehill.com/business/5131442-elon-musk-deputy-resign.

[35] Elon Musk (@elonmusk), X (Feb. 1, 2025, 1:52 AM), https://x.com/elonmusk/status/1885582076247712229.

[36] Elon Musk (@elonmusk), X (Feb. 2, 2025, 2:27 PM), https://x.com/elonmusk/status/1886134485822922785.

[37] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217.

[38] Jonathan Swan et al., *Inside Musk's Aggressive Incursion Into the Federal Government*, N.Y. TIMES (Feb. 3, 2025), https://www.nytimes.com/2025/02/03/us/politics/musk-federal-government.html.

working with Krause would have read-only access to the coded data of the payment systems.[39] The letter further stated that this was the type of access provided to individuals reviewing Treasury systems, such as auditors.

57.     On February 4, 2025, WIRED reported that, contrary to Leavitt's and Treasury's representations, Elez possessed read *and* write access to Treasury Department payment systems.[40] Elez's administrative-level privileges reportedly included the ability to write code on the Payment Automation Manager (PAM) and Secure Payment System (SPS) at the Bureau of the Fiscal Service (BFS). WIRED reported that "[t]ypically, those admin privileges could give someone the power to . . . change user permissions, and delete or modify critical files."

**Defendants' Disclosure of Information in the FDS to DOGE Officials Violates the Privacy Act**

*Payment Systems Within the FDS Are a System of Records*

58.     Multiple payment systems within FDS are systems of records, as certified by the Chief Privacy Officer of the Fiscal Service.[41] The Fiscal Service has published a Systems of Records Notice (SORN) for these payment systems.[42]

59.     The information in specific payment systems within FDS, including the Secure Payment System, the Invoice Processing Platform, and the Automated Standard Application for Payments, among others, is retrieved by an "identifying particular" assigned to an individual.[43]

60.     The payment systems maintained within FDS contain extensive personally identifiable information about individuals, including but not limited to Social Security numbers, sensitive financial information, and addresses.[44]

---

[39] U.S. Dep't Treasury, *Treasury Department Letter to Members of Congress Regarding Payment Systems* (Feb. 4, 2025), https://home.treasury.gov/news/press-releases/sb0009.
[40] Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, WIRED (Feb. 4, 2025), https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system/
[41] *See, e.g.*, *Privacy and Civil Liberties Impact Assessment: Secure Payment System*, U.S. Dep't Treasury (Mar. 22, 2021), https://www.fiscal.treasury.gov/files/pia/spspclia.pdf.
[42] 85 Fed. Reg. 11,776.
[43] See, e.g., *Privacy and Civil Liberties Impact Assessment: Secure Payment System*, U.S. Dep't Treasury (Mar. 22, 2021), https://www.fiscal.treasury.gov/files/pia/spspclia.pdf.
[44] 85 Fed. Reg. 11,776.

*Providing DOGE Representatives with Direct Access to the FDS is a "Disclosure"
Under the Privacy Act*

61.     Representatives of DOGE were granted access to payment systems within FDS and the records and data therein on January 31, 2025.[45] That access qualifies as a disclosure under the Privacy Act.

62.     None of the individual Plaintiffs, and on information and belief, none of the members of the Plaintiff Organizations requested disclosure or provided express written consent to the disclosure of their records and information to DOGE representatives.

*DOGE Representatives Do Not Require Access to the FDS in the Performance of Their Duties*

63.      The New York Times recently reported that "Musk allies who have been granted access to the payment system were made Treasury employees."[46]

64.     The Privacy Act's exception for disclosures to employees who need the record "in the performance of their duties" does not apply. Even if Krause and Elez were Treasury employees at the time Defendants provided them with access to the FDS, Musk's stated purpose for that access, which is to stop "approving" all payments,[47] is incompatible with any legitimate duties of the Department of the Treasury with respect to the FDS.

65.     The Treasury Department maintains the relevant record systems so that it may, in a non-discretionary manner, send out payments approved by other federal agencies.[48] Consistent with the Treasury Department's limited role in the payment disbursement process, FDS's payment systems are designed to "facilitate" payments from federal government entities to their recipients.[49] Stated differently, the payment systems contained within the FDS serve as

---

[45] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. Times, (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.
[46] *Id.*
[47] Elon Musk (@elonmusk), X (Feb. 2, 2025, 2:27 PM), https://x.com/elonmusk/status/1886134485822922785.
[48] *See* 31 U.S.C. § 3325(a); U.S. Dep't Treasury, *Treasury Department Letter to Members of Congress Regarding Payment Systems* (Feb. 4, 2025), https://home.treasury.gov/news/press-releases/sb0009 ("To be clear, the agency responsible for making the payment always drives the payment process.").
[49] 85 Fed. Reg. 11,776, 11,778.

processing centers that enact disbursement requests received from agencies; they are not independent centers of review.[50]

*Defendants' Disclosures of FDS Information to DOGE Representatives is Not a "Routine Use" of the Protected Information*

66.    The Privacy Act's "routine use" exception also does not apply. The SORN for payments systems within FDS lists 19 possible routine uses, none of which apply to DOGE staffers' access to FDS.[51]

67.    For example, representatives of DOGE are not accessing FDS records on behalf of the banking industry, an investigative agency, an agency responsible for law enforcement, a court, a foreign government, a congressional office, a union, a third party during the course of an investigation, a federal creditor agency, a state, debt collectors, or representatives of the National Archives and Records Administration.[52]

68.    Representatives of DOGE also are not responding to a suspected or confirmed "breach of the system of records,"[53] or "ensuring the efficient administration" of "payment processing services."[54]

69.    Rather, representatives of DOGE intend to change the purpose of payment systems within FDS to "scrutinize[]" payments and "pause" those they deem "improper," rather than disburse payments in a non-discretionary manner.[55] Consistent with this, Musk has indicated that DOGE officials are looking to control, and potentially cut off, disbursements from the Bureau of the Fiscal Service.[56] This is not a routine use listed in the SORN that would authorize Defendants' disclosure of sensitive personal and financial data to DOGE

---

[50] U.S. Dep't Treasury, *Privacy and Civil Liberties Impact Assessment: Secure Payment System* (Mar. 22, 2021), https://www.fiscal.treasury.gov/files/pia/spspclia.pdf.
[51] 85 Fed. Reg. 11,776, 11,778.
[52] *See id.*
[53] *Id.*
[54] *Id.*
[55] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html. ; Elon Musk (@elonmusk), X (Feb. 3, 2025, 11:43 AM), https://x.com/elonmusk/status/1886455404713943058.
[56] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217.

Representatives.[57] Nor could it be, given the Treasury's practice and policies regarding use of the FDS to fulfill its duty to disburse payments approved by other agencies.

70.    None of the other statutory exceptions for disclosure of personal information set forth in the Privacy Act applies or would have applied to authorize Defendants Bessell's and the Treasury's decision to disclose the sensitive information and data contained within the FDS to DOGE representatives.

**U.S. Office of Personnel Management Federal Work Force Files**

71.    OPM serves as the "chief human resources agency and personnel policy manager for the Federal Government."[58]

72.    As part of its workforce management responsibilities, OPM maintains systems that are responsible for "government-wide personnel management activities," such as tracking human resource and payroll data, operating centralized application and hiring systems for federal government jobs, and managing health benefits for more than 8 million federal civilian employees and other eligible individuals.[59]

73.    The systems that OPM operates and maintains contain extensive amounts of sensitive PII. This includes name, Social Security number, employment history, address, telephone number, demographic information, and disability status, among many other pieces of PII.[60] Within the OPM systems, there is PII for tens of millions of individuals, if not more,

---

[57] 85 Fed. Reg. 11,776.

[58] *About Us*, U.S. Off. Personnel Mgmt., https://www.opm.gov/about-us.

[59] *Privacy Impact Statement for Health Insurance Data Warehouse*, U.S. Off. Personnel Mgmt. (July 2, 2021), https://www.opm.gov/information-management/privacy-policy/privacy-policy/hidw-pia.pdf [hereinafter *HIDW PIA*]; *Privacy Impact Assessment for USAJOBS*, U.S. Off. Personnel Mgmt. (July 8, 2020), https://web.archive.org/web/20241228071153/https://www.opm.gov/information-management/privacy-policy/privacy-policy/usajobs-pia.pdf; *Privacy Impact Statement for Enterprise Human Resources Integration Data Warehouse*, U.S. Off. Personnel Mgmt. (July 11, 2019), https://www.opm.gov/information-management/privacy-policy/ehridw.pdf.

[60] *Privacy Impact Assessment Summaries*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/#url=PIAs.

including current and former federal employees and applicants to jobs at more than 500 federal agencies.[61]

74.    It has been reported that access to these OPM systems is generally held only by "senior career employees" at OPM.[62]  Some subsets of records in OPM systems are subject to even stricter access restrictions, such as those in the Health Insurance Data Warehouse, which are generally confined to "a limited number of well-trained [health insurance] analysts."[63]

**DOGE's Efforts to Improperly Access OPM Systems**

75.    Shortly after the inauguration of President Trump, civil servants within OPM received instructions to provide access to the sensitive OPM systems to DOGE representatives.[64]

76.    On information and belief, DOGE representatives have gained sweeping access to highly sensitive record systems within the last few weeks. The *Washington Post* reported on February 6:

> At least six DOGE agents were given broad access to all personnel systems at the OPM on the afternoon of Jan. 20, the day of Trump's inauguration, according to two agency officials. Three more gained access about a week later, they said.

> The data that the DOGE team can access includes a massive trove of personal information for millions of federal employees, included in systems called Enterprise Human Resources Integration and Electronic Official Personnel Folder. It also includes personal information for anyone who applied to a federal job through the site USAJobs, the people said. Last year alone, the people said, there were 24.5 million such applicants.

---

[61] U.S. Gov. Accountability Off., *USAJOBS Website: OPM Has Taken Actions to Assess & Enhance the User Experience* (Oct. 2020), https://www.gao.gov/assets/gao-21-31.pdf#:~:text=approximately%2017.5%20million%20job%20applications%20were%20started,applicants%20are%20deemed%20qualified%20and%20which%20are; *HIDW PIA, supra* note 59.

[62] Tim Reid, *Exclusive: Musk Aides Lock Workers Out of OPM Computer Systems*, Reuters (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31; *see, e.g., HIDW PIA, supra* note 59, at 9 (noting that "only a limited number of well-trained [health-insurance] analysts have access to the information in the [Health Insurance Data Warehouse system]."); *Privacy Impact Assessment for the Payment Processing Automation Initiative*, U.S. Off. Personnel Mgmt. at 8 (June 3, 2020), https://www.opm.gov/information-management/privacy-policy/privacy-policy/ppai-olbp.pdf (noting "access controls that limit access to only those with a need to know and only with access appropriate to their roles and responsibilities").

[63] *HIDW PIA, supra* note 59.

[64] Caleb Ecarma & Judd Legum, *Musk Associates Given Unfettered Access to Private Data of Government Employees*, Popular Info. (Feb. 3, 2025), https://popular.info/p/musk-associates-given-unfettered.

The two OPM officials said the level of access granted to DOGE agents means they could copy the Social Security number, phone numbers and personnel files for millions of federal employees.[65]

77.     The access instructions specified that DOGE representatives should have "admin user" access that allowed them to "code read and write permissions," in essence allowing these officials to "make updates to anything that they want."[66]

78.     Defendants OPM and Acting Director Ezell provided DOGE representatives, including a recent high school graduate, with access to these sensitive systems and databases, including USAJOBS, the Enterprise Human Resources Integration Data Warehouse ("EHRI DW"), USA Staffing, USA Performance, and the Health Insurance Data Warehouse ("HIDW"), and the personally identifiable information contained within.[67]

79.     In late January, career officials who have long had access to these systems had their permissions "revoked."[68]

80.     DOGE representatives at OPM have since used their access to examine job description data and "remove" specific government employees.[69] On February 8, 2025, the Washington Post reported that access to EHRI DW and the Electronic Official Personnel Folder was revoked for "some" DOGE agents.[70]

**Defendants' Disclosure of Information in OPM Systems to DOGE Representatives Violates the Privacy Act**

*OPM Systems Contain Systems of Records*

---

[65] Isaac Stanley-Becker et al., *Musk's DOGE Agents Access Sensitive Personnel Data, Alarming Security Officials*, Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/national-security/2025/02/06/elon-musk-doge-access-personnel-data-opm-security.
[66] Ecarma & Legum, *supra* note 64.
[67] *Id.*
[68] Tim Reid, *Exclusive: Musk Aides Lock Workers Out of OPM Computer Systems*, Reuters (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31.
[69] Ecarma & Legum, *supra* note 64.
[70] Isaac Stanley-Becker and Hannah Natanson, *Some DOGE agents removed from sensitive personnel systems after security fears*, Washington Post (Feb. 8, 2025), https://www.washingtonpost.com/nation/2025/02/08/doge-opm-musk/.

81.    The systems to which DOGE-related officials have access within OPM, including USAJOBS, EHRI DW, USA Staffing, USA Performance, and HI DW (collectively, "OPM Systems"), are systems of records, as certified by the Chief Privacy Officer of OPM.[71] OPM has published a SORN for these record systems.[72]

82.    The information in the OPM Systems is retrieved by "an identifying particular" assigned to an individual.[73]

83.    The systems within OPM contain extensive personally identifiable information about individuals, including but not limited to Social Security number, employment history, and addresses.[74]

*Providing DOGE Representatives with Direct Access to Specific OPM Systems is a Disclosure Under the Privacy Act*

84.    Representatives of DOGE were granted access to personnel- and benefit-related systems within OPM and the records therein on or before January 31, 2025.[75] That access qualifies as a disclosure under the Privacy Act.

85.    DOGE representatives within OPM have "'review[ed] position description level data,'" an act that would involve information retrieval from systems within OPM.[76]

86.    Disclosure can be written, oral, electronic, or a mechanical transfer between computers of record content.[77]

87.    None of the individual Plaintiffs, and on information and belief, none of the members of the Plaintiff Organizations requested disclosure or provided express written consent

---

[71] *Privacy Policy*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/#url=PIAs
[72] *System of Records Notices (SORN)*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/#url=SORNs.
[73] *OPM SORN GOVT-2 Employee Performance File System Records*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/sorn/opm-sorn-govt-2-employee-performance-file-system-records.pdf.
[74] *See, e.g.*, *HIDW PIA, supra* note 59.
[75] *See* Tim Reid, *Exclusive: Musk Aides Lock Workers Out of OPM Computer Systems*, REUTERS (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31.
[76] Ecarma & Legum, *supra* note 64.
[77] OMB Guidelines, 40 Fed. Reg. 28,948, 28,953 (July 9, 1975).

to the disclosure of their records and information to DOGE representatives. As such, Defendants'
continued and ongoing disclosure of their records to DOGE representatives constitutes a
violation of the Privacy Act, for which no exception applies.

*DOGE Representatives Do Not Require Access to the FDS in the Performance of Their
Duties*

88.    It has been reported that the DOGE representatives who have been provided by
Defendants with access to the OPM systems are "political appointees" at OPM.[78] However, it has
also been reported that DOGE representatives "have received official government credentials,
including official email addresses, at multiple agencies."[79] For example, some DOGE
representatives in the Department of Education's internal address book "also have GSA or OPM
email addresses," seemingly holding themselves out as employees of multiple agencies at the
same time, while ultimately serving DOGE's mission.

89.    The Privacy Act's exception for disclosures to employees who need the record "in
the performance of their duties" does not apply to the disclosures here. On information and
belief, DOGE's purpose for accessing that data is to significantly "restructur[e]" the government
by "push[ing]" out employees.[80]

*Defendants' Disclosures of Specific OPM Systems to DOGE Officials is Not a "Routine
Use" of the Protected Information*

90.    The Privacy Act's "routine use" exception also does not apply. The SORNs for
specific systems within OPM, namely USAJOBS, EHRI DW, USA Staffing, USA Performance,
and HI DW, list 114 overlapping possible routine uses, none of which apply here.[81]

---

[78] Ecarma & Legum, *supra* note 64.

