UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 25-1282**
**(8:25-cv-00430-DLB)**

───────────────

AMERICAN FEDERATION OF TEACHERS; INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS; NATIONAL ACTIVE AND RETIRED FEDERAL EMPLOYEES; NATIONAL FEDERATION OF FEDERAL EMPLOYEES; DONALD MARTINEZ, c/o Murphy Anderson PLLC; JASON CAIN, c/o Murphy Anderson PLLC; CLIFFORD GRAMBO, c/o Murphy Anderson PLLC; THOMAS FANT, c/o Murphy Anderson PLLC; CHRISTOPHER PURDY, c/o Murphy Anderson PLLC; KRISTOFER GOLDSMITH, c/o Murphy Anderson PLLC; INTERNATIONAL FEDERATION OF PROFESSIONAL & TECHNICAL ENGINEERS,

          Plaintiffs – Appellees,

    v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; CHARLES EZELL, in his official capacity as the Acting Director of the Office of Personnel Management; LINDA MCMAHON, in her official capacity as the Secretary of Education; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF EDUCATION,

          Defendants – Appellants.

───────────────

O R D E R

───────────────

A majority of judges in regular active service and not disqualified having voted in

a requested poll of the Court to grant initial hearing en banc on appellants' motion to stay

pending appeal, the Court denies initial hearing en banc. Chief Judge Diaz, along with Judges King, Gregory, Wynn, Thacker, Benjamin, and Berner, voted to grant initial hearing en banc. Judges Wilkinson, Niemeyer, Agee, Harris, Richardson, Quattlebaum, Rushing, and Heytens voted to deny initial hearing en banc.

Upon consideration of the submissions relative to appellants' motion to stay pending appeal, the Court grants the motion. Judges Agee and Richardson voted to grant the motion to stay pending appeal. Judge King voted to deny the motion to stay pending appeal.

This Order is entered for the Court at the direction of Judge King.

For the Court

/s/ Nwamaka Anowi, Clerk

AGEE, Circuit Judge, with whom Judge RICHARDSON joins, concurring:

I concur in the order granting the Government's motion for a stay pending appeal. The Government is entitled to a stay upon a "strong showing that [it] is likely to succeed on the merits," that it "will be irreparably injured absent a stay," that "issuance of the stay will [not] substantially injure the other parties interested in the proceeding," and that a stay is in "the public interest." *Nken v. Holder*, 556 U.S. 418, 434 (2009).

The first factor strongly favors the Government because it has made a strong showing that it will succeed on the merits as to standing. In concluding otherwise and ruling that Plaintiffs' alleged injury—"the ongoing access to their sensitive personal information by unauthorized government personnel"—constitutes a concrete injury for purposes of establishing standing, the district court misapplied *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), and our precedent interpreting *TransUnion*.

There, the Supreme Court considered "[w]hat makes a harm concrete for purposes of Article III[.]" *Id.* at 424. It recognized that "traditional tangible harms, such as physical harms and monetary harms" are concrete injuries, and that "[v]arious intangible harms can also be concrete," such as "injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425. It also reiterated that "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 426 (quoting *Spokeo*, 578 U.S. at 341 (2016)). Thus, even though Appellees allege a statutory violation, we are not "relieve[d] . . . of [our] responsibility to independently decide whether [they] ha[ve] suffered a concrete harm under Article III." *Id.*

3

The district court concluded that Plaintiffs' alleged injury is concrete because it bears a close relationship to intrusion upon seclusion. Critically, however, it misapplied *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022). The tort of inclusion upon seclusion is commonly defined as "intentional[] intru[sion], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) Torts § 652B. And in *Garey*, we held that the plaintiffs had a concrete injury for standing purposes where the defendants knowingly obtained each plaintiff's "name and address from a motor vehicle record for an impermissible purpose in violation of law," which were then used to "mail unsolicited attorney advertising materials to the [plaintiffs]." *Id.* at 920, 922.

The district court in our present case relied on the fact that we did not explicitly mention that the plaintiffs' receipt of the unsolicited materials at home informed and underlaid our conclusion that they had shown a legally cognizable injury. On that basis, the court below concluded that "[n]othing more, under *Garey*, is required to establish concrete injury in fact" than the fact that "the DOGE affiliates obtained access to [Appellees'] personal information."

