**No. 25-1282**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

AMERICAN FEDERATION OF TEACHERS, et al.,

Plaintiffs-Appellees,

v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury,
et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Maryland

**BRIEF FOR APPELLANTS**

> YAAKOV M. ROTH
>   *Acting Assistant Attorney General*
> ERIC D. MCARTHUR
>   *Deputy Assistant Attorney General*
> GERARD SINZDAK
> JACK STARCHER
> JACOB CHRISTENSEN
>   *Attorneys, Appellate Staff*
>   *Civil Division, Room 7515*
>   *U.S. Department of Justice*
>   *950 Pennsylvania Avenue NW*
>   *Washington, DC 20530*
>   *(202) 514-8877*

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION ......................................................... 3

STATEMENT OF THE ISSUES ............................................................... 4

PERTINENT STATUTES AND REGULATIONS ................................. 4

STATEMENT OF THE CASE .................................................................. 4

    A.    Background ........................................................................... 4

    B.    Prior Proceedings ............................................................... 8

        1. The parties and the complaint ................................... 8

        2. The preliminary injunction ..................................... 10

SUMMARY OF ARGUMENT .............................................................. 16

STANDARD OF REVIEW .................................................................... 21

ARGUMENT ........................................................................................... 21

I.    Plaintiffs Have No Likelihood of Success on the Merits ...................... 22

    A.    Plaintiffs suffer no cognizable Article III injury when agency
        employees are provided access to agency databases that
        contain personal information plaintiffs voluntarily
        supplied ............................................................................. 23

    B.    Plaintiffs fail to identify a final agency action reviewable
        under the APA ................................................................... 35

C.      Plaintiffs' APA claims are foreclosed because the Privacy
        Act provides an adequate remedy ................................................41

D.      Plaintiffs' Privacy Act claim fails on the merits.........................43

II.     Plaintiffs Also Failed to Establish the Remaining Preliminary
        Injunction Factors.......................................................................53

CONCLUSION...............................................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Air Brake Sys., Inc. v. Mineta,*
   357 F.3d 632 (6th Cir. 2004) ............................................................40

*Alliance for Retired Ams. v. Bessent,*
   --- F. Supp. 3d --- , No. 25-cv-313 (CKK),
   2025 WL 740401 (D.D.C. Mar. 7, 2025).........................................55

*Bennett v. Spear,*
   520 U.S. 154 (1997) .........................................................................39

*Bigelow v. Department of Def.,*
   217 F.3d 875 (D.C. Cir. 2000)......................................45-46, 47, 49

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) .........................................................................41

*Britt v. Naval Investigative Serv.,*
   886 F.2d 544 (3d Cir. 1989) .............................................................44

*California Cmtys. Against Toxics v. EPA,*
   934 F.3d 627 (D.C. Cir. 2019)..........................................................40

*Chung v. U.S. Dep't of Justice,*
   333 F.3d 273 (D.C. Cir. 2003)..........................................................41

*City of New York v. U.S. Dep't of Def.,*
   913 F.3d 423 (4th Cir. 2019) .....................................................17, 37

*Dick v. Holder,*
   67 F. Supp. 3d 167 (D.D.C. 2014) ...................................................49

*Doe v. Chao,*
   435 F.3d 492 (4th Cir. 2006) ............................................................43

*Electronic Privacy Info. Ctr. v. U.S. Office of Pers. Mgmt.*,
  No. 25-cv-255 (RDA/WBP), 2025 WL 580596 (E.D. Va. Feb. 21, 2025)......55

*Food & Drug Admin. v. Alliance for Hippocratic Med.*,
  602 U.S. 367 (2024) ......................................................................24

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
  204 F.3d 149 (4th Cir. 2000) ........................................................24

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006)..........................................................36

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) .............................................32, 33, 34

*Hinck v. United States*,
  550 U.S. 501 (2007) .....................................................................42

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
  48 F.4th 1236 (11th Cir. 2022) ......................................................40

*Hunt v. Washington State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) .....................................................................24

*Immigration & Naturalization Serv. v. Legalization Assistance Project of the L.A.
  Cty. Fed'n of Labor*,
  510 U.S. 1301 (1993) ...................................................................55

*Krakauer v. Dish Network, LLC*,
  925 F.3d 643 (4th Cir. 2019) .........................................................34

*Lujan v. National Wildlife Fed'n*,
  497 U.S. 871 (1990) .........................................................17, 36, 37

*MicroStrategy Inc. v. Motorola, Inc.*,
  245 F.3d 335 (4th Cir. 2001) .........................................................21

iv

*Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd.*,
  918 F.3d 353 (4th Cir. 2019) ...........................................................54

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................55

*O'Leary v. TrustedID, Inc.*,
  60 F.4th 240 (4th Cir. 2023) ...........................................................29

*Parks v. U.S. Internal Revenue Serv.*,
  618 F.2d 677 (10th Cir. 1980) .............................................50, 51, 52

*Pendleton v. Jividen*,
  96 F.4th 652 (4th Cir. 2024) ...........................................................21

*Peterson v. National Telecomms. & Info. Admin.*,
  478 F.3d 626 (4th Cir. 2007) ...........................................................24

*Raines v. Byrd*,
  521 U.S. 811 (1997) ........................................................................24

*Sierra Club v. EPA*,
  955 F.3d 56 (D.C. Cir. 2020) ...........................................................39

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................25

*Sussman v. U.S. Marshals Serv.*,
  494 F.3d 1106 (D.C. Cir. 2007) .......................................................42

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ....................................... 25, 26, 27, 28, 32

*United States v. Texas*,
  599 U.S. 670 (2023) ........................................................................23

*University of Cal. Student Ass'n v. Carter*,
--- F. Supp. 3d --- , No. 25-cv-354 (RDM),
2025 WL 542586 (D.D.C. Feb. 17, 2025) ................................... 54-55

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ...................................................................39

*Valley Forge Christian Coll. v. Americans United for Separation of Church &
State, Inc.*,
454 U.S. 464 (1982) ...................................................................23

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008) ...................................................40

*Wilson v. Libby*,
535 F.3d 697 (D.C. Cir. 2008) ..............................................18, 41

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................................21

**Statutes:**

5 U.S.C. § 551(6) ............................................................................37

5 U.S.C. § 551(13) ...................................................................36, 37

5 U.S.C. § 552a(a)(7) ................................................................44, 52

5 U.S.C. § 552a(b) .......................................................................9, 44

5 U.S.C. § 552a(b)(1) ......................................................12, 19, 44, 45

5 U.S.C. § 552a(b)(1)-(13) ...............................................................43

5 U.S.C. § 552a(b)(2)-(13) ..........................................................27, 32

5 U.S.C. § 552a(b)(3) ...............................................................19, 44, 52

5 U.S.C. § 552a(e)(4)(D) ..................................................................44, 52

5 U.S.C. § 552a(g) ....................................................................................26

5 U.S.C. § 552a(g)(1) ..............................................................................42

5 U.S.C. § 552a(g)(2) ..............................................................................42

5 U.S.C. § 552a(g)(3) ..............................................................................42

5 U.S.C. § 552a(g)(4) ..............................................................................42

5 U.S.C. § 552a(i)(1) ...............................................................................26

5 U.S.C. § 704 ...................................................... 11, 17, 18, 36, 41

5 U.S.C. § 706(2)(A) ...........................................................................9, 43

5 U.S.C. § 706(2)(C) ................................................................................ 9

5 U.S.C. § 2105(a)(1)(A) ........................................................................45

5 U.S.C. § 2105(a)(1)(D) ........................................................................45

5 U.S.C. § 2105(a)(2) ..............................................................................45

5 U.S.C. § 2105(a)(3) ..............................................................................45

28 U.S.C. § 1292(a)(1) ............................................................................. 3

28 U.S.C. § 1331 ...................................................................................... 3

**Regulatory Materials:**

Exec. Order No. 14,158,
  90 Fed. Reg. 8441 (Jan. 29, 2025) ................................................. 4

§ 1, 90 Fed. Reg. at 8441 ...................................................................4, 46, 53

§ 2(b), 90 Fed. Reg. at 8441................................................................... 5

§ 3(a), 90 Fed. Reg. at 8441................................................................... 5

§ 3(b), 90 Fed. Reg. at 8441................................................................... 5

§ 3(c), 90 Fed. Reg. at 8441 ................................................................... 5

§ 4, 90 Fed. Reg. at 8441 ...............................................................19, 46

§ 4(a), 90 Fed. Reg. at 8441.........................................................5, 46, 47

§ 4(b), 90 Fed. Reg. at 8442................................................................6, 46

Exec. Order No. 14,243 § 3,
    90 Fed. Reg. 13,681 (Mar. 25, 2025) .............................................48

