No. 25-1282

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

─────────────────

AMERICAN FEDERATION OF TEACHERS, ET AL.,

*Plaintiffs-Appellees,*

vs.

SCOTT BESSENT, ET AL.,

*Defendants-Appellants.*

─────────────────

On Appeal from the United States District Court for the District of
Maryland, Case No. 8:25-cv-00430-DLB
The Hon. Deborah L. Boardman

─────────────────

### RESPONSE BRIEF OF PLAINTIFFS-APPELLEES

─────────────────

Carson Scott
Roman Leal
MUNGER, TOLLES & OLSON LLP
560 Mission St., 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000

Mark Hanna
David Rodwin
MURPHY ANDERSON PLLC
1401 K Street NW
Suite 300
Washington, D.C. 20005
Telephone: (202) 223-2620

John L. Schwab
Wendy Q. Xiao
Liam Gennari
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Xiaonan April Hu
Andra Lim
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW,
Suite 500 E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Plaintiffs-Appellees*
*(additional counsel on inside cover)*

Kristy Parker
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
Telephone: (202) 843-3092

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, Plaintiffs-Appellees state that they are individuals, labor organizations, and labor unions.  They are not stock corporations, have no parent corporation, and have no shareholders.


DATED:  April 21, 2025                    MUNGER, TOLLES & OLSON LLP


By:  ___*/s/ John L. Schwab*_____
          John L. Schwab
          *Counsel for Plaintiffs-Appellees*

## TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........................................................1

INTRODUCTION .............................................................................1

STATEMENT OF THE ISSUES............................................................5

ADDENDUM OF STATUTORY AND REGULATORY AUTHORITIES...........6

STATEMENT OF THE CASE................................................................6

    A.    Legal Background ................................................6

    B.    Factual Background..............................................8

    C.    Procedural Background ........................................12

SUMMARY OF ARGUMENT ............................................................19

STANDARD OF REVIEW ................................................................21

ARGUMENT ................................................................................22

I.    The District Court Properly Ruled that Plaintiffs Are Likely To Succeed on the Merits of Their APA Claims ........................................22

    A.    Plaintiffs Are Likely To Establish Standing ...............22

    B.    Plaintiffs Are Likely to Succeed in Showing that Defendants' Decisions Were Final Agency Actions .................................30

    C.    Plaintiffs Are Likely to Succeed in Showing that the APA Provides a Cause of Action .................................35

    D.    Plaintiffs Are Likely to Succeed in Showing that No Privacy Act Exception Permitted Disclosure of Their Records............................39

II.    The District Court Did Not Abuse Its Discretion in Ruling that Plaintiffs Would Likely Be Irreparably Harmed Absent Preliminary Injunctive Relief................................................................50

III.    The District Court Did Not Abuse Its Discretion in Ruling that the Balance of the Equities and the Public Interest Favor a Preliminary Injunction ..............................................................55

CONCLUSION ..............................................................................56

## TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*All. For Retired Ams. v. Bessent*,
  2025 WL 740401 (D.D.C. Mar. 7, 2025) ....................................30, 53

*Am. Farm Bureau Fed'n v. EPA*,
  836 F.3d 963 (8th Cir. 2016) ...............................................32

*Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*,
  2025 WL 996542 (S.D.N.Y. Apr. 3, 2025) .................................30

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. SSA*,
  2025 WL 868953 (D. Md. Mar. 20, 2025) ..................................30

*Bennett v. Spear*,
  520 U.S. 154 (1997).........................................................34

*Bigelow v. Dep't of Def.*,
  217 F.3d 875 (D.C. Cir. 2000)............................................40

*Bohnak v. Marsh & McLennan Cos., Inc.*,
  79 F.4th 276 (2d Cir. 2023) ...............................................24

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)........................................................38

*Calvillo Manriquez v. Devos*,
  345 F. Supp. 3d 1077 (N.D. Cal. 2018)..................................37

*Centro Tepeyac v. Montgomery Cnty.*,
  722 F.3d 184 (4th Cir. 2013) .............................................21

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979).....................................................31, 32

*Church of Scientology of Cal. v. United States*,
  506 U.S. 9 (1992)..........................................................52

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Just.*,
  846 F.3d 1235 (D.C. Cir. 2017) ............................................................38

*City of New York v. U.S. Dep't of Def.*,
  913 F.3d 423 (4th Cir. 2019) ................................................................33

*Curry v. Schletter*,
  2018 WL 1472485 (W.D.N.C. Mar. 26, 2018) ....................................30

*Dep't of Agric. Rural Dev. Rural Housing Serv. v. Kirtz*,
  601 U.S. 42 (2024).................................................................................1

*Doe v. Chao*,
  306 F.3d 170 (4th Cir. 2002) ................................................................54

*Doe v. Chao*,
  435 F.3d 492 (4th Cir. 2006) .................................................. 5, *passim*

*Doe v. Chao*,
  540 U.S. 614 (2004)..........................................................................36, 37

*Doe v. Herman*,
  1998 WL 34194937 (W.D. Va. Mar. 18, 1998) ..............................37, 39

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988).......................................................31, 37

*Drazen v. Pinto*,
  74 F.4th 1336 (11th Cir. 2023) .............................................................30

*East Bay Sanctuary Covenant v. Trump*,
  354 F. Supp. 3d 1094 (N.D. Cal. 2018)................................................56

*Electronic Privacy Inf. Ctr. v. OPM*,
  2025 WL 580596 (E.D. Va. Feb. 21, 2025) ..........................................54

*FAA v. Cooper*,
  566 U.S. 284 (2012).....................................................................6, 24, 55

# TABLE OF AUTHORITIES

**Page(s)**

*Fort Bend Cnty. v. U.S. Army Corps of Eng'rs*,
  59 F.4th 180 (5th Cir. 2023) ...................................................................37

*Gadelhak v. AT&T Servs., Inc.*,
  950 F.3d 458 (7th Cir. 2020) ..................................................................30

*Garey v. James S. Farrin, P.C.*,
  35 F.4th 917 (4th Cir. 2022) ................................................. 3, *passim*

*In re Grand Jury Investigation No. 78-184*,
  642 F.2d 1184 (9th Cir. 1981) .........................................................50, 52

*Grayson O Co. v. Agadir Int'l LLC*,
  856 F.3d 307 (4th Cir. 2017) ..................................................................48

*Greentree v. U.S. Customs Serv.*,
  674 F.2d 74 (D.C. Cir. 1982)...................................................................32

*Haw. Psychiatric Soc'y v. Ariyoshi*,
  481 F. Supp. 1028 (D. Haw. 1979)....................................................51, 53

*In re Horizon Healthcare Servs., Inc. Data Breach Litig.*,
  846 F.3d 625 (3d Cir. 2017) ...................................................................24

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
  48 F.4th 1236 (11th Cir. 2022) .........................................................25, 26

*Hunter v. SEC*,
  879 F. Supp. 494 (E.D. Pa. 1995)...........................................................29

*Jurewicz v. U.S. Dep't of Agric.*,
  891 F. Supp. 2d 147 (D.D.C. 2012).....................................................32, 33

*Kalmin v. Dep't of Navy*,
  605 F. Supp. 1492 (D.D.C. 1985).............................................................39

*Krakauer v. Dish Network, L.L.C.*,
  925 F.3d 643 (4th Cir. 2019) ...........................................................24, 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...................................................................55

*Miranda v. Garland*,
   34 F.4th 338 (4th Cir. 2022) ..............................................................55

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
   915 F.3d 197 (4th Cir. 2019) ........................................................50, 51

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable
   Operating Co.*,
   22 F.3d 546 (4th Cir. 1994) ...............................................................54

*Nayab v. Capital One Bank (USA), N.A.*,
   942 F.3d 480 (9th Cir. 2019) ..............................................................24

*Parks v. IRS*,
   618 F.2d 677 (10th Cir. 1980) .......................................................44, 45

*Perez-Denison v. Kaiser Found. Health Plan of the Nw.*,
   868 F. Supp. 2d 1065 (D. Or. 2012) ...................................................29

*Persinger v. Sw. Credit Sys., L.P.*,
   20 F.4th 1184 (7th Cir. 2021) ...............................................24, 26, 30

*Pilon v. U.S. Dep't of Just.*,
   73 F.3d 1111 (D.C. Cir. 1996) .............................................................7

*Planned Parenthood S. Atl. v. Baker*,
   941 F.3d 687 (4th Cir. 2019) .........................................................21, 27

*Rice v. Wal-Mart Stores, Inc.*,
   2003 WL 22240349 (D. N.H. Sept. 30, 2003) ...................................29

*Roberts v. Austin*,
   632 F.2d 1202 (5th Cir. 1980) ............................................................53

*Roland Mach. Co. v. Dresser Indus., Inc.*,
   749 F.2d 380 (7th Cir. 1984) ..............................................................54

## TABLE OF AUTHORITIES

**Page(s)**

*Scrimgeour v. IRS*,
   149 F.3d 318 (4th Cir. 1998) .........................................................54

*Sorenson Commc'ns Inc. v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014) ......................................................44

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ......................................................................22

*Students for a Conservative Am. v. Greenwood*,
   378 F.3d 1129 (9th Cir. 2004) ......................................................51

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ..................................................14, 22, 25, 28

*U.S. Dep't of Just. v. Reporters Comm.*,
   489 U.S. 749 (1989) ................................................................27, 29

*United States v. Miami Univ.*,
   294 F.3d 797 (6th Cir. 2002) ...................................................51, 54

*Univ. of Cal. Student Ass'n v. Carter*,
   2025 WL 542586 (D.D.C. Feb. 17, 2025) .....................................53

*Venetian Casino Resort, L.L.C. v. EEOC*,
   530 F.3d 925 (D.C. Cir. 2008) ................................................34, 35

*Viktus v. Blinken*,
   79 F.4th 352 (4th Cir. 2023) .........................................................55

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ...................................................31, 33

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ......................................................................31

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) ....................................................................21, 54

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL STATUTES**

5 U.S.C. § 551 ........................................................................31, 32

5 U.S.C. § 552a(a)(4) ...................................................................6

5 U.S.C. § 552a(a)(4)-(5) .............................................................6

5 U.S.C. § 552a(a)(6) ...................................................................7

5 U.S.C. § 552a(a)(7) ...............................................................7, 48

5 U.S.C. § 552a(a)(8) ..................................................................49

5 U.S.C. § 552a(b) ...............................................................2, 7, 29

5 U.S.C. § 552a(b)(1) .............................................................7, 40

5 U.S.C. § 552a(b)(1)-(13) ...........................................................7

5 U.S.C. § 552a(b)(3) ..................................................................48

5 U.S.C. § 552a(c) .........................................................................7

5 U.S.C. § 552a(c)(1) ..................................................................49

5 U.S.C. § 552a(e)(4)(D) .............................................................48

5 U.S.C. § 552a(g)(4)(A) .............................................................55

5 U.S.C. § 552a(v)(1) ..................................................................38

5 U.S.C. § 701 .............................................................................34

5 U.S.C. § 704 .......................................................................31, 37

5 U.S.C. § 706 .........................................................15, 36, 40, 41

18 U.S.C. § 2724(a) .....................................................................23

28 U.S.C. § 1292 ...........................................................................1

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

28 U.S.C. § 1331 ............................................................................1

Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 .....................................1, 6

**FEDERAL REGULATIONS AND EXECUTIVE ORDERS**

40 Fed. Reg. 28948 (July 9, 1975) ...........................................................38

77 Fed. Reg. 73694 (Dec. 11, 2012) ........................................................49

85 Fed. Reg. 11776 (Feb. 27, 2020) ........................................................49

88 Fed. Reg. 41942 (June 28, 2023) ........................................................49

88 Fed. Reg. 42220 (June 29, 2023) ........................................................49

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025)....................................8

Exec. Order No. 14243, 90 Fed. Reg. 13681 (Mar. 20, 2025) ...............................46

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 93-1416 ...............................................................6, 7, 8

S. Rep. No. 93-1183.....................................................................45

Comm. on Gov't Operations, U.S. Senate, Legislative History of the
    Privacy Act of 1974, S. 3418 (Public Law 93-579), Source Book
    on Privacy (Sept. 1976) ...................................................... 1, *passim*

**TREATISES**

Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts*
    § 580 (2d ed.) ...........................................................28

Restatement (Second) Torts § 652B (Am. Law Inst. 1977) ...................................26

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

**OTHER AUTHORITIES**

Eli A. Meltz, *No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham L. Rev. 3431 (2015) ......................................................................................... 27

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' Administrative Procedure Act ("APA") claims under 28 U.S.C. § 1331. On March 24, 2025, the district court granted Plaintiffs' motion for a preliminary injunction and enjoined Defendants from providing Department of Government Efficiency ("DOGE") affiliates with access to Plaintiffs' personally identifiable information ("PII"). That same day, Defendants filed their notice of appeal. This Court has jurisdiction under 28 U.S.C. § 1292.

