**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 25-1282**

───────────

AMERICAN FEDERATION OF TEACHERS; INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS; NATIONAL ACTIVE AND RETIRED FEDERAL EMPLOYEES; NATIONAL FEDERATION OF FEDERAL EMPLOYEES; DONALD MARTINEZ, c/o Murphy Anderson PLLC; JASON CAIN, c/o Murphy Anderson PLLC; CLIFFORD GRAMBO, c/o Murphy Anderson PLLC; THOMAS FANT, c/o Murphy Anderson PLLC; CHRISTOPHER PURDY, c/o Murphy Anderson PLLC; KRISTOFER GOLDSMITH, c/o Murphy Anderson PLLC; INTERNATIONAL FEDERATION OF PROFESSIONAL & TECHNICAL ENGINEERS,

> Plaintiffs – Appellees,

> v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; CHARLES EZELL, in his official capacity as the Acting Director of the Office of Personnel Management; LINDA MCMAHON, in her official capacity as the Secretary of Education; UNITED STATES OFFICE OF PERSONNEL MANAGEMENT; UNITED STATES DEPARTMENT OF EDUCATION,

> Defendants – Appellants.

───────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah Lynn Boardman, District Judge. (8:25-cv-00430-DLB)

───────────

Argued: May 5, 2025                    Decided:  August 12, 2025

───────────

Before KING, AGEE, and RICHARDSON, Circuit Judges.

───────────

Vacated and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Agee joined. Judge King wrote a dissenting opinion.

———————

**ARGUED:** Jack E. Starcher, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. John L. Schwab, III, MUNGER, TOLLES & OLSON, Los Angeles, California, for Appellees. **ON BRIEF:** Yaakov M. Roth, Acting Assistant Attorney General, Eric D. McArthur, Deputy Assistant Attorney General, Gerard Sinzdak, Jacob Christensen, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. Carson Scott, Roman Leal, San Francisco, California, Wendy Q. Xiao, Liam Gennari, Los Angeles, California, Xiaonan April Hu, Andra Lim, MUNGER, TOLLES & OLSON LLP, Washington, D.C.; Mark Hanna, David Rodwin, MURPHY ANDERSON PLLC, Washington, D.C.; Kristy Parker, PROTECT DEMOCRACY PROJECT, Washington, D.C., for Appellees.

RICHARDSON, Circuit Judge:

A preliminary injunction is just that—preliminary. A decision to grant or deny one does not conclusively resolve the case. For that reason, the Supreme Court has repeatedly "cautioned against . . . treating preliminary injunctions as 'tantamount to decisions on the underlying merits.'" *Lackey v. Stinnie*, 145 S. Ct. 659, 667 (2025) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981)). Though the two relate and overlap, the decision to issue preliminary relief and the decision to issue ultimate relief are distinct and must be assessed on their own terms.

One feature unique to preliminary injunctions looms large in this case: "that the plaintiff must show a likelihood of success on the merits rather than actual success." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008) (quotation omitted). This difference is more significant than it might seem at first glance. As we will explain, adding "likelihood" to the merits analysis creates a probabilistic structure that stacks the deck against a plaintiff who must prevail on multiple independent issues to prevail overall. The district court failed to account for this structure and thus miscalculated Plaintiffs' likelihood of succeeding on the merits. So we vacate the district court's grant of a preliminary injunction and remand for further proceedings.

## I.      BACKGROUND

On January 20, 2025, the President issued Executive Order 14,158 with the purpose of "modernizing Federal technology and software to maximize governmental efficiency and productivity" in executive agencies. Exec. Order No. 14,158 § 1, 90 Fed. Reg. 8441 (Jan. 20, 2025). To achieve this goal, the order takes a two-pronged approach. *Outside* of

3

all existing executive agencies, it "establishes the Department of Government Efficiency" ("DOGE"). *Id.* §§ 1, 3(b). *Inside* of each existing executive agency, it requires administrative agencies to "establish within their respective Agencies a DOGE Team of at least four employees." *Id.* § 3(c). The DOGE agency on the outside is then instructed to work with the DOGE-affiliated employees on the inside of other agencies "to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* § 4.

Pursuant to this latter internal command, the Department of Education, the Office of Personnel Management ("OPM"), and the Department of the Treasury each quickly created DOGE Teams staffed with their own employees.[1] Each agency also created a plan to give its DOGE Team high-level IT access to its systems. At the Department of Education, Chief Information Officer Thomas Flagg issued a memorandum that "authoriz[ed] . . . [the] DOGE team [to have] full and prompt access to all unclassified IT systems and data." *Am. Fed'n of Teachers v. Bessent*, 772 F. Supp. 3d 608, 621 (D. Md. 2025). At OPM, Acting Director Charles Ezell requested that the chosen DOGE affiliates "be added to OPM systems as 'admins.'" *Id.* at 625. And at the Department of Treasury, Treasury Administrative Services set out an "engagement plan" that appears to have included a grant of "access to Treasury systems" to the Treasury DOGE affiliates. *Id.*

---

[1] Like the district court, we assume without deciding that the DOGE affiliates at each agency are indeed employees of those agencies. *See Am. Fed'n of Teachers*, 772 F. Supp. 3d at 645.