[79] Washington Post Staff, *Elon Musk's DOGE Has Swept into 15 Federal Agencies. Here's What to Know.*, WASH.
POST (Feb. 8, 2025), https://www.washingtonpost.com/business/2025/02/04/elon-musk-government-legal-doge.

[80] *Id.*; Reuters, *Musk's DOGE agents access sensitive government personnel data, Washington Post reports* (Feb. 6,
2025), *available at* https://www.reuters.com/world/us/musks-doge-agents-access-sensitive-opm-personnel-data-
washington-post-reports-2025-02-06/.

[81] *See* Privacy Act of 1974: Update and Amend System of Records, 79 Fed. Reg. 16834 (March 26, 2014); *OPM
GOVT-2 Applicant Race, Sex National Origin, & Disability Status Records*, U.S. Off. Personnel Mgmt.,
https://www.opm.gov/information-management/privacy-policy/sorn/opm-sorn-govt-7-applicant-race-sex-national-
origin-and-disability-status-records.pdf; Privacy Act of 1974: Update Existing System of Records, 77 Fed. Reg.

91.    For example, representatives of DOGE are not accessing OPM records on behalf of a training facility, educational institution, foreign government official, agency adjudicating benefit claims, agency choosing to honor employees, labor organization official, the Merit Systems Protection Board, or the Equal Employment Opportunity Commission, among others.[82]

92.    Rather, on information and belief, representatives of DOGE intend to misuse OPM's systems to indiscriminately remove individuals from their positions en masse.[83] This is not a routine use listed in the SORNs.[84]

93.    None of the other statutory exceptions for disclosure of personal information set forth in the Privacy Act applies or would have applied to authorize Defendants' decision to disclose the sensitive information and data contained within the FDS to DOGE representatives.

**Department of Education Student Loan System**s

94.    The Department of Education (ED) is responsible for managing the federal student loan system through its Federal Student Aid (FSA) office. ED maintains several systems of record that support operation of the federal student loan system.

*National Student Loan Data System*

95.    The National Student Loan Data System (NSLDS) is a comprehensive national database for the Federal financial aid program. "As the central database for Title IV student financial aid, NSLDS stores information about loans, grants, students, borrowers, lenders, guaranty agencies . . . , schools, and servicers. It provides detailed information on individuals

---

73694 (Dec. 11, 2012); *OPM GOVT-6 Personnel Research & Test Validation Records*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/sorn/opm-sorn-govt-6-personnel-research-and-test-validation-records.pdf; *OPM SORN GOVT-2 Employee Performance File System Records*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/sorn/opm-sorn-govt-2-employee-performance-file-system-records.pdf; Privacy Act of 1974; System of Records, 89 Fed. Reg. 72902 (Sep. 6, 2024).
[82] 77 Fed. Reg. 73694.
[83]Ecarma & Legum, *supra* note 64.
[84] U.S. Off. Personnel Mgmt., *System of Records Notices (SORN)*, https://www.opm.gov/information-management/privacy-policy/#url=SORNs.

ADD96

pertaining to their Title IV loans and grants during all stages of their aid life cycle, from approval through disbursement, repayment, default, and closure."[85]

96.    The NSLDS contains sensitive PII about the tens of millions of Americans who apply for or receive Federal student aid, including Social Security Number, name, date of birth, address, phone number, email address, and driver's license information, as well as demographic data about the borrower.[86]

97.    Personal data about a borrower's parents or co-signers is also contained in the NSLDS. Among other things, it contains "information on the parent(s) of a dependent recipient, including name, date of birth, SSN, marital status, email address, highest level of schooling completed, and income and asset information."[87]

*Common Origination and Disbursement System*

98.    The Common Origination and Disbursement System (CODS) processes information relating to determining eligibility for federal student aid.[88]

99.    The CODS includes records about aid applicants and recipients and their parents and spouses, including Social Security number, name, date of birth, mailing address, email address, driver's license, and telephone number, and demographic information.[89]

*FUTURE Act System*

100.    The FUTURE Act System (FAS) is used to determine eligibility for, or repayment obligations under, various income-driven repayment plans for federal student loans.[90]

101.    FAS contains information about aid applicants, including last name, date of birth, Social Security number and/or Tax Identification Number. It also includes similar information

---

[85] *See* U.S. Dep't of Educ., *Privacy Impact Assessment for the National Student Loan Data System (NLDS-New)* at 4-5 (May 19, 2022), https://www.ed.gov/sites/ed/files/notices/pia/pia-nslds-new.pdf. The records on the NSLDS "legacy" system were transferred to a revamped NSLDS-New system in October 2022. *Id.*
[86] U.S. Dep't of Educ., Notice of a Modified System of Records ("NSLDS SORN"), 87 Fed. Reg. 57,873, 57,878.
[87] *Id.* at 57,879.
[88] U.S. Dep't of Educ., *Privacy Impact Assessment for the Common Origination & Disbursement System* (Sept. 29, 2023), https://www.ed.gov/sites/ed/files/notices/pia/fsa-pia-cod.pdf.
[89] U.S. Dep't of Educ., Notice of a Modified System of Records ("CODS SORN"), 88 Fed. Reg. 41,942, 41,947 (June 28, 2023).
[90] U.S. Dep't of Educ., *Privacy Impact Assessment for the Federal Tax Information Module* (June 4, 2024), https://www.ed.gov/sites/ed/files/notices/pia/pia-ftim.pdf.

about parents of dependent applicants and spouses of independent applicants, plus spousal income and asset information and parental income and asset information.[91]

*Financial Management System*

102.    The Financial Management System ("FMS") interfaces with other Federal Student Aid systems and consolidates and centralizes all Federal Student Aid accounting and financial data into one system. FMS contains personally identifying information about individual borrowers who are entitled to a refund of an overpayment or discharge, or both. The system includes a borrower's Social Security number, name and address, amount of overpayment to be refunded and name of the loan holder.[92]

**DOGE's Efforts to Improperly Access ED's Systems**

103.    According to a report in the Washington Post, "roughly 20 people with Elon Musk's 'Department of Government Efficiency,' known as DOGE, have begun working inside the Education Department, looking to cut spending and staff."[93] The Washington Post has also written, "DOGE staffers have gained access to multiple sensitive internal systems, including a financial aid dataset that contains the personal information for millions of students enrolled in the federal student aid program."[94] The access has "deeply alarmed" career staff.[95] On information and belief, the systems accessed include NSLDS, COGS, FAS and/or FMS.

104.    It has been publicly reported that DOGE representatives "fed sensitive data from across the Education Department into artificial intelligence software to probe the agency's programs and spending."[96]  The Washington Post has reported that "[t]he DOGE team plans to

---

[91] U.S. Dep't of Educ., Notice of a New System of Records ("FAS SORN"), 88 Fed. Reg. 42,220, 42,222 (June 29, 2023).

[92] U.S. Dep't of Educ., Notice of a New System of Records ("FMS SORN"), 73 Fed. Reg. 177, 177 (Jan. 2, 2008).

[93] Laura Meckler et al., *Trump Preps Order to Dismantle Education Dept. as DOGE Probes Data*, WASH. POST (Feb. 3, 2025), https://www.washingtonpost.com/education/2025/02/03/trump-education-department-dismantling-executive-order-draft.

[94] *Id.*

[95] Jeff Stein et al., *U.S. Government Officials Privately Warn Musk's Blitz Appears Illegal*, Wash. Post (Feb. 4, 2025), https://www.washingtonpost.com/business/2025/02/04/elon-musk-government-legal-doge.

[96] Hannah Natanson et al., *Elon Musk's DOGE Is Feeding Sensitive Federal Data into AI to Target Cuts*, Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/nation/2025/02/06/elon-musk-doge-ai-department-education.

replicate this process across many departments and agencies, accessing the back-end software at different parts of the government and then using AI technology to extract and sift through information about spending on employees and programs."

**Defendants' Disclosure of Information in ED's Systems to DOGE Officials Violates the Privacy Act**

*The ED Systems are Systems of Record*

105.    NLSDS, COGS, FAS, and FMS (collectively, the "ED Systems") are each a system of records, and ED has published a SORN describing each system's purposes and uses.[97]

106.    The information in each of the ED Systems is retrieved by the name of the individual or other "identifying particular" assigned to an individual.[98]

107.    ED's systems contain extensive personally identifiable information about individuals, including but not limited to Social Security number, sensitive financial information, and address.

*Providing DOGE Representatives with Direct Access to ED Systems is a "Disclosure" Under the Privacy Act*

108.    On information and belief, Defendants Acting Secretary of Education Denise Carter and the Department of Education granted representatives of DOGE access to ED Systems on or before February 3, 2025. That access qualifies as a disclosure under the Privacy Act.

109.    None of the individual Plaintiffs, and on information and belief, none of the members of the Plaintiff Organizations requested disclosure or provided express written consent to the disclosure of their records and information to DOGE representatives.

*"Feeding" ED Systems Data to Unvetted AI Tools Is Likewise a "Disclosure" Under the Privacy Act*

110.    Public reporting has revealed that DOGE has begun "feeding" ED data into artificial intelligence tools, including "data with personally identifiable information for people

---

[97] *See* NSLDS SORN, CODS SORN, FAS SORN, FMS SORN.
[98] NLDS SORN, 87 Fed. Reg. 57,873, 57,881; CODS SORN, 88 Fed. Reg. 41,942, 41,950; FAS SORN, 88 Fed. Reg. 42,220, 42,225; FMS SORN, 73 Fed. Reg. 177, 179.

who manage grants, as well as sensitive internal financial data."[99] Reporting also indicates that DOGE plans to use artificial intelligence programs to analyze data retrieved from additional agency systems.[100] The AI tools DOGE is using to analyze agency data are reportedly hosted on cloud-based computers that are located outside of federal-government facilities.[101]

111.    Feeding ED Systems data into DOGE's AI tools constitutes additional unauthorized disclosures of data to the pur-based computers and operators of those systems.[102]

*DOGE Representatives Do Not Require Access to ED Systems in the Performance of their Duties*

112.    The Privacy Act carves out an exception for disclosures without prior written consent to "officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties."

113.    The Privacy Act's exception for disclosures to employees who need the record "in the performance of their duties" does not apply.

114.    Disclosure of data housed in any of the ED Systems to DOGE representatives is not necessary for the performance of the duties of ED employees or officials.

115.    The data stored on ED Systems is collected and maintained to enable administration of the student loan system under Title IV of the Higher Education Act.[103]

116.    DOGE and its representatives' access to ED Systems has a very different purpose: Musk has boasted online that DOGE is advancing President Trump's aim to "end[] the federal Department of Education."[104] Musk's claim comes after President Trump "repeatedly vowed to shutter the federal agency" on the campaign trail and announced after taking office that he

---

[99] *See Natanson*, *supra* n.102.
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] NLDS SORN, 87 Fed. Reg.  57,873, 57,877-78; CODS SORN, 88 Fed. Reg.  41,942, 41,945-46; FMS SORN, 73 Fed. Reg, 177, 178; FAS SORN, 88 Fed. Reg. 42,220, 42,221-22.
[104] Elon Musk (@elonmusk), X (Feb. 3, 2025, 8:30 PM), https://x.com/elonmusk/status/1886633448078475593; *see also* Meckler et al., *supra* note 92 (noting that DOGE access "is a prelude to a more dramatic effort to make good on one of Trump's campaign promises: eliminating the Education Department altogether").

expects his nominee for Secretary of Education to "put herself out of a job."[105] On February 7, 2025, after DOGE officials had gained access to ED systems, Musk claimed that the department "doesn't exist."[106]

> *Defendants' Disclosures of ED Systems Information to DOGE Officials is Not a "Routine Use" of the Protected Information*

117.    The Privacy Act's "routine use" exception also does not apply.

118.    The SORN for NSLDS lists 14 routine uses, none of which apply here.

119.    The routine uses for NSLDS generally fall into several broad categories: uses related to administration of the loan program; disclosures to enable enforcement by agencies "charged with the responsibility of investigating or prosecuting" specific violations; litigation or alternative disputes resolution procedures; disclosures required under the Freedom of Information Act or Privacy Act; contract-related disclosures; employment- or benefit-related matters; employee grievance proceedings; labor organization disclosure; disclosures to the Justice Department or OMB; disclosures in the course of responding to a data breach; disclosures in assisting another agency responding to a data breach; and disclosures to the National Archives and Records Administration.[107]

120.    None of the routine uses listed by the NSLDS SORN contemplate data access for the purpose of dismantling the Department of Education.

121.    None of the routine uses listed by the NSLDS SORN contemplate "feeding" data into artificial intelligence systems, and certainly not for the purpose of dismantling the Department of Education.

122.    As alleged above, DOGE officials are accessing the ED Systems for purposes of destroying ED, not for any of the purposes identified in the NSLDS SORN.

---

[105] Zachary Schermele, *President Trump Says He Wants His Education Secretary to 'Put Herself out of a Job'*, USA TODAY (Feb. 4, 2025), https://www.usatoday.com/story/news/education/2025/02/04/trump-education-department-mcmahon/78220522007.
[106] Elon Musk (@elonmusk), X (Feb. 7, 2025, 5:34 PM), https://x.com/elonmusk/status/1888038615780909178.
[107] NLDS SORN, 87 Fed. Reg. 57,873, 57,879-81.

123.    The SORN for CODS lists 15 routine uses, none of which apply here. The routine uses for CODS are similar to those for NSLDS.[108]

124.    As alleged above, DOGE officials are accessing the ED Systems for purposes of destroying ED, not for any of the purposes identified in the CODS SORN.

125.    The SORN for FAS lists 15 routine uses, none of which apply here. The routine uses for FAS are similar to those for NSLDS and CODS.[109]

126.    As alleged above, DOGE officials are accessing the ED Systems for purposes of destroying ED, not for any of the purposes identified in the FAS SORN.

127.    The SORN for FMS lists 10 routine uses, none of which apply here. The routine uses for FAS are similar to those for NSLDS, CODS, and FAS.[110]

128.    As alleged above, DOGE officials are accessing the ED Systems for purposes of destroying ED, not for any of the purposes identified in the FMS SORN.

129.    The use of the records contained in ED Systems to dismantle ED is incompatible with any legitimate duties of the Department and with the purpose for which the records were collected and maintained.

130.    None of the other statutory exceptions for disclosure of personal information set forth in the Privacy Act applies or would have applied to authorize Defendants' decision to disclose the sensitive information and data contained within the ED to DOGE representatives.

**Defendants' Disclosure of Protected Data to DOGE Employees Is Unprecedented**

131.    Defendants and DOGE have turned the data systems that enable the government to function into a weapon to dismantle the government from the inside. Indeed, Mr. Musk exults the non-routine nature of DOGE. In response to a post on X that said "DOGE is speedrunning government reform--$4B/day cuts could start THIS weekend. Bureaucracy never saw it

---

[108] CODS SORN, 88 Fed. Reg. 41,942, 41,948-50.
[109] FAS SORN, 88 Fed. Reg. 42,220, 42,223-25.
[110] FMS SORN, 93 Fed. Reg. 177, 178-79.

coming[,]" Musk seemed to agree, explaining: "Very few in the bureaucracy actually work the weekend, so it's like the opposing team just leaves the field for 2 days!"[111]

132.    As DOGE's intrusion into Plaintiffs' sensitive data is unprecedented, Defendants' disclosures cannot constitute "routine use" authorized by the Privacy Act.[112] When these systems are used for routine purposes, access is usually very restricted.[113] For instance, "the aggregate information contained in the OPM databases is so sensitive, said a U.S. official, that even White House requests for certain types of data were rebuffed under previous administrations."[114]

133.    Defendants are disclosing protected data to DOGE representatives not to advance their agencies' respective agendas, but to advance the DOGE agendas. Destroying Congressionally-established federal agencies is not a "routine use" of these systems. Identifying entire programs to eliminate is not a "routine use" of these systems. And feeding Americans' PII into private artificial intelligence systems is not a "routine use" of these systems.

**Defendants' Disclosure of Protected Data Has Harmed and Will Continue to Harm Plaintiffs**

134.    President Gerald Ford, who signed the Privacy Act into law, described the Act as codifying this country's long-held commitment to "safeguard personal privacy." Indeed, the Act mandates that the government "protect the right of privacy for every American." Defendants' unauthorized access and disclosure of that information to DOGE representatives violates Plaintiffs' rights under the Privacy Act. It has also exposed Plaintiffs' sensitive information to serious risk.