To isolate the actual intrusion into the home in *Garey* ignores our express reliance on *Krakauer v. Dish Network*, 925 F.3d 643 (4th Cir. 2019). In *Garey*, we framed *Krakauer* as "a nearly identical standing challenge." 35 F.4th at 921. In *Krakauer*, we recognized that "[o]ur legal traditions . . . have long protected privacy interests in the home," including "[i]ntrusions upon personal privacy," e.g., "intrusions made via phone calls." 925 F.3d at 653. We thus concluded that the harm—"a telemarketer disregard[ing] the [Do-Not-Call]

registry and actually plac[ing] multiple calls"—"impose[d] a concrete burden on his privacy." *Id.* In other words, it wasn't the mere possession of the phone numbers but their actual use to invade the home that was dispositive. Because *Krakauer* expressly relied on the fact that phone calls were made in concluding that the plaintiffs' injury was concrete, *Garey* plainly relied on the analogous fact: that the plaintiffs received unsolicited attorney advertisements. To conclude otherwise, the district court improperly excised one sentence from the necessary specific context for considering the injury that had been alleged—the use of the plaintiffs' "names and addresses on [accident] reports to mail unsolicited attorney advertising materials to the drivers involved in those crashes." 35 F.4th at 920.

Under *TransUnion*, the crucial touchstone is whether the kind of harm alleged by the Appellees bears a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." 594 U.S. at 424 (cleaned up); *see Gadelhak v. AT&T Servs.*, 950 F.3d 458, 462 (7th Cir. 2020) (J. Barrett) (explaining that "when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a 'close relationship' in kind, not degree"). At its core, the harm contemplated by the common-law tort of intrusion upon seclusion includes an intrusion into an individual's private space. We have recognized that it is "the unwanted intrusion into the home that marks intrusion upon seclusion." *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 246 (4th Cir. 2023). Our sister circuits have also concluded that the harm visited upon an individual by an intrusion upon seclusion must include some sort of interjection into the private sphere. *See, e.g.*, *Dickson v. Direct Energy, LP*, 69 F.4th 338, 345 (6th Cir. 2023) (finding that "invasion-of-privacy-like harms flow[] from unwanted telephonic communications" in part

because such communications "interject[] [the caller] into [the recipient's] private sphere"); *Six v. IQ Data Int'l, Inc.*, 129 F.4th 630, 634 (9th Cir. 2025) ("Courts have consistently found that the harm caused by *unwanted communications* [to a plaintiff] bears a close relationship to intrusion upon seclusion." (emphasis added)). At bottom, Appellees' alleged injury does not bear a close relationship to that harm.

Appellees fail to allege any interjection into the private sphere analogous to the unsolicited mailings in *Garey* or the unsolicited phone calls in *Krakauer*. Consequently, the district court misread our precedent in requiring nothing more than abstract access to personal information to establish a concrete injury.

The Government has thus met its burden of a strong showing that it is likely to succeed on the merits of their appeal. The remaining *Nken* factors also favor the government. The Supreme Court has told us that, unlike a private party, the government suffers an irreparable harm when it cannot carry out the orders of its elected representatives. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)). And the third and fourth factors, which "merge" when the government is involved, *Nken*, 556 U.S. at 435, tilt the same way. Judicial management of agency operations offends the Executive Branch's exclusive authority to enforce federal law. *See United States v. Texas*, 599 U.S. 678–79 (2023). I am wary of diminishing the separation of powers, which "is designed to preserve the liberty of all the people." *Collins v. Yellen*, 594 U.S. 220, 245 (2021). The Government is thus entitled to a stay pending appeal.

RICHARDSON, Circuit Judge, with whom Judge AGEE joins, concurring:

The plaintiffs sued three federal agencies—the Department of Education, the Office of Personnel Management, and the Department of the Treasury—alleging that they violated the Privacy Act by providing database and IT access to certain of their employees affiliated with the newly minted Department of Government Efficiency. To revoke access from the DOGE-affiliated employees during their lawsuit, the plaintiffs asked the district court to grant a preliminary injunction. The district court did so, thereby pausing the government's activities.