## Other Authorities:

77 Fed. Reg. 73,694 (Dec. 11, 2012) ..................................................53

84 Fed. Reg. 47,265 (Sept. 9, 2019) ..................................................53

85 Fed. Reg. 11,776 (Feb. 27, 2020)...................................31, 48, 52-53

88 Fed. Reg. 41,942 (June 28, 2023) ..................................................53

88 Fed. Reg. 42,220 (June 29, 2023) ..................................................53

GAO, GAO-22-105365, *Student Loans: Education Has Increased Federal Cost Estimates of Direct Loans by Billions Due to Programmatic and Other Changes* (2022) ............................................................................................ 7

GAO, GAO-23-104786, *Financial Audit: Bureau of the Fiscal Service's FY2022 Schedules of the General Fund* (2023), https://perma.cc/JH68-2X3J ............ 6

GAO, GAO-24-107660, *Payment Integrity: Significant Improvements Are Needed to Address Improper Payments and Fraud* (2024), https://perma.cc/NX6T-V8QX .................................................................. 6

Letter from Gene L. Dodaro, Comptroller Gen. of the United States GAO, to Honorable Robert Shriver, Acting Dir. OPM (May 28, 2024), https://perma.cc/Z6E4-STHL ........................................................................ 7

Restatement (Second) of Torts (Am. Law Inst. 1977), Westlaw (database updated Oct. 2024) ........................................................... 28, 29, 30

U.S. Department of Education, Office of Inspector General, A24FS0168, *Report of the Independent Auditors* (Nov. 14, 2024) ........................................ 7

## INTRODUCTION

The district court issued a preliminary injunction against three Executive Branch agencies, barring anyone whose "principal role is to implement the [Department of Government Efficiency (DOGE)] agenda" from accessing certain agency data or systems. That injunction suffers from a number of fatal defects, each one of which independently merits reversal.

First, as this Court recognized in granting the government's request to stay the injunction pending appeal, plaintiffs suffer no cognizable Article III injury when agencies grant particular employees access to records containing information plaintiffs voluntarily provided to the government and which is routinely accessed by other employees performing similar work. Moreover, there is no "final agency action" to review here, just routine operational acts that are not subject to review under the Administrative Procedure Act (APA). And even if there were such action, the Privacy Act provides an adequate remedy for violations of its provisions and thus forecloses APA review. Finally, there is nothing remotely unlawful about allowing DOGE team members to access agency data; the Privacy Act expressly authorizes such access when employees

"need" it, and the district court plainly erred in second-guessing the President's and the agencies' determination that these agency employees "need" access to the relevant information systems to implement the "DOGE agenda" of modernizing the government's information technology systems and rooting out fraud, waste, and abuse.

Plaintiffs fare no better with respect to the remaining preliminary injunction factors. As three other courts have concluded in denying requests for injunctive relief in materially similar cases, plaintiffs suffer no irreparable harm from the mere fact that particular agency employees have been granted access to data systems that hold records containing plaintiffs' personal information. Among other things, those employees are subject to the same legal and ethical obligations to maintain the confidentiality of those records as the other agency employees who have access, and there is no basis for concluding that they will misuse the information in a manner that harms plaintiffs.

Conversely, the district court's injunction represents an improper effort to usurp Article II authority and micromanage the Executive Branch by making its own determinations about what "agenda" federal employees should be implementing. The injunction is already posing immediate

2

impediments to the government's critical efforts to correct well-documented problems with its technological systems and to combat fraud, waste, and abuse in federal government programs. And the district court's reasoning is already being adopted by *other* district judges, including in a recent temporary restraining order that bars employees at the Social Security Administration from accessing information systems at that agency. This is the natural but untenable consequence of district courts using temporary restraining orders and injunctions to meddle in the everyday business of Executive Branch departments.

For these reasons, the government respectfully requests that this Court vacate the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, JA32, but the government contests the district court's jurisdiction over plaintiffs' claims on multiple grounds, *see infra* pp. 23-41. The district court granted plaintiffs' motion for a preliminary injunction on March 24, 2025, JA724, and the government timely appealed that same day, JA727. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

The issues presented in this appeal are:

1.     Whether the district court erroneously concluded that plaintiffs satisfied their burden of demonstrating jurisdiction and a likelihood of success on the merits of their claims.

2.     Whether the district court erred in concluding that plaintiffs had satisfied the remaining preliminary injunction factors.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Background

On January 20, 2025, the President signed Executive Order 14,158, aimed at "modernizing Federal technology and software to maximize governmental efficiency and productivity."  Exec. Order No. 14,158, § 1, 90 Fed. Reg. 8441, 8441 (Jan. 29, 2025) (USDS EO).  The Executive Order renamed the United States Digital Service as the United States DOGE Service (USDS) and established within the Executive Office of the President

4

a temporary organization known as "the U.S. DOGE Service Temporary Organization." *Id.* § 3(a), (b), 90 Fed. Reg. at 8441.

The Executive Order requires each "Agency Head"—*i.e.*, the highest-ranking official in each agency—to establish "within their respective Agencies" a "DOGE Team" consisting of at least four "employees" (which may include special government employees). USDS EO §§ 2(b), 3(c), 90 Fed. Reg. at 8441. It also charges a "USDS Administrator," established in the Executive Office of the President, with "commenc[ing] a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Id.* §§ 3(b), 4(a), 90 Fed. Reg. at 8441. And it directs the USDS Administrator to collaborate with agency heads to modernize the technology and software infrastructure of the federal government to "promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4(a), 90 Fed. Reg. at 8441.

Critically, to accomplish those objectives, the Executive Order further directs the USDS Administrator and agency heads to work together to ensure that USDS has access to "unclassified agency records, software

5

systems, and IT systems" to the "extent consistent with law."  USDS EO

§ 4(b), 90 Fed. Reg. at 8442.  The Executive Order further provides that

"USDS shall adhere to rigorous data protection standards."  *Id.*

The Executive Order addresses the government's well-documented,

urgent need to update and improve its information technology systems,

including to identify fraud.  The U.S. Government Accountability Office

(GAO) has found that "[i]mproper payments and fraud are long-standing

and significant problems in the federal government," with "cumulative

improper payment estimates by executive branch agencies" totaling about

$2.7 trillion since fiscal year 2003.  GAO, GAO-24-107660, *Payment Integrity:*

*Significant Improvements Are Needed to Address Improper Payments and Fraud*

(2024) https://perma.cc/NX6T-V8QX.

Specifically as to the Department of Treasury's (Treasury) systems,

the GAO has identified "[c]ertain deficiencies in internal control over

financial reporting" and a need to "[m]oderniz[e] Treasury's information

systems," among other issues.  *See* GAO, GAO-23-104786, *Financial Audit:*

*Bureau of the Fiscal Service's FY2022 Schedules of the General Fund* (2023),

https://perma.cc/JH68-2X3J.  GAO has likewise identified 16 "priority

recommendations" regarding the Office of Personnel Management's

6

(OPM) existing technology, including "[i]mproving payroll data,"

"[s]trengthening IT security and management," and "[p]reventing

improper payments"—which "OPM and the OPM Inspector General have

estimated to be up to $1 billion to $3 billion per year." *See* Letter from Gene

L. Dodaro, Comptroller Gen. of the United States GAO, to Honorable

Robert Shriver, Acting Dir. OPM, at 1-2 (May 28, 2024),

https://perma.cc/Z6E4-STHL. GAO stated that "[f]ully implementing

these open recommendations could significantly improve both OPM's

operations and its efforts to assist federal agencies in addressing various

human capital management issues." *Id.* at 1. GAO identified similar

problems at the Department of Education (Education) which resulted in

erroneous estimates of the cost of the federal student loan program—the

Federal Government's largest asset—to the tune of hundreds of billions of

dollars. *See* GAO, GAO-22-105365, *Student Loans: Education Has Increased*

*Federal Cost Estimates of Direct Loans by Billions Due to Programmatic and*

*Other Changes* (2022); *see also* U.S. Department of Education, Office of

Inspector General, A24FS0168, *Report of the Independent Auditors* (Nov. 14,

2024) (revealing that the Department failed its annual financial audit for

the third year in a row due, in part, "to persistent unmitigated IT control deficiencies").

## B.    Prior Proceedings

### 1.    The parties and the complaint

Defendants are the Department of Education, OPM, and the Department of the Treasury, as well as their respective agency heads in their official capacities.  Each agency maintains systems of records that contain personally identifiable information of individuals.  Education maintains such systems as part of its management of the federal student loan system.  JA659-660.  OPM does so in its role as the "chief human resources agency and personnel policy manager for the Federal Government."  JA661 (quotation omitted).  And Treasury's Bureau of the Fiscal Services maintains systems for the disbursement of payments for federal programs, including Social Security benefits, federal income tax refunds, and veterans' pay.  JA664.  Consistent with the President's Executive Order, each agency established a DOGE Team and authorized a limited number of team members to access certain information technology systems to carry out the Executive Order.  JA660-665; *see also* JA59 n.1.