## INTRODUCTION

The Privacy Act of 1974 was "[p]assed 'to protect the privacy of individuals in [federal] information systems.'" *Dep't of Agric. Rural Dev. Rural Housing Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) (quoting Pub. L. No. 93-579, 88 Stat. 1896 § 2(a)(5)). In particular, Congress sought to protect the people's "right to privacy"— that "most basic of our civil liberties as a free people." Comm. on Gov't Operations, U.S. Senate, Legislative History of the Privacy Act of 1974, S. 3418 (Public Law 93-579), Source Book on Privacy 4 (Sept. 1976) ("Source Book").[1] Recognizing that this fundamental liberty was under threat in an era of "massive information-gathering and dissemination through the use of sophisticated computer technology," in which "each of us is subject to cumulative records being stored by a variety of Government agencies," *id.* at 6, Congress acted decisively. It enacted the Privacy

---

[1] Available at https://www.justice.gov/d9/privacy_source_book.pdf.

Act to safeguard against not only the threat that government agencies would share highly sensitive personal information to outside actors but also the threat of "improper disclosure of information *within the agency*." *Id.* at 204 (emphasis added).

The Privacy Act thus generally prohibits agencies from disclosing an individual's records to anyone—including inside the government—without that individual's "prior written consent," 5 U.S.C. § 552a(b). The Act allows agencies to disclose without consent only as provided in enumerated exceptions. Thanks to the Act, the American people have had confidence that the government will safeguard the personal, sensitive information they must share when they interact with the government, from paying taxes to serving in the military. Plaintiffs, who are teachers, nurses, scientists, engineers, veterans, and federal workers, trusted the government would protect their information and share it only as permitted by law.

Defendants breached that trust. Defendants' administrative records—which they represent contain the full set of materials informing or reflecting their decisions—establish that Defendants violated the Privacy Act in granting more than two dozen DOGE affiliates unrestricted access to Plaintiffs' sensitive information. The records do not contain *any* evidence that Defendants gave DOGE affiliates access for any purpose allowed by the Privacy Act's exceptions. There is *no* evidence that the stated DOGE goal of modernizing technology required DOGE

2

affiliates to access Plaintiffs' PII, and *no* evidence that DOGE affiliates are tasked with "rooting out fraud, waste, and abuse," as Defendants claim over and over without citation, Op.Br.2; *see id.* 3, 19, 22, 52, 55.  In short, DOGE affiliates obtained "unfettered, unauthorized access to the highly sensitive personal data of millions of Americans," with no "substantiati[on] that they have any need" for it. Order at 17, 23 (King, J., dissenting).

The only conclusion the records permit is that Defendants flouted the law. After closely analyzing those records, and applying well-established precedent, the district court entered a "thorough and well-reasoned," *id.* at 24 (Berner, J., dissenting), order that preliminarily enjoins Defendants from disclosing Plaintiffs' PII to DOGE affiliates.  Defendants argue that the district court overstepped and abused its discretion in entering the preliminary injunction, but it is Defendants who badly overreach.

Defendants' primary argument is that the Privacy Act is a dead letter because Plaintiffs, and presumably any American, cannot seek injunctive relief for a Privacy Act violation under the APA.  Defendants advance this brazen argument even though this Court already held an injury indistinguishable from Plaintiffs' is sufficiently concrete for Article III standing, *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022), and courts routinely adjudicate cases seeking equitable relief under the APA for the government's disclosure of records.

3

Defendants focus their efforts on these threshold issues because their merits argument is glaringly weak. They do not cite the administrative records *even once* in contending that they did not violate the Privacy Act. That is unsurprising: As the district court correctly found after a searching review of the records, there is not a shred of evidence that Defendants granted DOGE affiliates access to Plaintiffs' PII for any lawful purpose. It is overwhelmingly likely that Plaintiffs will succeed in showing that Defendants violated the Privacy Act. Without a preliminary injunction, Plaintiffs will suffer the irreparable harm of an ongoing intrusion on the privacy interests Congress was determined to protect. And the public interest will be harmed by Defendants' continuing to provide unlawful access to sensitive information that millions of Americans thought—incorrectly—was safe in the government's hands.

Accepting Defendants' arguments would demolish the protections Congress enshrined in the Privacy Act. In Defendants' world, plaintiffs would not be able to enjoin the federal government from disclosing their personal information within the government in violation of the Act, no matter how egregious and unlawful the disclosure. And the government would be able to escape liability merely on its say-so that an exception to the Act applies, without any evidence supporting that bare assertion. Defendants would have this Court repudiate Congress's judgment that the law must guard against "the loss of our freedom" by forbidding the government's "careless[] and unthinking" distribution of personal records for reasons "irrelevant

to legitimate government needs," Source Book at 5, 24—and disregard its own precedent multiple times over in doing so.

The Court should affirm the district court's preliminary injunction order.

## STATEMENT OF THE ISSUES

I.    Whether the district court properly exercised its discretion in ruling that Plaintiffs were likely to succeed on the merits of their APA claims, given that:

    A.    This Court ruled in *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022), that an injury indistinguishable from Plaintiffs' is sufficiently concrete for Article III standing;

    B.    Courts routinely conclude decisions to disclose records are reviewable under the APA;

    C.    This Court instructed that plaintiffs may sue for prospective relief under the APA for Privacy Act violations in *Doe v. Chao*, 435 F.3d 492 (4th Cir. 2006);

    D.    Defendants' administrative records are devoid of evidence showing that Defendants' decisions to disclose Plaintiffs' PII to DOGE affiliates without Plaintiffs' written consent fall within a Privacy Act exception.

II.    Whether the district court properly exercised its discretion in ruling that Plaintiffs have shown a likelihood of irreparable harm because there is an

ongoing invasion of privacy interests that cannot be fully redressed by damages.

III. Whether the district court properly exercised its discretion in ruling that the balance of the equities and public interest favor a preliminary injunction where the public has a strong interest in Defendants complying with the Act.

## ADDENDUM OF STATUTORY AND REGULATORY AUTHORITIES

Relevant statutory and regulatory authorities appear in the Addendum.

## STATEMENT OF THE CASE

### A.    Legal Background

The Privacy Act governs the federal government's disclosure of personal information such as Social Security numbers and citizenship status.  It was intended to "curb governmental privacy abuses" by "provid[ing] certain safeguards for an individual against an invasion of personal privacy" by the government.  H.R. Rep. No. 93-1416, at 6; *FAA v. Cooper*, 566 U.S. 284, 295 (2012) (quoting Pub. L. No. 93-579, 88 Stat. 1896 § 2(b)).

The Act applies to any "record" in a "system of records" maintained by an agency.  5 U.S.C. § 552a(a)(4)-(5).  A record is "any item, collection, or grouping of information about an individual," "including, but not limited to, his education, financial transactions, . . . or employment history," and "that contains his name, or the identifying number . . . assigned to the individual." *Id.* § 552a(a)(4).  A system of records is "a group of any records under the control of any agency from which

information is retrieved by the name of the individual or by some identifying number." *Id.* § 552a(a)(6).

"[O]ne of the most important, if not the most important, provisions of" the Privacy Act governs disclosures. H.R. Rep. No. 93-1416, at 12. "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except . . . with the prior written consent of, the individual to whom the record pertains." 5 U.S.C. § 552a(b).

This prohibition is subject to limited exceptions. *Id.* § 552a(b)(1)-(13). Defendants rely on two. First, an agency "may disclose a protected record to an employee who has a need to use it in the course of his duties." *Pilon v. U.S. Dep't of Just.*, 73 F.3d 1111, 1122 (D.C. Cir. 1996); *see* 5 U.S.C. § 552a(b)(1). This is referred to as the "need-to-know" exception.

Second, an agency may disclose records for a "routine use" that is "compatible with the purpose for which [the records were] collected" and which was published in the Federal Register. 5 U.S.C. § 552a(a)(7), (b)(3). Any disclosure of records pursuant to the routine-use exception must be documented. *Id.* § 552a(c).

The Privacy Act's prohibition on disclosure reflects Congress's "attempt[] to strike [a] delicate balance." H.R. Rep. No. 93-1416, at 4. On the one hand, Congress weighed the interest "of the individual American for a maximum degree of privacy over personal information he furnishes his government." *Id.*; *see* Source Book at

776 ("I hope that we never see the day when a bureaucrat in Washington . . . can use his organization's computer facilities to assemble a complete dossier of all known information about an individual."). On the other hand, Congress considered the interest "of the government for information about the individual which it finds necessary to carry out its legitimate functions." H.R. Rep. No. 93-1416, at 4.

## B.  Factual Background

On January 20, 2025, President Donald J. Trump signed an Executive Order creating DOGE and directing it to "implement the President's DOGE agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." JA656 (quoting Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("DOGE Executive Order")). The DOGE Executive Order does not mention addressing fraud, waste, or abuse as a DOGE goal.

"Almost immediately after" the Executive Order was issued, and in some instances the same day, Defendants granted DOGE affiliates unrestricted access to agency systems that contain PII for "millions of Americans," including Plaintiffs. JA656. These decisions were documented in the administrative record produced by each agency Defendant in the district court, which Defendants represent "contain the extant materials that informed or reflect each agency's decisionmaking as to systems access for DOGE affiliates, and . . . provide sufficient information for the Court to evaluate Defendants' decisions." JA706 n.23.

8

**Department of Education.**  On February 5, 2025, the Department of Education ("Education") issued a half-page memorandum that "documented the need to know and authorized [DOGE] personnel onboarded to the Department of Education DOGE team full and prompt access to all unclassified IT systems and data."  JA700 (quoting JA574).  Those systems and data "contain the PII of individuals who receive federal student aid, such as Social Security numbers and taxpayer identification numbers, . . . income and asset information, federal tax information, demographic information including marital and citizenship status, and family members' personal and financial information."  JA659.  The memorandum states that "access was granted to 'support the implementation of' the DOGE Executive Order," JA701 (quoting JA574), and does not identify any other purpose.

A week later, on February 12, Education and DOGE executed an agreement which states that DOGE affiliates[2] will use Education "data, information, and systems" for "IT modernization, the facilitation of E[ducation] operations, and the improvement of government efficiency."  JA552; *see* JA703.  The agreement does not explain why access to PII is necessary for these purposes.  JA704.

The administrative record also contains short job descriptions for the DOGE affiliates who were granted access.  Those descriptions encompass "duties that cover

---

[2] Although Defendants "represent[ed]" to the district court that "there are six DOGE affiliates at Education," the administrative record identifies only four.  JA660 & n.2.

9

a wide range of IT services, such as software engineering and programming," none of which suggest a need for access to PII. JA703–704 (citing JA550). "Education apparently did not contemplate limiting access to avoid the disclosure of PII," even though it can "mask[] PII with 'dummy' data" for at least some of its systems to which DOGE affiliates were given access. JA702.