Shortly after the three agencies granted IT access to their DOGE-affiliated employees, Plaintiffs—five professional organizations and six individuals—sued in federal district court.  Plaintiffs alleged that they or their members have personally identifiable information housed in the agencies' databases and claimed that disclosing the information to the agencies' DOGE-affiliated employees would violate both the Privacy Act and the Administrative Procedure Act ("APA").  As relief, Plaintiffs sought to permanently enjoin the agencies from granting IT access to their DOGE affiliates.

In the meantime, Plaintiffs also moved for a temporary restraining order to revoke the IT access already given to the DOGE affiliates.  On February 24, after the DOGE affiliates at all three agencies had possessed varying degrees of IT access for about a month, the district court granted the motion.[2]  One month after that, on March 24, the district court supplanted its temporary restraining order by granting Plaintiffs' motion for a longer-lasting preliminary injunction against all three agencies.  This effectively paused the DOGE affiliates' activities within the three agencies.

The government appealed the preliminary injunction on the same day.  The government also moved to stay the preliminary injunction pending its appeal.  We granted that motion, "paus[ing] the district court's pause" as we decided the appeal of the district court's grant of a preliminary injunction.  *Am. Fed'n of Teachers v. Bessent*, No. 25-1282,

---

[2] The temporary restraining order was only granted as to Education and OPM and not to Treasury.  But this was because, just days earlier, Treasury had been preliminarily enjoined from granting IT access by a different district court.  *See New York v. Trump*, 767 F. Supp. 3d 44 (S.D.N.Y. 2025).  So by February 24, all three agencies were prevented from granting IT access to their DOGE affiliates, if not all under the same order.

2025 WL 1023638, at *3 (4th Cir. April 7, 2024) (Richardson, J., concurring).  A petition for rehearing en banc of the stay was denied.

As this appeal was pending, the Supreme Court stayed the preliminary injunction in a related case involving nearly identical Privacy Act and APA claims brought against the Social Security Administration ("SSA") and its DOGE-affiliated employees.  *See SSA v. AFSCME*, 145 S. Ct. 1626 (2025).  The Supreme Court's stay permits the SSA "to afford members of the SSA DOGE Team access to the agency records in question in order for those members to do their work."  *Id.*  This case and that one are exceedingly similar.  *See AFSCME v. SSA*, No. 25-1411, 2025 WL 1249608, at *6 (4th Cir. Apr. 30, 2025) (Richardson, J., dissenting) (explaining how this case is the "legal twin" of the other).  So while the Supreme Court's stay of the preliminary injunction against the SSA is "not conclusive as to the merits" of this preliminary injunction against Education, OPM, and Treasury, it nevertheless "inform[s] how a court should exercise its equitable discretion" here.  *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (July 23, 2025).

Mindful of the Supreme Court's actions, we now resolve the government's appeal.

## II.   DISCUSSION

A district court may only grant a preliminary injunction if it determines that the plaintiff has satisfied the four-factor test from *Winter*, 555 U.S. at 20.  This requires the plaintiff to show (1) that they are likely to succeed on the merits,[3] (2) that they are likely

---

[3] The use of the word "merits" in the first *Winter* factor is potentially confusing. Because the "merits" of a case are often contrasted with "jurisdictional" issues, *see generally Brownback v. King*, 592 U.S. 209 (2021), *Winter* could be taken to imply that we
(Continued)

to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that the injunction is in the public interest.  *Id.*

The four-factor *Winter* test is supposed to set a high bar.  In and since *Winter*, the Supreme Court has repeatedly admonished lower courts that a preliminary injunction "is an extraordinary remedy never awarded as of right."  *Id.* at 24; *see Benisek v. Lamone*, 585 U.S. 155, 158 (2018) ("extraordinary remedy"); *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) ("'extraordinary' equitable remedy").  Far from a mainstay in the ordinary course of litigation, a preliminary injunction is "extraordinary and drastic" and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Wright & Miller's Federal Practice & Procedure § 2948 (2d ed. 1995)).  As a result, granting a preliminary injunction should be "the exception," not "the rule."  *Munaf*, 553 U.S. at 690.

Part of what makes the four-factor *Winter* test a high bar is its asymmetry.  That is, "a preliminary injunction can be granted only if every factor is met," "[y]et *denying* a preliminary injunction only takes the rejection of a single factor."  *Frazier v. Prince*

---

do not consider jurisdictional issues in the first factor.  But the "likelihood of success on the merits" refers to the party's likelihood of success *in the lawsuit before the court*, including both merits *and* jurisdictional issues.  *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) (noting that when considering "likelihood of success on the merits" for a preliminary injunction, jurisdictional "impediments" "mak[e] such success more *unlikely*"); *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562 (2025) (grouping threshold questions with the underlying merits in the first *Nken* factor for stays).  So jurisdictional issues like standing can be considered as part of the first *Winter* factor.  *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (holding that standing must be proven only "with the manner and degree of evidence required at the successive stages of the litigation").

*George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023); *see also Henderson for NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) ("*Winter* made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief."). Plaintiffs seeking a preliminary injunction thus face an inherently uneven playing field.