---

[111] Elon Musk (@elonmusk), X (Feb. 1, 2025 3:37 PM), https://x.com/elonmusk/status/1885789468713476492.

[112] Charlie Warzel & Ian Bogost, *The Government's Computing Experts Say They are Terrified,* The Atlantic (Feb. 7, 2025), https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/.

[113] *Id.*

[114] Isaac Stanley-Becker et al., *Musk's DOGE Agents Access Sensitive Personnel Date, Alarming Security Officials*, Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/national-security/2025/02/06/elon-musk-doge-access-personnel-data-opm-security/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&carta-url=https%3A%2F%2Fs2.washingtonpost.com%2Fcar-ln-tr%2F40f0f54%2F67a4ea66cd86f13ee737dd6e%2F5972aa5bade4e21a84818a4e%2F14%2F60%2F67a4ea66cd86f13ee737dd6e.

135.    Plaintiffs, like many millions of Americans since the Act's passage, rely on the protections enshrined in the Privacy Act to safeguard their sensitive information housed in the systems described in this Complaint. Defendants' actions have run roughshod over those protections. Cyber security experts warn that Defendants' actions pose several extreme risks. "As one administrator for a federal agency with deep knowledge about the government's IT operations told [the *Atlantic*], "'I don't think the public quite understands the level of danger.'"[115]

136.    According to public reporting, a Treasury Department internal threat analysis has designated DOGE to be an "insider threat."[116] The Bureau of Fiscal Service's threat intelligence team recommended "suspending [DOGE's] access immediately and conducting a comprehensive review of all actions they may have taken on these systems."[117] The internal Treasury report went on, "Continued access to any payment systems by DOGE members, even 'read only,' likely poses the single greatest insider threat risk the Bureau of the Fiscal Service has ever faced."[118]

137.    The chaotic[119] and secretive[120] process by which DOGE representatives have gained access to protected data—sometimes without proper vetting or security clearances[121]—increases Plaintiffs' concern about additional risks of unauthorized disclosure. Even "read only" access allows users to copy and transfer Plaintiffs' protected data into other systems—without limitation.[122]

---

[115] Charlie Warzel & Ian Bogost, *The Government's Computing Experts Say They are Terrified,* The Atlantic (Feb. 7, 2025), https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/.

[116] Vittoria Elliott & Leah Feiger, *A US Treasury Intelligence Analysis Designates DOGE Staff as 'Insider Threat'*, Wired (Feb. 7, 2025), https://www.wired.com/story/treasury-bfs-doge-insider-threat/.

[117] *Id.*

[118] *Id.*

[119] Makena Kelly, *DOGE Staff Had Questions About the 'Resign' Email. Their New HR Chief Dodged Them*, Wired (Feb. 1, 2025), https://www.wired.com/story/doge-hr-elon-musk-resignation-fork-road-leaked-staff-meeting/.

[120] Vittoria Elliott et al., *The US Treasury Claimed DOGE Technologist Didn't Have "Write Access" When He Actually Did*, Wired (Feb. 6, 2025), https://www.wired.com/story/treasury-department-doge-marko-elez-access/.

[121] Nick Schwellenbach, *Elon Musk's DOGE Teams Raise Vetting, Ethic Concerns*, Project on Government Oversight (Feb. 6, 2025), https://www.pogo.org/investigations/elon-musks-doge-teams-raise-vetting-ethics-concerns.

[122] Charlie Warzel & Ian Bogost, *The Government's Computing Experts Say They are Terrified,* The Atlantic (Feb. 7, 2025), https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/.

138.    At least one DOGE representative has been publicly reported to have been a member of cybercrime communities[123] and was reported to have been previously fired from a cybersecurity firm for leaking company secrets.[124] It has also been widely reported that DOGE representatives are using non-government issued devices to connect to government servers, which significantly increases the risk of hacking.[125]

139.    Exacerbating the risk of additional unauthorized access to Plaintiffs' private records is the planned introduction of the at-issue data into artificial intelligence systems. The security risks associated with AI are well-documented. President Biden issued an Executive Order on October 30, 2023—which President Trump has since rescinded—identifying the "extraordinary potential" for "peril" associated with use of AI, including but not limited to "fraud, discrimination, bias, and disinformation" and creating risks "to national security."[126] Notwithstanding this, Defendants and DOGE representatives have adopted a "move fast and break things" "AI-first strategy" that has already resulted in the sharing of sensitive Education Department information with AI software with additional AI uses likely to follow.[127]

140.    Defendants' unlawful disclosures of Plaintiffs' data to DOGE representatives has caused Plaintiffs major distress and anxiety, as they do not know who their data has been or will be shared with, whether these disclosures have made them vulnerable to further privacy breaches, and how it may be weaponized against them. They are concerned that as a result of the

---

[123] Brian Krebs, *Teen on Musk's DOGE Team Graduated from 'The Com'*, Krebs on Security (Feb. 7, 2025), https://krebsonsecurity.com/2025/02/teen-on-musks-doge-team-graduated-from-the-com/.

[124] Jason Leopold et al., *Musk's DOGE Teen Was Fired By Cybersecurity Firm for Leaking Company Secrets*, Bloomberg (Feb. 7, 2025), https://www.bloomberg.com/news/articles/2025-02-07/musk-s-doge-teen-was-fired-by-cybersecurity-firm-for-leaking-company-secrets?accessToken=eyJhbGciOiJIUzI1NiIsInR5cCI6IkpXVCJ9.eyJzb3VyY2UiOiJTdWJzY3JpYmVyR2lmdGVkQXJ0aWNsZSIsImlhdCI6MTczODk1NzQyNCwiZXhwIjoxNzM5NTYyMjI0LCJhcnRpY2xlSWQiOiJTUkJXMTlUMVVNMFcwMCIsImJjb25uZWN0SWQiOiIyQjE3NzFFOTlEODc0QzRDOTY1Njg1RTZBQkJGM0QwRCJ9.vxGv4ncXEbIrUGmUYpTUdxLmCVDwzmEWp-VRWV9otME&leadSource=uverify%20wall.

[125] Cynthia Brumfield, *Musk's DOGE effort could spread malware, expose US systems to threat actors*, CSO (Feb. 4, 2025), https://www.csoonline.com/article/3815925/musks-doge-effort-could-spread-malware-expose-us-systems-to-threat-actors.html.

[126] Exec. Order No. 14,110, 88 Fed.Reg. 75,191 (Nov. 1, 2023).

[127] Victor Tangermann, *Elon Musk's DOGE Training an AI to Analyze Government Spending*, Futurism (Feb. 7, 2025), https://futurism.com/elon-musk-doge-ai-government; Natanson, *supra* n. 103.

unlawful disclosures, they will be subject to harassment, intimidation, and economic and reputational harm. These harms are ongoing and will continue absent judicial intervention.

**Ongoing Litigation**

141.    On February 3, several unions and membership associations sued Defendants Bessent and Department of the Treasury in Federal District Court of the District of Columbia asserting Privacy Act violations based on DOGE access to FDS systems. On February 6, the judge in that case deferred ruling on the plaintiffs' motion for a temporary restraining order on the basis of an agreement among the parties limiting access to FDS records to specific Treasury Department officials, as well as Krause and Elez, "until such time as the Court rules on the Plaintiffs' forthcoming Preliminary Injunction Motion."

142.    On February 7, 2025, the attorneys general of 19 states filed a lawsuit against President Trump and Defendants Bessent and Department of the Treasury in the Southern District of New York challenging the defendants' policy to expand the Bureau of Fiscal Services' access to political appointees and Special Government Employees. The States allege that the policy violates the Privacy Act, APA, separation of powers doctrine, and the Take Care Clause of the United States Constitution.

143.    On February 8, 2025, the judge in that case granted the plaintiffs' motion for a temporary restraining order, restraining the defendants from granting access to any Treasury Department data system containing PII to any political appointee, Special Government Employee, or detailee from another agency, and ordering them to direct any person who has already received such access to immediately destroy any and all copies of material downloaded from Treasury Department systems.

144.    Despite the existence of these other lawsuits, Plaintiffs anticipate additional disclosures of their protected data as DOGE continues its plans to expand its reach within the agencies.

**COUNT I – Violation of APA**

**(Not in accordance with law)**

145.     The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

146.     The Privacy Act prohibits Defendants from disclosing records on individuals to any person without the individual's consent except in specified circumstances, none of which are present here. 5 U.S.C. § 552a(b).

147.     Defendants have granted DOGE representatives ongoing access to their systems of records containing sensitive and personal data.

148.     Defendants have disclosed Plaintiffs' records and the records of Plaintiffs' members to DOGE representatives without obtaining their consent.

149.     Defendants have disclosed Plaintiffs' records and the records of Plaintiffs' members to DOGE representatives for uses other than the routine uses specified in the applicable SORNs.

150.     Defendants' actions violate the prohibitions in the Privacy Act and are therefore not in accordance with law.

151.     An individual action against Defendants for damages under the Privacy Act would not cause Defendants to end the unlawful disclosure of Plaintiffs' and their members' records to DOGE Representatives, including future DOGE Representatives. Defendants' action is "final agency action for which there is no other adequate remedy in a court" and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

## COUNT II – Violation of APA

### (Arbitrary and capricious)

152.     The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

153.     Defendants have failed to consider the consent requirements of the Privacy Act, 5 U.S.C. § 552a(b), and their duty to protect the sensitive data on their systems, 5 U.S.C. §

552a(e)(1); the risks that their disclosures would result in corrupted data; and the security threats that are likely to result from their action.

154.    Defendants failed to engage in reasoned decision-making to grant DOGE representatives sweeping access to their systems of records containing sensitive and personal data for the purposes of advancing the DOGE agenda.

155.    Because Defendants have failed to consider an important aspect of the problem, failed to engage in reasoned decision-making, and offer explanations that run counter to the evidence before them, Defendants' actions are arbitrary and capricious.

156.    An individual action against Defendants for damages under the Privacy Act would not cause Defendants to end the unlawful disclosure of Plaintiffs' and their members' records. Defendants' action is "final agency action for which there is no other adequate remedy in a court" and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

### COUNT III – Violation of APA
### (Excess of statutory authority)

157.    The APA directs courts to hold unlawful and set aside agency actions in excess of statutory authority. 5 U.S.C. § 706(2)(C).

158.    Defendants have a non-discretionary duty to protect records on individuals from unauthorized disclosure.

159.    Defendants' action to grant DOGE representatives access to their systems of records containing sensitive and personal data violates that duty.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.    Declare that Defendants acted unlawfully in disclosing records protected by the Privacy Act to DOGE representatives.

b.    Enjoin Defendants from continuing to permit such access or otherwise obtain such information.

c. Enjoin Defendants to ensure that there is no further unauthorized use or dissemination resulting from the unauthorized disclosures.

d. Enjoin Defendants to retrieve or ensure the destruction of any copies of any records that were unlawfully disclosed.

e. Enjoin Defendants to ensure that future disclosure of individual records will occur only in accordance with the Privacy Act and the SORNs applicable to the system of records at issue.

f. Grant any temporary, preliminary, or permanent injunctive relief necessary to protect the privacy of individuals whose information is contained within the system of records.

g. Award Plaintiffs their costs and attorneys' fees for this action; and

h. Grant any other relief as this Court deems appropriate.

ADD109

DATED:  February 12, 2025

By: _____/s/ Mark Hanna_____
Mark Hanna (Fed. Bar No. 16031)
David J. Rodwin (Fed. Bar No. 18615)
MURPHY ANDERSON PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
T: (202) 223-2620 | F: (202) 296-9600
mhanna@murphypllc.com
drodwin@murphypllc.com

Daniel McNeil (*pro hac* pending)
General Counsel
American Federation of Teachers, AFL-CIO
555 New Jersey Ave. NW
Washington, DC 20001
T: (202) 393-6305 | F: (202) 393-6385
dmcneil@aft.org

Kristy Parker (*pro hac* pending)
Jane Bentrott (*pro hac* pending)
Shalini Goel Agarwal (*pro hac* pending)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
202-843-3092
kristy.parker@protectdemocracy.org
jane.bentrott@protectdemocracy.org
shalini.agarwal@protectdemocracy.org

Benjamin L. Berwick (*pro hac* forthcoming)
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Jessica A. Marsden (*pro hac* pending)
PROTECT DEMOCRACY PROJECT
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Laurence M. Schwartztol (*pro hac* pending)
DEMOCRACY AND RULE OF LAW CLINIC
Harvard Law School
1525 Massachusetts Avenue
Cambridge, MA 02138
(617) 998-1877
lschwartztol@law.harvard.edu

John L. Schwab (*pro hac* pending)
MUNGER, TOLLES & OLSON LLP
350 S Grand Ave 50th Floor
Los Angeles, California 90071
(213) 683-9260
John.Schwab@mto.com

Xiaonan April Hu (*pro hac* pending)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 220-1123
April.Hu@mto.com

Carson Scott (*pro hac* pending)
Roman Leal (*pro hac* pending)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
(415) 512-4000
Carson.Scott@mto.com
Roman.Leal@mto.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2024, copies of the Amended

Complaint and Redlined Amended Complaint were filed via CM/ECF, emailed to Department of

Justice attorneys involved in other litigation, and sent via overnight delivery to the following:

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Civil Process Clerk
U.S. Attorney's Office for D.C.
601 D Street, NW
Washington, DC 20530

Erek Barron
United States Attorney for the District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201

Scott Bessent
Secretary of the Treasury
1500 Pennsylvania Ave. NW
Washington, DC 20220

Department of the Treasury
1500 Pennsylvania Ave. NW
Washington, DC 20220

Charles Ezell
Acting Director of the Office of Personnel Management
1900 E St. NW
Washington, D.C. 20415

U.S. Office of Personnel Management
1900 E St. NW
Washington, D.C. 20415

Denise Carter
Acting Secretary of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

ADD112

U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202


Dated:  February 12, 2025


*/s/ Xiaonan April Hu*
(signed by filer with permission)

Xiaonan April Hu

ADD113

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

AMERICAN FEDERATION OF
TEACHERS,
    555 New Jersey Ave. N.W.
    Washington, DC 2000,

INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS,
    9000 Machinists Place
    Upper Marlboro, MD 20772,

INTERNATIONAL FEDERATION OF
PROFESSIONAL AND TECHNICAL
ENGINEERS,
    513 C St. NE
    Washington, DC 20002,

NATIONAL ACTIVE AND RETIRED
FEDERAL EMPLOYEES ASSOCIATION,
    606 N Washington St.
    Alexandria, VA 22314,

NATIONAL FEDERATION OF FEDERAL
EMPLOYEES,
    225 New York ~~Avenue,~~ Ave., NW,
Suite 450
    Washington, DC 20005,

DONALD MARTINEZ,
    c/o Murphy Anderson PLLC
    1401 K St. NW
    Washington, D.C. 20005,

JASON CAIN,
    c/o Murphy Anderson PLLC
    1401 K St. NW
    Washington, D.C. 20005,

CLIFFORD GRAMBO,
    c/o Murphy Anderson PLLC
    1401 K St. NW
    Washington, D.C. 20005,

THOMAS FANT,
    c/o Murphy Anderson PLLC
    1401 K St. NW
    Washington, D.C. 20005,

Case No. 8:25-cv-00430

CHRISTOPHER PURDY,
     c/o Murphy Anderson PLLC
     1401 K St. NW
     Washington, D.C. 20005, and

KRISTOFER GOLDSMITH
     c/o Murphy Anderson PLLC
     1401 K St. NW
     Washington, D.C. 20005,

       *Plaintiffs*,

   vs.

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury,
     1500 Pennsylvania Ave. NW
     Washington, D.C. 20220,

The UNITED STATES DEPARTMENT OF
THE TREASURY,
     1500 Pennsylvania Ave. NW
     Washington D.C. 20220,

CHARLES EZELL, in his official capacity as
the Acting Director of the Office of Personnel
Management,
     1900 E St. NW
     Washington, D.C. 20415,

The UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT,
     1900 E St. NW
     Washington, D.C. 20415,

DENISE L. CARTER, in her official capacity
as the Acting Secretary of Education, and
     400 Maryland ~~Avenue,~~Ave., SW
     Washington, D.C. 20202,

The UNITED STATES DEPARTMENT OF
EDUCATION,
     400 Maryland ~~Avenue,~~Ave., SW
     Washington, D.C. 20202,

       *Defendants*.