The government appealed and now asks us to pause the district court's pause by staying the preliminary injunction while their appeal pends. To decide whether to grant the stay, we apply the four-factor *Nken* test and consider: (1) whether the government has made a strong showing that it is likely to succeed on the merits; (2) whether the government will be irreparably injured absent a stay; (3) whether a stay would substantially injure the plaintiffs; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 426 (2009). I agree with Judge Agee that the government has satisfied the four *Nken* factors and vote to grant the stay. I write to further explain why the government has a high likelihood of success on the merits.

Because the government is challenging the preliminary injunction, the "merits" of its appeal hinge on whether the district court abused its discretion in issuing one. And whether the district court abused its discretion depends on the four-factor *Winter* test for preliminary injunctions, which required the plaintiffs to clearly show "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[1] In other words, the government's likelihood of success under the first *Nken* factor on appeal encompasses and mirrors the plaintiffs' likelihood of satisfying all four *Winter* factors below.

As a matter of mathematics, this is an unfavorable structure for the plaintiffs. Between the four *Winter* factors themselves, several threshold jurisdictional questions, and the alleged Privacy Act violation, this case involves several issues that are each potentially dispositive of the appeal. To win, the government need only prevail on one of them; the plaintiffs, on the other hand, must prevail on *all* of them. This inherently lowers the plaintiffs' odds of success and correspondingly raises the government's. Even if the plaintiffs have a high probability of success on any one issue, the fact that they must run the table to receive their desired relief craters their overall odds. As probabilities are multiplied, their product shrinks rapidly, which means the mere existence of multiple hurdles tips the scales against granting a preliminary injunction.[2]

---

[1] Though preliminary injunctions and stays are not the same, the *Winter* test for preliminary injunctions has "substantial overlap" with the *Nken* test for stays "because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Nken*, 556 U.S. at 434.

[2] An example for clarity: If the plaintiffs in a case had a 75% chance of prevailing on each of five independent issues, but they needed to prevail on *all* of them to receive relief, then their likelihood of overall success is $(0.75)^5 = \sim 24\%$. Despite being 3:1 favorites on each issue, the plaintiffs end up as 3:1 underdogs. And the other side's odds are mirrored. Despite being 3:1 underdogs on each issue, the defendants become 3:1 favorites to prevail in the case overall.

This multiplicative problem is fatal to the plaintiffs' chances in this case. To have granted a preliminary injunction, the district court had to find, among other things, that the plaintiffs alleged an injury bearing a close relationship to a common-law harm, *see Am. Fed. Teachers v. Bessent*, 2025 WL 895326, at *7–13 (D. Md. Mar. 24, 2025), and that the government's actions here were judicially reviewable "final agency actions" under the Administrative Procedure Act, *id.* at *13–17, and that the availability of monetary damages under the Privacy Act did not qualify as an adequate remedy precluding a cause of action under the APA, *id.* at *19 n.17, and that the government's disclosure of data did not fall under the Privacy Act's listed "need-for-the-record" provision permitting intra-agency use, *id.* at *19–28, and that the ongoing access of the plaintiffs' data constituted an irreparable injury unable to be redressed later through an award of monetary damages, *id.* at *29–31. And for each of the five issues, the plaintiffs had to show their likelihood of success was not just high but *extremely* high—otherwise, the multiplicative product of the five probabilities, *i.e.* the likelihood of winning the entire case, would be too low. It is hard to believe the plaintiffs could have shown that.

## I.    Standing:  Concrete Injury

First and foremost, I agree with Judge Agee that the plaintiffs seemingly lack standing.[3] His opinion ably lays out how the district court erred when applying this Court's

---

[3] The use of the word "merits" in the first *Nken* and *Winter* factors is potentially confusing. Because the "merits" of a case are often contrasted with "jurisdictional" issues, *see generally Brownback v. King*, 592 U.S. 209 (2021), *Nken* and *Winter* could be taken to imply that we do not consider jurisdictional issues in their first factors. But the "likelihood of success on the merits" factor refers to the party's likelihood of success *in the lawsuit* (Continued)

decision in *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022). Apart from precedent, though, the plaintiffs' complaint here fails to allege a cognizable concrete injury.