8

Plaintiffs are several labor organizations, a nonprofit organization, and six individuals who "have worked for the federal government, have federal student loans, and/or receive government benefits" and who allege that their personally identifiable information is "housed in record systems maintained by Education, OPM, and/or Treasury."  JA666-667.  They filed this lawsuit on February 10, 2025, and filed an amended complaint two days later.  JA27.

Plaintiffs' amended complaint includes three causes of action.  First, they allege that Treasury, OPM, and Education have violated the Privacy Act of 1974 by "disclos[ing]" their personal data, in violation of 5 U.S.C. § 552a(b), and that those disclosures must therefore be "set aside" under the APA, 5 U.S.C. § 706(2)(A).  JA61-62 (¶¶ 145-151).  Second, they allege that defendants' conduct is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law under the APA, 5 U.S.C. § 706(2)(A).  JA62-63 (¶¶ 152-156).  And third, they allege that defendants acted "in excess of … statutory authority," 5 U.S.C. § 706(2)(C), by violating their "non-discretionary duty to protect records on individuals from unauthorized disclosure."  JA63 (¶¶ 157-159).

### 2. The preliminary injunction

On February 24, 2025, the district court entered a temporary restraining order against the Department of Education and OPM, as well as their (then-Acting) agency heads.  JA217.  The district court declined to enter relief against the Department of the Treasury or Secretary Bessent at that time because another district court had entered a preliminary injunction that barred DOGE team members at Treasury from accessing records containing plaintiffs' personally identifiable information.  JA218 n.1.

On March 24, 2025—after expedited briefing and a hearing—the district court issued a preliminary injunction against all defendants.  JA656, JA724.  The preliminary injunction enjoins them from "disclosing the personally identifiable information of the plaintiffs and the members of the plaintiff organizations to any DOGE affiliates, defined as individuals whose principal role is to implement the DOGE agenda as described in Executive Order 14,158 and who were granted access to agency systems of records for the principal purpose of implementing that agenda."  JA724-725.

10

As grounds for the preliminary injunction, the district court first determined that plaintiffs have Article III standing to challenge the agencies' disclosure of records in government databases to government employees.  The court analogized plaintiffs' alleged injury—that "DOGE affiliates have invaded their privacy by obtaining their personal information"—to "the common law tort of intrusion upon seclusion." JA673, JA675.  The court stated that, although plaintiffs "gave their private information to the government" and would have known that some government employees would access it, they did so "with the expectation that the government would not disclose it to anyone within the government who was not authorized to access it."  JA676.  The court reasoned that "[i]f the agencies' disclosures violated the Privacy Act, as the Court must assume for purposes of the standing analysis, then the plaintiffs have established that their trust has been breached, that government employees who should not have access to their information do, and that those employees have accessed records containing their [personally identifiable information."  JA676.

The district court also held that plaintiffs adequately identified "final agency action" for purposes of the APA.  5 U.S.C. § 704.  The court

11

characterized each agency's decision to provide access to a handful of its employees as agency "policy." JA684. And while the court acknowledged that district courts may not use the APA to review the "continuing (and thus constantly changing) operations of" federal agencies, or their "workaday dealings," JA686 (quotation omitted), the court distinguished agency decisions to grant particular employees access to agency data systems, on the theory that plaintiffs' (and their members') "privacy rights" were "impact[ed]," JA687, by the granting of such access. The court also deemed the agencies' actions "final" because "[t]he decisions to grant access were neither tentative nor interlocutory in nature." JA688.

Turning to the merits, the district court determined that plaintiffs are likely to succeed on their claim that granting access to agency DOGE team members violated the Privacy Act. The court recognized that the Privacy Act allows agency employees to access agency records when they "have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1); *see* JA696. But the court held that the government had not adequately established the DOGE employees' need for access. JA697-715. The court reasoned that although employees might need "some form of system access to modernize technology and software" consistent with the

12

President's Executive Order, the government had failed to explain why each employee needed access to each specific database or piece of information.  JA702; *see, e.g.*, JA709, JA714.  While declining to consider certain material outside the agency record—namely, declarations further explaining the data-access decisions at issue, *see* JA706 n.23—the court concluded that the government was unlikely to demonstrate the employees' need for access to modernize information systems or audit programs for waste, fraud, and abuse, *see, e.g.*, JA704, JA714.[1]

With respect to the remaining preliminary injunction factors, the district court found that plaintiffs "are likely to suffer actual and imminent harm" from continued agency access to their private information without injunctive relief.  JA716.  The court said that the threatened "ongoing violation" of plaintiffs' privacy interests was irreparable because "[a] final judgment of money damages or a permanent injunction w[ould] not make them whole."  JA720.  Finally, the court held that because it had found the

---

[1] The district court excluded three DOGE-affiliated OPM employees from its injunction—OPM's Chief Information Officer Greg Hogan, OPM's Acting Director Charles Ezell, and OPM Chief of Staff Amanda Scales. JA662 n.3.  The court reasoned that these individuals needed access to OPM systems "by virtue of their positions."  JA662 n.3.

13

agencies' actions likely unlawful, "[p]reventing the government's unauthorized disclosure of the plaintiffs' sensitive personal information [wa]s in the public interest" and the preliminary injunction would not cause cognizable injury to the government.  JA721.

The government filed a notice of appeal on March 24, 2025, the same day the preliminary injunction was issued.  JA727.  On April 7, this Court granted the government's motion to stay the preliminary injunction pending appeal, and the Court simultaneously denied a request for initial hearing en banc on the government's stay motion.  Order 1-2 (Apr. 7, 2025) (Order).  The majority of the motions panel held that the government was likely to succeed in showing that plaintiffs lacked standing to bring their claim because the injury they allege—"abstract access to [their] personal information" by agency employees—"does not bear a close relationship" to the kind of "interjection into the private sphere" that is the hallmark of intrusion upon seclusion.  Order 5-6 (Agee, J., concurring); Order 9-11 (Richardson, J., concurring).

The majority also explained that it had serious doubts that plaintiffs were likely to prevail on a number of additional, independent issues, any of which would be sufficient to defeat their request for a preliminary

14

injunction.  As Judge Richardson explained, plaintiffs were likely to have a difficult time establishing that the district court had jurisdiction to review their APA claims, both because plaintiffs had not challenged a reviewable "final agency action," and because the remedies provided in the Privacy Act likely provided an adequate alternative remedy and thus negated APA review.  Order 12-14 (Richardson, J., concurring).  In addition, the majority doubted that the granting of database access to the relevant employees violated the Privacy Act, given that the Act "does not prohibit sharing information with those whose jobs give them good reason to access it," and it did "not stretch the imagination to think that modernizing an agency's software and IT systems would require administrator-level access to those systems."  Order 13-14 (Richardson, J., concurring).  Finally, the majority observed that, even if plaintiffs could prevail on each of those issues, it was unlikely that they had suffered the kind of irreparable injury necessary to sustain a preliminary injunction.  Order 15-16 (Richardson, J., concurring).

Judge King dissented and would have denied the motion for a stay. Order 17-23 (King, J., dissenting).

## SUMMARY OF ARGUMENT

The district court's preliminary injunction should be set aside.

I.    To prevail on their Privacy Act claim, plaintiffs would need to establish, among other things, that they have Article III standing, that the agency decisions they challenge constitute final agency action reviewable under the APA, that the Privacy Act does not itself provide them with an adequate remedy, and that granting DOGE team members access to information systems those employees are working to improve violates the Privacy Act.  Plaintiffs are not likely to prevail on any of these issues, let alone all of them.

A.    As the motions panel recognized in granting the government's motion for a stay pending appeal, the district court faltered out of the gate by concluding that plaintiffs had standing to bring their claims.  To demonstrate standing, plaintiffs bore the burden of establishing that the injury they allege bears a close relationship to a harm recognized at common law.  Plaintiffs here allege only that the relevant agencies improperly allowed particular agency employees to access government-controlled data systems containing personal information that plaintiffs—and millions of others—voluntarily submitted to the government, on the

16

understanding that it would be routinely used by agency employees to

perform a variety of tasks.  That alleged harm bears no relationship to the

kind of highly offensive interjection into a person's private space that forms

the basis for the common law harm of intrusion upon seclusion.  The

district court erred as a matter of law in concluding otherwise, and that

alone warrants vacatur of the preliminary injunction.

  B. Plaintiffs also fail to identify a "final agency action" reviewable

under the Administrative Procedure Act.  *See* 5 U.S.C. § 704.  The

government actions plaintiffs challenge—a loosely defined series of

personnel decisions related to granting individual employees access to

agency systems—are the kind of day-to-day intra-agency operational

decisions that, as this Court and the Supreme Court have cautioned, are not

subject to review under the APA.  *See City of New York v. U.S. Dep't of Def.*,

913 F.3d 423, 431 (4th Cir. 2019); *Lujan v. National Wildlife Fed'n*, 497 U.S.

871, 899 (1990).  And even if plaintiffs identified some reviewable agency

action involving an agency's decision to grant database access to DOGE

team members, that action would not be "final" for purposes of the APA.