**Office of Personnel Management.** On January 20, 2025, Office of Personnel Management ("OPM") Acting Director Charles Ezell requested, without explanation, that "several '[i]ndividuals from the [p]olitical [t]eam,'" including three DOGE affiliates, "be added to OPM systems as 'admins.'" JA663 (quoting JA604). "That same day, these individuals were given 'super user permissions' for USAJOBS administrative systems," which contain PII of federal job applicants. JA663 (quoting JA601).

On January 27, Ezell sent a second email requesting "[c]ode read and write permissions," "regular user" access, and "admin user" access for DOGE engineers for "all the systems OPM operates and manages." JA663 (quoting JA283–285). In his email, Ezell acknowledged that—despite his request for "[c]ode read and write permissions"—OPM "did not 'have any immediate plans for new engineers to make direct changes to any of these systems.'" JA707–708 (quoting JA284–285). OPM staff confirmed they provided three more DOGE affiliates with access to OPM's systems. JA707 (citing JA605–606). "The PII in these systems includes"

10

information of current and former federal employees, such as "Social Security numbers, names and addresses, dates of birth, citizenship statuses, salaries" and more. JA706. On February 6, OPM Chief Information Officer Gregory Hogan sent an email stating that DOGE affiliates "have never needed access" to certain OPM systems. JA708 (quoting JA282). The administrative record "does not contain any substantive job descriptions, scope of work details, or other information about the DOGE affiliates' responsibilities at OPM." JA709.

**Department of Treasury.** On January 24, 2025, the Department of Treasury ("Treasury") authored an "engagement plan for supporting" the "DOGE team during their 4-6 week engagement to understand payment processes and opportunities to advance payment integrity and fraud reduction goals." JA665 (quoting JA393). The engagement plan states that to advance those goals, Treasury will provide a DOGE technical team member "access to in scope payment systems *source code*" and "development access." JA665 (emphasis added). The payment systems covered by the engagement plan contain PII, such as Social Security numbers, addresses, and bank information, for applicants to federal programs, including Social Security and veterans' pay. JA710. The engagement plan does not explain why access to PII is needed for DOGE affiliates to understand or improve payment processes. JA711.

Two DOGE affiliates were provided access to Treasury's systems of records pursuant to the engagement plan: Thomas Krause and Marko Elez. JA665, JA711,

11

JA713.  Krause was provided over-the-shoulder access in his capacity as Senior Advisor for Technology and Modernization.  JA711 (citing JA343, JA351, JA360). Treasury's documents reflect that Krause's job duties "center on technology modernization and innovation."  JA711.  Treasury's documents show that Elez was provided access in his capacity as Special Advisor for Information Technology and Modernization.  JA713 (citing JA340, JA358).  The Special Advisor is responsible for advising on "engineering, software, hardware, systems, and other technology matters."  JA713.  Elez later resigned, and a third DOGE affiliate, Ryan Wunderly, was hired in February to replace him with identical levels of access.  JA665 & n.4, JA713.  After Elez resigned, forensic analysis of his devices revealed that he had emailed "a spreadsheet containing PII to two United States General Services Administration officials."  JA653.  Treasury did not redact any PII in its systems before providing Krause and Elez with access, although it is capable of doing so. JA712–713.  In late March, a Treasury official represented there would be "future DOGE Team Treasury members."  JA654.

Nothing in Defendants' collective administrative records resembles the documentation that is required for disclosures made pursuant to the Privacy Act's routine use exception.  JA715 n.27.

### C.     Procedural Background

1.     Plaintiffs entrusted their confidential records to Defendant agencies when they obtained federal employment and served in the military, and in order to access government benefits and financial aid.  *See, e.g.*, JA70.  Plaintiffs "expected that the data would be used to facilitate [their] access to these services and only for legally authorized purposes."  JA80.  They also "expected that the government would zealously safeguard access to [their] information," as the Privacy Act requires.  JA80.  They did not provide written consent to the disclosure of their PII to DOGE affiliates.

Plaintiffs were unaware of Defendants' decisions to grant DOGE affiliates access until those decisions were  publicly reported.   The reports were deeply troubling.  They indicated, for example, that DOGE affiliates were granted access to Treasury's systems and the PII contained within over the objections of the Acting Secretary of the Treasury, a career civil servant who was placed on administrative leave following President Trump's inauguration.  JA41.  They noted that "access is usually very restricted," with even "White House requests" for data being rebuffed.  JA58.  And they stated that the level of access DOGE affiliates received was highly unusual and created an unprecedented insider threat risk.  JA53, JA59–60.

Plaintiffs promptly filed a complaint asking the district court to set aside under the APA Defendants' decisions to make those disclosures.  JA61–63.  Plaintiffs

13

requested a temporary restraining order to prevent Defendants from continuing to provide DOGE affiliates with access to Plaintiffs' PII.

2.    On February 24, 2025, following briefing and a lengthy hearing, the district court granted in part Plaintiffs' motion for a temporary restraining order and enjoined Education and OPM from providing DOGE affiliates with access to Plaintiffs' PII.  JA217–218.  (The court did not enjoin Treasury, which was the subject of a preliminary injunction issued by a different district court.  JA218 n.1.) The court ordered Defendants to produce administrative records, which they did. JA249, JA579.

3.    On March 24, 2025,  following briefing and another lengthy hearing, the district court issued a 68-page memorandum opinion and order granting a preliminary injunction.  JA656–723.

Applying this Court's decision in *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022), as well as the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), the district court first concluded that Plaintiffs had "made a clear showing that they are likely to establish a concrete injury in fact" for Article III standing.  JA670–671.  There was "injury" in "the ongoing access to [Plaintiffs'] sensitive personal information by unauthorized government personnel," and that injury went beyond "mere access."  JA671, JA680.  The court emphasized

14

Defendants' position that the DOGE affiliates "have a *need* for the records," and so "the DOGE affiliates must be putting that access to use."  JA679.

The district court next addressed an issue Defendants raised for the first time at the preliminary injunction stage: that their decisions to grant DOGE affiliates access to Plaintiffs' PII were not "agency actions" reviewable under the APA. Noting that "agency action" is a comprehensive term in the APA, the court concluded that Defendants' decisions easily qualified as "agency actions."  JA685. The court also ruled that those "agency actions" were "final," because Defendants' decisions clearly determined Plaintiffs' and Defendants' rights and obligations under the Privacy Act and had "legal effect."  JA687–689.  Finally, applying this Court's decision in *Doe v. Chao*, 435 F.3d 492 (4th Cir. 2006), the district court rejected Defendants' argument that the APA does not provide a cause of action.  JA695.

The district court then turned to the preliminary injunction factors.

*First*, the district court concluded that Plaintiffs "have shown a likelihood of success on the merits of their APA claim that Education, OPM, and Treasury took final agency actions 'not in accordance with law'" by violating the Privacy Act. JA695 (quoting 5 U.S.C. § 706(2)(A)).  Defendants relied on only two potential exceptions to justify their decisions to disclose Plaintiffs' PII without first obtaining written consent: (1) the need-to-know exception; and (2) the routine use exception. JA697, JA715 n.27.

As to the need-to-know exception, the district court rejected Defendants' attempts to retroactively justify their access decisions as necessary to audit programs for waste, fraud, or abuse—a justification the district court observed "appears to be created out of whole cloth." JA704. The court found that the only "purpose" identified in Education's and Treasury's records that could possibly support granting DOGE affiliates access to Defendants' systems was to "modernize technology and software." JA701–705, JA711. But nothing in the records explained *why* the DOGE affiliates at Education and Treasury "need access to the plaintiffs' PII" to modernize software or technology. JA699, JA704. The court also noted various job descriptions for the DOGE affiliates at Education and Treasury, none of which explained why the affiliates needed access to PII. JA704. As to OPM, the court found that its administrative record failed to identify any purpose for granting access at all—and in fact affirmatively showed that access was granted *without* a need. JA707–708. The court concluded that Defendants' decisions likely could not be justified under the need-to-know exception. JA715–716.

The district court decided that Defendants likely could not rely on the routine use exception because the administrative records were devoid of the documentation that the Privacy Act mandates for disclosures made pursuant to that exception. JA715 n.27. Therefore, "[t]he government's invocation of the routine use exception

16

appears to be an after-the-fact attempt to fit the disclosures into an exception." JA715 n.27.

*Second*, the district court determined that Plaintiffs had shown irreparable harm. It reasoned that DOGE affiliates had been granted access to Plaintiffs' PII, and "without an injunction, the DOGE affiliates' access to this trove of personal information will continue." JA717. The court held that this harm was irreparable based on decisions from other courts that "the continuing unlawful disclosure of sensitive personal information is irreparable harm." JA717.

*Third*, the district court concluded that the balance of the equities and public interest favored a preliminary injunction. JA720. The injunction would not "prevent the President from effectuating the administration's policies" because there was no showing that DOGE affiliates needed Plaintiffs' PII to do their jobs. JA721.

The district court enjoined Defendants from disclosing Plaintiffs' PII to DOGE affiliates, which the court "defined as individuals whose principal role is to implement the DOGE agenda as described in [the DOGE Executive Order] and who were granted access to agency systems of records for the principal purpose of implementing that agenda." JA724–725.

4.      Defendants sought, and a divided panel of this Court granted, a stay pending appeal. Order at 2. Judge King requested a poll of the Court to grant initial

hearing en banc on Defendants' motion to stay pending appeal. *Id.* The Court denied initial hearing en banc by an 8-7 vote. *Id.*

Judge Agee, joined by Judge Richardson, explained in a concurrence his view that Defendants had made a strong showing that they will prevail on their argument that Plaintiffs lack standing. *Id.* at 6.

Judge Richardson, in a separate concurrence joined by Judge Agee, expressed his view that the presence of multiple issues in this case meant Plaintiffs' chances of success are "inherently lower[]," even if Plaintiffs have shown a strong likelihood of success on "any one issue"—or indeed, all of them. *Id.* at 8 & n.2. Judge Richardson then ran through several issues presenting "hurdles" for Plaintiffs. *Id.* at 12.

Judge King, joined by five other judges, dissented from the denial of initial hearing en banc. *Id.* at 17 (King, J., dissenting). Judge King believed "the district court got things right," including because "there is ample evidence that the defendants have disclosed the plaintiffs' sensitive personal information to DOGE affiliates" and that the administrative records "fail to substantiate the purported 'need to know.'" *Id.* at 20–21. Judge King explained that Plaintiffs had identified a "compelling basis" for standing and that "the harm engendered by the disclosure of the plaintiffs' sensitive private information is irreparable." *Id.* at 21–22.

Judge Berner also dissented, noting that the stay of the district court's "thorough and well-reasoned ruling" "place[s] at risk the privacy of these veterans and public service workers" and ensures that "the plaintiffs will already have suffered irreparable harm" even if they "ultimately prevail." *Id.* at 24–25.

## SUMMARY OF ARGUMENT

I.      The district court did not abuse its discretion in concluding that Plaintiffs are likely to succeed on the merits of their APA claims.

A.      This Court already held that an injury indistinguishable from Plaintiffs' was sufficiently concrete for standing in *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022).  As in *Garey*, Plaintiffs' injury is an invasion of privacy in the form of Defendants' intrusion upon their personal information for purposes not authorized by law.  Indeed, Plaintiffs' injury is analogous to the common law tort of intrusion upon seclusion, which is all Article III requires.

Plaintiffs' claim is also reviewable under the APA.  *Contra* Defendants, their decisions to grant DOGE affiliates access to Plaintiffs' PII are "final agency actions" that the Court may review.  Numerous courts have held that government decisions to disclose records under the Privacy Act and a highly similar statute are "agency actions" and "final."  And Defendants' assertion that the APA does not provide Plaintiffs with a cause of action to seek equitable relief for violations of the Privacy

Act runs straight into this Court's own precedent in *Doe v. Chao*, 435 F.3d 492 (4th Cir. 2006).