Because of this asymmetry, a court need not consider all four *Winter* factors when denying—but only when denying—a preliminary injunction. In *Winter* itself, for example, the Supreme Court found that "the balance of equities and consideration of the overall public interest" weighed against the plaintiffs. *Winter*, 555 U.S. at 26. The plaintiffs' failure on those two factors "alone require[d] denial of the requested injunctive relief," so the Court vacated the district court's preliminary injunction without addressing either the plaintiffs' likelihood of success on the merits or their alleged irreparable injury. *Id.* at 23–24.

While the Court in *Winter* considered two factors, some requests for preliminary injunctions can be quickly resolved on just the first *Winter* factor alone. Such a truncated analysis is sufficient when a plaintiff must prevail on several independent issues, each potentially dispositive of the case, to prevail overall. To win under such circumstances, a plaintiff must show that they will likely prevail on the combination of all of the issues; the defendant, on the other hand, need only show they will likely prevail on one of them. That is, when a plaintiff must prevail on a first issue and on a second issue and on a third issue and so on to ultimately receive relief, the first *Winter* factor becomes an asymmetric gauntlet all its own.

In this structure, Plaintiffs face what can be called a "multiplicative problem." Their likelihood of success overall is the product of their probability of success on each of the independent, dispositive issues. And as probabilities are multiplied, their product shrinks rapidly. Even if a plaintiff has good odds to win any one issue, their overall odds crater because they must run the table to ultimately prevail. The plaintiff must therefore show an extremely high likelihood of success on each individual issue in order to have a normal likelihood of success overall—otherwise, the product of the probabilities will be too low.[4]

Just so in this case, where Plaintiffs face this multiplicative problem at the first *Winter* factor. The district court opinion itself reflects the structure of the case: To find Plaintiffs likely to succeed on the merits, the district court needed to conclude that it was likely that Plaintiffs alleged an injury bearing a close relationship to a common-law harm, *Am. Fed'n of Teachers*, 772 F. Supp. 3d, at 628–37, *and* that the government's actions here were judicially reviewable "final agency actions" under the APA, *id.* at 637–42, *and* that the availability of monetary damages under the Privacy Act did not qualify as an adequate remedy precluding a cause of action under the APA, *id.* at 644 n.17, *and*, finally, that the government's disclosure of data did not fall under the Privacy Act's listed "need-for-the-record" provision permitting intra-agency use, *id.* at 643–56. We do not believe the district court could have properly done so.

---

[4] An example for clarity: If plaintiffs in a case had a 75% chance of prevailing on each of five independent issues, but they needed to prevail on *all* of them to receive relief, then their likelihood of overall success is $(0.75)^5 = \sim 24\%$. Despite being 3:1 favorites on each issue, plaintiffs are 3:1 underdogs in the case overall. The other side's odds are mirrored; despite being 3:1 underdogs on each issue, defendants are 3:1 favorites overall. The mere existence of multiple issues disfavors plaintiffs.

Our conclusion does not result from the application of a "heightened standard," as the dissent mistakenly asserts. Dissent Op. at 27. Lest there be confusion: The district court was required to find that Plaintiffs here were "likely to succeed on the merits," just as it would for any other preliminary injunction. *Winter*, 555 U.S. at 20. But what it means to be "likely to succeed on the merits" in any given case will depend on the case's structure. If "success" means flipping heads every time, the more coins you need to flip, the less likely you are to win. Although the requisite likelihood of success is the same, it is simply harder to avoid a loss when there are more issues to lose on.

This inherent structural flaw in Plaintiffs' case should come as no great surprise; the same multiplicative problem previously played a central role in our decision to grant the government's motion for a stay pending appeal. *See Am. Fed'n of Teachers*, 2025 WL 1023638, at *3–4. Before, when we assessed the government's request for a stay under the four-factor test in *Nken*, we explained that "the government's likelihood of success [on the merits] under the first *Nken* factor on appeal encompasses and mirrors the plaintiffs' likelihood of satisfying all four *Winter* factors below." *Id.* at *3. Thus, in determining that the government had a high likelihood of success on the merits for their stay, we made a prediction about the likely outcome of this very appeal. And the prediction rested in large part on the difficulty Plaintiffs would have running the table on the myriad issues necessary to satisfy the first *Winter* factor. *See id.* at *4–6.

Today, that prediction comes to pass. We remain aware that after granting a stay, just like after granting any preliminary relief, we may still "reach[] a different conclusion upon full consideration" when deciding the appeal. *Lackey*, 145 S. Ct. at 667. And we

recognize that we review the district court's decision to grant a preliminary injunction under an abuse of discretion standard. *Ashcroft v. ACLU*, 542 U.S. 656, 664 (2004). But our full consideration these last few months has only deepened our preexisting concerns with Plaintiffs' likelihood of success. The number of obstacles Plaintiffs must surmount remains unchanged, and further briefing has only highlighted their arguments' weaknesses. We thus hold that the district court abused its discretion in concluding that Plaintiffs were likely to succeed on the merits. And without satisfying one *Winter* factor, Plaintiffs could not receive a preliminary injunction.[5]

---

[5] The structure of this case lends itself to resolution on the first *Winter* factor alone. But we do not mean to suggest by our focus on the first that Plaintiffs have carried the day on the remaining three. Indeed, we think it at least contestable whether Plaintiffs have shown they will suffer irreparable harm absent preliminary relief.