## AMENDED COMPLAINT

1.      Americans who interact with the U.S. Government routinely entrust federal agencies with sensitive personal information: Social Security numbers, home addresses, financial records, and more. The government has codified its promise to treat their information with care in the requirements of the Privacy Act. Today, Defendants are permitting Elon Musk and a cadre of loyalists imported from his private companies to help themselves to the personal information of millions of Americans, in violation of those legal requirements. Plaintiffs in this case seek immediate relief to stop the Defendants from further unlawful disclosures and halt the serious harms that flow from the exposure and dissemination of sensitive personal information.

2.      On January 20, 2025, President Trump issued an executive order refashioning the United States Digital Services as the "U.S. DOGE Service," ostensibly to promote government efficiency. It has been widely reported that the DOGE effort is led by the world's richest man, Elon Musk, and a small team of DOGE representatives that he directs, including at least one 19-year-old who had previously leaked proprietary information.

3.      The White House has revealed little about the members of the DOGE and their qualifications, training, or background. It is similarly unclear whether and to what extent the members of the DOGE have been subject to the same rigorous background checks that federal employees who have access to some of the government's most sensitive and closely guarded data systems undergo. Notwithstanding this, Defendants have provided representatives of the DOGE with access to these systems, which includes Social Security numbers, bank account numbers, dates and places of birth, and other extraordinarily sensitive records of millions of Americans.

4.      Steamrolling into sensitive government record systems threatens to upend how these critical systems are maintained and compromises the safety and security of personal identifying information for Americans all across the country. It also violates federal law.

5.      Collecting and securely maintaining sensitive personal information allows the federal government to provide crucial services—from managing Social Security and veterans' disability payments, to supporting Americans pursuing higher education and helping them access health care.

6.    The Privacy Act balances the government's legitimate need for information about individual Americans with the imperative to mitigate the risks inherent in collecting personal information at scale. "Enacted in the wake of the Watergate and the Counterintelligence Program (~~("~~COINTELPRO~~)"~~) scandals involving illegal surveillance on opposition political parties and individuals deemed to be 'subversive,' the Privacy Act sought to restore trust in government and to address what at the time was seen as an existential threat to American democracy." ~~Dep't. of Justice, Office~~Off. of Privacy ~~and Civil.~~& Civ. Liberties, *Overview of the Privacy Act of 1974*~~, p. 1 (~~*: 2020* ~~ed.).~~*Edition*, at 1. The statute carefully regulates the circumstances in which agency records about individuals can be shared. Disclosures beyond what the statute authorizes are unlawful.

7.    Defendants' mass disclosure of personal information flies in the face of that legal framework and tramples on the individual privacy rights and interests protected by the Privacy Act. It also threatens real people, including individual Plaintiffs and members of the Plaintiff Organizations (collectively, "Plaintiffs"), by exposing them to the risk of identity theft, harassment, intimidation, and embarrassment.

8.    For example, Defendants Treasury Department and Secretary of ~~the~~ Treasury Bessent have improperly disclosed to DOGE representatives the contents of the Federal Disbursement System, which is the government's mechanism for sending payments it owes to individual Americans (as well as other payees). That system contains records relating to every American who receives (among other things) a tax refund, social security benefit, veterans pay, or a federal salary. To facilitate these payments, the system maintains highly sensitive information about millions of Americans, including Social Security numbers, ~~date~~dates of birth, bank account information, and home addresses.

9.    Similarly, Defendants Department of Education and Acting Secretary of Education Denise L. Carter have improperly disclosed information maintained in the National Student Loan Data System. That system contains information on almost 43 million borrowers and their families necessary to manage federal student loan programs. This includes sensitive

personal information such as Social Security numbers, bank records, tax returns, home addresses,

employment data, documentation of marital status, mortgage statements, bank records, tax

returns, child support, investments, family financial status and records, dependent—care cost,

death, divorce, job loss, immigration status, and demographic data about student-borrowers—

and, often, also for their parents, spouses, or other family members.

10.     Defendants U.S. Office of Personnel Management and its Acting Director Charles

Ezell have improperly disclosed information in multiple sensitive record systems. Those records

contain information about the 2.3 million federal employees, as well as millions of other former

federal employees and job applicants. These files contain exceedingly sensitive personal

information: in addition to Social Security numbernumbers, contact information, and

demographic information, they contain highly sensitive employment information.

11.     All of these agencies have valid purposes for maintaining these record systems.

But that does not mean that Elon Musk or other DOGE representatives may have unlimited

access to them. The Privacy Act requires each of these agencies to provide access to records only

as part of the agencies' routine work to advance the legitimate purposes for which the records are

maintained in the first place, or with the express written consent of the individual whose data is

being sought.

12.     Representatives of the DOGE, however, do not believe themselves constrained by

those legitimate purposes or by the individual record-holders' consent. They have accessed

Defendants' data systems and the sensitive information contained within to "shut[] down"

payments and in the case of the Education Department, the agency itself.[1]

13.     The risks to Americans whose sensitive information is improperly disclosed are

very real. Failing to handle these records according to established safeguards increases the risks

that external actors may access them. The personal data contained in these systems could readily

---

[1] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217; Elon Musk (@elonmusk), X (Feb. 3, 2025, 8:30 PM), https://x.com/elonmusk/status/1886633448078475593.

facilitate identity theft and other economic crimes, with potentially devastating consequences for the victims.

14.     These disclosures have directly harmed Plaintiffs.  Plaintiffs include veterans who receive benefit payments as provided by law, current and former federal employees whose confidential employment files reside in the Office of Personnel Management's ("OPM") system, and teachers, first responders, and health care workers whose pathway to careers in public service included relying on student loans to fund their own educations. As to all of them, their personal data has been improperly disclosed to DOGE representatives in a manner completely divorced from the legitimate purposes for which it was maintained and in violation of their privacy rights. Plaintiffs are anxious about the implications of this government-facilitated breach of their personal information and uncertain about how their data is being used or who it will be shared with and whether it will be weaponized against them. They are concerned that the breach may well result in serious personal, social, and economic harm, from being targeted for harassment and threats to doxxing, swatting, and identity theft.

15.     The Administrative Procedure Act authorizes persons whose information has been unlawfully disclosed in violation of the Privacy Act to seek injunctive relief.  *Doe v. Chao*, 435 F.3d 492, 505 n.17 (4th Cir. 2006). Accordingly, Plaintiffs ask this Court to restore the privacy they are entitled to under federal law by preventing further unauthorized and improper disclosures and ensuring that improper disclosures to DOGE representatives stop immediately.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(C) because Defendants are officers and agencies of the United States, no real property is at issue in this case, and one or more Plaintiffs are residents of this District.

## PARTIES

18.    Plaintiff **American Federation of Teachers ("AFT")** is a national labor organization headquartered in Washington, D.C., representing over 1.8 million members who are employed as pre-K through 12th-grade teachers, early childhood educators, paraprofessionals, and other school-related personnel; higher education faculty and professional staff; federal, state, and local government employees; and nurses and other healthcare professionals. For over a decade the AFT has been fighting to help teachers and nurses burdened by student debt receive Public Service Loan Forgiveness. The national union has hosted hundreds of student debt clinics for tens of thousands of its members. As part of those clinics, the AFT has helped its members apply for the Public Service Loan Forgiveness Program, which is administered by the Department of Education. AFT members have records housed within OPM and Department of Education record systems and receive payments of various kinds from the United States Treasury. AFT also advocates for the ethical use of artificial intelligence and enforcement of government regulations that protect its members' personal data.[2]

19.    Plaintiff **National Active and Retired Federal Employees Association ("NARFE")** is a nonprofit organization founded in 1921, incorporated in the District of Columbia, and headquartered in Alexandria, Virginia, with a membership of approximately 128,000 current and former federal employees as well as spousal annuitants. NARFE's mission is to promote the general welfare of current federal civilian employees and federal retirees and their survivors, to advise and assist them with respect to their federal benefits, to represent their interests before appropriate authorities, and to support legislation and regulations beneficial to such employees and retirees and to oppose those detrimental to their interests. NARFE's members have records housed within OPM and Department of Education record systems and receive payments of various kinds from the United States Treasury. NARFE's advocacy efforts

---

[2] *See, e.g.*, *The Future of Public Work: Artificial Intelligence, Algorithms & Data Protection in a Digital Age*, Am. Fed'n Tchrs. (July 17, 2022), https://www.aft.org/resolution/future-public-work-artificial-intelligence-algorithms-and-data-protection.

include calling on federal agencies to take reasonable steps to protect the privacy of NARFE members' digital information.[3]

20.    Plaintiff **International Association of Machinists and Aerospace Workers ("IAM")** is an international labor organization and unincorporated membership organization headquartered in Upper Marlboro, Maryland.  IAM is one the largest and most diverse labor unions in North America with nearly 600,000 active and retired members. Among IAM's affiliate organizations is the National Federation of Federal Employees ("NFFE"), which is a national labor organization and unincorporated membership organization headquartered in Washington, D.C. Together, IAM and NFFE represent more than 100,000 federal workers, approximately 13,000 of whom are dues-paying members, from agencies across the federal government. IAM and NFFE also represent many veterans and veterans' groups, advocate on their behalf, and assist them in receiving their benefits, among other services. IAM and NFFE members have records housed within OPM and Department of Education record systems and receive payments of various kinds from the United States Treasury. IAM and NFFE advocacy efforts include assisting their members in seeking redress for federal agencies' unlawful disclosures of members' sensitive data.[4]

21.    Plaintiff **International Federation of Professional and Technical Engineers ("IFPTE")** is an international labor organization headquartered in Washington, D.C., that represents approximately 34,000 federal employees, 7,000 of which are dues-paying members. The majority of federal employees represented by IFPTE work at the Department of Defense, primarily shipyards. Other represented members include nuclear submarine engineers, scientists and researchers at NASA, Administrative Law Judges at the Social Security Administration, and nuclear engineers at the Tennessee Valley Authority, as well as employees of the Environmental Protection Agency. IFPTE comprises many members who are veterans and represents and advocates for veterans and veterans' groups. IFPTE members have records housed within OPM

---

[3] *See, e.g.*, *Updates on OPM Cybersecurity Incident*, Nat'l Active & Retired Fed. Emps. Ass'n (Jan. 10, 2019), https://www.narfe.org/blog/2019/01/10/updates-on-opm-cybersecurity-incident.
[4] *See, e.g.*, *Privacy Rights*, Nat'l Fed'n Fed. Emps., https://nffe.org/members-center/privacy-rights.

and Department of Education record systems and receive payments of various kinds from the United States Treasury. IFPTE advocacy efforts include calling on federal legislators and agencies to implement policies that protect IFPTE members' privacy interests.[5]

21.22.  Plaintiff **Jason Cain** is a resident of North Carolina and currently works as an instructor of political science. He served for 10 years in the U.S. Army, as Sergeant First Class in the U.S. Army Special Operations Command and the 82nd Airborne and had a Top Secret security clearance. He receives financial benefits from the federal government, including VA disability benefits. He previously received GI bill benefits, student loans, and a VA home loan from the federal government. As a result of his military service, employment in the civil service, and financial benefits, federal government agencies, including Defendants OPM and the Departments of Education and Treasury, have sensitive personal information about him in their record systems. When his VA account was previously hacked, and his disability and education benefits diverted to criminal enterprises, Plaintiff Cain experienced the fear and helplessness of having his personal information compromised. He is anxious about repeating this experience based on this unauthorized access to his personal information. He is outraged that such a grave breach of his privacy took place, given the extreme caution with which he was required to handle sensitive information during his service in the military and at the VA.

22.23.  Plaintiff **Kristofer Goldsmith** is a resident of New York and currently works as the head of a nonprofit organization combating domestic extremists. He is a military veteran of the U.S. Army, was deployed to Iraq in 2005, and left the Army as a Sergeant. He receives financial benefits from the federal government, including VA disability benefits. He has also previously received student loans from the federal government. As a result of his military service and financial benefits, federal government agencies, including Defendants Departments of Education and Treasury, have sensitive personal information about him in their record systems. Plaintiff Goldsmith is deeply concerned that his personal information is compromised, and may

---

[5] *See, e.g.*, Letter from Paul Shearon, Pres., Int'l Fed'n Prof. Tech. Engs., to Diane Feinstein, U.S. Senator (June 14, 2021), https://www.ifpte.org/s/IFPTE_NASA_MAP_Feinstein_letter _June142021_FINAL.pdf.

be exploited by domestic extremist organizations to harass, intimidate, and harm him and his family. These concerns are even more acute in light of the presidential pardons of many domestic extremists, with Musk's apparent support.

~~23.~~24.  Plaintiff **Clifford "Buzz" Grambo** is a resident of Maryland and is currently retired. He is a military veteran who served in the U.S. Navy for 20 years, retiring as Chief Petty Officer. He receives financial benefits from the federal government, including VA disability benefits and a military pension. Because of these financial benefits from his military service, federal government agencies, including Defendant Treasury, have sensitive personal information about him in their record systems. Plaintiff Grambo believes that the unauthorized access to his and others' personal information poses a national security risk.

~~24.~~25.  Plaintiff **Thomas Fant** is a resident of Massachusetts and is currently retired. He is a military veteran of the U.S. Coast Guard, from which he was medically discharged. He receives financial benefits from the federal government, including VA disability benefits. Because of these financial benefits from his military service, federal government agencies, including Defendant Treasury, have sensitive personal information about him in their record systems. Plaintiff Fant is apprehensive and anxious that the unauthorized access to his and others' personal information will enable third parties affiliated with DOGE representatives to profit at the expense of him and other Americans.

~~25.~~26.  Plaintiff **Donald Martinez** is a resident of Colorado and currently works as a rancher. He is a military veteran of the U.S. Army, and had two deployments to Iraq as a Field Artillery Officer with a Top Secret/Sensitive Compartmented Information security clearance. During his service, he sustained a traumatic brain injury and was medically retired. He receives financial benefits from the federal government, including veterans' benefits, Social Security Disability Insurance/Medicare, Combat Related Special Compensation, and a VA home loan. Apart from his military service, Plaintiff Martinez also worked for the Federal Emergency Management Agency. And he received student loans from the federal government. As a result of his military service, employment in the civil service, and financial benefits, federal government

agencies, including Defendants OPM and Departments of Education and Treasury, have sensitive personal information about him in their record systems. Especially because of his previous military service in a geographically sensitive area and involvement in high-level negotiations because of which he received death threats from terrorists, Plaintiff Martinez is worried that unauthorized access and disclosure of his personal information held within the federal government will compromise his personal safety and security.

~~26.~~27.  Plaintiff **Christopher Purdy** is a resident of Georgia and currently works as the head of a nonprofit organization. He served for eight years in the Army National Guard, where he was deployed to Iraq in 2011. He receives financial benefits from the federal government, including VA disability benefits. He previously also received a VA home loan and student loans from the federal government. As a result of his military service and financial benefits, federal government agencies, including Defendants Departments of Education and Treasury, have sensitive personal information about him in their record systems. Plaintiff Purdy is distressed that the breach of his personal information by unauthorized parties makes it more vulnerable to being released to the public, which could cause him severe economic harm. He is also very worried that Musk and DOGE may use their unauthorized access to his personal information to stop his VA disability payments, a major source of income in his household.

~~27.~~28.  Defendant the **United States Department of the Treasury** ("Treasury") is an agency of the United States.

~~28.~~29.  Defendant **Scott Bessent** is sued in his official capacity as the Secretary of the Treasury.

~~29.~~30.  Defendant the **Office of Personnel Management** is an agency of the United States.

~~30.~~31.  Defendant **Charles Ezell** is the Acting Director of the Office of Personnel Management ("OPM") and is sued in his official capacity.

~~31.~~32.  Defendant **United States Department of Education** is an agency of the United States.