In their complaint, the plaintiffs state that the "disclosure of their records to DOGE representatives constitutes a violation of the Privacy Act." *Am. Fed. Teachers*, 2025 WL 895326, at *6. "But under Article III, an injury in law is not an injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021). As the district court recognized, the plaintiffs must allege a concrete injury, defined as an injury with a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425. This requires a comparison between the *factual* harm alleged by the plaintiffs and another harm redressable at common law.

In factual terms, the plaintiffs complain that the agencies granted unauthorized parties access to their information. And this, they argued below, bore a close relationship to the harm inflicted by the common-law tort of intrusion upon seclusion. But intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace. *See* Restatement (Second) of Torts § 652B cmt. a (characterizing the tort as the "intentional interference with [an individual's] interest in solitude or seclusion"). Its

---

*before the court*, including both merits *and* jurisdictional issues. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) (noting that when considering "likelihood of success on the merits" for a preliminary injunction, jurisdictional "impediments" "mak[e] such success more *unlikely*"). So jurisdictional issues like standing can be considered as part of the first *Nken* factor. *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (holding that standing must be proven only "with the manner and degree of evidence required at the successive stages of the litigation").

harm is felt when a reporter accosts a convalescing patient in the hospital, when a private detective peers through a neighbor's bedroom window for weeks, and when a photographer snaps an opportunistic photo of a woman's underwear. *See id.* § 652B cmt. b, illus. 1, 2; cmt. c, illus. 7. This is distinct from the plaintiffs' alleged harm of unauthorized access.

To be sure, as the examples show, intrusion upon seclusion can occur beyond the confines of the home. And the government overreaches when arguing for such a limited understanding of the tort. Gov. Br. at 11–12 (citing *O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2023)). Prying eyes and probing fingers can be as disquieting when aimed at one's private affairs as when aimed at one's private bedroom. *See* Restatement (Second) of Torts § 652B cmt. b. But in those situations, it is not the information obtained, but the knowledge that a third party is engaged in targeted snooping, that causes the harm. *See* Eli A. Meltz, *No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham L. Rev. 3431, 3453 (2015) ("[T]he harm from an intrusion occurs even when no information is acquired because the intrusive act itself, the conduct that invades one's space or disrupts one's daily activities, takes away from one's interest in being left alone.").

That sort of harm is not present here. To begin with, I question whether entries of information stored in government databases could be part of any plaintiff's seclusion at all. Moreover, the plaintiffs here are far from being the subjects of targeted "investigation[s] or examination[s] into [their] private concerns." *See* Restatement (Second) of Torts § 652B cmt. b. Each plaintiff's information is one row in various databases that are millions upon millions of rows long. The harm that might come from granting database access to an

additional handful of government employees—prone as they may be to hacks or leaks, as the plaintiffs have alleged—strikes me as different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi.

Unauthorized knowledge of sensitive information is instead more closely shielded by other privacy torts, such as public disclosure of private facts, which finds its roots in defamation—unlike intrusion upon seclusion, which finds its roots in trespass. *See, e.g.*, William L. Prosser, *Privacy,* 48 Calif. L. Rev. 383, 389–90, 398 (1960). Yet those other privacy torts all require disclosure to the public at large, since they take aim at the reputational damage that can accompany publicity. *See id.* at 400. As the district court rightly noted, the plaintiffs here alleged no public disclosure. *Am. Fed. Teachers*, 2025 WL 895326, at *11 & n.13. So those other privacy torts do not support their assertion of concrete injury. And without a common-law analog, the plaintiffs lack standing under *TransUnion*.

## II.     Four More Threshold Issues

The plaintiffs' probable lack of standing is enough for the government to show a likelihood of success in their PI appeal. Yet standing is just one of several hurdles facing the plaintiffs. Four others are worth mentioning. Without the benefit of time—a motion for a stay pending appeal is only a prelude to the appeal—I do not hold firm views on these other issues. But given their number and complexity, the odds the plaintiffs could run the table on all of them *and* prevail on standing are low.