The decision to allow a particular agency employee to access an agency

17

data system does not create any rights, obligations, or direct legal consequences for plaintiffs.

C.    Plaintiffs' APA claims face an additional fatal barrier: the APA only provides a cause of action where "there is no other adequate remedy." 5 U.S.C. § 704.  That requirement is not satisfied here, however, because the Privacy Act provides an exclusive and "comprehensive remedial scheme" for injuries arising out of the inappropriate dissemination of private information in the government's possession.  *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008).  The Privacy Act authorizes parties injured by the disclosure of their information to seek monetary damages and allows plaintiffs to seek injunctive relief to compel compliance with the statute only under limited circumstances not present here.  The APA does not allow plaintiffs to circumvent the adequate and "comprehensive remedial scheme" Congress established for adjudicating Privacy Act violations.

D.    Finally, even if plaintiffs could overcome the barriers presented by each of the threshold issues they face, they are not likely to prevail on the merits of their Privacy Act claim.  While the Privacy Act generally prohibits disclosure of covered records containing personal information absent consent, it authorizes disclosure of such records to "those officers

18

and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). The disclosure of plaintiffs' records to DOGE team members within the agencies falls comfortably within that authorization. The DOGE-affiliated personnel plaintiffs identify are employees of the agencies they work for. And those employees plainly need to access agency data systems in order to carry out their vital work to modernize those systems and to "[m]aximize [e]fficiency and [p]roductivity" of agency records, software, and information technology, USDS EO § 4, 90 Fed. Reg. at 8441, including through the rooting out of fraud, waste, and abuse in government programs. Indeed, as the district court recognized and plaintiffs do not dispute, other agency employees performing similar functions have traditionally had administrative access to agency systems. The district court provided no sound reason why DOGE team employees lack the need to access systems that similarly situated employees possess.

In the alternative, defendants' actions are permissible under the Privacy Act's exception for "routine use[s]." *See* 5 U.S.C. § 552a(b)(3). Relevant System of Record Notices (SORNs) make clear that agencies can access data contained in systems for the purpose of improving those

19

systems, for identifying and preventing fraud, and for recouping improper payments.  Because DOGE-affiliated employees are working to perform exactly those functions, the Privacy Act permits them to review the relevant agency records.

II.    On the remaining preliminary injunction factors, the district court badly miscalculated the balance of the harms and the public interest. As numerous courts have recognized, plaintiffs suffer no harm, let alone irreparable harm, from the potential disclosure of their information to agency employees who are bound by law to maintain the information's confidentiality.  Indeed, such disclosure occurs routinely.  By contrast, the district court's injunction imposes significant burdens on the Executive Branch and runs counter to the public interest.  The injunction stymies the Executive Branch's critically important efforts to improve its information-technology infrastructure and eliminate waste.  And district court control of decisions about internal access to information also constitutes plainly inappropriate superintendence of a coequal branch.  The balance of equities thus weighs strongly against the injunction the district court entered here.

This Court should vacate the district court's preliminary injunction.

## STANDARD OF REVIEW

This Court "review[s] the grant or denial of a preliminary injunction for abuse of discretion, recognizing that preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quotation omitted). "A ruling that rests on an error of law is necessarily an abuse of discretion." *Pendleton v. Jividen*, 96 F.4th 652, 656 (4th Cir. 2024).

## ARGUMENT

Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To be entitled to a preliminary injunction, plaintiffs had to clearly show "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. The district court abused its discretion in ruling that plaintiffs met this high standard, and its preliminary injunction should be vacated.

21

I.    **Plaintiffs Have No Likelihood of Success on the Merits**

The district court enjoined employees of three government agencies from accessing information technology systems that those employees, like other employees at the relevant agencies, need to access to perform their vital work of modernizing and improving the systems, while also rooting out fraud, waste, and abuse in government programs.  The court did so at the behest of individuals and organizations whose members voluntarily gave those agencies personally identifiable information with the understanding that it would be accessed by government employees in various situations.

The district court abused its discretion in entering its injunction.  As this Court explained in granting a stay of that injunction, plaintiffs are not likely to prevail on their claims for multiple, independent reasons. Plaintiffs lack Article III standing; they do not suffer a cognizable harm when employees of an agency to whom plaintiffs have voluntarily provided their personal information access that data in the course of the employees' work.  Further, the agencies' operational decisions about data access are not final agency action reviewable under the APA.  And even if they were, the Privacy Act itself provides an adequate remedy for any

22

violation of the Act, thereby rendering APA review unavailable.  Assuming

plaintiffs could surmount these various threshold problems, their Privacy

Act claim would fail on the merits.  The Privacy Act allows agency

employees and others to access protected information when they need to

do so to perform their job duties.  The work of DOGE team members at the

three agencies easily satisfies that requirement.

> **A.  Plaintiffs suffer no cognizable Article III injury when agency employees are provided access to agency databases that contain personal information plaintiffs voluntarily supplied**

Article III standing is a "bedrock constitutional requirement that [the

Supreme] Court has applied to all manner of important disputes."  *United

States v. Texas*, 599 U.S. 670, 675 (2023).  It is "built on a single basic idea—

the idea of separation of powers."  *Id.* (quotation omitted).  The

requirement that plaintiffs demonstrate standing "helps safeguard the

Judiciary's proper—and properly limited—role in our constitutional

system," *id.* at 675-76, by ensuring that federal courts do not become

"forums for the ventilation of public grievances" more properly resolved

through the democratic process, *Valley Forge Christian Coll. v. Americans

United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).

23

To demonstrate Article III standing, a plaintiff must establish an injury that is both "legally and judicially cognizable," as well as causation and redressability. *Raines v. Byrd*, 521 U.S. 811, 819 (1997); *see also Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("[A] plaintiff must demonstrate … that she has suffered or likely will suffer an injury in fact … ."). The injury requirement includes that the plaintiff must have suffered "an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Peterson v. National Telecomms. & Info. Admin.*, 478 F.3d 626, 631 (4th Cir. 2007) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (en banc)). As relevant here, an organization may establish standing by showing (in addition to other requirements) the standing of its members. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

1.     Plaintiffs in this case have not—and cannot—demonstrate that they or their members have suffered any injury-in-fact. To satisfy Article III standing, an injury must be "actual or imminent, not speculative," meaning "the injury must have already occurred or be likely to occur soon." *Alliance for Hippocratic Med.*, 602 U.S. at 381. The harm must also be

24

"'concrete'—that is, 'real, and not abstract.'" *TransUnion LLC v. Ramirez*,

594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340

(2016)).  Although "tangible" harms more readily qualify as concrete

injuries, certain intangible harms can also be concrete.  *Id.* at 425.  "Central

to assessing concreteness is whether the asserted harm has a 'close

relationship' to a harm traditionally recognized as providing a basis for a

lawsuit in American courts."  *Id.* at 417 (quoting *Spokeo*, 578 U.S. at 341).

Plaintiffs cannot clear the bar just by alleging a bare statutory violation.

Congress can create "a statutory prohibition or obligation and a cause of

action," but it may not override Article III's injury requirement.  *Id.* at 426.

    Those requirements are fatal to plaintiffs' case.  Plaintiffs assert a

purely intangible form of injury—namely, that allowing agency DOGE

team members to access databases that contain their personal information

constitutes an invasion of their privacy.  *See, e.g.*, JA32 (alleging that

plaintiffs' "personal data has been improperly disclosed to DOGE

representatives … in violation of their privacy rights"); JA62 ("Defendants

have granted DOGE representatives ongoing access to their systems of

records containing sensitive and personal data.").  That alleged injury is

not concrete.  Plaintiffs do not contend that their information has been

shared with parties outside the government or others likely to misuse their information. To the contrary, agency DOGE team members—like everyone at the agencies—are bound by legal and ethical restrictions on the disclosure of plaintiffs' information, including the Privacy Act's authorization of criminal penalties for knowingly engaging in prohibited disclosures, 5 U.S.C. § 552a(i)(1). *See also id.* § 552a(g) (civil remedies against the agency).

Plaintiffs' asserted injury thus bears a close resemblance to the harms the Supreme Court deemed insufficiently concrete in *TransUnion*. There, the Court held that the mere fact that the defendant allegedly maintained inaccurate information about the plaintiffs within the company's files, in violation of a statutory requirement, was not sufficient to establish standing; any harm to the plaintiffs in *TransUnion* would become concrete only upon publication of the inaccurate information to third parties. 594 U.S. at 434. Here too, the mere fact that the government allegedly committed a statutory violation in allowing government employees to access information stored in government databases does not alone demonstrate a concrete harm. That is particularly true because plaintiffs voluntarily provided their information to the agencies; it is undisputed that

26

the information can lawfully be accessed by agency employees (and shared outside the agencies) for any of the numerous purposes set forth in the Privacy Act and the agencies' SORNs, *see* 5 U.S.C. § 552a(b)(2)-(13), and the agency DOGE team members are subject to the same confidentiality rules and constraints on further dissemination that bind other employees who may access plaintiffs' information.