B.    Defendants' insistence that they did not violate the Privacy Act is based on post-hoc legal arguments that are wholly untethered from the record. Defendants have represented that the administrative records contain the full set of materials informing or reflecting their decisions to grant DOGE affiliates access to Plaintiffs' PII, but those records contain *no evidence* that Defendants granted access for any use of PII permitted by the Privacy Act. It is exceedingly likely Plaintiffs will prevail in showing violations of the Act.

II.    The district court did not abuse its discretion in concluding that, absent a preliminary injunction, Plaintiffs will likely suffer irreparable harm. Defendants granted DOGE affiliates access to Plaintiffs' PII, and that access is likely to continue. Further, without a preliminary injunction, at least some of the agency systems that DOGE affiliates have access to are likely to be updated with new PII belonging to Plaintiffs, and additional DOGE affiliates are likely to be granted access to PII. The harm to Plaintiffs' privacy interests cannot be redressed by damages, which are both difficult to calculate for this type of injury and extremely limited under the Privacy Act.

III.    The district court did not abuse its discretion in concluding that the balance of the equities and the public interest favor a preliminary injunction.

Plaintiffs are likely to succeed in showing that Defendants violated the Privacy Act, and it is well-established that a preliminary injunction to stop likely unlawful activity serves the public interest. Defendants have not provided any substantiation for their argument that an injunction will impede the DOGE goals identified by the President and thereby harm the public interest.

**STANDARD OF REVIEW**

To obtain a preliminary injunction, plaintiffs must establish that they are "likely to succeed on the merits"; that they are "likely to suffer irreparable harm in the absence of preliminary relief"; that the "balance of equities tip" in their favor; and that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). This Court reviews the "entry of a preliminary injunction for abuse of discretion, accepting the [district] court's findings of fact absent clear error, but reviewing its conclusions of law *de novo*." *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 696 (4th Cir. 2019) (internal quotations and citation omitted). This Court may not "disturb[]" the entry of a preliminary injunction "unless the record shows an abuse of [the district court's] discretion, regardless of whether the appellate court would, in the first instance, have decided the matter differently." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc) (citation omitted).

# ARGUMENT

## I.　The District Court Properly Ruled that Plaintiffs Are Likely To Succeed on the Merits of Their APA Claims

### A.　Plaintiffs Are Likely To Establish Standing

1.　Article III requires that a "plaintiff's injury in fact be 'concrete'" for standing. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citation omitted). Intangible harms are concrete if they bear "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425. There need not be "an exact duplicate"; the inquiry is "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* at 424. "[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). "Congress may 'elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law.'" *TransUnion*, 594 U.S. at 424 (quoting *Spokeo*, 578 U.S. at 341).

This Court applied these principles in *Garey v. James S. Farrin, P.C.*, 35 F.4th 917 (4th Cir. 2022). In *Garey*, plaintiffs sued under the Driver's Privacy Protection Act ("DPPA") after personal injury lawyers obtained vehicular accident reports containing plaintiffs' names and addresses. *Id.* at 920. The DPPA provides a cause of action against any person "who knowingly obtains . . . personal information, from

22

a motor vehicle record, for a purpose not permitted under this chapter." *Id.* (quoting 18 U.S.C. § 2724(a)).  The Court held that plaintiffs had suffered an injury sufficient for standing.   Critically, that injury was having their "privacy invaded by Defendants' *knowingly obtaining [plaintiffs'] name and address* from a motor vehicle record *for an impermissible purpose in violation of law*."  *Id.* at 922 (emphases added).

*Garey* is dispositive, as the district court rightly concluded.  JA673–675.  As in *Garey*, DOGE affiliates intruded on Plaintiffs' personal information "for an impermissible purpose in violation of law." 35 F.4th at 922.  Defendants granted DOGE affiliates access to Plaintiffs' PII, and the administrative records contain *no* evidence that this was for a use permitted by the Privacy Act.  *See infra*, pp. 39–49.  Plaintiffs are likely to establish an injury indistinguishable from the one that *Garey* held was sufficiently concrete for standing:   intrusion upon their personal information, in which they have a strong privacy interest, for impermissible purposes.

*Garey*'s reasoning fits this case hand-to-glove.  As in *Garey*, Plaintiff's injury can be analogized to "common law privacy torts," which guard against invasions of privacy.  35 F.4th at 922.  Indeed, the Supreme Court has recognized that the Privacy Act "serves interests similar to those protected" by "privacy torts," and "there is good reason to infer that Congress relied upon those torts in drafting the Act."

*Cooper*, 566 U.S. at 295. No more is required; this Court does not demand an examination of "the elements" of any "common law tort[], piece by piece," to determine whether an injury is concrete. *Garey*, 35 F.4th at 922 (quoting *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653 (4th Cir. 2019)). Further, just like the DPPA in *Garey*, there can be no question that the Privacy Act protects the privacy right "to be let alone." *Id.* (citation omitted); *see* Source Book at 803 (referring to the "right 'to be let alone'").[3]

Defendants argue that *Garey* ruled plaintiffs' injury was concrete because the lawyers not only obtained their information but also used it to send mailings to their homes. Op.Br.33–34. That is incorrect. The *Garey* Court explained that while one set of plaintiffs had argued that the DPPA was violated by the lawyers both *obtaining* and *using* their information, the other set of plaintiffs had chosen to "focus[] 'only [on] the Defendants' *obtaining* of Plaintiffs' personal information.'" *Id.* at 923. The Court determined that *all* plaintiffs had asserted a concrete injury. *Id.* at 922. In so

---

[3] Other Circuits are in accord with *Garey*. As the Ninth Circuit explained, "[w]hen a third party obtains [a] consumer's credit report in violation of" federal statute— "that is, for a purpose not authorized by statute—the consumer is harmed because he or she is deprived of the right to keep private the sensitive information about his or her person." *Nayab v. Capital One Bank (USA), N.A.*, 942 F.3d 480, 491–92 (9th Cir. 2019). That harm suffices for standing, *regardless of whether the personal information is* "used by [the] third party." *Id.* at 493; *see also, e.g., Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 286 (2d Cir. 2023); *In re Horizon Healthcare Servs., Inc. Data Breach Litig.*, 846 F.3d 625, 638–39 (3d Cir. 2017); *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1193 (7th Cir. 2021).

ruling, it must have relied on the injury of *obtaining* personal information—the only injury common to all plaintiffs.

Defendants ignore all of this and rely instead on *Garey*'s passing description of plaintiffs' challenge as "nearly identical" to that in another case, *Krakauer*, 925 F.3d 643, which involved an intrusion into the home. Op.Br.34. Defendants extrapolate that *Garey* must therefore have been concerned with the mailings sent to plaintiffs' homes. Defendants' reading of *Garey* does not withstand scrutiny. *Garey* clarified that what it meant by "nearly identical" is that just as in *Krakauer*, the *Garey* plaintiffs had standing because they asserted a privacy injury; common law torts protect harms to privacy; and the statute plaintiffs sued under was designed to protect privacy interests. *See* 35 F.4th at 922. All of that reasoning applies with full force to this case.

Bereft of support from this Court's precedent, Defendants cite only one case in an attempt to buttress their position. Defendants analogize to *TransUnion*'s ruling that the mere *maintenance* of inaccurate information about plaintiffs in a company's files was insufficient for standing. Op.Br.26. Plaintiffs' injury is completely different: *disclosure* of their personal information for purposes unauthorized by the Privacy Act.[4]

---

[4] In another section of their brief, Op.Br.40, Defendants cite *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236 (11th Cir. 2022). That decision is

2.    Defendants' primary argument is that Plaintiffs' injury is not concrete because it is not sufficiently analogous to the common law tort of intrusion upon seclusion.  If the Court addresses this issue, *but see Garey*, 35 F.4th at 922 (declining to dissect "the elements of" individual "common law torts, piece by piece" (citation omitted)), it should reject Defendants' position.

a.    Intrusion upon seclusion occurs where there is an "intentional[] intru[sion], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, . . . if the intrusion would be highly offensive to a reasonable person."   Restatement (Second) Torts § 652B (Am. Law Inst. 1977). Plaintiffs are likely to be able to show that their injury is analogous to intrusion upon seclusion.  *See Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021) (unauthorized access to personal information analogous to intrusion upon seclusion). Plaintiffs entrusted their highly personal information to the government reasonably expecting that it would be kept private and used only for authorized purposes.  *See supra*, p. 13.  It is likely that Defendants granted DOGE affiliates access to Plaintiffs' personal information for purposes unauthorized by the Privacy Act, *see infra*, pp.

---

unpersuasive. *See id.* at 1267 (Newsom, J., dissenting) ("[T]oday's majority" places "this Court on the short side of . . . a 7-1 circuit split.").   In any event, it is distinguishable.  *Hunstein* rejected standing because the plaintiff's injury was not analogous enough to the tort of public disclosure. *Id.* at 1245.  Any analogy here is to intrusion upon seclusion.

39–49, thereby offensively intruding on Plaintiffs' reasonable expectation of privacy.

b.      Defendants first object that intrusion upon seclusion requires "an intrusion into an individual's private space," Op.Br.29 (quoting Order at 5 (Agee, J., concurring)), and here DOGE affiliates have access to agency systems but "may not ever even view a particular plaintiff's 'one row' of information," Op.Br.30 (quoting Order at 11 (Richardson, J., concurring)).  That argument misapprehends the facts. The district court found—based on extensive hearings and review of the administrative records—that DOGE affiliates "are accessing *and examining* the records containing [Plaintiffs'] personal information."  JA680 (emphasis added). Defendants make no attempt to show that this factual finding is clearly erroneous. *See Planned Parenthood S. Atl.*, 941 F.3d at 696.

Defendants' argument is also legally erroneous.  Numerous courts have ruled that intrusion upon seclusion merely requires access to a private "space"; it does not require that any sight, knowledge, information, or anything else be gleaned as a result of that access.  *See* Eli A. Meltz, *No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham L. Rev. 3431, 3454–58 (2015) (discussing cases).  Personal information is a private "space," as "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."  *U.S. Dep't of Just.*

*v. Reporters Comm.*, 489 U.S. 749, 763 (1989).  Plaintiffs' injury arises from access to that private "space" and is thus analogous to intrusion upon seclusion.  Even if the tort required more (it does not), that would not matter.  All *TransUnion* requires is an *analogy* to the common law, and the fact that multiple courts have found the elements of intrusion upon seclusion *actually satisfied* by access alone proves that there is such an analogy.

c.    Defendants' next argument—that there is no intrusion upon seclusion because "plaintiffs provided their information to the government," and "agency employees can and do regularly access their personal information," Op.Br.31–32— fares no better.  That a handful of *other* agency employees may have access to Plaintiffs' information for *lawful* purposes does not change the fact that Plaintiffs are likely to establish that the DOGE affiliates were granted access to their information for *unlawful* purposes, *see infra*, pp. 39–49—which is an injury analogous to intrusion upon seclusion.[5]

Intrusion upon seclusion requires a "reasonable and actual expectation of privacy" in the "place" intruded upon.  Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 580 (2d ed.).  When an individual voluntarily provides

---

[5] Defendants also attempt to argue that other agency employees use Plaintiffs' personal information "to perform the types of activities that the agency DOGE team members plan to undertake."  Op.Br.31.  As discussed below, Plaintiffs are likely to succeed in showing that Defendants granted DOGE affiliates access to PII for purposes not authorized by the Privacy Act.  *See infra*, pp. 39–49.

personal information to an entity like the government, the individual may nonetheless maintain an expectation of privacy, including that the information will only be used by the entity in certain ways and will otherwise remain private. *See U.S. Dep't of Just.*, 489 U.S. at 763–74 (information is "private" if it is "intended for or restricted to the use of a particular person or group or class of persons" (citation omitted)); *Rice v. Wal-Mart Stores, Inc.*, 2003 WL 22240349, at *3 (D. N.H. Sept. 30, 2003) ("Simply because plaintiffs voluntarily provided Wal-Mart with confidential information does not permit Wal-Mart to use that information however it desires without potentially intruding upon the privacy rights of its employees.").