To start, Plaintiffs have potentially failed to allege a harm entirely, as discussed below, let alone an irreparable harm. Additionally, it is at least plausible that Plaintiffs' alleged privacy injury can be remedied after the fact through "monetary damages," which would preclude a finding of irreparable harm. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551–52 (4th Cir. 1994) (quotation omitted). Finally, whatever the merits of Plaintiffs' claims, the injury they complain of, if it exists, appears to have already occurred. The information Plaintiffs seek to protect was "currently being obtained" by agency employees when Plaintiffs sued. *Am. Fed'n of Teachers*, 722 F. Supp. 3d at 657 (cleaned up). By that point, the DOGE-affiliated employees at all three agencies had IT systems access for nearly a month. *See id.* at 621, 623–27. Yet preliminary injunctions typically focus on *impending* events, not ongoing ones. *See* Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 Vand. L. Rev. 809, 846 & n.241 (2025).

Granted, the line between "impending" and "ongoing" can be nebulous. But this cuts both ways. The difficulty of drawing a line equally explains why Plaintiffs, who bear the burden of persuasion, have struggled to show irreparable harm. Indeed, the cases marshalled in support of their position are about mootness—a distinct concept entirely. *See* Resp. Br. at 50, 52 (citing *In re Grand Jury Investigation No. 78-184*, 642 F.2d 1184, 1188 (9th Cir. 1981) and *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

11

A.      **Plaintiffs Likely Lack Standing**

First and foremost in considering likelihood of success, Plaintiffs seemingly lack standing.  In their complaint, Plaintiffs state that the "disclosure of their records to DOGE representatives constitutes a violation of the Privacy Act."  *Am. Fed. Teachers*, 722 F.Supp.3d at 628.  "But under Article III, an injury in law is not an injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).  Plaintiffs must allege a concrete injury, defined as an injury with a "close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425.  This requires a comparison between the *factual* harm alleged by Plaintiffs and another harm redressable at common law.

In factual terms, Plaintiffs complain that the agencies granted unauthorized parties access to their information.  And this, they argued below, bore a close relationship to the harm inflicted by the common-law tort of intrusion upon seclusion.  But intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace.  *See* Restatement (Second) of Torts § 652B cmt. a (characterizing the tort as the "intentional interference with [an individual's] interest in solitude or seclusion").  Its harm is felt when a reporter accosts a convalescing patient in the hospital, when a private detective peers through a bedroom window for weeks, and when a photographer snaps an opportunistic photo of a woman's underwear.  *See id.* § 652B cmt. b, illus. 1, 2; cmt. c, illus. 7.  This is distinct from Plaintiffs' alleged harm of unauthorized access.

12

To be sure, as these examples show, intrusion upon seclusion can occur beyond the confines of the home.  And the government overreaches when arguing for such a limited understanding of the tort.  Gov. Mot. Br. at 11–12 (citing *O'Leary v. TrustedID, Inc.*, 60 F.4th 240 (4th Cir. 2023)).  Prying eyes and probing fingers can be as disquieting when aimed at one's private affairs as when aimed at one's private bedroom.  *See* Restatement (Second) of Torts § 652B cmt. b.  But in those situations, it is not the information obtained, but the knowledge that a third party is engaged in targeted snooping, that causes the harm.  *See* Eli A. Meltz, *No Harm, No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham L. Rev. 3431, 3453 (2015) ("[T]he harm from an intrusion occurs even when no information is acquired because the intrusive act itself, the conduct that invades one's space or disrupts one's daily activities, takes away from one's interest in being left alone.").

That sort of harm is not present here.  To begin with, it is less than clear that entries of information stored in government databases could be part of any Plaintiff's seclusion at all.  Moreover, Plaintiffs here are far from being the subjects of targeted "investigation[s] or examination[s] into [their] private concerns."  *See* Restatement (Second) of Torts § 652B cmt. b.  Each Plaintiff's information is one row in various databases that are millions upon millions of rows long.  In fact, Plaintiffs do not allege in their complaint that any particular row of information belonging to any particular Plaintiff has been examined at all.  The harm that might come from this generalized grant of database access to an additional handful of government employees—prone as they may be to hacks or leaks, as Plaintiffs

have alleged—seems different in kind, not just in degree, from the harm inflicted by reporters, detectives, and paparazzi.

Unauthorized knowledge of sensitive information is instead more closely shielded by other privacy torts, such as public disclosure of private information, which finds its roots in defamation—unlike intrusion upon seclusion, which finds its roots in trespass. *See, e.g.*, William L. Prosser*, Privacy,* 48 Calif. L. Rev. 383, 389–90, 398 (1960). Yet those other privacy torts all require disclosure to the public at large, since they take aim at the reputational damage that can accompany publicity. *See id.* at 400. As the district court rightly noted, Plaintiffs here alleged no public disclosure. *Am. Fed. Teachers*, 772 F. Supp. 3d at 634 & n.13. So those other privacy torts do not support their assertion of concrete injury. And without a common-law analog, Plaintiffs seemingly lack standing under *TransUnion*.