32.33.  Defendant **Denise Carter** is the Acting Secretary of Education and is sued in her official capacity.

## FACTUAL ALLEGATIONS

**Establishment of DOGE**

33.34.  On January 20th, 2025, President Trump signed an executive order replacing the United States Digital Services with the "United States DOGE Service," which serves as the parent agency for the new "U.S. DOGE Service Temporary Organization."[6] The order called for DOGE to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."[7]

34.35.  Even before the inauguration, President Trump announced that Elon Musk would lead the DOGE effort.  It has been publicly reported that Musk directly leads and supervises activities of DOGE and its team.[8]  According to the White House, Musk now serves as a Special Government Employee.[9]

35.36.  The order establishing DOGE also provided for "DOGE teams" of at least four employees, which can include Special Government Employees, to be embedded within Federal agencies. Special Government Employee is a temporary employment status typically used for outside advisors, experts or consultants appointed to work on a short-term basis within the federal government. They are exempt from some federal ethics rules.

36.37.  DOGE representatives within the government are a combination of friends and former employees of Musk and his companies and a cadre of young adult software engineers,

---

[6] Madeleine Ngo & Theodore Schleifer, *How Trump's Department of Government Efficiency Will Work*, N.Y. Times (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/doge-government-efficiency-trump-musk.html
[7] Executive Order, *Establishing and Implementing The President's "Department of Government Efficiency"* The White House (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/establishing-and-implementing-the-presidents-department-of-government-efficiency.
[8] Bobby Allyn & Shannon Bond, *Elon Musk Is Barreling into Government With DOGE, Raising Unusual Legal Questions*, NPR (Feb. 3, 2025), https://www.npr.org/2025/02/03/nx-s1-5285539/doge-musk-usaid-trump.
[9] Kaitlan Collins & Tierney Sneed, *Elon Musk Is Serving as a 'Special Government Employee,' White House Says*, CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/03/politics/musk-government-employee/index.html.

including college students and at least one teenager, whose identities the White House and DOGE have sought to conceal.[10]

**The Privacy Act's Prohibitions on Disclosure of Records Without Express Written Consent**

~~37.~~38.  "The Privacy Act directs agencies to establish safeguards to protect individuals against the disclosure of confidential records 'which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained.'" *F.A.A. v. Cooper*, 566 U.S. 284, 294-95 (2012) (quoting 5 U.S.C. § 552a(e)(1)). It does that by providing a legal framework for how the government handles sensitive records about Americans in a manner that protects their significant privacy rights.

~~38.~~39.  The Privacy Act states, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency" without consent of the individual whose information is in the record, subject to twelve statutory exceptions.[11]

~~39.~~40.  Under the Privacy Act, a system of records is "a group of any records under the control of an agency from which information is retrieved by the name of the individual or … other identifying particular assigned to the individual."[12]

~~40.~~41.  A record is "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph."[13]

~~41.~~42.  Office of Management and Budget ("OMB") guidelines state that disclosure under the Privacy Act "may be either the transfer of a record or the granting of access to a

---

[10] Theodore Schleifer et al., *Young Aides Emerge as Enforcers in Musk's Broadside Against Government,* N.Y. Times (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html.
[11] 5 U.S.C. § 552a(b).
[12] 5 U.S.C. § 552a(5).
[13] 5 U.S.C. § 552a(a)(4).

record."[14] Disclosure can be written, oral, electronic, or a mechanical transfer between computers of record content.[15]

~~42.~~43.  The Privacy Act specifies when individual information maintained in an agency record system may be disclosed. It does not prohibit disclosures to employees of the maintaining agency "who have a need for the record in the performance of their duties."[16]

~~43.~~44.  Similarly, the Privacy Act does not prohibit disclosures made for a "routine use," defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected."[17] Agencies must publish a Statement of Record Notice ("SORN") identifying all possible routine uses of a system of records.[18]

~~44.~~45.  Additionally, the Privacy Act mandates that "Each agency that maintains a system of rec-ords shall . . . establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained[.]"[19]

**The Treasury Department's Federal Disbursement Services**

~~45.~~46.  The Federal Disbursement Services ("FDS"), which is housed within the Treasury Department's Bureau of the Fiscal Service (the "Fiscal Service"), provides critical payment services for hundreds of federal agencies, allowing them to disburse payments such as Social Security benefits, federal income tax refunds, and veterans' pay, on which more than 70 million Americans rely.[20]

~~46.~~47.  In fiscal year 2024, FDS disbursed more than 1.27 billion payments, valued at

---

[14] OMB Guidelines, 40 Fed. Reg. 28,948, 28,953 (July 9, 1975).

[15] *Id*.

[16] 5 U.S.C. § 552a(b)(1).

[17] 5 U.S.C. § 552a(a)(7).

[18] *Id.*

[19] 5 U.S.C. § 552a(e)(10).

[20] *See* U.S. Dep't Treasury, *Federal Disbursement Services (FDS)*, (last modified Oct. 15, 2024), https://fiscal.treasury.gov/fds/; *Monthly Statistical Snapshot, December 2024*, Social Security Administration (Jan. 2025), https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/.

more than $5.45 trillion.[21]

47.48.  The payment systems that make up FDS contain extensive amounts of sensitive, personally identifiable information ("PII"). This includes name, Social Security number, date and location of birth, physical address, telephone number, and financial institution information, among many other pieces of PII.[22] Within the payment systems, there is PII for tens of millions of individuals, if not more.[23]

48.49.  Historically, "only a small group of career employees" has operated the payment systems.[24] It is "extremely unusual" for "anyone connected to political appointees" to request or gain access to the payment systems.[25] Payment system access is strictly limited to "[o]nly employees whose official duties require access."[26]

49.50.  The Fiscal Service does not play a discretionary role in providing payment services. Rather, when federal agencies provide the Fiscal Service with a payment voucher to disburse money to a recipient and the Fiscal Service verifies that the voucher has been completed properly, payment systems within Fiscal Service issue the disbursement without exercising independent judgment.[27] Stated differently, the Fiscal Service's routine use of the FDS is limited to issuing disbursements requested by various federal agencies.

**DOGE's Repeated Efforts to Improperly Access the Federal Disbursement Services**

50.51.  For months, individuals affiliated with the initiative that would later become DOGE have worked to gain access to the Federal Disbursement System.[28] Indeed, soon after the

---

[21] *Id.*

[22] U.S. Dep't Treasury, Notice of a Modified System of Records. 85 Fed. Reg. 11,776, 11,778 (Feb. 27, 2020).

[23] U.S. Dep't Treasury, *Privacy and Civil Liberties Impact Assessment: Payment Automation Manager* (Jul. 11, 2019), https://www.fiscal.treasury.gov/files/pia/pampclia.pdf.

[24] Jacqueline Alemany et al., *Senior U.S. Official Exits After Rift with Musk Allies over Payment System*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/business/2025/01/31/elon-musk-treasury-department-payment-systems.

[25] *Id.*

[26] 85 Fed. Reg. 11,776, 11,778.

[27] *See* 31 U.S.C. § 3325(a).

[28] Jacqueline Alemany et al., *Senior U.S. Official Exits After Rift with Musk Allies over Payment System*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/business/2025/01/31/elon-musk-treasury-department-payment-systems.

November 2024 election, they asked for access to the system in an effort to have the Treasury Department serve as a "chokepoint" on payments.[29]

~~51.~~52.   David A. Lebryk, a senior career civil servant at Treasury, denied all of DOGE's requests for access to the sensitive personal data stored on the FDS. On January 24, 2025, DOGE-related officials asked Lebryk, at the time Acting Secretary of the Treasury, to "immediately shut off all USAID payments using [Treasury's] ultra-sensitive payment processing system."[30] Lebryk refused to do so on the grounds that stopping payments other federal agencies have requested is not within the Treasury's purview or part of its practice.[31] Lebryk was subsequently placed on administrative leave and later announced his retirement.[32]

~~52.~~53.   On or before January 31, 2025, and following Lebryk's placement on administrative leave, at least two people affiliated with DOGE gained access to the Federal Disbursement System.[33] They included Tom Krause, the CEO of Cloud Software Group, and Marko Elez, a 25-year-old DOGE staffer and Elon Musk deputy.[34] The government has claimed that both Krause and Elez were appointed as Special Government Employees in the Treasury Department.

~~53.~~54.   The day after Krause and Elez gained access to the payment systems, Musk posted on X that DOGE representatives "discovered" that "payment approval officers at Treasury were instructed always to approve payments, even to known fraudulent or terrorist groups."[35]

---

[29] Katelyn Polantz, Phil Mattingly & Tierney Sneed, *How an Arcane Treasury Department Office Became Ground Zero In The War Over Federal Spending*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/01/31/politics/doge-treasury-department-federal-spending.
[30] *Id.*
[31] *Id.*
[32] Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's Requests on Payments*, N.Y. TIMES (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/us/politics/david-lebryk-treasury-resigns-musk.html.
[33] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.
[34] Tobias Burns, *DOGE Staffer Who Accessed Treasury Department Payment Systems Resigns after Racist Posts Exposed*, THE HILL (Feb. 6, 2025), https://thehill.com/business/5131442-elon-musk-deputy-resign.
[35] Elon Musk (@elonmusk), X (Feb. 1, 2025, 1:52 AM), https://x.com/elonmusk/status/1885582076247712229.

54.55.  On February 2, 2025, Musk posted on X that "[c]areer Treasury officials are breaking the law every hour … by approving payments that are fraudulent" and this had to "stop NOW!"[36] The same day, Musk replied to a post on X criticizing funding to specific religiously affiliated non-profit organizations and stated that "[t]he @DOGE team is rapidly shutting down these illegal payments."[37]

55.56.  On February 3, 2025, White House Press Secretary Karoline Leavitt said DOGE staff had been granted read-only access to the Treasury payments system.[38] A letter from the Treasury Department to members of Congress on February 4, 2025 reiterated that Treasury staff working with Krause would have read-only access to the coded data of the payment systems.[39] The letter further stated that this was the type of access provided to individuals reviewing Treasury systems, such as auditors.

56.57.  On February 4, 2025, WIRED reported that, contrary to Leavitt's and Treasury's representations, Elez possessed read *and* write access to Treasury Department payment systems.[40] Elez's administrative-level privileges reportedly included the ability to write code on the Payment Automation Manager (PAM) and Secure Payment System (SPS) at the Bureau of the Fiscal Service (BFS). WIRED reported that "[t]ypically, those admin privileges could give someone the power to . . . change user permissions, and delete or modify critical files."

**Defendants' Disclosure of Information in the FDS to DOGE Officials Violates the Privacy Act**

*Payment Systems Within the FDS Are a System of Records*

---

[36] Elon Musk (@elonmusk), X (Feb. 2, 2025, 2:27 PM), https://x.com/elonmusk/status/1886134485822922785.
[37] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217.
[38] Jonathan Swan et al., *Inside Musk's Aggressive Incursion Into the Federal Government*, N.Y. TIMES (Feb. 3, 2025), https://www.nytimes.com/2025/02/03/us/politics/musk-federal-government.html.
[39] U.S. Dep't Treasury, *Treasury Department Letter to Members of Congress Regarding Payment Systems* (Feb. 4, 2025), https://home.treasury.gov/news/press-releases/sb0009.
[40] Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, WIRED (Feb. 4, 2025), https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system/

57.58.  Multiple payment systems within FDS are systems of records, as certified by the Chief Privacy Officer of the Fiscal Service.[41] The Fiscal Service has published a Systems of Records Notice (SORN) for these payment systems.[42]

58.59.  The information in specific payment systems within FDS, including the Secure Payment System, the Invoice Processing Platform, and the Automated Standard Application for Payments, among others, is retrieved by an "identifying particular" assigned to an individual.[43]

59.60.  The payment systems maintained within FDS contain extensive personally identifiable information about individuals, including but not limited to Social Security numbers, sensitive financial information, and addresses.[44]

*Providing DOGE Representatives with Direct Access to the FDS is a "Disclosure"
Under the Privacy Act*

60.61.  Representatives of DOGE were granted access to payment systems within FDS and the records and data therein on January 31, 2025.[45] That access qualifies as a disclosure under the Privacy Act.

61.62.  None of the individual Plaintiffs, and on information and belief, none of the members of the Plaintiff Organizations requested disclosure or provided express written consent to the disclosure of their records and information to DOGE representatives.

*DOGE Representatives Do Not Require Access to the FDS in the Performance of Their
Duties*

62.63.  The New York Times recently reported that "Musk allies who have been granted access to the payment system were made Treasury employees."[46]

---

[41] *See, e.g.*, *Privacy and Civil Liberties Impact Assessment: Secure Payment System*, U.S. Dep't Treasury (Mar. 22, 2021), https://www.fiscal.treasury.gov/files/pia/spspclia.pdf.
[42] 85 Fed. Reg. 11,776.
[43] See, e.g., *Privacy and Civil Liberties Impact Assessment: Secure Payment System*, U.S. Dep't Treasury (Mar. 22, 2021), https://www.fiscal.treasury.gov/files/pia/spspclia.pdf.
[44] 85 Fed. Reg. 11,776.
[45] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. Times, (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.
[46] *Id.*

63.64.  The Privacy Act's exception for disclosures to employees who need the record "in the performance of their duties" does not apply. Even if Krause and Elez were Treasury employees at the time Defendants provided them with access to the FDS, Musk's stated purpose for that access, which is to stop "approving" all payments,[47] is incompatible with any legitimate duties of the Department of the Treasury with respect to the FDS.

64.65.  The Treasury Department maintains the relevant record systems so that it may, in a non-discretionary manner, send out payments approved by other federal agencies.[48] Consistent with the Treasury Department's limited role in the payment disbursement process, FDS's payment systems are designed to "facilitate" payments from federal government entities to their recipients.[49] Stated differently, the payment systems contained within the FDS serve as processing centers that enact disbursement requests received from agencies; they are not independent centers of review.[50]

*Defendants' Disclosures of FDS Information to DOGE Representatives is Not a "Routine Use" of the Protected Information*

65.66.  The Privacy Act's "routine use" exception also does not apply. The SORN for payments systems within FDS lists 19 possible routine uses, none of which apply to DOGE staffers' access to FDS.[51]

66.67.  For example, representatives of DOGE are not accessing FDS records on behalf of the banking industry, an investigative agency, an agency responsible for law enforcement, a court, a foreign government, a congressional office, a union, a third party during the course of an investigation, a federal creditor agency, a state, debt collectors, or representatives of the National Archives and Records Administration.[52]

---

[47] Elon Musk (@elonmusk), X (Feb. 2, 2025, 2:27 PM), https://x.com/elonmusk/status/1886134485822922785.
[48] *See* 31 U.S.C. § 3325(a); U.S. Dep't Treasury, *Treasury Department Letter to Members of Congress Regarding Payment Systems* (Feb. 4, 2025), https://home.treasury.gov/news/press-releases/sb0009 ("To be clear, the agency responsible for making the payment always drives the payment process.").
[49] 85 Fed. Reg. 11,776, 11,778.
[50] U.S. Dep't Treasury, *Privacy and Civil Liberties Impact Assessment: Secure Payment System* (Mar. 22, 2021), https://www.fiscal.treasury.gov/files/pia/spspclia.pdf.
[51] 85 Fed. Reg. 11,776, 11,778.
[52] *See id.*

67.68.  Representatives of DOGE also are not responding to a suspected or confirmed "breach of the system of records,"[53] or "ensuring the efficient administration" of "payment processing services."[54]

68.69.  Rather, representatives of DOGE intend to change the purpose of payment systems within FDS to "scrutinize[]" payments and "pause" those they deem "improper," rather than disburse payments in a non-discretionary manner.[55] Consistent with this, Musk has indicated that DOGE officials are looking to control, and potentially cut off, disbursements from the Bureau of the Fiscal Service.[56] This is not a routine use listed in the SORN that would authorize Defendants' disclosure of sensitive personal and financial data to DOGE Representatives.[57] Nor could it be, given the Treasury's practice and policies regarding use of the FDS to fulfill its duty to disburse payments approved by other agencies.