*Final Agency Action*. It is unclear, for instance, whether the plaintiffs seek judicial review of final agency action, which is necessary for us to possess jurisdiction under the

12

APA. *See Nat'l Veterans Legal Servs. Program v. United States Dep't of Def.*, 990 F.3d 834, 836 (4th Cir. 2021) (citing 5 U.S.C. § 704). For agency action to be "final," it must both "mark the consummation of the agency's decisionmaking process" and determine "rights or obligations" or generate "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks omitted). The types of agency action that traditionally satisfy this two-prong test are what one would expect: binding agency opinions, *see id.* at 157–159; compliance orders, *see Sackett v. EPA*, 566 U.S. 120, 126 (2012); and promulgated rules, *see Frozen Food Express v. United States*, 351 U.S. 40, 43–44 (1956). The types of agency action that traditionally fail this two-prong test are also what one would expect: tentative recommendations, *see Franklin v. Massachusetts*, 505 U.S. 788, 799–800 (1992); intermediate decisions, *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948); and the initiation of enforcement proceedings, *see FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980). The agency action here—granting IT access to certain employees—does not fit comfortably into either bucket. And the caselaw interpreting final agency action is "hardly crisp" given that the standard "lacks many self-implementing, bright-line rules." *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 541 (D.C. Cir. 2016) (quotation omitted). So I am doubtful the district court could so definitively find final agency action here.

*APA Cause of Action*. The APA poses another hurdle for the plaintiffs. Even if there exists final agency action, the APA only permits plaintiffs to sue over final agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. But the Privacy Act already permits plaintiffs to recover damages for violations. *Id.* § 552a(g)(4).

13

So we would have to answer whether the Privacy Act's damages qualify as an "adequate remedy" for the agency actions here. Admittedly, both the Supreme Court and this Court have implied in footnotes that plaintiffs may seek non-monetary relief under the APA for Privacy Act violations. *See Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004); *Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir. 2006). But those footnotes are dicta. And on first principles without binding authority, determining whether Congress intended damages to be the exclusive remedy for Privacy Act violations is not a trivial question.

*Privacy Act Violation*. Nor do I think the district court could so firmly conclude that the plaintiffs have alleged a Privacy Act violation. The Privacy Act permits the plaintiffs' records to be shared intra-agency with "those officers and employees of the agency . . . who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). In other words, the Privacy Act does not prohibit sharing information with those whose jobs give them good reason to access it. *See Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000). The agency employees here are tasked with "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." Exec. Order No. 14,158 § 4(a), 90 Fed. Reg. 8441 (Jan. 20, 2025). More record evidence may be needed to answer whether the need-for-the-record provision of the Privacy Act applies. But it does not stretch the imagination to think that modernizing an agency's software and IT systems would require administrator-level access to those systems, including any internal databases. And given the district court's recognition that OPM's Chief Information Officer, Greg Hogan, needed unlimited access to OPM's systems, *Am. Fed. Teachers*, 2025 WL 895326, at *4 n.3, the district court should

not have been so eager to tangle the judiciary in the weeds of distinguishing the needs of one high-level IT employee from another.

*Irreparable Injury*.    Granting a preliminary injunction also "requires . . . that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22.  But, as explained, plaintiffs likely lack standing because they have not alleged a cognizable injury in the first place.  And if the plaintiffs cannot show injury, they *a fortiori* cannot show irreparable injury.

But even assuming the plaintiffs have standing, they would "fail[] to establish irreparable injury for preliminary injunction purposes" if their injury was the type redressable through "monetary damages."  *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551–52 (4th Cir. 1994) (quotation omitted).  As referenced above, the Privacy Act provides a plaintiff who shows a violation of its requirements with "actual damages" with a floor of "$1,000."  5 U.S.C. § 552a(g)(4)(A).  In light of Congress's judgment that Privacy Act violations are a type of injury at least sometimes redressable through damages, I am, without more, unconvinced by the plaintiffs' assertion that their injury is so irreparable as to merit immediate equitable relief.