2.      The district court nevertheless held that plaintiffs established an injury-in-fact because their alleged injury purportedly "resemble[s] a specific type of invasion of privacy—the common law tort of intrusion upon seclusion."  JA675.  In reaching that conclusion, however, the district court misapplied *TransUnion* and this Court's precedent interpreting *TransUnion*.

As noted, *TransUnion* requires a "close relationship" between the kind of harm recognized under the asserted common-law tort and the alleged injury.  594 U.S. at 425.  Although an "exact duplicate" is not required, plaintiffs' contentions must be close cousins to a common-law analogue; even relatively modest distinctions foreclose standing.  *Id.* at 424.  Thus, *TransUnion* rejected the plaintiffs' fallback argument that the internal publication of information to "employees within TransUnion and to …

27

vendors" constituted a concrete injury. *Id.* at 434 n.6. Not only was that

argument "forfeited," but it was also "unavailing" because "[m]any

American courts did not traditionally recognize intra-company

disclosures" or those to vendors "as actionable publications for purposes

of" the relevant analogue—there, the common-law "tort of defamation."

*Id.* The cases generally required "that the document was actually read and

not merely processed," but that "evidence [wa]s lacking" in *TransUnion*.

*Id.*

Here, as this Court recognized in its stay decision, plaintiffs' novel

theory of injury under the Privacy Act bears no resemblance to the

traditional tort of intrusion upon seclusion. As a result, plaintiffs have not

suffered, and are not in imminent peril of suffering, a concrete, cognizable

injury.

The tort of intrusion upon seclusion is commonly defined as an

"intentiona[l] intru[sion], physically or otherwise, upon the solitude or

seclusion of another or his private affairs or concerns, … if the intrusion

would be highly offensive to a reasonable person." Restatement (Second)

of Torts § 652B (Am. Law Inst. 1977), Westlaw (database updated Oct.

2024); *see also id.* § 652B cmt. a (describing the tort as "an intentional

28

interference with" a person's interest in "solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable man"). The Restatement provides examples that would meet that high standard, including "physical intrusion into … the plaintiff's room in a hotel" or his home; "use of the defendant's senses …  to oversee or overhear the plaintiff's private affairs"; and "opening [the plaintiff's] private and personal mail [or] searching his safe or his wallet." *Id*. § 652B cmt.b. The harm is experienced "when a reporter accosts a convalescing patient in the hospital, when a private detective peers through a neighbor's bedroom window for weeks, and when a photographer snaps an opportunistic photo of a woman's underwear." Order 11 (Richardson, J., concurring). As these examples illustrate, the harm contemplated by the common-law tort of intrusion on seclusion "includes an intrusion into an individual's private space." Order 5 (Agee, J., concurring); *see also O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 246 (4th Cir. 2023) (It is "the unwanted intrusion into the home that marks intrusion upon seclusion.").

Contrary to the district court's determination, JA678, plaintiffs' alleged injury in this case in no way resembles the situations in the

29

Restatement, let alone rises to the level of "highly offensive" conduct. *See* Restatement (Second) of Torts § 652B cmt. a. Agency personnel here are not surreptitiously invading plaintiffs' hotel rooms, monitoring their private communications, or rummaging through their safe deposit box. Instead, the agencies undisputedly obtained plaintiffs' personal information legally and through plaintiffs' or their members' volunteering that information, and the agencies legally retain that information in data systems that are maintained by, and housed within, the agencies. The kind of access plaintiffs identify is different in kind from the targeted "investigation[s]" or "examination[s]" described in the Restatements. *Id.* § 652B cmt. b. As the majority of the motions panel noted, "[e]ach plaintiff's information is one row in various databases that are millions upon millions of rows long." Order 11 (Richardson, J., concurring). Whatever harm arises from allowing additional agency personnel to generally access those systems—at which point they may or may not ever even view a particular plaintiff's "one row" of information—is nothing like the kind of injuries underlying intrusion upon seclusion.

Moreover, when plaintiffs provided their information to the government—in exchange for government benefits like employment or

student loans—they did so on the understanding that the information

would routinely be used by agency employees and others within and

outside the government to perform the types of activities that the agency

DOGE team members plan to undertake.  For example, the SORN that

pertains to Treasury's payment record system states that Treasury

employees and others will use the information for the "development of

computer systems" and in connection with the "investigation of

unauthorized or fraudulent activity."  85 Fed. Reg. 11,776, 11,779 (Feb. 27,

2020).  It further provides that the information will be "routine[ly]" shared

with, among others, "federal or state agenc[ies], [their] employees, agents

(including contractors of its agents) or contractors"; "financial agent[s]" of

Treasury; and Treasury "contractors" for the purpose "of identifying,

preventing, or recouping improper payments."  *Id.* at 11,780.  Plaintiffs can

hardly complain of a concrete injury when they provided their information

to a government agency on the understanding that it would be used by

agency employees and others to build and maintain computer systems and

to investigate improper payments, which is exactly what the agencies'

DOGE team members plan to do.

31

Indeed, plaintiffs do not dispute that their personal information *can* lawfully be accessed by employees of the agency and shared outside of the agency for any of the numerous purposes set forth in the Privacy Act and the agencies' SORNs. *See* 5 U.S.C. § 552a(b)(2)-(13). Nor do plaintiffs dispute that agency employees can and do regularly access their personal information, located in government systems. In practice, plaintiffs would have no reason even to know that a particular employee has accessed their information in the normal course of that employee's duties. *See TransUnion*, 594 U.S. at 438 (certain plaintiffs had not suffered an injury sufficient to support standing where they did not "even kn[o]w" their files contained inaccurate information (emphasis omitted)). Far from constituting a highly objectionable invasion of personal privacy, agency DOGE team members who access plaintiffs' information are doing the same thing that other agency employees routinely and properly do. That constitutes no injury at all, let alone a cognizable Article III injury.

In concluding otherwise, the district court misapplied this Court's decision in *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022). *See* Order 5-6 (Agee, J., concurring). That case does not support plaintiffs' contention that their alleged injury bears a close relationship to the

32

common-law tort of intrusion upon seclusion. First, the facts of *Garey* are readily distinguishable. Unlike here, the defendants in *Garey* were private third parties who obtained plaintiffs' records from the government and then used that information for an unlawful purpose. Those facts bear no resemblance to the routine use of information by employees of an agency to whom plaintiffs voluntarily provided their data on the understanding that it could be regularly accessed by such employees.

Moreover, plaintiffs are wrong that the Court in *Garey* held that merely obtaining information from a database alone qualifies as an intrusion upon an individual's seclusion. This Court in *Garey* summarized its understanding of the kind of injury undergirding invasion upon seclusion as sounding in "the right of the plaintiff … to be let alone." 35 F.4th at 922 (quotation omitted). That summation only makes sense if, in addition to obtaining or looking at data contained in a government system, the plaintiff also alleges some kind of intrusion that disrupts the plaintiff's seclusion. That requirement was obviously met in *Garey*, where the core of the plaintiffs' complaint was that the defendants had obtained their addresses from the government *and then used that information to send*

33

*solicitations to the plaintiffs' homes*. *See id*. at 920; *see also* Order 5-6 (Agee, J., concurring.

Indeed, as the motions panel noted, Order 4-5 (Agee, J., concurring), *Garey*'s express reliance on *Krakauer v. Dish Network, LLC*, 925 F.3d 643 (4th Cir. 2019), confirms that some kind of intrusion into an individual's private space is an essential element of the common-law tort of intrusion upon seclusion and that mere access to a person's information is insufficient. *See Garey*, 35 F.4th at 921-22. This Court in *Garey* described the *Garey* plaintiffs' standing theory as "nearly identical" to that raised by the plaintiffs in *Krakauer*. *Id*. at 921. In *Krakauer*, the plaintiff alleged that he was harmed when a telemarketer "disregard[ed] the [Do Not Call] registry and actually place[d] multiple calls" to the plaintiff's home. 925 F.3d at 654. Citing the Restatement, this Court concluded that the phone calls represented a "[c]ognizable intrusion[n]" upon the plaintiff's seclusion. *Id*. at 653. This Court emphasized that the calls "impose[d] a concrete burden" on the plaintiff's "long protected privacy interes[t] in the home." *Id*. at 653-54. In describing the injury the plaintiffs in *Garey* experienced as "nearly identical" to the alleged injury in *Krakauer*, this Court thus necessarily understood the alleged injury in *Garey* to include not only the defendants'

34

obtaining of the plaintiffs' information but also, crucially, the defendants'
mailing of unsolicited advertising materials to the plaintiffs' homes.

In contrast, neither plaintiffs nor the district court identified any
remotely comparable invasion into plaintiffs' private sphere.  Instead, the
district court held that "[n]othing more, under *Garey*, is required to
establish concrete injury in fact" beyond allegations that "the DOGE
affiliates obtained access to [plaintiffs'] personal information."  JA674 n.11.
That holding misinterprets *Garey*, cannot be squared with the traditional
understanding of the tort of intrusion on seclusion, and is incompatible
with the Supreme Court's holding in *TransUnion*.