Because of the Privacy Act, Plaintiffs had reasonable expectations that the federal government would not disclose their PII for unauthorized purposes. *See* 5 U.S.C. § 522a(b); *Hunter v. SEC*, 879 F. Supp. 494, 499 (E.D. Pa. 1995) (Act "creates legitimate limited privacy expectation[s]"); Source Book at v (Act "secur[es] for each citizen" the "right of privacy with respect to confidential information held by the Federal Government"). Defendants' likely violation of those expectations is an intrusion on Plaintiffs' private concerns, like the common law tort addresses. *See, e.g.*, *Perez-Denison v. Kaiser Found. Health Plan of the Nw.*, 868 F. Supp. 2d 1065, 1089–90 (D. Or. 2012) (unauthorized access of plaintiff's records, despite access being authorized for certain other purposes, was an intrusion upon

private matters); *Curry v. Schletter*, 2018 WL 1472485, at \*5 (W.D.N.C. Mar. 26, 2018) (similar).

d.     Defendants argue in passing that the "highly offensive to a reasonable person" element of intrusion upon seclusion is not met here.  Op.Br.29–30.  But judge after judge has agreed that DOGE affiliates' access to sensitive information is "highly offensive."  *See All. For Retired Ams. v. Bessent*, 2025 WL 740401, at \*17 (D.D.C. Mar. 7, 2025); *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. SSA*, 2025 WL 868953, at \*43 (D. Md. Mar. 20, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. OPM*, 2025 WL 996542, at \*6 (S.D.N.Y. Apr. 3, 2025).  And, again, the standing inquiry is not whether the elements of the common law tort are *actually satisfied*, but whether there is an *analogy* to the tort.  Here, Plaintiffs' likely injury—that DOGE affiliates accessed their personal information for purposes not allowed by the Privacy Act—is at minimum offensive to some extent.  That suffices.  *See Drazen v. Pinto*, 74 F.4th 1336, 1345 (11th Cir. 2023) (asking whether the injury was "offensive to some degree to a reasonable person" in assessing standing); *Persinger*, 20 F.4th at 1192 n.3 (similar); *see also Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (inquiry is whether injury relates "in kind, not degree" to common law tort).

**B.     Plaintiffs Are Likely to Succeed in Showing that Defendants' Decisions Were Final Agency Actions**

The APA provides for review of "final agency action." 5 U.S.C. § 704. Despite the fact that courts routinely review APA claims regarding the federal government's disclosure of records, Defendants contend that there is no "agency action" here, and that even if there is, it is not "final." Op.Br.35–41. They are wrong.

1.    "'[A]gency action' includes . . . an agency rule [or] order," 5 U.S.C. § 551(13), and defines both "rule" and "order" broadly.[6] The Supreme Court has explained that "agency action" in the APA "cover[s] comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). This Court has similarly stated that "agency action" broadly "focuses on an agency's *determination* of rights and obligations," "whether by rule, order, . . . or similar action." *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013).

An agency's decision to disclose records is such a "*determination*," *id.*, as numerous courts have recognized. The D.C. Circuit concluded that "agency action" under the APA covers the government's "disclosure of [a person's] psychiatric records" made pursuant to the Privacy Act. *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988). And the Supreme Court concluded in *Chrysler Corp. v. Brown*,

---

[6] *Id.* § 551(4) ("rule" means "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency"); *id.* § 551(6) ("order" means "a final disposition").

441 U.S. 281 (1979), that the government's decision to disclose records under the Freedom of Information Act ("FOIA") was "reviewable agency action." *Id.* at 317−18; *see also, e.g.*, *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 969 (8th Cir. 2016) (same); *Jurewicz v. U.S. Dep't of Agric.*, 891 F. Supp. 2d 147, 151 (D.D.C. 2012) (same). That *Chrysler* involved FOIA instead of the Privacy Act is immaterial: what matters for purposes of determining whether "agency action" exists is the *substance* of the agency's act, and the substance here—the government's disclosure of records—is the same across both statutes. *Cf. Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 78 (D.C. Cir. 1982) (Privacy Act and FOIA "substantially overlap").

Here, Defendants made the determination to grant DOGE affiliates access to agency systems containing Plaintiffs' PII. Each grant was an "order"—a "final disposition," 5 U.S.C. § 551(6)—because it disposed of the matter of DOGE affiliates gaining access to systems. Each grant was also a "rule"—a "statement of . . . particular applicability and future effect designed to implement . . . policy," *id.* § 551(4)—because it implemented a "policy" to "grant DOGE affiliates access to agency record systems so that they may implement the DOGE Executive Order." JA684.

Defendants' sole substantive argument addresses an irrelevant strawman. They contend that Plaintiffs are asking the Court to review "work-a-day internal

decisions," Op.Br.38, and point to cases finding no agency action where plaintiffs essentially ask the judiciary to inject itself "into day-to-day agency management," *Vill. of Bald Head Island*, 714 F.3d at 194 (citation omitted), such as by intervening "to improve an agency's performance or operations" writ large, Op.Br.37 (quoting *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019)). But Plaintiffs do not ask the Court to monitor Defendants' actions or improve their operations. Rather, they challenge Defendants' decisions to grant access— quintessential "discrete agency action" that courts regularly review and set aside under the APA. *Vill. of Bald Head Island*, 714 F.3d at 194; *see also Jurewicz*, 891 F. Supp. 2d at 151 ("[d]ecisions to disclose information" are "in the nature of informal adjudications, and as such are reviewable" under the APA (internal quotations and citation omitted)).

Lacking law to support their position, Defendants resort to a slippery-slope argument. They assert that if their decisions to grant access are reviewable agency actions, then "virtually every aspect of an agency's relationship with its employees" will become reviewable overnight. Op.Br.37–38. That argument rests on the demonstrably untrue assumption that the decision to "grant DOGE affiliates access to records with the PII of millions of Americans," JA687, is indistinguishable from tasks such as opening an email account for a new employee or staffing an employee on a particular issue. Unlike Defendants' examples, an agency's decision to disclose

sensitive personal records is strictly circumscribed by a federal statute—the Privacy Act—that provides standards for a court assessing whether the agency's action was proper. *See* 5 U.S.C. § 701(a)(2) (no review of action "committed to agency discretion by law").

2.    Defendants' decisions to grant access were also "final." Agency action is "final" when it is an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation omitted).

Defendants' actions fit that bill. *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), is instructive. There, a company sued the EEOC over a "policy" that "allows the agency to release documents that the submitting party has identified as containing trade secrets and/or confidential material without first notifying the submitting party." *Id.* at 929. The company contended that this policy of disclosure without notification "violate[d] the Trade Secrets Act" and the EEOC's "regulations." *Id.* at 931. The D.C. Circuit concluded that EEOC's adoption of the policy was a final action because it determined the "rights" of the "submitter[]" (*i.e.*, that it had no right under the Trade Secrets Act and the EEOC's regulations not to have material disclosed without notice), as well as the "obligations" of the "agency[]" (*i.e.*, that the agency had no obligation to notify the company of disclosure). *Id.*

34

*Venetian*'s reasoning applies here.  Under the Privacy Act, Plaintiffs have a statutory right not to have their PII disclosed without their written consent, unless it will be used for certain purposes specified by the Act.  *See supra*, pp. 7–8.  Even on Defendants' telling—that this right is not applicable because the PII was disclosed for purposes permitted by the Act, Op.Br.44—Defendants plainly *made a determination about the right*.  *See* JA689.  So it is simply not the case that Defendants' decisions had no "direct and appreciable legal consequences" for Plaintiffs.  Op.Br.40 (citation omitted).  In addition, Defendants' disclosure decisions affected agency obligations, because they determined the agencies had no obligation to seek written consent from Plaintiffs before disclosing their PII.

Defendants attempt to distinguish *Venetian* on the basis that the government's policy in that case concerned the disclosure of confidential information to third parties rather than to government employees, and such disclosures "can have direct and immediate consequences for plaintiffs."  Op.Br.40.  But the identity of the person to whom the records could be disclosed under the policy was immaterial to the D.C. Circuit's analysis.  As *Venetian* explained, it was adoption of the "policy of permitting employees to disclose confidential information without notice"—full stop—that constituted final agency action.  530 F.3d at 927.  So too, here.

**C.     Plaintiffs Are Likely to Succeed in Showing that the APA Provides a Cause of Action**

Unable to show that review is unavailable under the APA, Defendants resort to yet another untenable assertion: that the APA does not provide Plaintiffs with a cause of action for injunctive and declaratory relief. Op.Br.41–43. The APA permits plaintiffs to seek injunctive and declaratory relief to redress unlawful agency action. 5 U.S.C. § 706. That is no less true of plaintiffs alleging violations of the Privacy Act—as this Court, the Supreme Court, and other courts have uniformly recognized.

1.      In *Doe v. Chao*, this Court explained that the APA enables plaintiffs to sue for prospective relief for violations of the Privacy Act. 435 F.3d 492 (4th Cir. 2006). The Court began by stating that the Privacy Act generally precludes "declaratory and injunctive relief," such that the only available remedy under the Act itself is "monetary relief." *Id.* at 504. Critically, this Court specifically *rejected* the notion that "the Government may not be enjoined from violating the Privacy Act." *Id.* at 504 n.17. Instead, the Court explained that even though "such relief is not authorized by the Privacy Act, *standing alone*," "injunctive relief for a Government's violation of the Act" will be "appropriate and authorized *by the APA*." *Id.* (emphases added).

The Supreme Court has also suggested that plaintiffs can seek equitable relief for violations of the Privacy Act under the APA. The Supreme Court explained in *Doe v. Chao* that the Privacy Act "says nothing about standards of proof governing

36

equitable relief" because of the "general provisions for equitable relief within *the Administrative Procedure Act*." 540 U.S. 614, 619 n.1 (2004) (emphasis added). It then approvingly noted that the district court in that case had "relied on *the APA* in determining that it had jurisdiction to enforce" equitable relief. *Id.* (emphasis added).

In line with this Court and the Supreme Court, every court to have addressed this issue has concluded that plaintiffs may sue under the APA to enjoin violations of the Privacy Act. *See, e.g.*, *Stephens*, 851 F.2d at 1466; *Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077, 1097 (N.D. Cal. 2018); *Doe v. Herman*, 1998 WL 34194937, at *6 (W.D. Va. Mar. 18, 1998). Defendants do not cite *any* authority to the contrary.

2.      Defendants instead urge this Court not to follow its decision in *Chao*, 435 F.3d 492—and thus to depart from the clear consensus of the courts. Op.Br.43. Defendants incorrectly argue that because damages are available for Privacy Act violations, Plaintiffs have an "adequate remedy" under the Act and therefore cannot sue for prospective relief under the APA. Op.Br.42.

Under the APA, agency action is not "subject to judicial review" if another "adequate remedy in a court" exists. 5 U.S.C. § 704. To invoke this narrow exception, Defendants must show that the alternative remedy "offer[s] the same genre of relief" that the APA would provide. *Fort Bend Cnty. v. U.S. Army Corps*

*of Eng'rs*, 59 F.4th 180, 192 (5th Cir. 2023) (citation omitted).  Defendants must also identify "'clear and convincing' evidence of 'legislative intent' to create a special, alternative remedy and thereby bar APA review."  *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Just.*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) (citation omitted).