The district court thought otherwise, relying heavily on this Court's decision in *Garey v. James S. Farrin, P.C*, 35 F.4th 917 (4th Cir. 2022), to find that intrusion upon seclusion served as a sufficiently close common-law analog. But when properly read, *Garey* only confirms our understanding of intrusion upon seclusion.

In *Garey*, plaintiffs sued several attorneys under the Driver's Privacy Protection Act for gathering their names and addresses from car accident reports and using the information to mail them unsolicited ads. *Id.* at 919–20. This Court held that the attorneys' actions inflicted a concrete injury similar to the harm of intrusion upon seclusion. *Id.* at 922. In reaching that conclusion, the *Garey* Court explained that it was following in the footsteps of a "nearly identical" case from three years prior, *Krakauer v. Dish Network, LLC*, 925

14

F.3d 643 (4th Cir. 2019), arising under the Telephone Consumer Protection Act. *Garey*, 35 F.4th at 921–22. Indeed, the *Garey* Court went so far as to say that they were "[a]pplying the same analysis as *Krakauer*" and thereby "reach[ed] the same result." *Id.* at 922. So to understand the holding in *Garey*, we must understand the analysis in *Krakauer*.

In *Krakauer*, the alleged harm was the receipt of "unwanted calls on multiple occasions" to "a residential number listed on the Do-Not-Call registry." *Krakauer*, 925 F.3d at 653. As should be immediately apparent, this harm does not involve unauthorized access to any information. The *Krakauer* plaintiffs were not concerned with the fact the caller knew their phone numbers. Instead, *Krakauer* recognized that the unwanted calls injured the plaintiffs by intruding upon their personal privacy "in the home." *Id.* It was this disturbance of the sense of serenity the plaintiffs had in their most intimate spaces, not the acquisition of any private information, that the *Krakauer* Court rightly thought bore a close relationship to the harm caused by the tort of intrusion upon seclusion.

That "same analysis" must be imported into *Garey*. Like the unwanted calls in *Krakauer*, the unwanted ads in the mail in *Garey* intruded upon the plaintiffs in their intimate spaces. Without the mailing, the plaintiffs in *Garey* would have suffered no harm akin to intrusion upon seclusion. Given *Garey*'s repeated reliance on *Krakauer*, we cannot sensibly read *Garey* to hold that the unauthorized acquisition of information itself—which is nowhere to be found in *Krakauer*—suffices for standing under *TransUnion*.

Plaintiffs here attempt to defend the district court's interpretation by noting that the complaint in *Garey* sought "actual damages" from the attorneys only for "knowingly

15

obtaining . . . name[s] and address[es] from a motor vehicle record for an impermissible purpose in violation of law," not for "using" that information to mail unwanted ads. *See Garey*, 35 F.4th at 922–23. They argue that because the attorneys were not sued under the Driver's Privacy Protection Act for the mailings, *Garey*'s standing analysis cannot turn on the mailings. This is conceptually mistaken.

A plaintiff's theory of statutory liability and their standing should not be conflated. A plaintiff can seek redress from a defendant in federal court by, among other ways, claiming that the defendant has violated a statute. The plaintiff must also plead a concrete injury to proceed. Crucially, the concrete injury need not be necessary for the statutory violation. This relationship—or lack thereof—between statutory liability and standing can be seen in *TransUnion* itself. In *TransUnion*, the plaintiffs sued under the Fair Credit Reporting Act, which requires credit agencies to "follow reasonable procedures to assure maximum possible accuracy" in credit reports. *TransUnion*, 594 U.S. at 418 (quoting 15 U.S.C. § 1681e(b)). This reasonable-procedure requirement can be violated without disclosing any credit reports to third parties—indeed, without *any* concrete injury at all. *Id.* at 434. All the same, the Supreme Court found that a portion of the plaintiffs had established concrete injury akin to common-law defamation by alleging that their credit reports had been disseminated. *Id.* at 432. Their concrete injury was downstream and caused by, but not necessary for, their asserted "reasonable procedure" statutory violation.

The same is true for the plaintiffs in *Garey*. Their complaint only asserted that the attorneys violated the Driver's Privacy Protection Act by "obtaining" their information. *Garey*, 35 F.4th at 923. But they were permitted to establish their concrete injury by

16

alleging that they were sent unwanted ads in the mail—an injury downstream and caused by, but not necessary for, their "obtaining" statutory theory of liability. *Id.* at 920, 922. That alleged injury was then assessed by the *Garey* Court under the *Krakauer* framework for intrusion upon seclusion, as discussed. *Garey* thus provides no help to Plaintiffs.

Plaintiffs do not appear to have standing at the end of the day. On its own, the lack of standing means Plaintiffs cannot show they are ultimately likely to succeed on the merits.

### B.    Three More Dispositive Issues

And even if standing on its own did not foreclose Plaintiffs' path at this preliminary juncture, the combination of the remaining issues would. As before, when considering the stay pending appeal, we need not come to firm conclusions on any of these questions to conclude that Plaintiffs cannot show a likelihood of success at the preliminary injunction stage. It suffices to show that the answers are uncertain at best.