69.70.  None of the other statutory exceptions for disclosure of personal information set forth in the Privacy Act applies or would have applied to authorize Defendants Bessell's and the Treasury's decision to disclose the sensitive information and data contained within the FDS to DOGE representatives.

**U.S. Office of Personnel Management Federal Work Force Files**

70.71.  OPM serves as the "chief human resources agency and personnel policy manager for the Federal Government."[58]

71.72.  As part of its workforce management responsibilities, OPM maintains systems that are responsible for "government-wide personnel management activities," such as tracking human resource and payroll data, operating centralized application and hiring systems for federal

---

[53] *Id.*
[54] *Id.*
[55] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html. ; Elon Musk (@elonmusk), X (Feb. 3, 2025, 11:43 AM), https://x.com/elonmusk/status/1886455404713943058.
[56] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217.
[57] 85 Fed. Reg. 11,776.
[58] *About Us*, U.S. Off. Personnel Mgmt., https://www.opm.gov/about-us.

government jobs, and managing health benefits for more than 8 million federal civilian employees and other eligible individuals.[59]

~~72.~~73.  The systems that OPM operates and maintains contain extensive amounts of sensitive PII. This includes name, Social Security number, employment history, address, telephone number, demographic information, and disability status, among many other pieces of PII.[60] Within the OPM systems, there is PII for tens of millions of individuals, if not more, including current and former federal employees and applicants to jobs at more than 500 federal agencies.[61]

~~73.~~74.  It has been reported that access to these OPM systems is generally held only by "senior career employees" at OPM.[62]  Some subsets of records in OPM systems are subject to even stricter access restrictions, such as those in the Health Insurance Data Warehouse, which are generally confined to "a limited number of well-trained [health insurance] analysts."[63]

**DOGE's Efforts to Improperly Access OPM Systems**

---

[59] *Privacy Impact Statement for Health Insurance Data Warehouse*, U.S. Off. Personnel Mgmt. (July 2, 2021), https://www.opm.gov/information-management/privacy-policy/privacy-policy/hidw-pia.pdf [hereinafter *HIDW PIA*]; *Privacy Impact Assessment for USAJOBS*, U.S. Off. Personnel Mgmt. (July 8, 2020), https://web.archive.org/web/20241228071153/https://www.opm.gov/information-management/privacy-policy/privacy-policy/usajobs-pia.pdf; *Privacy Impact Statement for Enterprise Human Resources Integration Data Warehouse*, U.S. Off. Personnel Mgmt. (July 11, 2019), https://www.opm.gov/information-management/privacy-policy/privacy-policy/ehridw.pdf.

[60] *Privacy Impact Assessment Summaries*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/#url=PIAs.

[61] U.S. Gov. Accountability Off., USAJOBS Website: OPM Has Taken Actions to Assess & Enhance the User Experience (Oct. 2020), https://www.gao.gov/assets/gao-21-31.pdf#:~:text=approximately%2017.5%20million%20job%20applications%20were%20started,applicants%20are%20deemed%20qualified%20and%20which%20are; *HIDW PIA, supra* note 59.

[62] Tim Reid, *Exclusive: Musk Aides Lock Workers Out of OPM Computer Systems*, Reuters (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31; *see, e.g.*, *HIDW PIA, supra* note 59, at 9 (noting that "only a limited number of well-trained [health-insurance] analysts have access to the information in the [Health Insurance Data Warehouse system]."); *Privacy Impact Assessment for the Payment Processing Automation Initiative*, U.S. Off. Personnel Mgmt. at 8 (June 3, 2020), https://www.opm.gov/information-management/privacy-policy/privacy-policy/ppai-olbp.pdf (noting "access controls that limit access to only those with a need to know and only with access appropriate to their roles and responsibilities").

[63] *HIDW PIA, supra* note 59.

74.75.  Shortly after the inauguration of President Trump, civil servants within OPM received instructions to provide access to the sensitive OPM systems to DOGE representatives.[64]

75.76.  On information and belief, DOGE representatives have gained sweeping access to highly sensitive record systems within the last few weeks. The *Washington Post* reported on February 6:

> At least six DOGE agents were given broad access to all personnel systems at the OPM on the afternoon of Jan. 20, the day of Trump's inauguration, according to two agency officials. Three more gained access about a week later, they said.

> The data that the DOGE team can access includes a massive trove of personal information for millions of federal employees, included in systems called Enterprise Human Resources Integration and Electronic Official Personnel Folder. It also includes personal information for anyone who applied to a federal job through the site USAJobs, the people said. Last year alone, the people said, there were 24.5 million such applicants.

> The two OPM officials said the level of access granted to DOGE agents means they could copy the Social Security number, phone numbers and personnel files for millions of federal employees.[65]

76.77.  The access instructions specified that DOGE representatives should have "admin user" access that allowed them to "code read and write permissions," in essence allowing these officials to "make updates to anything that they want."[66]

77.78.  Defendants OPM and Acting Director Ezell provided DOGE representatives, including a recent high school graduate, with access to these sensitive systems and databases, including USAJOBS, the Enterprise Human Resources Integration Data Warehouse ("EHRI DW"), USA Staffing, USA Performance, and the Health Insurance Data Warehouse ("HIDW"), and the personally identifiable information contained within.[67]

---

[64] Caleb Ecarma & Judd Legum, *Musk Associates Given Unfettered Access to Private Data of Government Employees*, Popular Info. (Feb. 3, 2025), https://popular.info/p/musk-associates-given-unfettered.
[65] Isaac Stanley-Becker et al., *Musk's DOGE Agents Access Sensitive Personnel Data, Alarming Security Officials*, Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/national-security/2025/02/06/elon-musk-doge-access-personnel-data-opm-security.
[66] Ecarma & Legum, *supra* note 64.
[67] *Id.*

78.79.  In late January, career officials who have long had access to these systems had their permissions "revoked."[68]

79.80.  DOGE representatives at OPM have since used their access to examine job description data and "remove" specific government employees.[69] On February 8, 2025, the Washington Post reported that access to EHRI DW and the Electronic Official Personnel Folder was revoked for "some" DOGE agents.[70]

**Defendants' Disclosure of Information in OPM Systems to DOGE Representatives Violates the Privacy Act**

*OPM Systems Contain Systems of Records*

80.81.  The systems to which DOGE-related officials have access within OPM, including USAJOBS, EHRI DW, USA Staffing, USA Performance, and HI DW (collectively, "OPM Systems"), are systems of records, as certified by the Chief Privacy Officer of OPM.[71] OPM has published a SORN for these record systems.[72]

81.82.  The information in the OPM Systems is retrieved by "an identifying particular" assigned to an individual.[73]

82.83.  The systems within OPM contain extensive personally identifiable information about individuals, including but not limited to Social Security number, employment history, and addresses.[74]

---

[68] Tim Reid, *Exclusive: Musk Aides Lock Workers Out of OPM Computer Systems*, Reuters (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31.

[69] Ecarma & Legum, *supra* note 64.

[70] Isaac Stanley-Becker and Hannah Natanson, *Some DOGE agents removed from sensitive personnel systems after security fears*, Washington Post (Feb. 8, 2025), https://www.washingtonpost.com/nation/2025/02/08/doge-opm-musk/.

[71] *Privacy Policy*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/#url=PIAs

[72] *System of Records Notices (SORN)*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/#url=SORNs.

[73] *OPM SORN GOVT-2 Employee Performance File System Records*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/sorn/opm-sorn-govt-2-employee-performance-file-system-records.pdf.

[74] *See, e.g.*, *HIDW PIA, supra* note 59.

*Providing DOGE Representatives with Direct Access to Specific OPM Systems is a Disclosure Under the Privacy Act*

~~83.~~84.   Representatives of DOGE were granted access to personnel- and benefit-related systems within OPM and the records therein on or before January 31, 2025.[75] That access qualifies as a disclosure under the Privacy Act.

~~84.~~85.   DOGE representatives within OPM have "'review[ed] position description level data,'" an act that would involve information retrieval from systems within OPM.[76]

~~85.~~86.   Disclosure can be written, oral, electronic, or a mechanical transfer between computers of record content.[77]

~~86.~~87.   None of the individual Plaintiffs, and on information and belief, none of the members of the Plaintiff Organizations requested disclosure or provided express written consent to the disclosure of their records and information to DOGE representatives. As such, Defendants' continued and ongoing disclosure of their records to DOGE representatives constitutes a violation of the Privacy Act, for which no exception applies.

*DOGE Representatives Do Not Require Access to the FDS in the Performance of Their Duties*

~~87.~~88.   It has been reported that the DOGE representatives who have been provided by Defendants with access to the OPM systems are "political appointees" at OPM.[78] However, it has also been reported that DOGE representatives "have received official government credentials, including official email addresses, at multiple agencies."[79] For example, some DOGE representatives in the Department of Education's internal address book "also have GSA or OPM

---

[75] *See* Tim Reid, *Exclusive: Musk Aides Lock Workers Out of OPM Computer Systems*, REUTERS (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31.
[76] Ecarma & Legum, *supra* note 64.
[77] OMB Guidelines, 40 Fed. Reg. 28,948, 28,953 (July 9, 1975).
[78] Ecarma & Legum, *supra* note 64.
[79] Washington Post Staff, *Elon Musk's DOGE Has Swept into 15 Federal Agencies. Here's What to Know.*, WASH. POST (Feb. 8, 2025), https://www.washingtonpost.com/business/2025/02/04/elon-musk-government-legal-doge.

email addresses," seemingly holding themselves out as employees of multiple agencies at the same time, while ultimately serving DOGE's mission.

88.89.  The Privacy Act's exception for disclosures to employees who need the record "in the performance of their duties" does not apply to the disclosures here. On information and belief, DOGE's purpose for accessing that data is to significantly "restructur[e]" the government by "push[ing]" out employees.[80]

*Defendants' Disclosures of Specific OPM Systems to DOGE Officials is Not a "Routine Use" of the Protected Information*

89.90.  The Privacy Act's "routine use" exception also does not apply. The SORNs for specific systems within OPM, namely USAJOBS, EHRI DW, USA Staffing, USA Performance, and HI DW, list 114 overlapping possible routine uses, none of which apply here.[81]

90.91.  For example, representatives of DOGE are not accessing OPM records on behalf of a training facility, educational institution, foreign government official, agency adjudicating benefit claims, agency choosing to honor employees, labor organization official, the Merit Systems Protection Board, or the Equal Employment Opportunity Commission, among others.[82]

91.92.  Rather, on information and belief, representatives of DOGE intend to misuse OPM's systems to indiscriminately remove individuals from their positions en masse.[83] This is not a routine use listed in the SORNs.[84]

---

[80] *Id.*; Reuters, *Musk's DOGE agents access sensitive government personnel data, Washington Post reports* (Feb. 6, 2025), *available at* https://www.reuters.com/world/us/musks-doge-agents-access-sensitive-opm-personnel-data-washington-post-reports-2025-02-06/.
[81] *See* Privacy Act of 1974: Update and Amend System of Records, 79 Fed. Reg. 16834 (March 26, 2014); *OPM GOVT-2 Applicant Race, Sex National Origin, & Disability Status Records*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/sorn/opm-sorn-govt-7-applicant-race-sex-national-origin-and-disability-status-records.pdf; Privacy Act of 1974: Update Existing System of Records, 77 Fed. Reg. 73694 (Dec. 11, 2012); *OPM GOVT-6 Personnel Research & Test Validation Records*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/sorn/opm-sorn-govt-6-personnel-research-and-test-validation-records.pdf; *OPM SORN GOVT-2 Employee Performance File System Records*, U.S. Off. Personnel Mgmt., https://www.opm.gov/information-management/privacy-policy/sorn/opm-sorn-govt-2-employee-performance-file-system-records.pdf; Privacy Act of 1974; System of Records, 89 Fed. Reg. 72902 (Sep. 6, 2024).
[82] 77 Fed. Reg. 73694.
[83] Ecarma & Legum, *supra* note 64.
[84] U.S. Off. Personnel Mgmt., *System of Records Notices (SORN)*, https://www.opm.gov/information-management/privacy-policy/#url=SORNs.

92.93.   None of the other statutory exceptions for disclosure of personal information set forth in the Privacy Act applies or would have applied to authorize Defendants' decision to disclose the sensitive information and data contained within the FDS to DOGE representatives.

**Department of Education Student Loan System**s

93.94.   The Department of Education (ED) is responsible for managing the federal student loan system through its Federal Student Aid (FSA) office. ED maintains several systems of record that support operation of the federal student loan system.

*National Student Loan Data System*

94.95.   The National Student Loan Data System (NSLDS) is a comprehensive national database for the Federal financial aid program. "As the central database for Title IV student financial aid, NSLDS stores information about loans, grants, students, borrowers, lenders, guaranty agencies . . . , schools, and servicers. It provides detailed information on individuals pertaining to their Title IV loans and grants during all stages of their aid life cycle, from approval through disbursement, repayment, default, and closure."[85]

95.96.   The NSLDS contains sensitive PII about the tens of millions of Americans who apply for or receive Federal student aid, including Social Security Number, name, date of birth, address, phone number, email address, and driver's license information, as well as demographic data about the borrower.[86]

96.97.   Personal data about a borrower's parents or co-signers is also contained in the NSLDS. Among other things, it contains "information on the parent(s) of a dependent recipient, including name, date of birth, SSN, marital status, email address, highest level of schooling completed, and income and asset information."[87]

---

[85] *See* U.S. Dep't of Educ., *Privacy Impact Assessment for the National Student Loan Data System (NLDS-New)* at 4-5 (May 19, 2022), https://www.ed.gov/sites/ed/files/notices/pia/pia-nslds-new.pdf. The records on the NSLDS "legacy" system were transferred to a revamped NSLDS-New system in October 2022. *Id.*
[86] U.S. Dep't of Educ., Notice of a Modified System of Records ("NSLDS SORN"), 87 Fed. Reg. 57,873, 57,878.
[87] *Id.* at 57,879.

*Common Origination and Disbursement System*

97.98.   The Common Origination and Disbursement System (CODS) processes information relating to determining eligibility for federal student aid.[88]

98.99.   The CODS includes records about aid applicants and recipients and their parents and spouses, including Social Security number, name, date of birth, mailing address, email address, driver's license, and telephone number, and demographic information.[89]

*FUTURE Act System*

99.100.        The FUTURE Act System (FAS) is used to determine eligibility for, or repayment obligations under, various income-driven repayment plans for federal student loans.[90]

100.101.        FAS contains information about aid applicants, including last name, date of birth, Social Security number and/or Tax Identification Number. It also includes similar information about parents of dependent applicants and spouses of independent applicants, plus spousal income and asset information and parental income and asset information.[91]

*Financial Management System*

101.102.        The Financial Management System ("FMS") interfaces with other Federal Student Aid systems and consolidates and centralizes all Federal Student Aid accounting and financial data into one system. FMS contains personally identifying information about individual borrowers who are entitled to a refund of an overpayment or discharge, or both. The system includes a borrower's Social Security number, name and address, amount of overpayment to be refunded and name of the loan holder.[92]

---

[88] U.S. Dep't of Educ., *Privacy Impact Assessment for the Common Origination & Disbursement System* (Sept. 29, 2023), https://www.ed.gov/sites/ed/files/notices/pia/fsa-pia-cod.pdf.
[89] U.S. Dep't of Educ., Notice of a Modified System of Records ("CODS SORN"), 88 Fed. Reg. 41,942, 41,947 (June 28, 2023).
[90] U.S. Dep't of Educ., *Privacy Impact Assessment for the Federal Tax Information Module* (June 4, 2024), https://www.ed.gov/sites/ed/files/notices/pia/pia-ftim.pdf.
[91] U.S. Dep't of Educ., Notice of a New System of Records ("FAS SORN"), 88 Fed. Reg. 42,220, 42,222 (June 29, 2023).
[92] U.S. Dep't of Educ., Notice of a New System of Records ("FMS SORN"), 73 Fed. Reg. 177, 177 (Jan. 2, 2008).