It is particularly hard to see the need for immediate relief under these circumstances because, whatever the merits of the plaintiffs' claims, the injury they complain of has already occurred.  As the district court observed, the information plaintiffs seek to protect was already "currently being obtained" by agency employees.  *Am. Fed. Teachers*, 2025 WL 895326, at *29 (cleaned up).  In fact, the three defendant agencies each granted access to its DOGE-affiliated employees in late January to early February—days to weeks before

this lawsuit was even filed. *See id.* at *1, 3–5. Yet preliminary injunctions typically focus on forestalling impending events that would be difficult to reverse. *See* Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. (forthcoming 2025) (manuscript at 45 & n.237). Once the cat is out of the bag, that rationale loses much of its force.

Last, it is worth mentioning that other district courts have recently declined to find irreparable harm from identical actions. *See, e.g.*, *Univ. of Cal. Student Ass'n v. Carter*, No. CV 25-354, 2025 WL 542586, at *5–6 (D.D.C. Feb. 17, 2025) (Moss, J). As Judge Moss notes, disclosure cases finding irreparable harm uniformly involve disclosures to the *public*, and "no authority [supports] the proposition that mere 'access' to personal data by government employees who are not formally authorized to view it, without more, creates an irreparable injury." *Id.* at *6. It is thus, at a minimum, contestable that the plaintiffs can show irreparable harm here.

*     *     *

Probable failure on any one of these issues—standing, final agency action, the existence of an APA cause of action, the scope of the Privacy Act, and the lack of irreparable harm—would have been reason enough to deny the plaintiffs' request for a preliminary injunction. So I am deeply skeptical that the district court remained within its discretion when finding that the plaintiffs were likely to prevail on each one, and with such certainty that they were likely to succeed overall. In light of the plaintiffs' multiplicative problem, the government has made a strong showing that it will prevail on the merits.

KING, Circuit Judge, with whom Judges GREGORY, WYNN, THACKER, BENJAMIN, and BERNER join, dissenting:

Given the exceptional importance of this matter, I sought initial en banc consideration of the government's motion for a stay pending appeal of the district court's award of preliminary injunctive relief — an injunction that bars the defendant federal agencies and officials from disclosing to affiliates of the President's new Department of Government Efficiency, or "DOGE," highly sensitive personal information belonging to millions of Americans. Regrettably, my request for initial hearing en banc has been denied on an 8-7 vote, and the panel majority has granted the government's motion for a stay pending appeal on a 2-1 vote. I strongly dissent from both decisions.[*]

At stake is some of the most sensitive personal information imaginable — including Social Security numbers, income and assets, federal tax records, disciplinary and other personnel actions, physical and mental health histories, driver's license information, bank account numbers, and demographic and family details. This information was entrusted to the government, which for many decades had a record of largely adhering to the Privacy Act of 1974 and keeping the information safe. And then suddenly, the defendants began disclosing the information to DOGE affiliates without substantiating that they have any need to access such highly sensitive materials.

---

[*] Insofar as I dissent from the Court's denial of initial hearing en banc, I am joined by five colleagues who voted in favor of my request for initial en banc consideration of the government's stay motion: Judge Gregory, Judge Wynn, Judge Thacker, Judge Benjamin, and Judge Berner.

This action quickly ensued, among many others like it. Here, the defendants are three federal agencies and their respective agency heads: the U.S. Department of the Treasury, whose Bureau of the Fiscal Service maintains systems for the disbursement of payments for federal programs including Social Security benefits, federal income tax refunds, and veterans pay; the U.S. Department of Education, which manages the federal student loan system; and the U.S. Office of Personnel Management, which maintains a host of systems with information about federal employees. The defendants are subject to the Executive Order of January 20, 2025, establishing DOGE to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity," and commanding federal agency heads to "take all necessary steps, . . . to the maximum extent consistent with law, to ensure [the United States DOGE Service] has full and prompt access to all unclassified agency records, software systems, and IT systems." *See* Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025).