Without a common-law analog to their alleged injury in this case,
plaintiffs cannot establish an injury-in-fact and therefore lack standing to
pursue their claims.  The district court's preliminary injunction should be
reversed on that ground alone.

**B.    Plaintiffs fail to identify a final agency action
reviewable under the APA**

The district court additionally lacked authority to resolve plaintiffs'
claims because only "final agency action" is reviewable under the APA.

5 U.S.C. § 704.  An agency's decisions regarding which employees may access particular agency databases do not qualify.

1.    It is well settled that not all agency conduct is subject to review under the APA.  The APA defines reviewable "agency action" to include, as relevant here, an "agency rule, order, license, sanction, relief, or the equivalent."  5 U.S.C. § 551(13).  As the Supreme Court has emphasized, the APA therefore does not permit "general judicial review of [an agency's] day-to-day operations."  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990).  Nor does the APA authorize agencies to oversee "the common business of managing government programs."  *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).

Plaintiffs' complaint seeks review of exactly that kind of day-to-day management of agency operations.  The supposed "agency action" they identify is a loosely defined series of personnel decisions related to granting individual employees access to agency information systems.  Plaintiffs contend that the agencies granted access to DOGE team members too quickly and without adequately vetting those employees, providing them with sufficient training, or correctly assessing their need for access to the agencies' systems.  Looking to the definition of "agency action," the

36

only conceivable match for what plaintiffs challenge is an "order." 5 U.S.C.

§ 551(13). But no one would naturally describe the kind of decisions

plaintiffs identify here as the "disposition … of an agency in a matter." 5

USC § 551(6) (definition of "order"). Instead, those decisions are precisely

the type of day-to-day operational decisions and conduct that the Supreme

Court in *Lujan* advised do not fall within the APA's ambit. *See Lujan*, 497

U.S. at 899. As this Court has recognized, courts "are woefully ill-suited …

to adjudicate" "'attack[s]'" "asking [the judiciary] to improve an agency's

performance or operations." *City of New York v. U.S. Dep't of Def.*, 913 F.3d

423, 431 (4th Cir. 2019). In that kind of case, "courts would be forced either

to enter a disfavored 'obey the law' injunction or to engage in day-to-day

oversight of the executive's administrative practices. Both alternatives are

foreclosed by the APA, and rightly so." *Id.* (citation omitted).

The district court nevertheless concluded that plaintiffs' allegations

about a loosely defined series of personnel decisions related to granting

individual employees access to agency systems were enough to make out a

challengeable "agency action." But that understanding of what qualifies as

"agency action" would have sweeping and untenable consequences.

Agencies make thousands of personnel decisions every day of the type

37

plaintiffs challenge here, whether creating an e-mail account for an employee, staffing an employee on a particular matter, or ensuring that an employee has the relevant training and credentials to access systems or participate in programs. A court could not review such decisions without bringing within the scope of the APA virtually every aspect of an agency's relationship with its employees, from initial hiring, to onboarding, to day-to-day oversight. At the very least, the district court's approach would allow plaintiffs and courts to micro-manage data access decisions government-wide. Every time an agency wished to grant a new employee access to one of its systems or assign an existing employee to a new project that requires such access, the agency could have to seek a court's permission and convince the court, through detailed submissions, that the employee had a sufficient need to access the relevant information system.

Neither plaintiffs nor the district court identified any precedent accepting that those kinds of work-a-day internal decisions are reviewable under the APA. Instead, the district court simply labeled the decisions to permit access to government databases as agency "policy" and stated that such policies are "hardly comparable" to the government's examples. JA686-687. But attaching the "policy" label does not provide a workable

line; rather, it invites future courts to micro-manage agency operations under the guise of the APA.

2. Even if the agencies' decisions to grant certain employees access to agency databases qualify as "agency action," they are not "final" for purposes of the APA. Such decisions are not actions through which "rights or obligations have been determined" or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation omitted). The district court failed to explain how providing employees with system access creates any rights, obligations, or legal consequences for plaintiffs. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). There is no final agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities" and "d[id] not subject them to new penalties or enforcement risks." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). Plaintiffs are not regulated by internal agency decisions to allow new employees access to the agency's systems, nor have they identified any direct legal consequences that arise from those decisions.

The fact that such decisions could potentially lead to indirect, practical consequences for plaintiffs down the line does not change the

analysis. Adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004). For example, "[i]nitiating an enforcement proceeding against a company … may have a devastating effect on the company's business, but that does not make the agency's action final." *Id.* What matters is that the alleged data access decisions here have no "direct and appreciable legal consequences" for plaintiffs. *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). That forecloses plaintiffs' APA claim.

In reaching the opposite conclusion, the district court likened this case to *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), in which the D.C. Circuit held that an agency policy to disclose confidential information to third parties constituted final agency action. *See* JA687-689. But there, the court recognized that such unauthorized third-party *disclosures* can have direct and immediate consequences for plaintiffs. *See Venetian Casino Resort*, 530 F.3d at 931. By contrast, review of data contained in internal agency systems by agency employees does not threaten the same immediate harms. *Cf. Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245-50 (11th Cir. 2022) (en banc)

40

(explaining that without third-party disclosure, claims founded on internal

disclosure of data do not state a cognizable injury for standing purposes);

*see also supra* pp. 26-28 (discussing *TransUnion*'s rejection of an internal-

disclosure theory of standing).

### C. Plaintiffs' APA claims are foreclosed because the Privacy Act provides an adequate remedy

The APA provides a vehicle for review only in circumstances where

"there is no other adequate remedy."  5 U.S.C. § 704; *see also Bowen v.*

*Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that

Congress did not intend the general grant of review in the APA to

duplicate existing procedures for review of agency action.").  That

requirement is not satisfied here, however, because the Privacy Act

provides an exclusive and "comprehensive remedial scheme" for injuries

arising out of the inappropriate dissemination of private information in the

government's possession.  *Wilson v. Libby*, 535 F.3d 697, 703 (D.C. Cir. 2008)

(citing *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 274 (D.C. Cir. 2003)).

Plaintiffs may not use the APA to circumvent that carefully crafted scheme.

Plaintiffs seek a form of relief that Congress did not make available

under the Privacy Act.  Section 552a(g) of the Act establishes the narrow

41

causes of action under which an "individual may bring a civil action against the agency" for violations of the Act. *See* 5 U.S.C. § 552a(g)(1). Here, plaintiffs seek an injunction barring the relevant agencies from taking actions that, in plaintiffs' view, violate § 552a(b)'s prohibition on the disclosure of their personal information. Congress authorized suits seeking prospective injunctive relief to enforce certain provisions of the Act, namely where a plaintiff asks an agency to "amend" a record or seeks to access a record they are entitled to under the statute. *Id.* § 552a(g)(2), (3). It did not, however, authorize suits for injunctive relief to prevent violations of § 552a(b). Congress instead permitted individuals to enforce their rights under § 552a(b) only through suits for money damages. *See id.* § 552a(g)(4); *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1122 (D.C. Cir. 2007). In short, Congress concluded that suits for money damages provide an adequate remedy for violations of § 552a(b) and limited relief to suits for such damages. That congressional determination forecloses plaintiffs' APA claim. *See Hinck v. United States*, 550 U.S. 501, 506 (2007) (applying the "the well-established principle that, in most contexts, a precisely drawn, detailed statute pre-empts more general remedies" (cleaned up)).

Defendants recognize that, in dicta, this Court has suggested that prospective injunctive relief may be available under the APA for alleged Privacy Act violations. *See Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir. 2006). But as the motions panel recognized, that dicta is not binding on this panel. Order 14 (Richardson, J., concurring). And for the reasons discussed, this panel should not follow it—Congress's decision to provide narrow, targeted causes of action for damages or particular kinds of injunctive relief under the Privacy Act strongly suggests that it did not intend to allow plaintiffs to end-run that carefully constructed scheme via APA claims.

### D.    Plaintiffs' Privacy Act claim fails on the merits

Even were this case justiciable, plaintiffs' APA claim would fail on the merits. The district court found that plaintiffs are likely to succeed on their claim that the agencies "did not act 'in accordance with law'"— specifically, the Privacy Act—"when they disclosed agency records containing [plaintiffs' personally identifiable information] to DOGE affiliates." JA695 (quoting 5 U.S.C. § 706(2)(A)). That was error. While the Privacy Act generally prohibits disclosure of covered records containing

43

personal information absent consent, 5 U.S.C. § 552a(b), it contains several exceptions, *id.* § 552a(b)(1)-(13), two of which are relevant here.