Defendants do not even attempt to make such a showing, nor could they.  The monetary relief offered by the Privacy Act is manifestly different from the injunctive and declaratory relief Plaintiffs seek under the Privacy Act.  *See id.* at 1246 (noting that the Supreme Court has "rejected an alternative remedy that offered only monetary relief as an inadequate substitute for the 'general equitable powers of a district court'" (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988))).  And all evidence indicates that Congress intended to *permit* APA review, not bar it.  In the Privacy Act, Congress ordered the Office of Management and Budget ("OMB") to "prescribe guidelines" for implementing the Act.  5 U.S.C. § 552a(v)(1).  The OMB Guidelines, published soon after, specifically state that plaintiffs can "seek judicial review under . . . the Administrative Procedure Act" for violations of the Privacy Act*.*  40 Fed. Reg. 28948, 28968 (July 9, 1975).  The OMB Guidelines were then incorporated by the Senate into the "Legislative History of the Privacy Act of 1974," which "bring[s] together in one publication the legislative history" of the Act.  Source Book at v.  The OMB Guidelines thus reflect what Congress intended to

achieve, *see, e.g.*, *Kalmin v. Dep't of Navy*, 605 F. Supp. 1492, 1495 (D.D.C. 1985), and they are explicit that Congress wanted plaintiffs to be able to seek judicial review under the APA.

*    *    *

The upshot of Defendants' arguments about standing and the APA is that no plaintiff can sue the federal government to enjoin it from disclosing their information to others inside the government in violation of the Privacy Act—no matter how sensitive the information, how widely it is disseminated within the government, and for what purpose it is disseminated, even a flagrantly unlawful one.  Courts would be "powerless to prevent an agency from systematically running roughshod over the rights the [Privacy] Act was promulgated to protect." *Herman*, 1998 WL 34194937, at \*6.  The Congress that passed the Act would be shocked at this development. *See* Source Book at 156 (envisioning that "any aggrieved person" would be able "to enjoin violations or threatened violations of the Act").  This Court should decline Defendants' invitation to dismantle the privacy protections that Congress so carefully wrote into law to protect everyday Americans from governmental abuse of their personal information.

### D.  Plaintiffs Are Likely to Succeed in Showing that No Privacy Act Exception Permitted Disclosure of Their Records

Plaintiffs are likely to succeed in showing that Defendants violated the Privacy Act and that their actions were therefore "not in accordance with law."  5

39

U.S.C. § 706(2)(A).  Defendants assert that their disclosures were lawful under the Act's (1) need-to-know exception, and (2) routine use exception, but it is likely that neither applies here.

1.    The Privacy Act permits disclosure without written consent where an agency employee has "a need for the record in the performance of their duties."  *Id.* § 552a(b)(1).[7]  Defendants do not contest that the "need-to-know exception" applies only when the agency employee *requires* access to the relevant record in the performance of their duties.  Op.Br.45–46; *see, e.g.*, *Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000) (asking whether the official "had to" examine the record "in order to perform those duties properly").  This demanding standard effectuates Congress's intent to make the "restrictions on the transfer of individually-identifiable data as strong as they can be without impairing the ability of government agencies to perform their duties."  Source Book at 307.

a.    It is likely that DOGE affiliates did not require access to troves of PII to perform their job duties.  In evaluating that question, this Court's review is

---

[7] The need-to-know exception applies only to disclosures to *agency employees*.  The district court assumed without deciding that all DOGE affiliates are employees of the agency that disclosed records to them, as Defendants argued.  JA697.  Plaintiffs make the same assumption for purposes of this appeal, but preserve the argument that at least some of the DOGE affiliates are not employees of the relevant agency.

confined to the administrative records produced by Defendants.  5 U.S.C. § 706.[8]

The district court correctly found that nothing in those records shows why DOGE

affiliates require access to the PII in agency systems for their jobs.

**Education**.  The administrative record contains a February 5, 2025

memorandum, which purported to "document[] the need to know and authorize[]

[DOGE] personnel onboarded to the Department of Education DOGE team full and

prompt access to *all* unclassified IT systems and data."  JA574 (emphasis added).

The memorandum stated that access "support[s] the implementation of" the DOGE

Executive Order.  JA574.  The district court found that neither the memorandum

itself "nor the DOGE Executive Order to which the memorandum refers explains

why DOGE affiliates need to know the information in Education's records to

perform their jobs."  JA703.  The court further found that even if "DOGE

affiliates . . . need some form of system access to modernize technology and

software, . . . that does not mean that they need access to all of the records containing

PII housed in those systems."  JA702.

---

[8] Defendants represent that the records contain all materials that "that informed or
reflect each agency's decisionmaking as to systems access for DOGE affiliates,
and . . . provide sufficient information for the Court to evaluate Defendants'
decisions."  JA706 n.23.  There is thus no need for "[m]ore record evidence . . . to
answer whether the need-for-the-record provision of the Privacy Act applies."  Order
at 14 (Richardson, J., concurring).

The district court also reviewed descriptions of DOGE affiliates' job duties contained in the administrative record and found that "[n]one of these myriad job duties explain why the person performing them has a need for records with PII contained within Education's systems." JA704.

**OPM**.  The district court's review of the OPM administrative record centered on emails from Acting Director Ezell granting access to DOGE affiliates.  The court found that "none of the emails explains the DOGE affiliates' need to access the records contained within these systems." JA707.  In fact, "the emails suggest some [DOGE affiliates] do *not* have a need to know." JA708 (emphasis added).  For example, Ezell "granted sweeping access," including "code read and write permissions," while simultaneously acknowledging there were no "immediate plans" to change any of the systems.  JA707–708.  And after Ezell granted access, another OPM official wrote in an email that some DOGE affiliates "have *never needed access*" to certain agency systems.  JA708 (emphasis added).

The district court then reviewed other parts of the administrative record, such as "employment forms" for DOGE affiliates.  JA709.  At best, these forms provided "only meager clues" as to DOGE affiliates' "roles at OPM."  JA709.  And nothing else in the record "justif[ied] OPM's disclosure."  JA709.

Finally, the district court found that there is no "record evidence that explains *why* a directive to modernize technology requires access to the extensive PII housed within OPM's systems." JA709.

**Treasury**. The district court found that the Treasury administrative record likewise fails to "reveal . . . why the DOGE affiliates need access to the PII within those payment systems to modernize technology." JA711. The court first focused on record descriptions of the jobs of the two affiliates who were granted access; those descriptions make clear that the affiliates were to focus on "technology modernization," "cybersecurity," "financial management strategy," and other technological matters. JA712–714. The court found that the job descriptions contain nothing "suggest[ing]" the DOGE affiliates "require[] access to the PII in Treasury's payment records." JA714. And the court found that nothing else in the record "support[s] the DOGE affiliates' need to know." JA715. Lastly, citing DOGE's stated goal of "technology modernization," the court found that the record "does not explain why" this "requires access to PII within Treasury payment records." JA715.

The district court correctly found that the administrative records are devoid of *any* evidence showing that the DOGE affiliates *required* access to the reams of PII in the agency systems they were granted access to. Tellingly, Defendants do not include any record citation in the need-to-know section of their brief to dispute the court's finding with respect to the records. Op.Br.44–52. This gaping hole in the

43

records—which Defendants tacitly concede exists—means that it is likely that no Privacy Act exception applies to Defendants' actions, and Plaintiffs are likely to succeed on the merits of their claim.

      b.    Defendants make three arguments in response, all baseless.

*First*, Defendants assert that it should be obvious from the DOGE Executive Order's purpose to "modernize technology" that DOGE affiliates need access to agency systems to conduct that modernization. Op.Br.46–47. They fault the district court for "carefully pars[ing]" whether DOGE affiliates in fact need access to PII. Op.Br.51. But "the wisdom of agency action is rarely so self-evident that no other explanation is required," and—as the district court properly recognized—that is true here. *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). It is hardly obvious that DOGE affiliates need access to *Plaintiffs' PII*—such as their Social Security numbers and birthdates—to "modernize technology." And Defendants make no attempt to explain why redacting or otherwise obscuring PII before granting access, as was their historical practice, would prevent "moderniz[ing] technology." *See supra*, pp. 10, 12.

The Tenth Circuit rejected a nearly identical argument in *Parks v. IRS*, 618 F.2d 677 (10th Cir. 1980). President Nixon had signed an Executive Order to "formulate a plan of organization and sales promotion of the savings bond program." *Id.* at 681. IRS officials were granted access to PII indicating whether Treasury

employees had purchased savings bonds, and called the plaintiffs to encourage them to purchase bonds. *Id.* at 679. The IRS argued that the officials needed to know that information to carry out the Executive Order's broad goal of encouraging participation in the savings bond program. The Tenth Circuit disagreed, concluding that the Executive Order was insufficient to "justify the use of information derived from the personnel files of employees." *Id.* at 681.

Defendants say *Parks* is distinguishable because it relied in part on legislative history stating that the need-to-know exception was intended to stop "internal blacklisting . . . on persons who do not comply with the organizational norms" of an agency, such as by "not participating in savings bonds drives"—which was what had happened in *Parks*. *Id.* at 681 & n.1 (citation omitted). But Defendants ignore that the same legislative history also states that the need-to-know exception was intended to address concerns about "the easy exchange of data about the same individual" within an agency—precisely what happened here. S. Rep. No. 93-1183, at 51.

*Second*, Defendants assert that DOGE affiliates investigating "improper expenditures" need access to PII in agency systems. Op.Br.47. But the district court correctly found that nothing in the administrative records supports this attorney argument. As to Education, the court found that the administrative record contains no indication that DOGE affiliates were *ever* tasked with auditing student loan programs for fraud and other issues. JA704. As to OPM, the court found that the

administrative record contains very little about DOGE affiliates' job duties—and none of that material suggests the DOGE affiliates have duties related to investigating fraud or other improprieties. JA709. Finally, as to Treasury, the court found that the two DOGE affiliates are broadly tasked with "efforts to improve Treasury's technology." JA714. Although those efforts may support "payment integrity and fraud prevention," that does not mean the DOGE affiliates are *themselves* directly "ferret[ing] out fraud" such that they would need to actually "look at the PII within payment records." JA714.

Defendants' cite to a recent Executive Order stating that "Federal officials designated by the President or Agency Heads (or their designees)" should have access to systems for fraud-related purposes, Op.Br.48 (quoting Exec. Order No. 14243, 90 Fed. Reg. 13681 (Mar. 20, 2025)), is misleading. Nothing in the Order says that *DOGE affiliates* are among the designated officials that should have access for fraud-related purposes. Even if it did, there is *no evidence* that access for fraud-related purposes requires access to all of Plaintiffs' PII in any of the agency systems DOGE affiliates were granted access to. In Treasury, for example, the access provided to Elez was "broader in scope than what has occurred in the past," even compared to "auditors" whose access has historically been "significantly limited." ECF 27-3 at 4–5.

*Third*, Defendants argue that DOGE affiliates must need access because *other* agency employees have access to the systems. They claim that the district court "concluded that three DOGE-affiliated OPM employees had a need to access the relevant systems 'by virtue of their positions.'" Op.Br.47 (quoting JA662 n.3). This materially misrepresents the court's opinion, which stated that the three OPM employees in question—Chief Information Officer Hogan, Acting Director Ezell, and Chief of Staff Scales—were not "DOGE affiliates" and were "not granted access for the principal purpose of implementing the President's DOGE agenda." JA662 n.3. The fact that other agency employees have access to agency systems for *non-DOGE* purposes does nothing to prove that DOGE affiliates need access to those systems for *DOGE* purposes.