#### 1.    Final agency action

For their APA claim, Plaintiffs must seek review of final agency action. *See Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 836 (4th Cir. 2021) (citing 5 U.S.C. § 704). For agency action to be "final," it must both "mark the consummation of the agency's decisionmaking process" and determine "rights or obligations" or generate "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation omitted). The types of agency action that traditionally satisfy this two-prong test are what one would expect: binding agency opinions, *see id.* at 157–159; compliance orders, *see Sackett v. EPA*, 566 U.S. 120, 126 (2012); and promulgated rules,

*see Frozen Food Express v. United States*, 351 U.S. 40, 43–44 (1956).  The types of agency action that traditionally fail this two-prong test are also what one would expect:  tentative recommendations, *see Franklin v. Massachusetts*, 505 U.S. 788, 799–800 (1992); intermediate decisions, *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948); and the initiation of enforcement proceedings, *see FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 241 (1980).  The agency action here—granting IT access to certain employees—does not fit comfortably into either bucket.  And the caselaw interpreting final agency action is "hardly crisp" given that the standard "lacks many self-implementing, bright-line rules." *Friedman v. Fed. Aviation Admin.*, 841 F.3d 537, 541 (D.C. Cir. 2016) (quotation omitted).

The district court below and Plaintiffs on appeal both draw heavily on *Venetian Casino Resort, LLC. v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008).  But we find this reliance misplaced.  In *Venetian Casino*, a casino sued the Equal Employment Opportunity Commission ("EEOC") over the EEOC's information-disclosure policy that permitted the Commission to release documents purportedly containing trade secrets without first notifying the purported owners of the trade secrets.  *Id.* at 929.  The D.C. Circuit permitted the suit to go forward, accepting the information-disclosure policy as a final agency action under the APA.  *Id.* at 931.

Superficially, this case resembles *Venetian Casino* because both cases concern information disclosure.  But the similarity ends there.  The disclosure policy in *Venetian Casino* was long-running, agency-wide, conceded to exist by agency counsel, and expressly written down in the agency's formal Compliance Manual—four crucial features

18

all missing from this case. *Id.* at 928–31. True, *Venetian Casino* may not delineate the outer bound of what counts as final agency action. But if granting IT access to a handful of employees amounts to a disclosure policy, it is one that looks substantially different from the one in *Venetian Casino*. Given the lack of clear precedent in this area, it seems unlikely that the district court could so definitively find final agency action here.

### 2.    APA cause of action

The APA poses another hurdle for Plaintiffs. Even if they challenge final agency action, the APA only permits Plaintiffs to sue over final agency actions "for which there is no other adequate remedy in a court." 5 U.S.C. § 704. While the APA's "central purpose" is to "provid[e] a broad spectrum of judicial review of agency action," that "general grant" is not intended to "duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). So another statute will preclude suit under the general provisions of APA when it contains its own specific procedural scheme of judicial review. *See id.* at 904 ("[A] 'special and adequate review procedure' . . . will oust a district court of its normal jurisdiction under the APA."). For Plaintiffs to proceed here, then, we would have to conclude that the Privacy Act's own scheme of review does not provide an "adequate remedy."

It is not obvious that we can come to that conclusion. The Privacy Act allows plaintiffs to seek "Civil Remedies" for four enumerated kinds of agency violations and grants "jurisdiction" under the statute to the district courts only for those violations. § 552a(g)(1). It then specifies the precise relief that can be sought for each of the four violations. For a (g)(1)(A) violation, a district court may, after a "de novo" determination,

19

"order the agency to amend [a plaintiff's] record in accordance with his request."
§ 552a(g)(2)(A).  For a (g)(1)(B) violation, a district court may "enjoin the agency from
withholding the records and order the production to the [plaintiff]."  § 552a(g)(3)(A).  For
the remaining two violations under (g)(1)(C) and (D)—which include the asserted
violations in this case—plaintiffs can recover "actual damages sustained," with a statutory
minimum of "$1,000," but no equitable relief.  § 552a(g)(4)(A).  Finally, the Privacy Act
specifies both the permitted venues and the statute of limitations for suit.  § 552a(g)(5).
With its enumerated violations and details on jurisdiction, venue, and timing, the Privacy
Act at least plausibly reflects Congress's intent to preclude suit under the APA in
circumstances like those presented here.  *See Cell Assocs., Inc. v. Nat'l Inst. of Health*, 579
F.2d 1155, 1159–60 (9th Cir. 1978) ("We think it unlikely that Congress would have gone
to the trouble [in the Privacy Act] of authorizing equitable relief for two forms of agency
misconduct and monetary relief for all other forms if it had intended to make injunctions
available across the board.").

Admittedly, both the Supreme Court and this Court have implied in footnotes that
the Privacy Act does not preclude suits seeking equitable relief under the APA.  *See Doe
v. Chao*, 540 U.S. 614, 619 n.1 (2004); *Doe v. Chao*, 435 F.3d 492, 504 n.17 (4th Cir.
2006).  But those footnotes are dicta, and the Supreme Court has more recently reserved
the question.  *See Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 303 n.12 (2012)
(remarking that the Privacy Act "possibly" permits injunctive relief under the APA).  And
there is more generally a dearth of case law on how the Privacy Act intersects with the

APA.  In fact, it appears that no court of appeals has opined directly on the question.[6]  In the absence of binding precedent, answering this question does not strike us as a trivial task.  So Plaintiffs have yet another obstacle in their way.