**DOGE's Efforts to Improperly Access ED's Systems**

~~102.~~103.    According to a report in the Washington Post, "roughly 20 people with Elon Musk's 'Department of Government Efficiency,' known as DOGE, have begun working inside the Education Department, looking to cut spending and staff."[93] The Washington Post has also written, "DOGE staffers have gained access to multiple sensitive internal systems, including a financial aid dataset that contains the personal information for millions of students enrolled in the federal student aid program."[94] The access has "deeply alarmed" career staff.[95] On information and belief, the systems accessed include NSLDS, COGS, FAS and/or FMS.

~~103.~~104.    It has been publicly reported that DOGE representatives "fed sensitive data from across the Education Department into artificial intelligence software to probe the agency's programs and spending."[96]  The Washington Post has reported that "[t]he DOGE team plans to replicate this process across many departments and agencies, accessing the back-end software at different parts of the government and then using AI technology to extract and sift through information about spending on employees and programs."

**Defendants' Disclosure of Information in ED's Systems to DOGE Officials Violates the Privacy Act**

*The ED Systems are Systems of Record*

~~104.~~105.    NLSDS, COGS, FAS, and FMS (collectively, the "ED Systems") are each a system of records, and ED has published a SORN describing each system's purposes and uses.[97]

---

[93] Laura Meckler et al., *Trump Preps Order to Dismantle Education Dept. as DOGE Probes Data*, WASH. POST (Feb. 3, 2025), https://www.washingtonpost.com/education/2025/02/03/trump-education-department-dismantling-executive-order-draft.

[94] *Id.*

[95] Jeff Stein et al., *U.S. Government Officials Privately Warn Musk's Blitz Appears Illegal*,  Wash. Post (Feb. 4, 2025), https://www.washingtonpost.com/business/2025/02/04/elon-musk-government-legal-doge.

[96] Hannah Natanson et al., *Elon Musk's DOGE Is Feeding Sensitive Federal Data into AI to Target Cuts*,  Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/nation/2025/02/06/elon-musk-doge-ai-department-education.

[97] *See* NSLDS SORN, CODS SORN, FAS SORN, FMS SORN.

105.106.    The information in each of the ED Systems is retrieved by the name of the individual or other "identifying particular" assigned to an individual.[98]

106.107.    ED's systems contain extensive personally identifiable information about individuals, including but not limited to Social Security number, sensitive financial information, and address.

*Providing DOGE Representatives with Direct Access to ED Systems is a "Disclosure" Under the Privacy Act*

107.108.    On information and belief, Defendants Acting Secretary of Education Denise Carter and the Department of Education granted representatives of DOGE access to ED Systems on or before February 3, 2025. That access qualifies as a disclosure under the Privacy Act.

108.109.    None of the individual Plaintiffs, and on information and belief, none of the members of the Plaintiff Organizations requested disclosure or provided express written consent to the disclosure of their records and information to DOGE representatives.

*"Feeding" ED Systems Data to Unvetted AI Tools Is Likewise a "Disclosure" Under the Privacy Act*

109.110.    Public reporting has revealed that DOGE has begun "feeding" ED data into artificial intelligence tools, including "data with personally identifiable information for people who manage grants, as well as sensitive internal financial data."[99] Reporting also indicates that DOGE plans to use artificial intelligence programs to analyze data retrieved from additional agency systems.[100] The AI tools DOGE is using to analyze agency data are reportedly hosted on cloud-based computers that are located outside of federal-government facilities.[101]

---

[98] NLDS SORN, 87 Fed. Reg. 57,873, 57,881; CODS SORN, 88 Fed. Reg. 41,942, 41,950; FAS SORN, 88 Fed. Reg. 42,220, 42,225; FMS SORN, 73 Fed. Reg. 177, 179.
[99] *See Natanson*, *supra* n.102.
[100] *Id.*
[101] *Id.*

110.111.    Feeding ED Systems data into DOGE's AI tools constitutes additional unauthorized disclosures of data to the pur-based computers and operators of those systems.[102]

*DOGE Representatives Do Not Require Access to ED Systems in the Performance of their Duties*

111.112.    The Privacy Act carves out an exception for disclosures without prior written consent to "officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties."

112.113.    The Privacy Act's exception for disclosures to employees who need the record "in the performance of their duties" does not apply.

113.114.    Disclosure of data housed in any of the ED Systems to DOGE representatives is not necessary for the performance of the duties of ED employees or officials.

114.115.    The data stored on ED Systems is collected and maintained to enable administration of the student loan system under Title IV of the Higher Education Act.[103]

115.116.    DOGE and its representatives' access to ED Systems has a very different purpose: Musk has boasted online that DOGE is advancing President Trump's aim to "end[] the federal Department of Education."[104] Musk's claim comes after President Trump "repeatedly vowed to shutter the federal agency" on the campaign trail and announced after taking office that he expects his nominee for Secretary of Education to "put herself out of a job."[105] On February 7, 2025, after DOGE officials had gained access to ED systems, Musk claimed that the department "doesn't exist."[106]

---

[102] *Id.*

[103] NLDS SORN, 87 Fed. Reg.  57,873, 57,877-78; CODS SORN, 88 Fed. Reg.  41,942, 41,945-46; FMS SORN, 73 Fed. Reg, 177, 178; FAS SORN, 88 Fed. Reg. 42,220, 42,221-22.

[104] Elon Musk (@elonmusk), X (Feb. 3, 2025, 8:30 PM), https://x.com/elonmusk/status/1886633448078475593; *see also* Meckler et al., *supra* note 92 (noting that DOGE access "is a prelude to a more dramatic effort to make good on one of Trump's campaign promises: eliminating the Education Department altogether").

[105] Zachary Schermele, *President Trump Says He Wants His Education Secretary to 'Put Herself out of a Job'*, USA TODAY (Feb. 4, 2025), https://www.usatoday.com/story/news/education/2025/02/04/trump-education-department-mcmahon/78220522007.

[106] Elon Musk (@elonmusk), X (Feb. 7, 2025, 5:34 PM), https://x.com/elonmusk/status/1888038615780909178.

*Defendants' Disclosures of ED Systems Information to DOGE Officials is Not a "Routine Use" of the Protected Information*

~~116.~~117.     The Privacy Act's "routine use" exception also does not apply.

~~117.~~118.     The SORN for NSLDS lists 14 routine uses, none of which apply here.

~~118.~~119.     The routine uses for NSLDS generally fall into several broad categories: uses related to administration of the loan program; disclosures to enable enforcement by agencies "charged with the responsibility of investigating or prosecuting" specific violations; litigation or alternative disputes resolution procedures; disclosures required under the Freedom of Information Act or Privacy Act; contract-related disclosures; employment- or benefit-related matters; employee grievance proceedings; labor organization disclosure; disclosures to the Justice Department or OMB; disclosures in the course of responding to a data breach; disclosures in assisting another agency responding to a data breach; and disclosures to the National Archives and Records Administration.[107]

~~119.~~120.     None of the routine uses listed by the NSLDS SORN contemplate data access for the purpose of dismantling the Department of Education.

~~120.~~121.     None of the routine uses listed by the NSLDS SORN contemplate "feeding" data into artificial intelligence systems, and certainly not for the purpose of dismantling the Department of Education.

~~121.~~122.     As alleged above, DOGE officials are accessing the ED Systems for purposes of destroying ED, not for any of the purposes identified in the NSLDS SORN.

~~122.~~123.     The SORN for CODS lists 15 routine uses, none of which apply here. The routine uses for CODS are similar to those for NSLDS.[108]

~~123.~~124.     As alleged above, DOGE officials are accessing the ED Systems for purposes of destroying ED, not for any of the purposes identified in the CODS SORN.

---

[107] NLDS SORN, 87 Fed. Reg. 57,873, 57,879-81.
[108] CODS SORN, 88 Fed. Reg. 41,942, 41,948-50.

~~124.~~125.      The SORN for FAS lists 15 routine uses, none of which apply here. The routine uses for FAS are similar to those for NSLDS and CODS.[109]

~~125.~~126.      As alleged above, DOGE officials are accessing the ED Systems for purposes of destroying ED, not for any of the purposes identified in the FAS SORN.

~~126.~~127.      The SORN for FMS lists 10 routine uses, none of which apply here. The routine uses for FAS are similar to those for NSLDS, CODS, and FAS.[110]

~~127.~~128.      As alleged above, DOGE officials are accessing the ED Systems for purposes of destroying ED, not for any of the purposes identified in the FMS SORN.

~~128.~~129.      The use of the records contained in ED Systems to dismantle ED is incompatible with any legitimate duties of the Department and with the purpose for which the records were collected and maintained.

~~129.~~130.      None of the other statutory exceptions for disclosure of personal information set forth in the Privacy Act applies or would have applied to authorize Defendants' decision to disclose the sensitive information and data contained within the ED to DOGE representatives.

**Defendants' Disclosure of Protected Data to DOGE Employees Is Unprecedented**

~~130.~~131.      Defendants and DOGE have turned the data systems that enable the government to function into a weapon to dismantle the government from the inside. Indeed, Mr. Musk exults the non-routine nature of DOGE. In response to a post on X that said "DOGE is speedrunning government reform--$4B/day cuts could start THIS weekend. Bureaucracy never saw it coming[,]" Musk seemed to agree, explaining: "Very few in the bureaucracy actually work the weekend, so it's like the opposing team just leaves the field for 2 days!"[111]

~~131.~~132.      As DOGE's intrusion into Plaintiffs' sensitive data is unprecedented, Defendants' disclosures cannot constitute "routine use" authorized by the Privacy Act.[112] When

---

[109] FAS SORN, 88 Fed. Reg. 42,220, 42,223-25.
[110] FMS SORN, 93 Fed. Reg. 177, 178-79.
[111] Elon Musk (@elonmusk), X (Feb. 1, 2025 3:37 PM), https://x.com/elonmusk/status/1885789468713476492.
[112] Charlie Warzel & Ian Bogost, *The Government's Computing Experts Say They are Terrified,* The Atlantic (Feb. 7, 2025), https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/.

these systems are used for routine purposes, access is usually very restricted.[113] For instance, "the aggregate information contained in the OPM databases is so sensitive, said a U.S. official, that even White House requests for certain types of data were rebuffed under previous administrations."[114]

~~132.~~133.    Defendants are disclosing protected data to DOGE representatives not to advance their agencies' respective agendas, but to advance the DOGE agendas. Destroying Congressionally-established federal agencies is not a "routine use" of these systems. Identifying entire programs to eliminate is not a "routine use" of these systems. And feeding Americans' PII into private artificial intelligence systems is not a "routine use" of these systems.

**Defendants' Disclosure of Protected Data Has Harmed and Will Continue to Harm Plaintiffs**

~~133.~~134.    President Gerald Ford, who signed the Privacy Act into law, described the Act as codifying this country's long-held commitment to "safeguard personal privacy." Indeed, the Act mandates that the government "protect the right of privacy for every American." Defendants' unauthorized access and disclosure of that information to DOGE representatives violates Plaintiffs' rights under the Privacy Act. It has also exposed Plaintiffs' sensitive information to serious risk.

~~134.~~135.    Plaintiffs, like many millions of Americans since the Act's passage, rely on the protections enshrined in the Privacy Act to safeguard their sensitive information housed in the systems described in this Complaint. Defendants' actions have run roughshod over those protections. Cyber security experts warn that Defendants' actions pose several extreme risks. "As one administrator for a federal agency with deep knowledge about the government's IT

---

[113] *Id.*

[114] Isaac Stanley-Becker et al., *Musk's DOGE Agents Access Sensitive Personnel Date, Alarming Security Officials*, Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/national-security/2025/02/06/elon-musk-doge-access-personnel-data-opm-security/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&carta-url=https%3A%2F%2Fs2.washingtonpost.com%2Fcar-ln-tr%2F40f0f54%2F67a4ea66cd86f13ee737dd6e%2F5972aa5bade4e21a84818a4e%2F14%2F60%2F67a4ea66cd86f13ee737dd6e.

operations told [the *Atlantic*], "'I don't think the public quite understands the level of danger.'"[115]

~~135.~~136.         According to public reporting, a Treasury Department internal threat analysis has designated DOGE to be an "insider threat."[116] The Bureau of Fiscal Service's threat intelligence team recommended "suspending [DOGE's] access immediately and conducting a comprehensive review of all actions they may have taken on these systems."[117] The internal Treasury report went on, "Continued access to any payment systems by DOGE members, even 'read only,' likely poses the single greatest insider threat risk the Bureau of the Fiscal Service has ever faced."[118]

~~136.~~137.         The chaotic[119] and secretive[120] process by which DOGE representatives have gained access to protected data—sometimes without proper vetting or security clearances[121]—increases Plaintiffs' concern about additional risks of unauthorized disclosure. Even "read only" access allows users to copy and transfer Plaintiffs' protected data into other systems—without limitation.[122]

~~137.~~138.         At least one DOGE representative has been publicly reported to have been a member of cybercrime communities[123] and was reported to have been previously fired from a

---

[115] Charlie Warzel & Ian Bogost, *The Government's Computing Experts Say They are Terrified,* The Atlantic (Feb. 7, 2025), https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/.
[116] Vittoria Elliott & Leah Feiger, *A US Treasury Intelligence Analysis Designates DOGE Staff as 'Insider Threat'*, Wired (Feb. 7, 2025), https://www.wired.com/story/treasury-bfs-doge-insider-threat/.
[117] *Id.*
[118] *Id.*
[119] Makena Kelly, *DOGE Staff Had Questions About the 'Resign' Email. Their New HR Chief Dodged Them*, Wired (Feb. 1, 2025), https://www.wired.com/story/doge-hr-elon-musk-resignation-fork-road-leaked-staff-meeting/.
[120] Vittoria Elliott et al., *The US Treasury Claimed DOGE Technologist Didn't Have "Write Access" When He Actually Did*, Wired (Feb. 6, 2025), https://www.wired.com/story/treasury-department-doge-marko-elez-access/.
[121] Nick Schwellenbach, *Elon Musk's DOGE Teams Raise Vetting, Ethic Concerns*, Project on Government Oversight (Feb. 6, 2025), https://www.pogo.org/investigations/elon-musks-doge-teams-raise-vetting-ethics-concerns.
[122] Charlie Warzel & Ian Bogost, *The Government's Computing Experts Say They are Terrified,* The Atlantic (Feb. 7, 2025), https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/.
[123] Brian Krebs, *Teen on Musk's DOGE Team Graduated from 'The Com'*, Krebs on Security (Feb. 7, 2025), https://krebsonsecurity.com/2025/02/teen-on-musks-doge-team-graduated-from-the-com/.

cybersecurity firm for leaking company secrets.[124] It has also been widely reported that DOGE representatives are using non-government issued devices to connect to government servers, which significantly increases the risk of hacking.[125]

~~138.~~139.    Exacerbating the risk of additional unauthorized access to Plaintiffs' private records is the planned introduction of the at-issue data into artificial intelligence systems. The security risks associated with AI are well-documented.  President Biden issued an Executive Order on October 30, 2023—which President Trump has since rescinded—identifying the "extraordinary potential" for "peril" associated with use of AI, including but not limited to "fraud, discrimination, bias, and disinformation" and creating risks "to national security."[126] Notwithstanding this, Defendants and DOGE representatives have adopted a "move fast and break things" "AI-first strategy" that has already resulted in the sharing of sensitive Education Department information with AI software with additional AI uses likely to follow.[127]

~~139.~~140.    Defendants' unlawful disclosures of Plaintiffs' data to DOGE representatives has caused Plaintiffs major distress and anxiety, as they do not know who their data has been or will be shared with, whether these disclosures have made them vulnerable to further privacy breaches, and how it may be weaponized against them. They are concerned that as a result of the unlawful disclosures, they will be subject to harassment, intimidation, and economic and reputational harm. These harms are ongoing and will continue absent judicial intervention.