There are six individual plaintiffs, all military veterans seeking to protect from disclosure personally identifiable information relating to, inter alia, their Social Security disability benefits, VA disability benefits and home loans, military pensions, federal student loans, and federal employment. Similar protections are sought by five additional organizational plaintiffs — unions representing more than 2 million veterans, teachers, healthcare workers, and federal employees, including employees at the Department of Defense, NASA, the Social Security Administration, the Tennessee Valley Authority, and the Environmental Protection Agency.

18

The district court entered a temporary restraining order on February 24, 2025, and then issued the preliminary injunction on March 24, 2025, accompanied by a thorough and cogent 68-page memorandum opinion. *See Am. Fed'n of Tchrs. v. Bessent*, No. 8:25-cv-00430 (D. Md. Mar. 24, 2025), ECF Nos. 68 & 69 (respectively, the "Opinion" and the "Preliminary Injunction"). The Preliminary Injunction bars the defendant federal agencies and officials from further disclosing the plaintiffs' personally identifiable information to DOGE affiliates.

Specifically, the court awarded the Preliminary Injunction on the plaintiffs' claim under the Administrative Procedure Act (the "APA") that the defendants have not acted "in accordance with law," *see* 5 U.S.C. § 706(2)(A), in that they have violated the Privacy Act by disclosing to DOGE affiliates the plaintiffs' personally identifiable information without their consent, *see id.* § 552a(b). Although the defendants have invoked the Privacy Act's need-to-know exception for intra-agency disclosures — allowing disclosure "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties," *id.* § 552a(b)(1) — the plaintiffs assert that many of the DOGE affiliates are not employees of the relevant agencies. In any event, the plaintiffs further contend that none of the DOGE affiliates has a need to know the plaintiffs' personally identifiable information.

The Opinion reflects that the plaintiffs came to the district court in early February 2025 with urgent allegations that the defendant agencies "have granted DOGE representatives sweeping access to systems that are typically accessed by only a small number of career employees at the respective agencies." *See* Opinion 12. The plaintiffs

invoked "reports that DOGE representatives' access to systems with sensitive data caused significant concern among career agency employees and cyber security experts"; that "a Treasury analyst characteriz[ed] DOGE as an 'insider threat'"; and "that DOGE representatives input sensitive data into artificial intelligence software." *Id.* Additionally, the plaintiffs asserted that the disclosures of their personally identifiable information "to DOGE representatives have caused the plaintiffs major distress and anxiety, as they do not know who their data has been or will be shared with, whether these disclosures have made them vulnerable to further privacy breaches, and how [their personal information] may be weaponized against them." *Id.* at 13 (internal quotation marks omitted).

In awarding the Preliminary Injunction, the district court concluded that the plaintiffs are likely to succeed on the merits of their APA claim and concomitantly rejected the defendants' contentions that the plaintiffs lack Article III standing to pursue that claim, *see* Opinion 14-26; cannot satisfy the APA jurisdictional requirement of a final agency action, *id.* at 26-35; and have not demonstrated an underlying Privacy Act violation, *id.* at 36-61. The court further concluded that the plaintiffs are likely to suffer irreparable harm without a preliminary injunction, *id.* at 61-65, and that the balance of the equities and the public interest favor such injunctive relief, *id.* at 65-66.

Simply put, I think the district court got things right. I briefly highlight just a few key aspects of the court's Opinion.

*First*, the Opinion underscores that there is ample evidence that the defendants have disclosed the plaintiffs' sensitive personal information to DOGE affiliates and that the defendants are intent on continuing to do so, based on their assertions that such access is

necessary.  Meanwhile, however, the pertinent administrative records fail to substantiate the purported "need to know."  Instead, the government has attempted "to fill this gap after the fact with its own answers."  *See* Opinion 49.  And the government's post-hoc rationalizations, in the words of the district court, "appear[] to be created out of whole cloth."  *Id.*

*Second*, on the contested issue of standing, the Opinion identifies a compelling basis for standing under *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (recognizing that "concrete injuries under Article III" can include "intangible harms" such as "intrusion upon seclusion").  Specifically, the Opinion invokes the Restatement's definition of intrusion upon seclusion as "intentional intrusion, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, if the intrusion would be highly offensive to a reasonable person."  *See* Opinion 21 (alterations omitted) (quoting Restatement (Second) of Torts § 652B).  The Opinion further invokes the Restatement for the proposition "that a person's privacy is invaded when there is 'some form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.'"  *Id.* at 23 (alteration omitted) (quoting Restatement (Second) of Torts § 652B cmt. b).  From there, the Opinion concludes that the disclosure to DOGE affiliates of the plaintiffs' sensitive personal information "obviously concerns their 'private affairs'"; that the disclosures are "just as, if not more, intrusive than an examination of a wallet or bank

record"; and that "[t]his ongoing intrusion into the plaintiffs' private affairs is highly offensive to a reasonable person." *Id.* at 21-23.