First, the statute expressly authorizes disclosure of covered records to "those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). In addition, the Privacy Act authorizes disclosure of a record to Federal employee (as well as individuals and entities outside the government) "for a routine use," if certain conditions are met. *See* id. § 552a(b)(3) (permitting disclosure absent consent for certain routine uses that are "compatible with the purpose for which [the record] was collected," 5 U.S.C. § 552a(a)(7), and defined in a published SORN, *see id.* § 552a(e)(4)(D)). The disclosure of plaintiffs' records to DOGE team members within the agencies falls comfortably within both authorized uses.

1.a. The need-to-know exception applies to the disclosure of records maintained by an agency to employees of that agency. *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 547 (3d Cir. 1989) (noting that § 552a(b)(1) applies to "intra-agency disclosures"). That requirement is met here because the relevant employees at Treasury, Education, and OPM are

44

employees of those agencies for Privacy Act purposes and seek access to information systems maintained by the agency which employs them. "For the purpose of" Title 5 of the U.S. Code—which includes the Privacy Act— "employee" means "an officer and an individual who is" first "appointed in the civil service by," *inter alia*, "the President" or "an individual who is an employee under this section." 5 U.S.C. § 2105(a)(1)(A), (D). An employee must also be "engaged in the performance of a Federal function under authority of law or an Executive act," and "subject to the supervision of an individual named by paragraph (1) of this subsection while engaged in the performance of the duties of his position." *Id.* § 2105(a)(2), (3). The individuals at issue easily satisfy that definition, and the district court did not hold otherwise. *See* JA697 (assuming without deciding that the relevant team members are agency employees).

Second, the employees at issue have a "need" to access the records contained in the relevant systems to perform their official duties. 5 U.S.C. § 552a(b)(1). Courts have explained that access is consistent with that requirement if "the official examined the record in connection with the performance of duties assigned to him and [if] he had to do so in order to perform those duties properly." *Bigelow v. Department of Def.*, 217 F.3d 875,

45

877 (D.C. Cir. 2000). That standard is plainly met here. The DOGE teams at Treasury, Education, and OPM have been established to "moderniz[e] Federal technology and software to maximize governmental efficiency and productivity." USDS EO § 1; 90 Fed. Reg. at 8441; *see id.* § 4, 90 Fed. Reg. at 8441-42. Specifically, the Executive Order has directed the undertaking of a "Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology … systems," and it requires agency heads to work with USDS to "promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4(a), 90 Fed. Reg. at 8441.

The Executive Order thus focuses on modernizing the federal government's technology infrastructure. Consistent with that effort, the Executive Order instructs agency heads "to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," and in turn requires USDS to "adhere to rigorous data protection standards." USDS EO § 4(b), 90 Fed. Reg. at 8442. The Executive Order thus provides agency personnel working pursuant to that Order with a "need" to access records and

46

systems of records under the Privacy Act in order to do their jobs properly. *See Bigelow*, 217 F.3d at 877. As the motions panel noted, "it does not stretch the imagination to think that modernizing an agency's software and IT systems would require administrator-level access to those systems, including any internal databases." Order 14 (Richardson, J., concurring). Indeed, it is difficult to imagine how agency personnel seeking to modernize agency systems could do so *without* access to the systems themselves. Such access is necessarily required to assess the state of the systems and to "improve [their] quality and efficiency." USDS EO § 4(a), 90 Fed. Reg. at 8442. The district court appeared to recognize as much when it concluded that three DOGE-affiliated OPM employees had a need to access the relevant systems "by virtue of their positions" and the fact that individuals occupying those positions have traditionally had access to OPM systems. JA662 n.3. The court nowhere explained why other DOGE team members did not similarly possess a need to access agency databases by virtue of their positions.

It is likewise plain that DOGE team members investigating whether the government has made improper expenditures require access to the records detailing the relevant payments. To assess the propriety of any

47

payment, an analyst needs to know the details surrounding that payment, including information about the recipient of that payment, the amount of the payment, the payment's purpose, and so forth. It is hard to fathom how such investigative work could be performed without access to the relevant payment records. Indeed, the President recently directed agency heads to ensure that "Federal officials designated by the President or Agency Heads (or their designees) have full and prompt access to all unclassified agency records, data, software systems, and information technology systems" for exactly these purposes. Exec. Order No. 14,243 § 3, 90 Fed. Reg. 13,681 (Mar. 25, 2025).

SORNs, issued under the Privacy Act for the various data systems, further confirm the DOGE employees' need to access those systems. Again, those SORNs state that the records contained within the systems will be used to "develo[p] … computer systems" and to identify, prevent, and recoup improper payments, among other uses. 85 Fed. Reg. at 11,779-80; *see also infra* pp. 52-53. The agencies have thus made clear to the public, including plaintiffs, that the types of tasks being performed by DOGE team members involve the regular use of the records in those systems.

48

b.    The district court erred in holding that plaintiffs are likely to succeed on their claim that the DOGE team members lack the need for access required by § 552a(b)(1).

The district court's determination stemmed largely from its view that the scope of disclosure in this case "appears to be" larger than in prior Privacy Act disputes.  JA699.  But it is hardly surprising—much less legally relevant—that employees would "need" to access more records in an effort to modernize the government's information systems than would be necessary in a one-off case concerning the government's investigation into, for example, allegations against a particular employee.  *See, e.g.*, *Bigelow*, 217 F.3d at 370-71.

The district court analogized this case to one in which an agency allegedly engaged in an "agency-wide release of information," "blast[ing]" information "indiscriminately throughout the agency and not just specifically to those who may have needed to receive it in connection with their job responsibilities."  *Dick v. Holder*, 67 F. Supp. 3d 167, 178 (D.D.C. 2014) (cited at JA699).  That analogy is simply wrong.  A limited number of agency DOGE team members have been granted access to information for specific purposes that require that access.  The Privacy Act does not

49

authorize the district court to superintend that lawful access. Moreover, the district court's reasoning would apparently call into doubt the legality of the agencies' granting of access to the many non-DOGE employees who have had access to the relevant systems for years and who have been performing tasks substantially similar to the work being performed by DOGE team members. The only apparent difference is that the district court approves of the non-DOGE-related agency employees' work but draws the line at the DOGE mission—but that is the kind of policy judgment that the Constitution vests in the Executive Branch, not district courts.

The district court's reliance on *Parks v. United States Internal Revenue Service*, 618 F.2d 677 (10th Cir. 1980), is similarly inapposite. *See* JA698-699. In that nearly 50-year-old out-of-circuit decision, the plaintiffs—employees of the Internal Revenue Service (IRS)—complained that "nonsupervisory personnel" at IRS had been given access to their personnel files in order to call them at home "for the purpose of soliciting their purchase of U.S. Savings Bonds." *Parks*, 618 F.2d at 679-80. The plaintiffs' information was included in a list of "recalcitran[t]" employees who had not yet purchased those bonds and was put together for the sole purpose of pressuring

50

employees to purchase bonds. *Id.* at 679. In finding the plaintiffs had stated a claim, the Tenth Circuit relied on the fact that, in passing the Privacy Act, "Congress expressly held out" this kind of "internal blacklisting" of federal employees who do not "participat[e] in savings bonds drives or charity campaigns" "as an example of information not needed in the performance of federal employees' regular duties." *Id.* at 681 & n.1. Against that backdrop, the court in *Parks* held that the IRS's reliance on a general Executive Order to encourage the voluntary purchase of savings bonds did not itself "license the defendants to violate the Privacy Act" and therefore was "not … ground for justifying the dismissal of plaintiffs' complaint." *Id.* at 681.

Even putting aside the vastly different facts in *Parks*, nothing in *Parks* supports the district court's assertion of roving authority to carefully parse an agency's stated reasons for allowing its employees to access internal agency systems and records, particularly where the justification for that access is unremarkable and inoffensive, and particularly where the district court's parsing is directly contrary to the President's own specific directives to his subordinates. The justifications for the access granted here—modernizing and increasing the efficiency of government systems,

51

including by rooting out fraud, waste, and abuse—are plainly legitimate purposes and establish the DOGE team members' need for access to the systems, a need that is evidenced by the fact that other agency employees use plaintiffs' records for those purposes as a routine part of their official duties. Plaintiffs do not seriously suggest otherwise. Nor are those objectives the kinds of things that Congress has expressly flagged as uses of "information not needed in the performance of federal employees' regular duties." *Parks*, 618 F.2d at 681 & n.1.