In a similar vein, Defendants repeatedly insist—never with any record citation—that "many non-DOGE employees . . . have had access to the relevant systems for years and . . . have been performing tasks substantially similar to the work being performed by DOGE team members." Op.Br.50; *see, e.g.*, Op.Br.1, 48. In fact, the record shows that "access is usually very restricted," such that even "White House requests" for access are refused. JA58. And there is no evidence that DOGE affiliates' tasks are "substantially similar" to the limited number of other agency employees with access. For example, Defendants assert that other agency employees have access to "develo[p] . . . computer systems," Op.Br.48, but make no

47

showing that DOGE affiliates' "moderniz[ing] technology" work is remotely similar to those employees' duties.

2. In the alternative, Defendants make the frivolous claim that their disclosures were lawful because the Privacy Act permits disclosure of records for a "routine use." 5 U.S.C. § 552a(b)(3). The routine use exception requires the agency to show that (1) the disclosure was for a use "compatible with the purpose for which" the records were "collected"; and (2) that the use is one published in the Federal Register. *Id.* § 552a(a)(7), (e)(4)(D).

*First*, Defendants do not argue that their disclosures are consistent with the purpose for which Plaintiffs' data was collected. Op.Br.52–53. The argument is thus waived, *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017), and Defendants cannot show that their decisions to disclose satisfied the statutory prerequisites for routine use.

*Second*, Defendants cannot show that DOGE affiliates' use of PII falls within any routine use published in the Federal Register. Defendants cite various routine uses related to prevention of fraud or (for Treasury) identification of improper payments, Op.Br.52–53, but there is no evidence that DOGE affiliates are tasked with directly investigating fraud or other improprieties, *see supra*, pp. 45–46.

Moreover, Defendants ignore other requirements for the routine uses they cite—requirements they do not satisfy. Defendants' cited OPM routine use permits

48

disclosure of records only "for use in computer matching," 77 Fed. Reg. 73694, 73697 (Dec. 11, 2012), which requires a computer matching agreement between participating agencies, 5 U.S.C. § 552a(a)(8). Defendants concede they are not aware of any such computer matching agreements with DOGE. JA191. Similarly, the Education routine uses allow for disclosure only on a "case-by-case basis" (*i.e.*, not *en masse* disclosure of millions of individuals' records) or pursuant to a computer matching agreement (which does not exist here). 88 Fed. Reg. 41942, 41948 (June 28, 2023); 88 Fed. Reg. 42220, 42223 (June 29, 2023). Defendants' cited Treasury routine use applies only to disclosures "*outside* Treasury," 85 Fed. Reg. 11776, 11779 (Feb. 27, 2020) (emphasis added), but Defendants have maintained that Treasury's DOGE affiliates are Treasury *employees*, ECF 62 at 5–6.[9]

Defendants admit that the administrative records themselves lack any documentation that Defendants relied on the routine use exception to disclose Plaintiffs' PII to DOGE affiliates. JA787. Given that such documentation is statutorily required, 5 U.S.C. § 552a(c)(1), "[t]he government's invocation of the routine use exception appears to be an after-the-fact attempt to fit the disclosures into an exception." JA715 n.27.

---

[9] Defendants also misleadingly suggest that "develop[ment of] computer systems" is a routine use, Op.Br.48, but that phrase does not appear in the part of the Federal Register publication discussing routine uses. *See* 85 Fed. Reg. at 11779–80.

## II.    The District Court Did Not Abuse Its Discretion in Ruling that Plaintiffs Would Likely Be Irreparably Harmed Absent Preliminary Injunctive Relief

"To establish irreparable harm," plaintiffs must show "actual and imminent" harm that "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (citations omitted).  The district court did not abuse its discretion in concluding that Plaintiffs are likely to suffer irreparable harm absent a preliminary injunction.

1.    Plaintiffs' harm is actual and imminent.  There is ongoing harm to privacy interests when there is continued, unauthorized access to confidential materials.  The Ninth Circuit determined that there is an ongoing injury to privacy interests when there is "continued access" to materials that may have been disclosed improperly, and the Supreme Court held that this determination was "correct[]." *In re Grand Jury Investigation No. 78-184*, 642 F.2d 1184, 1188 (9th Cir. 1981), *aff'd*, *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 422 n.6 (1983).  In the view of these courts, it did not matter that the "materials in question ha[d] already been disclosed"; "the veil of secrecy" continues to be "lifted higher by . . . the *continued access* of those to whom the materials have already been disclosed." *In re Grand Jury Investigation*, 642 F.2d at 1187–88 (emphasis added); *see Sells*, 463 U.S. at 422 n.6. Although these statements were made in the mootness context, the mootness inquiry—whether there is an ongoing injury—is the same in substance as whether

there is an actual and imminent injury. *See Students for a Conservative Am. v. Greenwood*, 378 F.3d 1129, 1131 (9th Cir. 2004).

Here, Plaintiffs have shown a likelihood that DOGE affiliates were granted access to their PII for unauthorized purposes, thereby violating Plaintiffs' expectation of privacy in that information. JA680; *see supra*, pp. 39–49. Further, Defendants have represented that access to agency systems with Plaintiffs' PII "is *necessary* for [DOGE affiliates] to do their jobs," and the affiliates' "mission to implement the DOGE Executive Order is ongoing." JA717. Absent judicial intervention, DOGE affiliates will likely continue to "access records with the plaintiffs' personal information" for purposes unauthorized by the Privacy Act. JA717. On those facts, Plaintiffs' harm is actual and imminent.

Such harm "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline*, 915 F.3d at 216. The ongoing harm to the privacy interests that Congress protected in the Privacy Act are "irreversible" and cannot be remedied by any final judgment. *Haw. Psychiatric Soc'y v. Ariyoshi*, 481 F. Supp. 1028, 1052 (D. Haw. 1979); *see United States v. Miami Univ.*, 294 F.3d 797, 818 (6th Cir. 2002) (similar). If Defendants are later ordered to stop providing access to DOGE affiliates, that will not change the fact that DOGE affiliates have irretrievably invaded Plaintiffs' privacy in the interim on a continuing basis.

Defendants assert that DOGE affiliates "have already been given access to the relevant systems," so the asserted injury "has already occurred," and there is no ongoing harm to enjoin. Op.Br.54 (second quote from Order at 15–16 (Richardson, J., concurring)). Although it is "too late to prevent . . . the invasion of privacy that occurred when" DOGE affiliates *first* "obtained" access to Plaintiffs' PII, it is *not* too late to prevent the ongoing injury to Plaintiffs' privacy interests from DOGE affiliates' "continued" access of their PII. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992); *see Grand Jury*, 642 F.2d at 1187–88 (rejecting argument of no ongoing injury because materials "have already been disclosed").

Even if Plaintiffs needed to show more than continued, unauthorized access— if they had to show a likelihood of *new* invasions on their privacy absent a preliminary injunction—they can do so. At least some of the systems DOGE affiliates were granted access to are continuously updated with new information— such as a database with "federal employees' personnel files that cover their entire period of federal civilian service." JA661. Thus, it is likely that DOGE affiliates will access new PII belonging to Plaintiffs, absent a preliminary injunction. Further, it is likely that without a preliminary injunction, Defendants will grant access to additional DOGE affiliates. Defendants repeatedly emphasize the importance of DOGE affiliates' work and the magnitude of the supposed problems those affiliates are assigned to solve, Op.Br.6–8, 55, strongly suggesting that additional DOGE

affiliates will access Plaintiffs' PII.  Indeed, Defendants have already said they intend to onboard "future DOGE Team Treasury" members.  JA654.

Defendants also cite—in passing—*University of California Student Association v. Carter*, 2025 WL 542586 (D.D.C. Feb. 17, 2025), which declined to find irreparable injury because DOGE affiliates are "obligated to keep" information "confidential."  Op.Br.55.  But *Carter* assumed that DOGE affiliates would use plaintiffs' "information for *lawful* purposes."  2025 WL 542586, *6 (emphasis added).  Here, it is likely that DOGE affiliates' access is for purposes *unauthorized* by the Privacy Act.  *See supra*, pp. 39–49.  And courts have found irreparable harm in those circumstances, even when those accessing the information were under confidentiality obligations.  *See Roberts v. Austin*, 632 F.2d 1202, 1205–06, 1214 (5th Cir. 1980) (disclosure of food stamp recipients' files to state's attorney and police, where state's attorney "instructed the police not to disclose unnecessarily any of the information obtained," produced irreparable harm); *Haw. Psychiatric*, 481 F. Supp. at 1033–34, 1052 (government's obtaining of medical providers' records, which the government was required to keep "confidential[]," produced irreparable harm).[10]

---

[10] Defendants cite two other district court cases that are similarly unhelpful.  One relies on *Carter*'s flawed and distinguishable reasoning, *All. For Retired Ams.*, 2025 WL 740401, at *21, and the other does not address whether DOGE affiliates'

2.      It is irrelevant that "Privacy Act violations" are "sometimes redressable through damages."  Order at 15 (Richardson, J., concurring).  The bare availability of money damages does not prevent a harm from being irreparable; if damages are "difficult to ascertain" for the injury, then this Court considers the injury "irreparable."  *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (citation omitted), *abrogated in part on other grounds by Winter*, 555 U.S. 7.  This Court has recognized that "damages for the invasion of privacy that occurs when [documents] are wrongfully disclosed can be hard to quantify."  *Scrimgeour v. IRS*, 149 F.3d 318, 327 n.11 (4th Cir. 1998).  Because damages for the loss of privacy are difficult to ascertain, that harm cannot be repaired by money damages.  *See, e.g.*, *Miami Univ.*, 294 F.3d at 819 ("money damages" are "insufficient relief" for "loss of privacy").

There is also irreparable harm when damages are "inadequate," *Multi-Channel*, 22 F.3d at 551 (citation omitted), meaning they are "seriously deficient as a remedy for the harm suffered," *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984).  Plaintiffs' injury here is the "typical injury caused by invasions of privacy":  "mental distress."  *Doe v. Chao*, 306 F.3d 170, 198 (4th Cir. 2002) (Michael, J., concurring in part).  Damages under the Privacy Act are

---

unauthorized access to PII constitutes irreparable harm, *Electronic Privacy Inf. Ctr. v. OPM*, 2025 WL 580596, at *6 (E.D. Va. Feb. 21, 2025).

insufficient for that harm.  The Act allows a plaintiff to recover actual damages—which does not encompass "nonpecuniary harm" such as mental distress, *Cooper*, 566 U.S. at 301—and in some cases statutory damages of $1,000, a fixed amount that does not reflect the harm actually suffered.  *See* 5 U.S.C. § 552a(g)(4)(A).

## III.    The District Court Did Not Abuse Its Discretion in Ruling that the Balance of the Equities and the Public Interest Favor a Preliminary Injunction

The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (citation omitted).  The district court did not abuse its discretion in concluding that these factors favor Plaintiffs.

Because Plaintiffs have demonstrated a likelihood of success on their claim that Defendants violated the Privacy Act, *see supra*, pp. 39–49, that is "a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  After all, "the public undoubtedly has an interest in seeing its governmental institutions follow the law." *Viktus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (internal quotations omitted).  Given Congress's desire to protect ordinary Americans from the government unlawfully accessing their personal information, it is beyond dispute that "[p]reventing the government's unauthorized disclosure of the plaintiffs' sensitive personal information is in the public interest." JA721.

Defendants contend that preliminary injunctive relief hurts the public interest by interfering with President Trump's directive that DOGE affiliates "modernize federal government systems and identify fraud, waste, and abuse."  Op.Br.55.  But the DOGE Executive Order did *not* task DOGE affiliates with identifying fraud, waste, and abuse—a justification the district court correctly observed was created out of "whole cloth."  JA704.  And Plaintiffs are likely to show that DOGE affiliates did not require access to their sensitive PII to perform duties related to modernizing technology.  *See supra*, pp. 39–48.[11]  Thus, "[a] preliminary injunction in this case does not prevent the President from effectuating the administration's policies" but instead "prevents the likely unlawful disclosure of the plaintiffs' sensitive personal information."  JA721.