### 3.    Privacy Act violation

Finally, even if Plaintiffs could overcome the threshold issues above, it appears difficult for them to establish a Privacy Act violation.  The Privacy Act allows records to be shared intra-agency with "those officers and employees of the agency . . . who have a need for the record in the performance of their duties."  5 U.S.C. § 552a(b)(1).  In other words, the Privacy Act does not prohibit sharing information with those whose jobs give them good reason to access it.  *See Bigelow v. Dep't of Def.*, 217 F.3d 875, 877 (D.C. Cir. 2000).

What counts as a "need for the record in the performance of their duties" necessarily depends on what those duties are.  The broader an employee's duties, the broader their needs.  A consultant tasked with a broad and open-ended duty to improve the efficiency and operations of her local library branch, for example, likely needs correspondingly broad and open-ended access to the library.  At the very start of her task, the whole problem is that the consultant does not know what she does not know.  Perhaps the check-out counter

---

[6] A few courts have decided cases involving both Privacy Act and APA claims without raising a concern.  *See, e.g.*, *Doe v. Stephens*, 851 F.2d 1457, 1463 (D.C. Cir. 1988).  But these cases contain little to no reasoning on why the Privacy Act fails to provide an "adequate remedy" under the APA.  We therefore decline to interpret them as firmly concluding one way or the other how the two statutes intersect.  *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) (doubting the "precedential effect" of "drive-by" decisions).

runs slowly due to a poorly optimized borrower database, so access to the database is needed. Perhaps the library's patrons are dissatisfied because the shelves are laid out haphazardly, so access to the shelf-organization logs is needed. Or perhaps the library's budget languishes in the red due to embezzlement, so access to the library's financials is needed. Barring the consultant at the library doors and requiring her to specify the precise records she needs to improve the library before she knows what improvements are needed would seem to get the order of operations precisely backward.

The DOGE-affiliated agency employees are tasked with a similarly broad and open-ended duty. The Executive Order requires them to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." Exec. Order No. 14,158 § 4(a). Much like the library consultant, the DOGE affiliates at Education, OPM, and Treasury would seem hard-pressed to know what needs improvement at their respective agencies before getting a lay of the land.[7] To insist that the DOGE affiliates explain in advance the exact information they need and why is to demand something just short of clairvoyance.[8] So it does not stretch the imagination to

---

[7] Consistent with this, counsel for the government explained at a hearing before the district court that "because Mr. Krause [a DOGE affiliate at Treasury] is tasked with broad, sweeping reforms and reviews in a way that requires a broad, sweeping review of these systems in order to assess what kinds of issues and modernizations may be available and appropriate." J.A. 171.

[8] Despite this, there in fact seems to be a decent degree of granularity in some of the justifications given. In Krause's request for Treasury IT systems access, for example, the agency record shows that he was starting a project to "ensure that all payments through [Bureau of Fiscal Service] BFS's payment systems included Treasury Account Symbols (TAS) and Business Event Type Codes (BETCs)," and that this project, along with others, (Continued)

think that an employee tasked with modernizing an agency's software and IT systems would require administrator-level access to those systems, including any internal databases, especially when conducting the initial survey of the agency's technological ailments. And given the district court's recognition that OPM's Chief Information Officer, Greg Hogan, needed unlimited access to OPM's systems, *Am. Fed'n of Teachers*, 722 F. Supp. 3d at 625 n.3, the district court should not have been so eager to tangle the judiciary in the weeds of distinguishing the needs of one high-level IT employee from another.

*    *    *

We do not hold with certainty that Plaintiffs lack standing, that they have not challenged final agency action, that they cannot sue under the APA, or that the DOGE affiliates' IT access falls into the Privacy Act's need-to-know exception. We instead come to a statistically surer conclusion: that Plaintiffs have failed, by a decent margin, to show that they will likely prevail on *all* of these issues combined. The district court abused its discretion in finding that Plaintiffs were likely to prevail on each one, and with such certainty that they were likely to succeed overall. The district court's order granting Plaintiffs' motion for a preliminary injunction is vacated, and the case is remanded to the district court for further proceedings.

*IT IS SO ORDERED.*

---

"required review of the source code for BFS's payment systems and databases across multiple BFS payment systems as well as the ability to review sensitive payment data." D. Ct. Dkt No. 27-1 ¶¶ 14–15.

KING, Circuit Judge, dissenting:

Just in early February 2025, the district court found itself confronted with this matter of immense urgency and import: the President's new Department of Government Efficiency, or "DOGE," had been accorded sudden, unfettered, unprecedented, and apparently unnecessary access to highly sensitive personal information belonging to millions of Americans and entrusted to the U.S. Department of the Treasury, Department of Education, and Office of Personnel Management. That information includes Social Security numbers, income and assets, federal tax records, disciplinary and other personnel actions, physical and mental health histories, driver's license information, bank account numbers, and demographic and family details. The court acted quickly — but extremely carefully — in temporarily barring the defendant federal agencies and officials from disclosing the plaintiffs' personally identifiable information to DOGE and its affiliates, first by a temporary restraining order, *see Am. Fed'n of Tchrs. v. Bessent*, No. 8:25-cv-00430 (D. Md. Feb. 24, 2025), ECF No. 38 (the "TRO"), and then by the preliminary injunction and accompanying 68-page memorandum opinion at issue in this appeal, *see Am. Fed'n of Tchrs. v. Bessent*, No. 8:25-cv-00430 (D. Md. Mar. 24, 2025), ECF Nos. 68 & 69 (respectively, the "Opinion" and the "Preliminary Injunction"), *published at* 772 F. Supp. 3d 608 (D. Md. 2025).