**Ongoing Litigation**

---

[124] Jason Leopold et al., *Musk's DOGE Teen Was Fired By Cybersecurity Firm for Leaking Company Secrets*, Bloomberg (Feb. 7, 2025), https://www.bloomberg.com/news/articles/2025-02-07/musk-s-doge-teen-was-fired-by-cybersecurity-firm-for-leaking-company-secrets?accessToken=eyJhbGciOiJIUzI1NiIsInR5cCI6IkpXVCJ9.eyJpb3VyY2UiOiJTdWJzY3JpYmVyR2lmdGVkQXJ0aWNsZSIsImlhdCI6MTczODk1NzQyNCwiZXhwIjoxNzM5NTYyMjI0LCJhcnRpY2xlSWQiOiJTUkJXMTlUMVVNMFcwMCIsImJpb25uN0SWQiOiIyQjE3NzFFOTlEODc0QzRDOTY1Njg1RTZBQkJGM0QwRCJ9.vxGv4ncXEbIrUGmUYpTUdxLmCVDwzmEWp-VRWV9otME&leadSource=uverify%20wall.
[125] Cynthia Brumfield, *Musk's DOGE effort could spread malware, expose US systems to threat actors*, CSO (Feb. 4, 2025), https://www.csoonline.com/article/3815925/musks-doge-effort-could-spread-malware-expose-us-systems-to-threat-actors.html.
[126] Exec. Order No. 14,110, 88 Fed.Reg. 75,191 (Nov. 1, 2023).
[127] Victor Tangermann, *Elon Musk's DOGE Training an AI to Analyze Government Spending*, Futurism (Feb. 7, 2025), https://futurism.com/elon-musk-doge-ai-government; Natanson, *supra* n. 103.

140.141.　　　On February 3, several unions and membership associations sued Defendants Bessent and Department of the Treasury in Federal District Court of the District of Columbia asserting Privacy Act violations based on DOGE access to FDS systems. On February 6, the judge in that case deferred ruling on the plaintiffs' motion for a temporary restraining order on the basis of an agreement among the parties limiting access to FDS records to specific Treasury Department officials, as well as Krause and Elez, "until such time as the Court rules on the Plaintiffs' forthcoming Preliminary Injunction Motion."

141.142.　　　On February 7, 2025, the attorneys general of 19 states filed a lawsuit against President Trump and Defendants Bessent and Department of the Treasury in the Southern District of New York challenging the defendants' policy to expand the Bureau of Fiscal Services' access to political appointees and Special Government Employees. The States allege that the policy violates the Privacy Act, APA, separation of powers doctrine, and the Take Care Clause of the United States Constitution.

142.143.　　　On February 8, 2025, the judge in that case granted the plaintiffs' motion for a temporary restraining order, restraining the defendants from granting access to any Treasury Department data system containing PII to any political appointee, Special Government Employee, or detailee from another agency, and ordering them to direct any person who has already received such access to immediately destroy any and all copies of material downloaded from Treasury Department systems.

143.144.　　　Despite the existence of these other lawsuits, Plaintiffs anticipate additional disclosures of their protected data as DOGE continues its plans to expand its reach within the agencies.

## COUNT I – Violation of APA

### (Not in accordance with law)

144.145.　　　The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

145.146.     The Privacy Act prohibits Defendants from disclosing records on individuals to any person without the individual's consent except in specified circumstances, none of which are present here. 5 U.S.C. § 552a(b).

146.147.     Defendants have granted DOGE representatives ongoing access to their systems of records containing sensitive and personal data.

147.148.     Defendants have disclosed Plaintiffs' records and the records of Plaintiffs' members to DOGE representatives without obtaining their consent.

148.149.     Defendants have disclosed Plaintiffs' records and the records of Plaintiffs' members to DOGE representatives for uses other than the routine uses specified in the applicable SORNs.

149.150.     Defendants' actions violate the prohibitions in the Privacy Act and are therefore not in accordance with law.

150.151.     An individual action against Defendants for damages under the Privacy Act would not cause Defendants to end the unlawful disclosure of Plaintiffs' and their members' records to DOGE Representatives, including future DOGE Representatives. Defendants' action is "final agency action for which there is no other adequate remedy in a court" and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

## COUNT II – Violation of APA

### (Arbitrary and capricious)

151.152.     The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

152.153.     Defendants have failed to consider the consent requirements of the Privacy Act, 5 U.S.C. § 552a(b), and their duty to protect the sensitive data on their systems, 5 U.S.C. § 552a(e)(1); the risks that their disclosures would result in corrupted data; and the security threats that are likely to result from their action.

153.154.    Defendants failed to engage in reasoned decision-making to grant DOGE representatives sweeping access to their systems of records containing sensitive and personal data for the purposes of advancing the DOGE agenda.

154.155.    Because Defendants have failed to consider an important aspect of the problem, failed to engage in reasoned decision-making, and offer explanations that run counter to the evidence before them, Defendants' actions are arbitrary and capricious.

155.156.    An individual action against Defendants for damages under the Privacy Act would not cause Defendants to end the unlawful disclosure of Plaintiffs' and their members' records. Defendants' action is "final agency action for which there is no other adequate remedy in a court" and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704.

## COUNT III – Violation of APA
### (Excess of statutory authority)

156.157.    The APA directs courts to hold unlawful and set aside agency actions in excess of statutory authority. 5 U.S.C. § 706(2)(C).

157.158.    Defendants have a non-discretionary duty to protect records on individuals from unauthorized disclosure.

158.159.    Defendants' action to grant DOGE representatives access to their systems of records containing sensitive and personal data violates that duty.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.    Declare that Defendants acted unlawfully in disclosing records protected by the Privacy Act to DOGE representatives.

b.    Enjoin Defendants from continuing to permit such access or otherwise obtain such information.

c.    Enjoin Defendants to ensure that there is no further unauthorized use or dissemination resulting from the unauthorized disclosures.

d. Enjoin Defendants to retrieve or ensure the destruction of any copies of any records that were unlawfully disclosed.

e. Enjoin Defendants to ensure that future disclosure of individual records will occur only in accordance with the Privacy Act and the SORNs applicable to the system of records at issue.

f. Grant any temporary, preliminary, or permanent injunctive relief necessary to protect the privacy of individuals whose information is contained within the system of records.

g. Award Plaintiffs their costs and attorneys' fees for this action; and

h.  Grant any other relief as this Court deems appropriate.

DATED:  February 1012, 2025

By: _____/s/ Mark Hanna_____

Mark Hanna (Fed. Bar No. 16031)
David J. Rodwin (Fed. Bar No. 18615)
MURPHY ANDERSON, PLLC
1401 K Street NW, Suite 300
Washington, DC 20005
T: (202) 223-2620 | F: (202) 296-9600
mhanna@murphypllc.com
drodwin@murphypllc.com

Daniel McNeil (*pro hac* ~~forthcoming~~pending)
General Counsel
American Federation of Teachers, AFL-CIO
555 New Jersey Ave. NW
Washington, DC 20001
T: (202) 393-6305 | F: (202) 393-6385
dmcneil@aft.org

Kristy Parker (*pro hac* ~~forthcoming~~pending)
Jane Bentrott (*pro hac* ~~forthcoming~~pending)
Shalini Goel Agarwal (*pro hac* ~~forthcoming~~pending)
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
202-843-3092
kristy.parker@protectdemocracy.org
jane.bentrott@protectdemocracy.org
shalini.agarwal@protectdemocracy.org

Benjamin L. Berwick (*pro hac* forthcoming)
PROTECT DEMOCRACY PROJECT
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
ben.berwick@protectdemocracy.org

Jessica A. Marsden (*pro hac ~~forthcoming~~pending*)
PROTECT DEMOCRACY PROJECT
510 Meadowmont Village Circle, No. 328
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Laurence M. Schwartztol (*pro hac
~~forthcoming~~pending*)
DEMOCRACY AND RULE OF LAW CLINIC
Harvard Law School
1525 Massachusetts Avenue
Cambridge, MA 02138
(617) 998-1877
lschwartztol@law.harvard.edu

John L. Schwab (*pro hac ~~forthcoming~~pending*)
MUNGER, TOLLES & OLSON LLP
350 S Grand Ave 50th Floor
Los Angeles, California 90071
(213) 683-9260
John.Schwab@mto.com

Xiaonan April Hu (*pro hac ~~forthcoming~~pending*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
Washington, DC 20001
(202) 220-1123
April.Hu@mto.com

Carson Scott (*pro hac ~~forthcoming~~pending*)
Roman Leal (*pro hac ~~forthcoming~~pending*)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
(415) 512-4000
Carson.Scott@mto.com
Roman.Leal@mto.com

*Attorneys for Plaintiffs*

ADD154

**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
SOUTHERN DIVISION**

AMERICAN FEDERATION OF
TEACHERS, *et al.*,

              Plaintiffs,

    v.

SCOTT BESSENT, *et al.*,

              Defendants.

Case No. 8:25-cv-430-DLB

**DEFENDANTS' MOTION FOR STAY PENDING APPEAL AND MEMORANDUM IN
SUPPORT OF THE MOTION**

## INTRODUCTION

Defendants respectfully move for a stay pending resolution on appeal of this Court's preliminary injunction entered on March 24, 2025, ECF Nos. 68, 69. For the reasons stated in Defendants' opposition to Plaintiffs' motion for preliminary injunction, Defendants are likely to prevail on appeal. This Court lacks jurisdiction because Plaintiffs have not alleged a concrete harm and because the data access decisions Plaintiffs challenge are not reviewable under the Administrative Procedure Act. Moreover, on the merits, and assuming jurisdiction, Defendants are likely to prevail on Plaintiffs' claims that Defendants acted in violation of the Privacy Act and arbitrarily and capriciously. The equities also weigh in favor of a stay. Neither Plaintiffs nor their members will be harmed during the pendency of an appeal, and the Court's injunction intrudes on the basic operation of federal agencies and thwarts implementation of a critical Presidential directive.

Plaintiffs indicated that they would respond with their position on this motion by 1:00 p.m. Because they have not yet responded, we assume that they oppose.

## ARGUMENT

### THE COURT SHOULD STAY ITS INJUNCTION PENDING APPEAL

Defendants request a stay pending appeal of the Court's preliminary injunction under Federal Rule of Civil Procedure 62. In evaluating whether to grant a stay pending appeal, courts consider four factors: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).

For the reasons stated in Defendants' opposition to Plaintiffs' preliminary injunction motion, Defendants are likely to prevail on appeal. *See* Defs.' Opp'n to Pls.' Prelim. Inj. Mot., ECF No. 62 ("Defs.' Opp'n"). First, Plaintiffs lack Article III standing because they fail to allege concrete injury. *Id.* at 11–16; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021). Plaintiffs claim a purely intangible form of injury—namely, they allege that the disclosure of their personal information to DOGE team members at the agencies constitutes an invasion of privacy. That injury is not concrete. Nor does the tort of intrusion upon seclusion have a "close relationship" to Plaintiffs' claimed injury. *TransUnion*, 594 U.S. at 417. Mere access to data housed by a government agency by government employees is not an unwarranted intrusion in the home, or otherwise into Plaintiffs' members solitude or seclusion. *See O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 246 (4th Cir. 2023). *Compare Gadelhak v. AT&T Servs., Inc.* 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (finding standing based on "irritating intrusions" caused by unwanted text messages, which is "analogous to [the] type of "intrusive invasion of privacy" covered by the tort of intrusion upon seclusion); *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 919, 922 (4th Cir. 2022) (finding standing where defendants had obtained plaintiffs information to mail unsolicited advertising materials to the plaintiffs' homes). There is no intrusion at all into Plaintiffs' members seclusion, much less one that would be "highly offensive" to a reasonable person. Restatement (Second) of Torts § 652B. Nor have Plaintiffs alleged any non-speculative harm based on the alleged increased risk of identity theft based on Defendants' provision of access to agency personnel. *See Beck v. McDonald*, 848 F.3d 252, 274 (4th Cir. 2017).

The Court also lacks jurisdiction because Plaintiffs do not challenge final agency action reviewable under the APA. Defs.' Mem. at 16–21. Plaintiffs sought, and have now received, an injunction that manages the day-to-day operations of the defendant agencies. But the APA does

2

ADD157

not provide oversight of the types of decisions such as which agency employees get access to which data systems. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). And personnel decisions about which particular agency personnel have access to any particular agency data system is not "final" because they are not decisions by which "rights and obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

On the merits, Plaintiffs fail to show any violation of the Privacy Act because the DOGE team members of the three agencies are employed (or effectively employed through detail arrangements) by their respective agencies and have a "need to know" within the meaning of 5 U.S.C. § 552a(b)(1). Defs.' Mem. at 23–28. The Court's contrary conclusion is inconsistent with federal agency practice broadly and imposes obligations on agencies beyond what the Privacy Act requires. Defendants are also likely to prevail on Plaintiffs' claim that Defendants acted arbitrarily and capriciously. Plaintiffs (and the Court) find fault with the agencies' administrative records. But it was not arbitrary and capricious for Defendants not to extensively document the decision to grant specific personnel access to specific systems. It is sufficient and reasonable that members of the agency DOGE teams were employed by the relevant agency and that Defendants, in their broad discretion to manage agency operations, found it appropriate to grant access so that those employees could perform duties within the scope of their employment.

The remaining factors—irreparable harm, the balance of harms, and the public interest— likewise favor the requested stay. *See id.* at 30–31. In their preliminary injunction motion and reply brief, Plaintiffs repeatedly claim that the continued disclosure of the Plaintiffs' members personal information *within* each agency is irreparable harm that money damages cannot rectify. ECF Nos. 59, 63. But as other courts have found in cases addressing similar issues, that kind of

harm is not irreparable because the mere possibility of misuse of data is conjectural, and Plaintiffs fail to provide evidence that their information has been improperly made public. *See* Defs.' Mem. at 31 (citing similar cases denying injunctions based on lack of irreparable harm).

By contrast, the preliminary injunction causes direct irreparable injuries to the government and the public, whose interests "merge" in this context. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The injunction here impinges on the President's broad authority over and responsibility for directing employees in important work to modernize federal government systems and identify fraud, waste, and abuse throughout the federal government. It is therefore "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Immigration & Naturalization Serv. v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers). By instructing the government who can and cannot access the defendant agencies' data systems, the Court curtails the Executive Branch's core duty to manage the day-to-day operations of its agencies. *See City of New York v. United States Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers."); *see also Walmart Inc. v. U.S. Dep't of Just.*, 517 F. Supp. 3d 637, 655 (E.D. Tex. 2021) (finding that challenges to agency action "must identify specific and discrete governmental conduct, rather than launch a 'broad programmatic attack' on government's operations.'"), *aff'd*, 21 F.4th 300 (5th Cir. 2021).

## CONCLUSION

For these reasons, and for the reasons stated in Defendants' opposition to Plaintiffs' motion for preliminary injunction, Defendants ask the Court to stay its preliminary injunction pending resolution on appeal. Defendants intend to seek relief from the Fourth Circuit later today.

Dated:  March 24, 2025

Respectfully submitted

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

EMILY HALL
Counsel to the Assistant Attorney General
Civil Division

*/s/ Elizabeth J. Shapiro*
ELIZABETH J. SHAPIRO
BRADLEY P. HUMPHREYS
Attorneys
Civil Division, Federal Programs Branch
United States Department of Justice
1100 L Street NW. Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

Kelly O. Hayes
Interim United States Attorney

ARIANA WRIGHT ARNOLD
USDC Md Bar No. 23000
Assistant United States Attorney
36 S. Charles St., 4th Floor
Baltimore, Maryland 21201
Tel: (410) 209-4813 Ph
Fax: (410) 962-2310 Fax
Ariana.Arnold@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on March 24, 2025, I electronically filed the foregoing with the Clerk of Court

using the CM/ECF system, which will send a notification of such filing to all counsel of record.


*/s/ Elizabeth J. Shapiro*
ELIZABETH J. SHAPIRO

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## SOUTHERN DIVISION

AMERICAN FEDERATION OF
TEACHERS, *et al.*,

           Plaintiffs,

   v.

SCOTT BESSENT, *et al.*,

           Defendants.

Case No. 8:25-cv-430-DLB

## [PROPOSED] ORDER

For the reasons stated in Defendants' Motion for a Stay Pending Appeal, Defendants' Motion is hereby **GRANTED**. It is **HEREBY ORDERED** that the Court's Preliminary Injunction, ECF Nos. 68, 69, is **STAYED** pending Defendants' appeal to the United States Court of Appeals for the Fourth Circuit.

**SO ORDERED.**

Dated: _____

_____
Hon. Deborah L. Boardman
United States District Judge

ADD162

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*s/ Jack Starcher*
Jack Starcher