*And third*, the Opinion is clear that the harm engendered by the disclosure of the plaintiffs' sensitive private information is irreparable harm that could never "be redressed by a final judgment of money damages or by permanent injunctive relief." *See* Opinion 65.

On the same day that the Preliminary Injunction was issued, March 24, 2025, the government noted its appeal and sought stays of the Preliminary Injunction in both the district court and this Court. By an order of March 28, 2025, the district court denied the stay motion that was pending there. *See Am. Fed'n of Tchrs. v. Bessent*, No. 8:25-cv-00430 (D. Md. Mar. 28, 2025), ECF No. 77. In its order, the court emphasized additional points worth repeating: that "[t]he President's power to direct federal agencies to implement his agenda does not authorize the agencies to disregard the law," and that "[t]he public interest lies in protecting the privacy rights of individuals who gave sensitive personal information to the federal government with the understanding that the government would protect this information from unlawful disclosure." *Id.* at 2-3.

As for the stay motion pending in this Court, once my friends in the panel majority voted to grant a stay pending appeal, I took the extraordinary step of requesting our colleagues to grant initial en banc consideration of the stay motion because of the exceptional importance of this matter. With his permission, I share the response of our esteemed colleague Judge Wynn, which perfectly conveys my own views:

This exceptionally important matter warrants the extraordinary step of initial en banc consideration. A stay would permit what appears to be the illegal intra-governmental disclosure of highly sensitive personal information. Even a momentary lapse in the preliminary injunction preventing that disclosure could irreparably harm the plaintiffs. The matters at stake — unfettered, unauthorized access to the highly sensitive personal data of millions of Americans, including veterans — merit the immediate and collective attention of this Court.

Of course, a bare majority of the Court disagreed, initial hearing en banc has been denied, and the stay pending appeal has been granted.

Respectfully — and with all the energy an old judge can muster — I dissent from the vote of the en banc Court and the action of the panel majority.

BERNER, Circuit Judge, dissenting from the denial of initial hearing en banc:

I respectfully dissent from the decision to deny initial hearing en banc. While I am pleased to join Judge King's dissent, I write separately to shine a light on the ordinary Americans impacted by today's decision.

The plaintiffs in this case are, among others, veterans and public service workers represented through their unions. They are teachers, engineers, healthcare workers, scientists, administrative law judges, and more. Many chose to forsake lucrative alternative career paths in business or industry, opting instead to serve the public good. They dedicated their professional lives to providing services and improving the lives of others.

The plaintiffs allege that by virtue of their service to this country some of their most sensitive personal information and, in some instances, that of their family members, has been unlawfully disclosed and is at risk of continued unauthorized disclosure. This personal information includes Social Security numbers, federal tax records, health records, and bank account numbers. The district court agreed and issued a thorough and well-reasoned ruling temporarily enjoining further disclosure. The panel's decision to stay that ruling and this court's decision, by the slimmest of margins, to deny initial en banc review place at risk the privacy of these veterans and public service workers.

Not unlike other workers who—as a condition of employment—entrust their employer with sensitive personal information, the public service workers here provided their employer—the federal government—sensitive personal information. They trusted that it would remain private consistent with applicable law. Today's decision staying the district court's injunction allows the government to breach that trust.

By granting the stay, the majority effectively denies the plaintiffs the relief they seek without adjudication of their case on the merits. Permitting DOGE unfettered access to the plaintiffs' personally identifiable information lets the proverbial genie out of the bottle. Even if they ultimately prevail, the plaintiffs will already have suffered irreparable harm.