2.     In the alternative, plaintiffs' actions were also authorized under the Privacy Act's exception for "routine use." 5 U.S.C. § 552a(b)(3). As noted, that exception permits disclosure of records to agency employees, government employees at other agencies, and parties outside the government for certain routine uses that are "compatible with the purpose for which [the record] was collected," *id.* § 552a(a)(7), and defined in a published SORN, *see id.* § 552a(e)(4)(D). The three agencies' decisions to grant access to DOGE team members satisfy that standard. Treasury's published Routine Use 17 permits disclosure to federal agency personnel "for the purpose of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, federal funds." 85 Fed. Reg.

at 11,780.  Treasury's DOGE Team is tasked with doing just that.  USDS EO §§ 1, 4, 90 Fed. Reg. at 8441-42.  Education's SORNs likewise cover the functions of the DOGE team members.  For example, they allow for disclosure "[t]o support the investigation of possible fraud and abuse and to detect and prevent fraud and abuse" in program funds.  88 Fed. Reg. 41,942, 41,949 (June 28, 2023); 88 Fed. Reg. 42,220, 42,223 (June 29, 2023); see also 84 Fed. Reg. 47,265, 47,269 (Sept. 9, 2019) (permitting disclosure to "support governmental researchers and policy analysts").  So too with OPM's SORN, which permit disclosure in certain circumstances "to help eliminate waste, fraud, and abuse in Governmental programs."  77 Fed. Reg. 73,694, 73,697 (Dec. 11, 2012).  Because these are precisely the functions OPM DOGE team members are performing, the Privacy Act permits disclosure of the relevant records to them.

## II.    Plaintiffs Also Failed to Establish the Remaining Preliminary Injunction Factors

The remaining factors—irreparable harm, the balance of harms, and the public interest—likewise favor the government and fail to support the district court's injunction.  Even assuming that plaintiffs could establish that they suffer a cognizable injury for purposes of standing, *but see supra*

pp. 23-35, they far fall short of establishing the kind of irreparable harm necessary to support their entitlement to a preliminary injunction. *See Mountain Valley Pipeline, LLC v. Western Pocahontas Props. Ltd.*, 918 F.3d 353, 366 (4th Cir. 2019) ("Each of [the] four [preliminary injunction] requirements must be satisfied.").

The district court's contrary conclusion was premised on fundamental errors. Plaintiffs fail to make a clear showing of actual and imminent harm from the intra-agency disclosure of information, especially given that employees who view that information are subject to the same confidentiality obligations that apply to other similarly situated agency employees. And as the majority of the motions panel noted, it "is particularly hard to see" how plaintiffs can establish a need for immediate injunctive relief here because "the injury they complain of has already occurred"—DOGE-affiliated employees have already been given access to the relevant systems, in some cases for "weeks before this lawsuit was even filed." Order 15-16 (Richardson, J., concurring).

Indeed, three other courts addressing similar claims have denied motions for emergency relief based on the plaintiffs' failure to establish irreparable harm. *See University of Cal. Student Ass'n v. Carter*, --- F. Supp.

54

3d --- , No. 25-cv-354 (RDM), 2025 WL 542586, at *5 (D.D.C. Feb. 17, 2025)

("[C]ourts have declined to find irreparable injury where the challenged

disclosure is not 'public,' but [rather] involves individuals obligated to

keep it confidential"); *Electronic Privacy Info. Ctr. v. U.S. Office of Pers.*

*Mgmt.*, No. 25-cv-255 (RDA/WBP), 2025 WL 580596, at *6-7 (E.D. Va. Feb.

21, 2025); *Alliance for Retired Ams. v. Bessent*, --- F. Supp. 3d --- , No. 25-cv-

313 (CKK), 2025 WL 740401, at *20–24 (D.D.C. Mar. 7, 2025).

As for the remaining factors, allowing the injunction to stand

threatens irreparable injuries to the government and the public, whose

interests "merge" in this context. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The injunction here impinges on the President's broad authority over and

responsibility for directing employees in important work to modernize

federal government systems and identify fraud, waste, and abuse

throughout the federal government. It is therefore "an improper intrusion

by a federal court into the workings of a coordinate branch of the

Government." *Immigration & Naturalization Serv. v. Legalization Assistance

Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1306 (1993) (O'Connor,

J., in chambers).

At every turn, the injunction inflicts irreparable constitutional harm. It erodes the President's control over subordinates and countermands his specific directions to agency heads.  It frustrates the public's interest in having their elected President effectuate policy priorities—including ensuring tax dollars are not wasted on outdates systems or improper or fraudulent payments—through lawful direction of the Executive Branch. And it inserts the Judicial Branch into the day-to-day, internal operations of federal agencies.

## CONCLUSION

For the foregoing reasons, this Court should vacate the preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*
ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*
GERARD SINZDAK

 *s/ Jack Starcher*
JACK STARCHER
JACOB CHRISTENSEN

  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*
  *john.e.starcher@usdoj.gov*

April 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,778 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.


*s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jack Starcher*

Jack Starcher

**ADDENDUM**

# TABLE OF CONTENTS

5 U.S.C. § 552a ................................................................ A1

5 U.S.C. § 500 .................................................................. A4

5 U.S.C. § 704 .................................................................. A4

5 U.S.C. § 706 .................................................................. A4

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ............................ A5

**The Privacy Act of 1974 - 5 U.S.C. § 552a**

**§ 552a. Records maintained on individuals**

\*\*\*

**(b) Conditions of disclosure.**--No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be--

    **(1)** to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

    \*\*\*

    **(3)** for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

\*\*\*

    **(7)** to another agency or to an instrumentality of any governmental jurisdiction within or under the control of the United States for a civil or criminal law enforcement activity if the activity is authorized by law, and if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought;

\*\*\*

**(e) Agency requirements.**--Each agency that maintains a system of records shall--

    **(1)** maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President;

\*\*\*

**(4)** subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include--

**(A)** the name and location of the system;

**(B)** the categories of individuals on whom records are maintained in the system;

**(C)** the categories of records maintained in the system;

**(D)** each routine use of the records contained in the system, including the categories of users and the purpose of such use;

**(E)** the policies and practices of the agency regarding storage, retrievability, access controls, retention, and disposal of the records;

**(F)** the title and business address of the agency official who is responsible for the system of records;

**(G)** the agency procedures whereby an individual can be notified at his request if the system of records contains a record pertaining to him;

**(H)** the agency procedures whereby an individual can be notified at his request how he can gain access to any record pertaining to him contained in the system of records, and how he can contest its content; and

**(I)** the categories of sources of records in the system;

**\*\*\***

**(g)(1) Civil remedies.**--Whenever any agency

**(A)** makes a determination under subsection (d)(3) of this section not to amend an individual's record in accordance with his request, or fails to make such review in conformity with that subsection;

**(B)** refuses to comply with an individual request under subsection (d)(1) of this section;

**(C)** fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to

assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual; or

**(D)** fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual,

the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

***

**(i)(1) Criminal penalties.**--Any officer or employee of an agency, who by virtue of his employment or official position, has possession of, or access to, agency records which contain individually identifiable information the disclosure of which is prohibited by this section or by rules or regulations established thereunder, and who knowing that disclosure of the specific material is so prohibited, willfully discloses the material in any manner to any person or agency not entitled to receive it, shall be guilty of a misdemeanor and fined not more than $5,000.

**(2)** Any officer or employee of any agency who willfully maintains a system of records without meeting the notice requirements of subsection (e)(4) of this section shall be guilty of a misdemeanor and fined not more than $5,000.

**(3)** Any person who knowingly and willfully requests or obtains any record concerning an individual from an agency under false pretenses shall be guilty of a misdemeanor and fined not more than $5,000.

***

A3

**Administrative Procedure Act - 5 U.S.C. § 500 et seq.**

## § 500. Definitions

For the purpose of this subchapter--

***

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

***

(13) "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act;

***

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

***

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

***

(2) hold unlawful and set aside agency action, findings, and conclusions found to be--

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

***

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## Establishing and Implementing the President's "Department of Government Efficiency" - Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025)

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose. This Executive Order establishes the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity.

Sec. 2. Definitions. As used in this order:

(a) "Agency" has the meaning given to it in section 551 of title 5, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

Sec. 3. DOGE Structure. (a) Reorganization and Renaming of the United States Digital Service. The United States Digital Service is hereby publicly renamed as the United States DOGE Service (USDS) and shall be established in the Executive Office of the President.

A5

(b) Establishment of a Temporary Organization. There shall be a USDS Administrator established in the Executive Office of the President who shall report to the White House Chief of Staff. There is further established within USDS, in accordance with section 31611 of title 5, United States Code, a temporary organization known as "the U.S. DOGE Service Temporary Organization". The U.S. DOGE Service Temporary Organization shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda. The U.S. DOGE Service Temporary Organization shall terminate on July 4, 2026. The termination of the U.S. DOGE Service Temporary Organization shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order.

(c) DOGE Teams. In consultation with USDS, each Agency Head shall establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees, hired or assigned within thirty days of the date of this Order. Agency Heads shall select the DOGE Team members in consultation with the USDS Administrator. Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney. Agency Heads shall ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda.

Sec. 4. Modernizing Federal Technology and Software to Maximize Efficiency and Productivity. (a) The USDS Administrator shall commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization. **\*8442**

(b) Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems. USDS shall adhere to rigorous data protection standards.

A6

(c) This Executive Order displaces all prior executive orders and regulations, insofar as they are subject to direct presidential amendment, that might serve as a barrier to providing USDS access to agency records and systems as described above.

Sec. 5. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

January 20, 2025.