## CONCLUSION

This Court should affirm the district court's preliminary injunction order.

---

[11] President Trump has conceded in public remarks that DOGE affiliates have no need for PII to perform their jobs.  ECF 59-1 at 28; *see East Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1107–08 (N.D. Cal. 2018) (nothing in APA bars consideration "of extra-record evidence for assessing the balance of the equities and the public interest").

DATED: April 21, 2025          MUNGER, TOLLES & OLSON LLP

By:       */s/ John L. Schwab*

| | |
|---|---|
| Carson Scott | John L. Schwab |
| Roman Leal | Wendy Q. Xiao |
| MUNGER, TOLLES & OLSON LLP | Liam Gennari |
| 560 Mission St., 27th Floor | MUNGER, TOLLES & OLSON LLP |
| San Francisco, CA 94105 | 350 South Grand Avenue, 50th Floor |
| Telephone: (415) 512-4000 | Los Angeles, California 90071 |
| | Telephone: (213) 683-9100 |
| Mark Hanna | |
| David Rodwin | Xiaonan April Hu |
| MURPHY ANDERSON PLLC | Andra Lim |
| 1401 K Street NW | MUNGER, TOLLES & OLSON LLP |
| Suite 300 | 601 Massachusetts Avenue NW, |
| Washington, D.C. 20005 | Suite 500 E |
| Telephone: (202) 223-2620 | Washington, D.C. 20001 |
| | Telephone: (202) 220-1100 |
| Kristy Parker | |
| PROTECT DEMOCRACY PROJECT | |
| 2020 Pennsylvania Ave. NW, | |
| Suite 163 | |
| Washington, DC 20006 | |
| Telephone: (202) 843-3092 | |

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  I further certify that this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in proportionally spaced 14-point Times New Roman font using Microsoft Word.

DATED: April 21, 2025          MUNGER, TOLLES & OLSON LLP


By:      */s/ John L. Schwab*
     John L. Schwab
     *Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2025, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: April 21, 2025          MUNGER, TOLLES & OLSON LLP

By: _____*/s/ John L. Schwab*_____
        John L. Schwab

# ADDENDUM

# INDEX TO ADDENDUM

5 U.S.C. § 552a ................................................................................ ADD-1

5 U.S.C. § 551 ................................................................................. ADD-2

5 U.S.C. § 704 ................................................................................. ADD-3

Executive Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025).................... ADD-3

40 Fed. Reg. 28948 (July 9, 1975)......................................................... ADD-5

77 Fed. Reg. 73694 (Dec. 11, 2012) ...................................................... ADD-5

85 Fed. Reg. 11776 (Feb. 27, 2020)....................................................... ADD-6

88 Fed. Reg. 41942 (June 28, 2023) ....................................................... ADD-6

88 Fed. Reg. 42220 (June 29, 2023) ....................................................... ADD-7

**5 U.S.C. § 552a - Records maintained on individuals**

**(a) Definitions.**--For purposes of this section--

* * *

(7) the term "routine use" means, with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected;

* * *

**(b) Conditions of disclosure.**--No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be--

(1) to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties;

* * *

(3) for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section;

* * *

**(c) Accounting of certain disclosures.**--Each agency, with respect to each system of records under its control, shall--

(1) except for disclosures made under subsections (b)(1) or (b)(2) of this section, keep an accurate accounting of--

(A) the date, nature, and purpose of each disclosure of a record to any person or to another agency made under subsection (b) of this section; and

(B) the name and address of the person or agency to whom the disclosure is made;

(2) retain the accounting made under paragraph (1) of this subsection for at least five years or the life of the record, whichever is longer, after the disclosure for which the accounting is made;

* * *

**(e) Agency requirements.**--Each agency that maintains a system of records shall--

ADD-1

* * *

**(4)** subject to the provisions of paragraph (11) of this subsection, publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records, which notice shall include--

* * *

**(D)** each routine use of the records contained in the system, including the categories of users and the purpose of such use;

* * *

## 5 U.S.C. § 551 - Definitions

For the purpose of this subchapter--

* * *

**(4)** "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

* * *

**(6)** "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

* * *

**(13)** "agency action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act; and

* * *

ADD-2

**5 U.S.C. § 704 - Actions reviewable**

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.

\* \* \*

**Executive Order No. 14158, 90 FR 8441 (January 20, 2025)**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose. This Executive Order establishes the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity.

Sec. 2. Definitions. As used in this order:

(a) "Agency" has the meaning given to it in section 551 of title 5, United States Code, except that such term does not include the Executive Office of the President or any components thereof.

(b) "Agency Head" means the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director, unless otherwise specified in this order.

Sec. 3. DOGE Structure.

(a) Reorganization and Renaming of the United States Digital Service. The United States Digital Service is hereby publicly renamed as the United States DOGE Service (USDS) and shall be established in the Executive Office of the President.

(b) Establishment of a Temporary Organization. There shall be a USDS Administrator established in the Executive Office of the President who shall report to the White House Chief of Staff. There is further established within USDS, in accordance with section 3161 of title 5, United States Code, a temporary organization known as "the U.S. DOGE Service Temporary Organization". The U.S. DOGE Service Temporary Organization shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda. The U.S. DOGE Service Temporary Organization shall terminate on July 4, 2026. The termination of the U.S. DOGE Service Temporary Organization shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order.

ADD-3

(c) DOGE Teams. In consultation with USDS, each Agency Head shall establish within their respective Agencies a DOGE Team of at least four employees, which may include Special Government Employees, hired or assigned within thirty days of the date of this Order. Agency Heads shall select the DOGE Team members in consultation with the USDS Administrator. Each DOGE Team will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney. Agency Heads shall ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda.

Sec. 4. Modernizing Federal Technology and Software to Maximize Efficiency and Productivity.

(a) The USDS Administrator shall commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization.

(b) Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems. USDS shall adhere to rigorous data protection standards.

(c) This Executive Order displaces all prior executive orders and regulations, insofar as they are subject to direct presidential amendment, that might serve as a barrier to providing USDS access to agency records and systems as described above.

Sec. 5. General Provisions.

(a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE, January 20, 2025.

**40 Fed. Reg. 28948 (July 9, 1975)**

\* \* \*

This subsection prescribes the circumstances under which an individual may seek court relief in the event that a Federal agency violates any requirement of the Privacy Act or any rule or regulation promulgated thereunder, the basis for judicial intervention, and the remedies which the courts may prescribe. It should be noted that an individual may have grounds for action under other provisions of the law in addition to those provided in this section. For example—

An individual may seek judicial review under other provisions of the Administrative Procedure Act (APA).

\* \* \*

**77 Fed. Reg. 73694 (Dec. 11, 2012)**

NOTICES; OFFICE OF PERSONNEL MANAGEMENT; Privacy Act of 1974: Update Existing System of Records

\* \* \*

**Routine Uses of Records Maintained in the Systems, Including Categories of Users and the Purposes of Such Uses:**

These records and information in these records may be used—

\* \* \*

hh. To disclose relevant information with personal identifiers of Federal civilian employees whose records are contained in the EHRI to authorized Federal agencies and non-Federal entities for use in computer matching. The matches will be performed to help eliminate waste, fraud, and abuse in Governmental programs; to help identify individuals who are potentially in violation of civil or criminal law or regulation; and to collect debts and overpayments owed to Federal, State, or local governments and their components. The information disclosed may include, but is not limited to, the name, social security number, date of birth, sex, annualized salary rate, service computation date of basic active service, veteran's preference, retirement status, occupational series, health plan code, position occupied, work schedule (full time, part time, or intermittent), agency identifier,

ADD-5

geographic location (duty station location), standard metropolitan service area, special program identifier, and submitting office number of Federal employees.

\* \* \*

**85 Fed. Reg. 11776 (Feb. 27, 2020)**

NOTICES; DEPARTMENT OF THE TREASURY; Privacy Act of 1974; System of Records

\* \* \*

**ROUTINE USES OF RECORDS MAINTAINED IN THE SYSTEM, INCLUDING CATEGORIES OF USERS AND THE PURPOSES OF SUCH USES:**

In addition to those disclosures generally permitted under the Privacy Act of 1974, 5 U.S.C. 552a(b), records and/or information or portions thereof maintained as part of this system may be disclosed outside Treasury as a routine use pursuant to 5 U.S.C. 552a(b)(3) as follows to:

\* \* \*

(17) (a) a federal or state agency, its employees, agents (including contractors of its agents) or contractors; (b) a fiscal or financial agent designated by the Fiscal Service or other Department of the Treasury bureau or office, including employees, agents or contractors of such agent; or (c) a contractor of the Fiscal Service, for the purpose of identifying, preventing, or recouping improper payments to an applicant for, or recipient of, federal funds, including funds disbursed by a state in a state-administered, federally-funded program; disclosure may be made to conduct computerized comparisons for this purpose;

\* \* \*

**88 Fed. Reg. 41942 (June 28, 2023)**

NOTICES; DEPARTMENT OF EDUCATION; [Docket ID ED-2023-FSA-0076]; Privacy Act of 1974; System of Records

\* \* \*

**ROUTINE USES OF RECORDS MAINTAINED IN THE SYSTEM, INCLUDING CATEGORIES OF USERS AND PURPOSES OF SUCH USES:**

ADD-6

The Department may disclose information contained in a record in this system of records under the routine uses listed in this system of records without the consent of the individual if the disclosure is compatible with the purposes for which the record was collected. The Department may make these disclosures on a case-by-case basis or, if the Department has complied with the computer matching requirements of the Privacy Act, under a computer matching agreement.

(1) Program Disclosures. The Department may disclose records from the system of records for the following program purposes:

\* \* \*

(h) To support the investigation of possible fraud and abuse and to detect and prevent fraud and abuse in title IV, HEA program funds, disclosures may be made to institutions of higher education, third-party servicers, and Federal, State, local, or Tribal agencies;

\* \* \*

**88 Fed. Reg. 42220 (June 29, 2023)**

NOTICES; DEPARTMENT OF EDUCATION; [Docket ID ED-2023-FSA-0113]; Privacy Act of 1974; System of Records

\* \* \*

**ROUTINE USES OF RECORDS MAINTAINED IN THE SYSTEM, INCLUDING CATEGORIES OF USERS AND PURPOSES OF SUCH USES:**

The Department may disclose information maintained in a record in this system of records under the routine uses listed in this system of records without the consent of the individual if the disclosure is compatible with the purposes for which the record was collected. These disclosures may be made on a case-by-case basis or pursuant to a computer matching agreement that meets the requirements of the Privacy Act of 1974, as amended (Privacy Act) (5 U.S.C. 552a). However, any FTI maintained in a record in this system of records may only be disclosed without the consent of the individual under the routine uses listed in this system of records notice if the disclosure is compatible with the purposes for which the record was collected and if the disclosure is permissible under section 6103(l)(13) of the IRC. Section 483(a)(3)(E) of the HEA, which will be in effect until June 30, 2024, also restricts the use of the information collected by the electronic FAFSA to the application, award, and administration of aid awarded under title IV of the HEA or of aid awarded by States, eligible IHEs, or such entities as the Secretary of Education may designate. Thus, until July 1, 2024, any such FAFSA information may only be disclosed under the routine uses listed in this system of records notice if the disclosure is compatible with the purposes

for which the record was collected and if the disclosure is for the application, award, and administration of aid awarded under title IV of the HEA or of aid awarded by States, eligible IHEs, or such entities as the Secretary of Education may designate.

Program Disclosures. The Department may disclose records from this system of records for the following program purposes:

\* \* \*

(f) To support the investigation of possible fraud and abuse and to detect and prevent fraud and abuse in title IV, HEA program funds, the Department may disclose records to IHEs, third-party servicers, Tribal, and Federal, State, or local agencies; and

\* \* \*