Although the district court's relief was limited to the personally identifiable information of the six individual plaintiffs (each a military veteran) and members of the five organizational plaintiffs (unions representing more than two million veterans, teachers, healthcare workers, and federal employees), the government has advised us that the TRO

and Preliminary Injunction served to protect *all* personally identifiable information in the defendant federal agencies' possession that otherwise would have been available to DOGE. In early April 2025, however, our Court's panel majority outvoted me and stayed the Preliminary Injunction pending this appeal. *See Am. Fed'n of Tchrs. v. Bessent*, No. 25-1282 (4th Cir. Apr. 7, 2025), ECF No. 17 (granting the government's stay motion on a 2-1 vote and also denying my request for initial en banc consideration of the stay motion on an 8-7 vote).

Today, once again over my dissent, the panel majority vacates the Preliminary Injunction as an abuse of the district court's discretion. In so doing, the majority focuses on the first of the four *Winter* factors, relating to the plaintiffs' likelihood of success on the merits of their claim under the Administrative Procedure Act (the "APA") premised on the defendants' Privacy Act violations. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tip in his favor, and [4] that an injunction is in the public interest.").

As the panel majority recognizes, "[t]he four-factor *Winter* test is supposed to set a high bar." *See ante* at 7. But the majority then conjures up an even higher one, asserting that because the plaintiffs' claim involves several contested merits issues, the plaintiffs "face what can be called a 'multiplicative problem'" and "must therefore show an extremely high likelihood of success on each individual issue in order to have a normal likelihood of success overall." *Id.* at 9. Applying its heightened standard, the majority

25

faults the district court for concluding that the plaintiffs "were likely to prevail on each [of the contested merits issues], and with such certainty that they were likely to succeed overall." *Id.* at 23.[1]

Contrary to the panel majority, the district court did exactly what it was obliged to do. Specifically, in its thorough and cogent Opinion, the district court separately assessed the plaintiffs' likelihood of success on the contested merits issues — i.e., whether the plaintiffs possess Article III standing to pursue their APA claim, whether there was a final agency action for purposes of APA jurisdiction, whether the APA claim is otherwise precluded by the existence of an adequate remedy under the Privacy Act, and whether the Privacy Act's need-to-know exception renders lawful the disclosure of personally identifiable information to DOGE. Having determined that the plaintiffs demonstrated what the panel majority now terms a "normal" likelihood of success on each of these issues, the district court then properly concluded that the plaintiffs established a "normal"

---

[1] Notably, the panel majority denies applying a heightened standard and claims to instead be heeding the statistical principle that "it is simply harder to avoid a loss when there are more issues to lose on." *See ante* at 10. In that regard, the majority compares a multi-issue likelihood-of-success analysis to flipping coins, such that "[i]f 'success' means flipping heads every time, the more coins you need to flip, the less likely you are to win." *Id.*

Of course, the panel majority's denial of a heightened standard is belied by its unambiguous statement that the plaintiffs must "show an extremely high likelihood of success on each individual issue in order to have a normal likelihood of success overall." *See ante* at 9. And to the extent that the majority does not intend for this statement to mean what it plainly says, the majority's alternative interpretation is no less problematic. A multi-issue likelihood-of-success analysis turns on the facts and the law relevant to each issue, not statistical odds.

likelihood of success overall. *See* Opinion 68 ("No matter how important or urgent the President's DOGE agenda may be, federal agencies must execute it in accordance with the law. That likely did not happen in this case.").

I would reject the panel majority's heightened standard and affirm the district court's Preliminary Injunction as a proper application of the entire four-factor *Winter* test. In any event, similar questions about the applicable standard, the likelihood of success on the merits, and the other *Winter* factors are set to be considered and decided by our en banc Court in appeal No. 25-1411, *American Federation of State, County & Municipal Employees v. Social Security Administration* (the "*SSA* case"), concerning DOGE's access to Social Security records containing the highly sensitive personal information of essentially everyone in our Country.[2]

Today, in this case, I dissent.

---

[2] In the *SSA* case, on April 30, 2025, our Court granted initial en banc consideration of the government's motion to stay the district court's preliminary injunction pending appeal and denied such a stay. On May 6, 2025, we then granted initial hearing en banc on the merits of the appeal. Thereafter, the Supreme Court granted the government a stay pending appeal, succinctly explaining:

> After review, we determine that the application of [the four *Nken* stay] factors in this case warrants granting the requested stay. We conclude that, under the present circumstances, SSA may proceed to afford members of the SSA DOGE Team access to the agency records in question in order for those members to do their work.

*See Soc. Sec. Admin. v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 145 S. Ct. 1626, 1626 (June 6, 2025) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). Justice Jackson, joined by Justice Sotomayor, wrote a compelling dissent. *Id.* at 1626-32. The *SSA* case is calendared for argument before our en banc Court on September 11, 2025.